**RECORD NO. 13-5342**

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals
### For The District of Columbia Circuit

# MORGAN DREXEN, INC.; KIMBERLY A. PISINSKI,

*Plaintiffs – Appellants*,

**v.**

# CONSUMER FINANCIAL PROTECTION BUREAU,

*Defendant – Appellee*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

––––––––––––

**JOINT APPENDIX
VOLUME I OF II
(Pages 1 – 397)**

––––––––––––

Randall K. Miller
Nicholas M. DePalma
Randal M. Shaheen
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Tysons Corner, Virginia  22182
(703) 905-1449
rkmiller@venable.com
nmdepalma@venable.com
rmshaheen@venable.com

*Counsel for Appellants*

John R. Coleman
David M. Gossett
CONSUMER FINANCIAL
  PROTECTION BUREAU
1700 G Street, NW
Washington, DC  20552
(202) 435-7254
john.coleman@cfpb.com
david.gossett@cfpb.com

*Counsel for Appellee*

THE LEX GROUP<sup>DC</sup> ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C.  20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

# TABLE OF CONTENTS
## Volume I of II

**Appendix Page**

**Docket Entries** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Complaint**
> filed July 22, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

**Plaintiffs' Motion for Preliminary Injunction and Request for**
**Oral Argument Pursuant to LCvR 7(f) and LCvR 78.1 and**
**Hearing Pursuant to LCvR 65.1(d),**
**With Attachments,**
> filed July 22, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

> **Attachments:**

> **Statement of Points and Authorities in Support of**
> **Motion for Preliminary Injunction,**
> **With Exhibits,**
>> dated July 22, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

> **Declaration of Walter Ledda**
>> sworn July 21, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **66**

> **Declaration of Kimberly A. Pisinski**
>> sworn July 21, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **71**

> **Declaration of Professor Todd Zywicki**
>> sworn July 21, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **74**

> **Declaration of Randal M. Shaheen,**
> **With Exhibits**
>> sworn July 21, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **79**

**Scheduling and Procedures Order of**
**The Honorable Colleen Kollar-Kotelly**
> filed July 25, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **332**

**Attachments to Plaintiffs' Motion for Summary Judgment**
        **filed August 7, 2013:**

<u>**Attachments:**</u>

**Local Rule LCvR 7(h)(1) Statement of Facts in**
**Support of Motion for Summary Judgment**
        **dated August 7, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **337**

**Memorandum of Points and Authorities in**
**Support of Motion for Summary Judgment**
        **dated August 7, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **363**

# TABLE OF CONTENTS
## Volume II of II

**Appendix Page**

**Defendant's Notice,
With Exhibit,**
  **filed August 20, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **398**

  **Exhibit:**

  **Complaint for Permanent Injunction and Other Relief**
    **dated August 20, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **401**

**Plaintiffs' Motion for a Temporary Restraining Order and
Preliminary Injunction Enjoining CFPB from
Prosecuting its Second-Filed Action,
With Attachment,**
  **filed August 22, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **421**

  **Attachment:**

  **Points and Authorities in Support of Motion for a
  Temporary Restraining Order and Preliminary Injunction
  Enjoining CFPB from Prosecuting its Second-Filed Action**
    **dated August 22, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **423**

**Defendant's Motion to Dismiss or,**
**in the Alternative, for Summary Judgment,**
**With Attachments,**
　　**filed August 27, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **431**

　　**Attachments:**

　　**Memorandum of Points and Authorities in Support of**
　　**Defendant's Motion to Dismiss or,**
　　**in the Alternative, for Summary Judgment**
　　　　**dated August 27, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **433**

　　**Defendant's Response to Plaintiffs' Statement of Facts in**
　　**Support of Defendant's Cross-Motion for Summary Judgment**
　　　　**dated August 27, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **485**

**Defendant's Memorandum of Points and Authorities in**
**Opposition to Plaintiffs' Motion for a Temporary Restraining**
**Order and Preliminary Injunction Enjoining CFPB from**
**Prosecuting its Second-Filed Action**
　　**filed August 29, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **528**

**Plaintiffs' Reply in Support of Motion for a Temporary**
**Restraining Order and Preliminary Injunction Enjoining**
**CFPB from Prosecuting its Second-Filed Action**
　　**filed September 3, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **539**

**Plaintiffs' Opposition to CFPB's Motion to Dismiss,**
**With Exhibit,**
　　**filed September 13, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **556**

　　**Exhibit:**

　　**A.** 　**Order of**
　　　　**The Honorable Michael A. Martinez**
　　　　　　**dated September 12, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . **584**

**Plaintiffs' Reply in Support of Motion for Summary Judgment,**
**With Exhibits,**
        filed September 13, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 623

        <u>Exhibits:</u>

        1.      **Rachel Witkowski, Lawmakers Fume Over**
                **Unanswered Questions to CFPB, American Banker,**
                **Consumer Finance Vol. 178 No. 177 (Sept. 13, 2013)** . . . . . . . . . 651

        2.      **Opening Statement of Rep. Jeb Hensarling,**
                **Chairman of the House Financial Services**
                **Committee, House Financial Services Committee**
                **Hearing (Sept. 12, 2013)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 656

**Defendant's Reply in Support of its Motion to Dismiss or,**
**in the Alternative, for Summary Judgment**
        filed September 25, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 660

**Order of**
**The Honorable Colleen Kollar-Kotelly**
        filed October 17, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 690

**Memorandum Opinion of**
**The Honorable Colleen Kollar-Kotelly**
        filed October 17, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 691

APPEAL,CLOSED,TYPE-D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:13-cv-01112-CKK

| | |
|---|---|
| MORGAN DREXEN, INC. et al v. CONSUMER FINANCIAL PROTECTION BUREAU | Date Filed: 07/22/2013 |
| | Date Terminated: 10/17/2013 |
| Assigned to: Judge Colleen Kollar-Kotelly | Jury Demand: None |
| Case in other court: 13-05342 | Nature of Suit: 890 Other Statutory Actions |
| Cause: 28:2201 Injunction | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**MORGAN DREXEN, INC.**                    represented by    **Randall K. Miller**
VENABLE LLP
8010 Towers Crescent Drive
Suite 300
Tysons Corner, VA 22182
(703) 905-1449
Email: rkmiller@venable.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Martin DePalma**
VENABLE LLP
8010 Towers Cresent Drive
Suite 300
Vienna, VA 22182
(703) 905-1455
Fax: (703) 821-8949
Email: nicholas.depalma@venable.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KIMBERLY A. PISINSKI**                    represented by    **Randall K. Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Martin DePalma**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**CONSUMER FINANCIAL PROTECTION BUREAU**                    represented by    **John R. Coleman**
CONSUMER FINANCIAL PROTECTION BUREAU
Legal Division

- 1 -

1700 G Street, NW
Washington, DC 20552
(202) 435-7254
Fax: (202) 435-7080
Email: john.coleman@cfpb.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nandan M. Joshi**
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
(202) 435-7269
Email: nandan.joshi@cfpb.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristin Lee Bateman**
CONSUMER FINANCIAL PROTECTION
BUREAU
1700 G Street, NW
Washington, DC 20552
(202) 435-7821
Fax: (202) 435-7329
Email: kristin.bateman@cfpb.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/22/2013 | 1 ℝ | COMPLAINT against CONSUMER FINANCIAL PROTECTION BUREAU ( Filing fee $ 400 receipt number 0090-3407313) filed by KIMBERLY A. PISINSKI, MORGAN DREXEN, INC.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(DePalma, Nicholas) (Entered: 07/22/2013) |
| 07/22/2013 | 2 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by MORGAN DREXEN, INC., KIMBERLY A. PISINSKI (DePalma, Nicholas) (Entered: 07/22/2013) |
| 07/22/2013 | 3 | WITHDRAWN PURSUANT TO NOTICE FILED 8/7/2013..... MOTION for Preliminary Injunction by MORGAN DREXEN, INC., KIMBERLY A. PISINSKI (Attachments: # 1 Memorandum in Support, # 2 Declaration of Walter Ledda, # 3 Declaration of Kimberly Pisinski, # 4 Declaration of Todd Zywicki, # 5 Declaration of Randal Shaheen, # 6 Text of Proposed Order)(DePalma, Nicholas) Modified on 8/8/2013 (znmw, ). (Entered: 07/22/2013) |
| 07/22/2013 | | Case Assigned to Judge Colleen Kollar-Kotelly. (sth, ) (Entered: 07/22/2013) |
| 07/22/2013 | | SUMMONS Not Issued as to CONSUMER FINANCIAL PROTECTION BUREAU (sth, ) (Entered: 07/22/2013) |
| 07/22/2013 | | MINUTE ORDER (paperless). The Court shall hold a telephone conference call on the record in this matter July 24, 2013, at 2:30 PM, in order to discuss a schedule for briefing the Plaintiff's 3 Motion for Preliminary Injunction. Signed by Judge Colleen Kollar-Kotelly on 7/22/13. (lcckk2) (Entered: 07/22/2013) |

- 2 -

| | | |
|---|---|---|
| 07/22/2013 | | Set/Reset Hearings: Telephone Conference on the record set for 7/24/2013 02:30 PM in Courtroom 28A before Judge Colleen Kollar-Kotelly. (dot ) (Entered: 07/23/2013) |
| 07/24/2013 | 4 | ORDER Establishing Procedures for Filing for Cases Assigned to Judge Colleen Kollar-Kotelly, signed on July 24, 2013. (SM) (Entered: 07/24/2013) |
| 07/24/2013 | 5 | NOTICE of Appearance by Randall K. Miller on behalf of All Plaintiffs (Miller, Randall) (Entered: 07/24/2013) |
| 07/24/2013 | | Minute Entry for proceedings held before Judge Colleen Kollar-Kotelly: Telephone Conference on the record held on 7/24/2013. Telephone Conference on the record set for 7/25/2013 01:30 PM in Chambers before Judge Colleen Kollar-Kotelly. (Court Reporter Lisa Foradori.) (dot ) (Entered: 07/24/2013) |
| 07/25/2013 | 6 | NOTICE of Appearance by John R. Coleman on behalf of All Defendants (Coleman, John) (Main Document 6 replaced on 7/26/2013) (znmw, ). (Entered: 07/25/2013) |
| 07/25/2013 | 7 | NOTICE of Filing Revised Summonses by MORGAN DREXEN, INC., KIMBERLY A. PISINSKI re 1 R Complaint (DePalma, Nicholas) (Entered: 07/25/2013) |
| 07/25/2013 | | Minute Entry for proceedings held before Judge Colleen Kollar-Kotelly: Telephone Conference on the record held on 7/25/2013. (Court Reporter Lisa Foradori.) (dot) (Entered: 07/25/2013) |
| 07/25/2013 | 8 | ORDER. The Court held two on the record telephone conference calls with the parties on July 24, 2013 and July 25, 2013, during which Plaintiffs consented to withdraw their 3 motion for preliminary injunction and both parties consented to instead proceed with an expedited briefing on the merits of Plaintiffs' Complaint. The parties jointly proposed a schedule, which this Court granted. Accordingly, and in order to administer this civil action in a manner fair to the litigants and consistent with the parties' interest in completing this litigation in the shortest possible time and at the least possible cost, the parties are directed to comply with each of the directives set forth in this Order. Further, the parties shall adhere to the following schedule: (a) On or before AUGUST 7, 2013, Plaintiffs shall file their motion for summary judgment; (b) On or before AUGUST 27, 2013, Defendant shall file its opposition to Plaintiffs' motion for summary judgment and cross-motion to dismiss and/or for summary judgment; (c) On or before SEPTEMBER 13, 2013, Plaintiffs shall file their reply in further support of their motion for summary judgment and opposition to Defendant's cross-motion; and (d) On or before SEPTEMBER 25, 2013, Defendants shall file its reply in further support of its cross-motion to dismiss and/or for summary judgment. Additional dates will be set as necessary. The dates identified above are firm; the Court has endeavored to give the parties the schedule that they have requested and expects that they will adhere to that schedule. The Court shall also endeavor to issue a ruling on the parties' motions on an expedited basis and will advise the parties in the event a hearing is necessary. Signed by Judge Colleen Kollar-Kotelly on July 25, 2013. (lcckk1) (Entered: 07/25/2013) |
| 07/26/2013 | 9 | ELECTRONIC SUMMONS (3) Issued as to CONSUMER FINANCIAL PROTECTION BUREAU, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw, ) (Entered: 07/26/2013) |
| 07/26/2013 | 10 | NOTICE of Appearance by Kristin Lee Bateman on behalf of All Defendants (Bateman, Kristin) (Entered: 07/26/2013) |
| 07/29/2013 | 11 | NOTICE of Appearance by Nandan M. Joshi on behalf of All Defendants (Joshi, Nandan) (Main Document 11 replaced on 7/30/2013) (znmw, ). (Entered: 07/29/2013) |

- 3 -

| | | |
|---|---|---|
| 08/07/2013 | 12 | NOTICE OF WITHDRAWAL OF MOTION by MORGAN DREXEN, INC., KIMBERLY A. PISINSKI re 3 MOTION for Preliminary Injunction (DePalma, Nicholas) (Entered: 08/07/2013) |
| 08/07/2013 | 13 | MOTION for Summary Judgment *pursuant to the Court's Expedited Briefing Schedule* by MORGAN DREXEN, INC., KIMBERLY A. PISINSKI (Attachments: # 1 Statement of Facts, # 2 Memorandum in Support, # 3 Text of Proposed Order)(DePalma, Nicholas) (Entered: 08/07/2013) |
| 08/20/2013 | 14 | NOTICE by CONSUMER FINANCIAL PROTECTION BUREAU (Attachments: # 1 Exhibit)(Coleman, John) (Entered: 08/20/2013) |
| 08/22/2013 | 15 | MOTION for Temporary Restraining Order *and Preliminary Injunction enjoining CFPB from prosecuting its second-filed action* by MORGAN DREXEN, INC., KIMBERLY A. PISINSKI (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order) (DePalma, Nicholas). Added MOTION for Preliminary Injunction on 8/23/2013 (znmw, ). (Entered: 08/22/2013) |
| 08/23/2013 | | MINUTE ORDER (paperless). By no later than 2:00 PM on AUGUST 23, 2013, the parties shall confer and file a JOINT STATUS REPORT indicating a briefing schedule for Plaintiffs' 15 Motion for a Temporary Restraining Order and Preliminary Injunction Enjoining CFPB From Prosecuting Its Second-Filed Action. Signed by Judge Colleen Kollar-Kotelly on August 23, 2013. (lcckk1) (Entered: 08/23/2013) |
| 08/23/2013 | 16 | STATUS REPORT *on behalf of all Parties* by MORGAN DREXEN, INC., KIMBERLY A. PISINSKI. (DePalma, Nicholas) (Entered: 08/23/2013) |
| 08/23/2013 | | MINUTE ORDER (paperless). The Court has reviewed the parties' 16 Joint Status Report and enters the following briefing schedule for Plaintiffs' 15 Motion for a Temporary Restraining Order and Preliminary Injunction Enjoining CFPB from Prosecuting Its Second-Filed Action: The Defendant shall file its opposition to the Motion on or before 5:00 PM on August 29, 2013. The Plaintiffs shall file their reply on or before 12:00 PM on September 3, 2013. Signed by Judge Colleen Kollar-Kotelly on August 23, 2013. (lcckk1) (Entered: 08/23/2013) |
| 08/27/2013 | 17 | MOTION to Dismiss *or, in the alternative, for Summary Judgment* by CONSUMER FINANCIAL PROTECTION BUREAU (Attachments: # 1 Memorandum in Support of Defendant's Motion to Dismiss or for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, # 2 Statement of Facts, # 3 Text of Proposed Order) (Coleman, John). Added MOTION for Summary Judgment on 8/28/2013 (znmw, ). (Entered: 08/27/2013) |
| 08/29/2013 | 18 | Memorandum in opposition to re 15 MOTION for Temporary Restraining Order *and Preliminary Injunction enjoining CFPB from prosecuting its second-filed action* MOTION for Preliminary Injunction filed by CONSUMER FINANCIAL PROTECTION BUREAU. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Coleman, John) (Entered: 08/29/2013) |
| 09/03/2013 | 19 | REPLY to opposition to motion re 15 MOTION for Temporary Restraining Order *and Preliminary Injunction enjoining CFPB from prosecuting its second-filed action* MOTION for Preliminary Injunction filed by MORGAN DREXEN, INC., KIMBERLY A. PISINSKI. (DePalma, Nicholas) (Entered: 09/03/2013) |
| 09/13/2013 | 20 | Memorandum in opposition to re 17 MOTION to Dismiss *or, in the alternative, for Summary Judgment* MOTION for Summary Judgment filed by MORGAN DREXEN, INC., KIMBERLY A. PISINSKI. (Attachments: # 1 Exhibit A)(DePalma, Nicholas) |

| | | (Entered: 09/13/2013) |
|---|---|---|
| 09/13/2013 | 21 | REPLY to opposition to motion re 13 MOTION for Summary Judgment filed by MORGAN DREXEN, INC., KIMBERLY A. PISINSKI. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(DePalma, Nicholas) Modified link on 9/16/2014 (znmw, ). (Entered: 09/13/2013) |
| 09/25/2013 | 22 | REPLY to opposition to motion re 17 MOTION to Dismiss *or, in the alternative, for Summary Judgment* MOTION for Summary Judgment filed by CONSUMER FINANCIAL PROTECTION BUREAU. (Coleman, John) (Entered: 09/25/2013) |
| 10/17/2013 | 23 | ORDER GRANTING Defendant's 17 Motion to Dismiss or, in the Alternative, for Summary Judgment; DENYING WITHOUT PREJUDICE Plaintiffs' 13 Motion for Summary Judgment; DENYING AS MOOT Plaintiffs' 15 Motion for a Temporary Restraining Order and Preliminary Injunction Enjoining CFPB from Prosecuting its Second-Filed Action. Signed by Judge Colleen Kollar-Kotelly on October 17, 2013. (lcckk1) (Entered: 10/17/2013) |
| 10/17/2013 | 24 | MEMORANDUM OPINION. Signed by Judge Colleen Kollar-Kotelly on October 17, 2013. (lcckk1) (Entered: 10/17/2013) |
| 11/15/2013 | 25 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 23 Order on Motion for Summary Judgment, Order on Motion for TRO, Order on Motion for Preliminary Injunction, Order on Motion to Dismiss,,,,,, by MORGAN DREXEN, INC., KIMBERLY A. PISINSKI. Filing fee $ 455, receipt number 0090-3536136. Fee Status: Fee Paid. Parties have been notified. (DePalma, Nicholas) (Entered: 11/15/2013) |
| 11/18/2013 | 26 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date 11/15/13 re 25 Notice of Appeal to DC Circuit Court,. (td, ) (Entered: 11/18/2013) |
| 12/04/2013 | | USCA Case Number 13-5342 for 25 Notice of Appeal to DC Circuit Court, filed by MORGAN DREXEN, INC., KIMBERLY A. PISINSKI. (td, ) (Entered: 12/04/2013) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/04/2014 08:15:17 | | |
| **PACER Login:** | tl0027 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:13-cv-01112-CKK |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIMBERLY A. PISINSKI, an individual,<br>54 Hazard Avenue, Suite 118, Enfield,<br>Connecticut 06082<br><br>and<br><br>MORGAN DREXEN, INC., a Nevada<br>Corporation,<br>675 Anton Boulevard, Costa Mesa, California<br>92626,<br><br>    Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU,<br>1700 G Street NW, Washington, District of<br>Columbia 20552<br><br>    Defendant. | Case No.: 13-CV-1112<br><br><br>**COMPLAINT** |

Plaintiffs Kimberly A. Pisinski ("Pisinski") and Morgan Drexen, Inc. ("Morgan Drexen") (together, "Plaintiffs"), by and through their undersigned counsel, file this Complaint against Defendant Consumer Financial Protection Bureau (the "CFPB"), a federal agency recently created pursuant to the Dodd-Frank Act, Title X, 12 U.S.C. §§ 5481 *et seq*. ("Dodd-Frank Act"), making the following allegations based on personal knowledge and upon information and belief.

### NATURE OF THE ACTION

1. Plaintiffs bring this action because CFPB's structure insulates it from political accountability and internal checks and balances in violation of the United States Constitution. Unbridled from constitutionally-required accountability, CFPB has engaged in *ultra vires* and abusive practices, including attempts to regulate the practice of law (a function reserved for state bars), attempts to collect attorney-client protected material, and overreaching demands for, and

- 1 -

mining of, personal financial information of American citizens, which has prompted a

Government Accountability Office ("GAO") investigation, commenced on July 12, 2013.

2.      Serious constitutional questions have been raised about CFPB's structure and

insulation from mandatory checks and balances, but to date, no court has passed on these

questions.  CFPB obtained its first Senate-confirmed Director only days ago on July 16, 2013.

CFPB has threatened Plaintiffs with legal action and has used improper and coercive tactics

against Plaintiffs.

3.      Plaintiffs seek an order halting these tactics and declaring CFPB's structure to be

unconstitutional, and declaring unconstitutional the provisions of the Dodd-Frank Act creating

and empowering the CFPB.

### PARTIES

4.      Pisinski is an attorney licensed to practice law in Connecticut, with a physical

office at 54 Hazard Avenue, Suite 118, Enfield, Connecticut 06082.  Pisinski contracts with

Morgan Drexen for support services and for use of the company's proprietary software for select

practice areas that she offers to her clients.

5.      Morgan Drexen is a Nevada Corporation with its principal place of business at

675 Anton Boulevard, Costa Mesa, California 92626.

6.      CFPB is a recently-created agency of the United States that is charged with

regulating consumer protection as it relates to financial products and services.  CFPB's business

address is 1700 G Street NW, Washington, District of Columbia 20552.

### JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action and the parties under 28 U.S.C. § 1331

(federal question).

8.      Venue lies in this district under 28 U.S.C. § 1391(e) because a substantial part of the activities alleged herein occurred in this judicial district.

## FACTUAL ALLEGATIONS

**I.      KIMBERLY A. PISINSKI'S LEGAL PRACTICE**

9.      Pisinski is an attorney licensed to practice law in Connecticut.

10.     From 1998 to 2000, Pisinski served as a Deputy Assistant Public Defender in Litchfield County, Connecticut.

11.     Since 2000, Pisinski has focused her practice on providing legal representation to adults and children in criminal court, juvenile court, civil court, administrative hearings, and education settings.

12.     When not providing the underprivileged with legal advice and counseling, Pisinski spends her time volunteering for non-profit organizations such as MotherWoman, Inc., and Zonta International – organizations dedicated to promoting and improving the welfare of women and children worldwide.

13.     Pisinski is a solo practitioner.

14.     In order to continue providing legal services to the underprivileged, Pisinski keeps her operation costs down by employing a very limited office staff.

15.     Pisinski offers her clients bankruptcy services.

16.     As a part of any bankruptcy engagement with Pisinski, clients may elect for her to first attempt to amicably resolve their debts with creditors prior to filing a bankruptcy petition.

17.     Pisinski's efforts at resolving her clients' debts are ancillary to, and a part of, the bankruptcy services that she provides for her clients.

18.     Pisinski does not charge an additional upfront fee if her clients request that she first attempt to amicably resolve their debts with their creditors.

19.     Pisinski does not collect any fees for the time and expense she incurs in attempting to settle with her clients' creditors until she successfully obtains a settlement agreement for the account on behalf of her clients and at least one payment is made per the terms of the agreement.

20.     Law firms which provide bankruptcy services to consumers are often high volume practices.

21.     Pisinski may represent dozens of individual bankruptcy clients at a time.

22.     In representing her clients in bankruptcy or other legal matters Pisinski can delegate tasks to non-attorney support staff when such staff is supervised by Pisinski, pursuant to Rule 5.3 of the Connecticut Rules of Professional Conduct, and Pisinski remains responsible for her non-attorney staff.

23.     In order to represent her clients in the most efficient and cost-effective way possible, and rather than hiring additional full-time paralegals and administrative staff, Pisinski has chosen to engage independent contractor non-lawyer assistants to provide support services for her law practice.

24.     Pisinski has exercised her right as an attorney to engage Morgan Drexen as a non-lawyer assistant to provide her with these legal support services.

25.     Morgan Drexen personnel serve as Pisinski's paralegals and support staff.

26.     By contracting with Morgan Drexen for these legal support services, Pisinski is able to realize efficiencies and significant cost savings for her law practice and serve a greater number of consumers with dire legal needs, but limited financial means.

27.     Pisinski maintains supervisory authority over the non-lawyer support staff at Morgan Drexen and remains responsible for the services delegated to Morgan Drexen.

## II.     MORGAN DREXEN'S SUPPORT SERVICES FOR LAWYERS

28.     Morgan Drexen licenses its proprietary software and provides live paraprofessional and support services to lawyers and law firms.

29.     By contracting with Morgan Drexen, law firms can reduce their overhead fees, improve efficiencies, and realize greater profitability.

30.     Morgan Drexen has provided support services to attorneys in the areas of debt resolution, bankruptcy, personal injury, mass tort litigation, and tax preparation.

31.     The attorneys who use Morgan Drexen's services direct and supervise Morgan Drexen to ensure that the quality of all services provided to their clients is compatible with their professional obligations as attorneys.

32.     The attorneys control the services performed by Morgan Drexen and maintain ultimate responsibility for services Morgan Drexen performs for the attorneys' clients.

33.     Pisinski has retained Morgan Drexen to provide legal support services of the nature described above, including: assisting in intake based upon screening parameters proscribed by Pisinski; assisting in document collection and processing; handling scheduling matters; offering the first line of communication to Pisinski for her clients and the clients' creditors; completing necessary paperwork; assisting in accounting; and otherwise providing administrative support.

34.     All of the services provided by Morgan Drexen are designed to ensure that the attorneys contracting with Morgan Drexen, including Pisinski, and their clients are kept informed of all events and developments during the course of the legal representation.

35.     Morgan Drexen is retained and compensated by the attorneys that engage its services.

36.     Morgan Drexen is not compensated by any client of the attorneys.

37.     Morgan Drexen does not directly contract with consumers.

38.     Morgan Drexen only contracts to provide its services to attorneys.

**III.    CFPB'S INVESTIGATION OF MORGAN DREXEN AND DEMAND FOR CONFIDENTIAL AND PRIVILEGED FINANCIAL DATA**

39.     On March 13, 2012, CFPB issued a Civil Investigative Demand ("CID") to Morgan Drexen seeking various categories of information.

40.     The information sought by CFPB is relevant to Morgan Drexen's business and its relationship with attorneys that provide debt settlement services that are ancillary to their legal representation.

41.     Morgan Drexen cooperated with CFPB's investigation, providing numerous responses to interrogatories and producing documents.  The following occurred as part of CFPB's investigation:

    a.     CFPB sent CIDs or similar documents seeking information to at least one attorney supported by Morgan Drexen;

    b.     CFPB sent CIDs or similar documents seeking information to financial institutions and other companies associated with Morgan Drexen;

    c.     CFPB demanded that Morgan Drexen produce confidential financial information belonging to the clients of the attorneys supported by Morgan Drexen; and

    d.     CFPB deposed various officers of Morgan Drexen, including its Chief Executive Officer, Walter Ledda.

42.     Most recently, on April 22, 2013, CFPB staff contacted counsel for Morgan

Drexen by telephone.

43.     CFPB staff advised that CFPB was proceeding in accordance with its Notice and

Opportunity to Respond and Advise (NORA) process, and that CFPB was considering

enforcement action against Morgan Drexen.

44.     CFPB has also taken the position that the attorneys supported by Morgan Drexen

are in violation of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. §§ 310.1 *et seq.*, because

CFPB considers the attorneys' hour rates for bankruptcy services as "upfront" fees, apparently

because the attorneys also perform ancillary debt-settlement services.

45.     CFPB staff sent a letter on April 22, 2013, inviting Morgan Drexen to submit its

own written statement as to why CFPB should not take action against Morgan Drexen.

46.     On May 8, 2013, counsel for Morgan Drexen responded with a written

submission refuting CFPB's allegations.

47.     Specifically, Morgan Drexen explained that CFPB did not have jurisdiction over

the law practice of the attorneys supported by Morgan Drexen; that the fees charged by the

attorneys supported by Morgan Drexen for bankruptcy services are not collected in connection

with debt settlement and are thus not "upfront fees" prohibited by the TSR; and that CFPB could

not prohibit Morgan Drexen from supporting attorneys who provide services in parallel with debt

settlement because this would be tantamount to an outright ban on commercial speech in

violation of the First Amendment.

### IV.     GAO'S INVESTIGATION OF CFPB FOR DATA-MINING PERSONAL INFORMATION OF AMERICAN CITIZENS

48.     On April 23, 2013, the Senate Committee on Banking, Housing, and Urban

Affairs held a hearing on the Semi-Annual Agenda of CFPB.

49.     At the April 23, 2013 hearing, United States Senator Mike Crapo (R-Idaho) raised concerns regarding CFPB's data collection efforts.

50.     On May 16, 2013, Senator Crapo sent a letter to CFPB Director Richard Cordray requesting that CFPB furnish information concerning its "legal authority to collect consumer lending and credit data for the agency's Big Data initiative."

51.     On May 23, 2013, Director Cordray sent a letter to Senator Crapo responding to Senator Crapo's May 16, 2013 letter and disputing that CFPB had a "Big Data initiative."

52.     On July 2, 2013, Senator Crapo wrote to the Comptroller General of GAO, requesting an investigation into CFPB's data collection practices.

53.     On July 12, 2013, GAO accepted Senator Crapo's request as within the scope of its authority and stated that it would begin the work (*i.e.*, investigate CFPB's data collection practices) "shortly."

54.     Other government officials and groups, including public watchdog groups, have expressed concern about CFPB's actions in collecting personal consumer financial data.

55.     For example, Judicial Watch President Tom Fitton stated that CFPB's actions were "a more direct assault on American citizens' reasonable expectation of privacy than the gathering of general phone records."

56.     Mr. Fitton has also stated that CFPB is "an out-of-control government agency that threatens the fundamental privacy and financial security of Americans.  This is every bit as serious as the controversy over the NSA's activities."

57.     David T. Hirschmann, the President and Chief Executive Officer of the U.S. Chamber of Commerce's Center for Capital Markets, wrote in a letter to Director Cordray that

CFPB "should not misuse the supervision process to demand huge amounts of data" and expressed concern that CFBP's requests are otherwise improper.

58.     John Berlau, a scholar of the Competitive Enterprise Institute, has called CFPB's data collection activities "an NSA-style surveillance program without any serious justification, such as terrorism."

59.     Randy E. Barnett, a professor of constitutional law at Georgetown University, wrote in the Wall Street Journal that NSA and CFPB's activities "dangerously violate[] the most fundamental principles of our republican form of government" (the Fourth Amendment's prohibition against unreasonable searches and seizures, and the requirement that no warrants shall issue but upon probable cause).  Mr. Barnett further rote that:  "[t]he secrecy of these programs makes it impossible to hold elected officials and appointed bureaucrats accountable."

## V.     CFPB LACKS CONSTITUTIONALLY-REQUIRED ACCOUNTABILITY

### A.     Unlawful Delegation of Broad, Undefined Power

60.     Congress created CFPB through Title X of the Dodd-Frank Act.

61.     Section 1011(a) of the Dodd-Frank Act established CFPB to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws."  12 U.S.C. § 5491(a).

62.     The Dodd-Frank Act grants authority to CFPB over consumer financial product and service firms.

63.     Section 1031(a) of the Dodd-Frank Act authorizes CFPB to take any of several enumerated actions, including direct enforcement action, to prevent a covered person from engaging in "unfair," "deceptive," or "abusive" practices.  12 U.S.C. § 5531(a).

64.    Section 1031(b) of the Dodd-Frank Act authorizes CFPB to prescribe rules identifying such practices under Federal law.  12 U.S.C. § 5531(b)

65.    The Dodd-Frank Act provides no definition for "unfair" or "deceptive" acts or practices, leaving those terms to CFPB to interpret and enforce, either through ad hoc litigation or regulation.

66.    CFPB is not bound by prior agencies' interpretations of similar statutory terms.

67.    The Dodd-Frank Act does not provide meaningful limits on what CFPB can deem an "abusive" act or practice.

68.    Section 1031(d) leaves the term "abusive" to be defined by CFPB, subject only to the limitations that the act or practice "(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; (2) takes unreasonable advantage of (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d).

69.    These limits offer no transparency or certainty for covered persons.

70.    These limits are subjective factors that can be interpreted broadly by CFPB.

71.    The Dodd-Frank Act's open-ended grant of power over what CFPB deems to be "unfair," "deceptive," or "abusive" practices is exacerbated by CFPB's discretion under Section 1022(b)(3) to unilaterally exempt any class of covered person, service providers, or consumer financial products or services from the scope of any rule promulgated under Title X.  12 U.S.C. 5512(b)(3).

72.     The Dodd-Frank Act grants CFPB wide-ranging investigation and enforcement powers.

73.     Section 1052 authorizes CFPB to engage in investigations, issue subpoenas, civil investigative demands, and commence judicial proceedings.  12 U.S.C. § 5562.

74.     Section 1053 authorizes CFPB to conduct hearings and adjudicative proceedings to ensure or enforce compliance with the Dodd-Frank Act, any rules promulgated thereunder, or any other Federal law that CFPB is authorized to enforce.  12 U.S.C. § 5563.

75.     Section 1054 authorizes CFPB to commence a civil action against any person whom it deems to have violated a Federal consumer financial law, and to seek all legal and equitable relief.  12 U.S.C. § 5564.

76.     On May 7, 2013, CFPB announced that it has undertaken a "comprehensive effort to prevent consumer harm in the debt-relief industry."

**B.     Elimination of Checks and Balances**

77.     Title X of the Dodd-Frank Act eliminates the Constitution's fundamental checks and balances that would ordinarily limit or channel CFPB's use of power.

78.     Congress has no power of the purse over CFPB, because the Dodd-Frank Act authorizes CFPB to fund itself by unilaterally claiming funds from the Federal Reserve Board ("FRB").

79.     The Director of CFPB cannot be removed at the pleasure of the President.

80.     The Director of CFPB determines the amount of funding CFPB receives from FRB under Section 1017(a)(1) of the Dodd-Frank Act.  12 U.S.C. § 5497(a)(1).

81.     FRB must then transfer those funds to CFPB.

82.     Section 1017(a)(2)(B) authorizes CFPB to claim an increasing percentage of the Federal Reserve System's 2009 operating expenses, beginning in fiscal year 2011 at up to 10

- 11 -

percent of those expenses, and reaching up to 12 percent in fiscal year 2013 and thereafter, adjusted for inflation.  12 U.S.C. § 5497(a)(2)(B).

83.     This structure will permit CFPB's Director to unilaterally requisition up to $597,600,000 in 2013, and thereafter, adjusted for inflation.

84.     CFPB's automatic budget authority is nearly double the FTC's entire budget request to Congress for fiscal year 2013.

85.     Section 1017(a)(2)(C) also prohibits the House and Senate Appropriations Committees from attempting to "review" CFPB's self-funded budget.  12 U.S.C. § 5497(a)(2)(C).

86.     The Dodd-Frank Act also insulates CFPB from the President's oversight.

87.     Under Section 1011(c), after appointment (with the advice and consent of the Senate), CFPB's Director receives a five-year term in office and may be removed by the President only for "inefficiency, neglect of duty, or malfeasance in office."  12 U.S.C. § 5491(c).

88.     Thus, all of CFPB's power is vested in its Director, without the moderating influence of other commissioners, officials, or governors.

89.     Judicial oversight is also reduced, because Section 1022(b)(4)(B) requires that courts grant the same deference to CFPB's interpretation of federal consumer financial laws that they would "if the Bureau were the only agency authorized to apply, enforce, interpret, or administer the provisions of such Federal consumer financial law."  12 U.S.C. § 5512(b)(4)(B).

90.     The foregoing violates the Constitution's separation of powers.

**VI.     CFPB'S ATTEMPT TO USURP STATE FUNCTIONS BY ATTEMPTING TO REGULATE LAWYERS IN THE PRACTICE OF LAW**

91.     Section 1011(a) of the Dodd-Frank Act established CFPB to "regulate the offering and provision of consumer financial products or services under the Federal Consumer Financial Laws."  12 U.S.C. 5491(a).

92.     Among the authority transferred to CFPB by the Federal Trade Commission ("FTC") is the authority to regulate "debt relief services" under the TSR.

93.     While the Dodd-Frank Act bestows upon CFPB relatively broad authority to regulate many aspects of "financial products or services," Section 1027(e) explicitly carves out an exception for attorneys engaged in the practice of law. 12 U.S.C. § 5517(e).

94.     Specifically Section 1027(e) states, under "exclusion for the practice of law":

> Except as provided under paragraph (2), the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law. . . . Paragraph (1) shall not be construed so as to limit the exercise by the Bureau of any supervisory, enforcement, or other authority regarding the offering or provision of a consumer financial product or service described in any subparagraph of section 5481(5) of this title (A) that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship; or (B) that is otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service.

95.     Thus, CFPB cannot exercise authority over attorneys that fall within this exclusion pursuant to the Dodd-Frank Act.

96.     Sections 1061 to 1067 of the Dodd-Frank Act also granted to CFPB the authority to enforce certain business practices transferred to it by other administrative agencies. 12 U.S.C. §§ 5581-5587.

97.     On August 10, 2010, the FTC, in exercising its rulemaking authority amended the TSR to extend its reach to "debt relief services."   The amendments of the TSR have been codified as 16 C.F.R. § 310 *et seq*.

98.    The FTC explained that the purpose of the amendments was to "protect consumers from deceptive or abusive practices in the telemarketing of debt relief service." 75 Fed. Reg. 48458, 48458 (Aug. 10, 2010).

99.    The FTC amended the TSR to accomplish the following:

> define debt relief services, prohibit debt relief providers from collecting fees until after services have been provided, require specific disclosures of material information about offered debt relief services, prohibit specific misrepresentations about material aspects of debt relief services, and extend the TSR's coverage to include inbound calls made to debt relief companies in response to general media advertisements.

*Id.*

100.    Under the amended TSR, the term "debt relief services" was defined to include "any program or service represented, directly or by implication to negotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecure creditor or debt collector."  16 C.F.R. § 310.2.

101.    The TSR does not include an exemption for attorneys practicing law.

102.    The FTC explained that "an exemption from the amended rule for attorneys engaged in the telemarketing of debt relief services is not warranted." 75 Fed. Reg. 48458, 48468.  The FTC based its findings on the following:

> a.    First, the FTC's assumption that attorneys "who provide bona fide legal services," do not engage in "interstate telephonic communications in order to solicit potential clients to purchase debt relief services." *Id.*

b.   Second, attorneys generally meet their prospective clients in person before agreeing to represent them. *Id.*

c.   Third, the FTC believed that "attorneys acting in compliance with state bar rules and providing bona fide legal services already fall outside of the TSR's coverage in most instances." *Id.*

d.   Fourth, attorneys, and "those partnering with attorneys, who principally rely on telemarketing to obtain debt relief service clients . . . engaged in the same types of deceptive and abusive practices as those committed by non-attorneys." *Id.*

**e.**   Fifth, the existing scope of the TSR and several other statutes and FTC rules designed to curb deception, abuse, and fraud" also does not exempt attorneys from their regulations. 75 Fed. Reg. 48458, 48469.

103.   The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

104.   Aside from the attorney exemption found in the Dodd-Frank Act, the U.S. Supreme Court and the U.S. District Court for the District of Columbia have both found that the licensing and regulation of lawyers is left exclusively to the states, including the setting forth of professional standards and discipline for attorneys. *See, e.g., ABA v. FTC,* 430 F.3d 457 (D.C. Cir. 2005); *Leis v. Flynt,* 439 U.S. 438, 442 (1979).

105.   The States have the power to regulate the practice of law absent a clear Congressional statement in the language of a statute indicating otherwise. *ABA v. FTC*, 430 F.3d 457, 471-72 (D.C. Cir. 2005).

## VII.   CFPB'S ACTIONS THREATEN PLAINTIFFS WITH IRREPARABLE HARM

106.   CFPB has demanded that Morgan Drexen produce documents that contain the personal financial information that belongs to clients of attorneys (like Pisinski) that are supported by Morgan Drexen, and that have been retained with regard to possible bankruptcy.

107.   Morgan Drexen does not have authorization from the attorneys to disclose this information, which is protected by the attorney-client privilege, as well as any applicable state laws that require the safekeeping of client information, including personal financial information.

108.   Providing this information to CFPB would cause Morgan Drexen harm because:

    a.   Attorneys who contract with Morgan Drexen will potentially terminate their contracts in favor of other companies that are not being required to produce their clients' personal financial information to CFPB;

    b.   Clients of the attorneys that contract with Morgan Drexen would potentially terminate their attorneys (who would then stop paying Morgan Drexen for its services); and

    c.   Morgan Drexen would potentially be at risk for lawsuits related to the violation of any applicable laws requiring the protection of client confidences and personal financial data, particularly if Morgan Drexen produces such data to an unconstitutional entity and one that is under investigation by the GAO.

109.   CFPB agents have stated to Morgan Drexen that the only way it can comply with CFPB's directives is to stop providing non-attorney/paralegal services to attorneys who offer their clients debt settlement services as a component of the attorneys' bankruptcy services or as a separate engagement along with the attorneys' bankruptcy services.

110.    Stopping the provision of these services would cause irreparable harm to Plaintiffs for several additional reasons:

      a.    The attorneys supported by Morgan Drexen believe that providing debt settlement services while a bankruptcy petition is being deliberated and prepared is a component of the attorney's strategy; and

      b.    If Morgan Drexen cannot support such attorneys with regard to such engagements (*i.e.*, bankruptcy and debt settlement), they will likely seek support elsewhere, or, alternatively, be forced to re-evaluate the cost of their services because they will not benefit from the economies of scale and efficiencies that Morgan Drexen provides.

111.    The foregoing engagements comprise a large percentage of Morgan Drexen's total business, and any requirement that Morgan Drexen stop providing these services to attorneys would threaten the viability of Morgan Drexen's business.

112.    In addition to the foregoing, CFPB's investigation has caused Morgan Drexen significant harm, including:

      a.    Morgran Drexen has diverted substantial attention and resources, in terms of paying attorney's fees, as well as the company time necessary to provide officers for depositions, collect and review documents, and otherwise respond to CFPB's demands;

      b.    CFPB's investigation has significantly increased Morgran Drexen's costs with respect to accessing credit.  For example, CFPB sent a CID to Morgan Drexen's banking partners, which led to the company's losing its credit facilities.  CFPB also sent a CID to U.S. Capital, which has

impacted Morgan Drexen's ability to obtain reasonable financing.  Morgan

Drexen now pays 22% interest where, before the CID, Morgan Drexen

was able to obtain financing at 4.5%;

c.    Responding to CFPB's investigation has placed a severe strain on Morgan

Drexen's business operations;

d.    CFPB has demanded documents from certain of attorneys supported by

Morgan Drexen;

e.    CFPB has demanded documents of Kovel/Fuller, which partners with

Morgan Drexen to provide marketing services to the attorneys supported

by Morgan Drexen;

f.    CFPB's investigation, coupled with Morgan Drexen's disclosure of the

investigation to its attorney business customers, has been stigmatizing to

Morgan Drexen; and

g.    CFPB has threatened to send CIDs to all of Morgan Drexen's attorney

customers in order to obtain their clients' bankruptcy information.

113.    Section 1011(b)(2) of the Dodd Frank Act requires that CFPB have a Senate-

confirmed Director.  *See* 12 U.S.C.  § 5491(b)(2) ("[T]he Director shall be appointed by the

President, by and with the advice and consent of the Senate.").

114.    Until recently, no Senate-confirmed director was in place.

115.    On July 16, 2013, the Senate confirmed CFPB's first Director.

## CAUSES OF ACTION

### COUNT I
### (Violation of United States Constitution)

116.    Plaintiffs re-allege and incorporate by reference the allegations contained in all of the preceding paragraphs.

117.    The Constitution provides that all "legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  U.S. Const. art. I, § 1.

118.    The Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law. . ."  U.S. Const. art. I, § 9.

119.    The Constitution provides that the "executive Power shall be vested in a President," U.S. Const. art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

120.    By delegating effectively unlimited powers to CFPB, by eliminating Congress's power of the purse over CFPB, by eliminating the President's power to remove CFPB's Director at will, and by limiting judicial review of CFPB's actions and legal interpretations, Title X of the Dodd-Frank Act violates the Constitution's separation of powers.

121.    Title X's delegation of unlimited power to CFPB, together with the elimination of the necessary checks and balances on CFPB's exercise of that power, is unconstitutional, must be declared unconstitutional, and must be enjoined.

122.    Because CFPB has taken the position that Pisinski and Morgan Drexen are directly subject to CFPB's authority, Title X's violation of the separation of powers creates a here-and-now injury entitling Pisinski and Morgan Drexen to judicial review to ensure that any enforcement will only be by a constitutional agency accountable to the Executive.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Provide for expeditious proceedings in this action in light of CFPB's threatened

actions and irreparable harm faced by Plaintiffs;

B.      Enter judgment in the Plaintiffs' favor;

C.      Declare unconstitutional the provisions of the Dodd-Frank Act creating and

empowering CFPB;

D.      Provide for preliminary and permanent injunctive relief;

A.      Award the Plaintiffs their costs and reasonable attorneys' fees incurred in this

action pursuant to 28 U.S.C. § 2412; and

B.      Grant Plaintiffs such other relief as the Court deems just and proper.

**RESERVATION OF RIGHTS**

In the event that CFPB is found to be constitutional, Plaintiffs preserve their other claims,

including their claims that:

a.      CFPB's application of the CFPB and the TSR to attorneys engaged in the practice

of law violates the Tenth Amendment and the statutory exemption in the Dodd

Frank Act, 2 U.S.C. § 5517(e);

b.      Pursuant to 5 U.S.C. § 706(2)(c), CFPB has acted "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right";

c.      The application of the CFPB and the TSR to lawyers engaged in the practice of

law is arbitrary, capricious and contrary to law pursuant to 5 U.S.C. § 706(2)(a),

and CFPB has failed to articulate, among other things: an explanation of how the

manner in which lawyers offer services to and bill their clients can be considered

a violation of the TSR or the Dodd-Frank Act; how legal services constitute a

- 20 -

"financial product or service," or any legally supportable basis for application of

the TSR or the Dodd-Frank Act to lawyers and their staff engaged in the practice

of law.

Respectfully submitted,

Dated:  July 22, 2013

/s/

Randall K. Miller
D.C. Bar No. 460682
Nicholas DePalma
D.C. Bar No. 974664
Venable LLP
8010 Towers Crescent Drive, Suite 300
Tysons Corner, VA 22182
(703) 905-1449
(703) 821-8949 (facsimile)
rkmiller@venable.com
nmdepalma@venable.com

*Counsel for Plaintiffs Morgan Drexen, Inc. and
Kimberly A. Pisinski*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIMBERLY A. PISINSKI, an individual, and MORGAN DREXEN, INC., a Nevada Corporation<br><br>　　　　　　　　Plaintiffs<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU<br><br>　　　　　　　　Defendant | Case No.: 13-CV-1112<br><br>**MOTION FOR PRELIMINARY INJUNCTION AND REQUEST FOR ORAL ARGUMENT PURSUANT TO LCvR 7(f) AND LCvR 78.1 AND A HEARING PURSUANT TO LCvR 65.1(d)** |

Plaintiffs Kimberly A. Pisinski ("Pisinski") and Morgan Drexen, Inc. ("Morgan Drexen") ("Plaintiffs"), by and through their undersigned counsel, hereby move for a preliminary injunction prohibiting Defendant Consumer Financial Protection Bureau ("CFPB") from taking any further action with respect to Plaintiffs until after the final hearing in this matter and only as permitted by Court order, on the basis that the provisions of the Dodd-Frank Act creating and empowering CFPB (Dodd-Frank Act, Title X, 12 U.S.C. § 5481 *et seq*.) are unconstitutional because they fail to provide CFPB with sufficient political oversight and internal checks and balances.  Points and authorities and a proposed order are submitted herewith.

Plaintiffs respectfully request oral argument pursuant to LCvR 7(f) and LCvR 78.1, and a hearing on this motion pursuant to LCvR 65.1.  Expedition is essential for the reasons explained in the supporting points and authorities, including the Declarations of Pisinski, Walter Ledda, the Chief Executive Officer of Morgan Drexen, and Randal M. Shaheen, an attorney for Morgan Drexen.  Plaintiffs are facing irreparable harm because they are subject to an ongoing, invasive, and coercive inquisition by a purported government agency that does not possess the

constitutionally-required structure to survive a separation of powers analysis.  These constitutional violations alone constitute irreparable harm, but, as explained in the declarations, CFPB's actions have threatened the very existence of Plaintiffs' businesses (including Pisinski's ability to offer bankruptcy services to low-income clients, and Morgan Drexen's ability to offer support services to attorneys who offer bankruptcy services and debt settlement services).  *See* Ledda Decl. at ¶ 13 ("any requirement that Morgan Drexen stop providing these services to attorneys would threaten the viability of Morgan Drexen's business").

Furthermore, CFPB has demanded that Morgan Drexen produce the personal information of clients of the attorneys supported by Morgan Drexen.  *See, e.g.*, Shaheen Decl. at Ex. 35. CFPB has taken the position that Morgan Drexen must produce such data in violation of the attorney-client privilege and confidentiality that the supported attorneys owe their clients, and has placed Morgan Drexen in the untenable position of violating such confidences and thereby threatening its business, or choosing to protect such personal data and facing the imposition of CFPB sanctions.  *See* Ledda Decl. at ¶ 10(c) ("Morgan Drexen would be potentially at risk for lawsuits related to the violation of any applicable laws requiring the protection of client confidences and personal financial data . . ."); Pisinski Decl. at ¶ 9 ("Permitting CFPB to obtain client information through Morgan Drexen puts shackles on me and my law practice").

WHEREFORE, Morgan Drexen requests that the Court set a prompt hearing date as contemplated by LCvR 65.1, and that, after such hearing and appropriate briefing, the Court grant the relief requested herein.

Respectfully submitted,

Dated:  July 22, 2013                          _____/s/_____

                                               Randall K. Miller
                                               D.C. Bar No. 460682
                                               Nicholas DePalma
                                               D.C. Bar No. 974664
                                               Venable LLP
                                               8010 Towers Crescent Drive, Suite 300
                                               Tysons Corner, VA 22182
                                               (703) 905-1449
                                               (703) 821-8949 (facsimile)
                                               rkmiller@venable.com
                                               nmdepalma@venable.com

                                               *Counsel for Plaintiffs Morgan Drexen, Inc. and
                                               Kimberly A. Pisinski*

6936060

3

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2013, a copy of the foregoing document was filed electronically via the Court's ECF system, through which a notice of the filing will be sent to all counsel of record.

I further certify that a paper copy of the foregoing document was hand-delivered upon the following:

> Ronald C. Machen, Jr.
> United States Attorney for the District of Columbia
> c/o Civil Process Clerk, 555 4th Street, N.W.
> Washington, D.C. 20530
>
> Eric H. Holder, Jr.
> Attorney General of the United States
> Department of Justice Room D103950
> Pennsylvania Avenue, N.W.
> Washington, D.C. 20530-0001
>
> Consumer Financial Protection Bureau
> ATTN:  Clerk for Legal Service of Process,
> 1700 G. Street, N.W.
> Washington, D.C. 20552

_____/s/_____
Randall K. Miller

4

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIMBERLY A. PISINSKI, an individual, and MORGAN DREXEN, INC., a Nevada Corporation,<br><br>    Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>    Defendant. | Case No.: 13-CV-1112<br><br>**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

Randall K. Miller
D.C. Bar No. 460682
Nicholas DePalma
D.C. Bar No. 974664
Venable LLP
8010 Towers Crescent Drive, Suite 300
Tysons Corner, VA 22182
(703) 905-1449
(703) 821-8949 (facsimile)
rkmiller@venable.com
nmdepalma@venable.com

*Counsel for Plaintiffs Kimberly A. Pisinski and Morgan Drexen, Inc.*

**TABLE OF CONTENTS**

INTRODUCTION   ………………………………………………………..   1

SUMMARY OF FACTUAL BACKGROUND   ……………………………….   1

ARGUMENT   …………………………………………………………   3

I.      LEGAL STANDARD   ……………………………………………   3

II.     PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION   ……..   4

        A.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS   ……..   4

                1.      THE COURT HAS THE AUTHORITY
                        TO CONSIDER THIS CASE ……………………………   4

                2.      CFPB VIOLATES THE CONSTITUTIONAL
                        SEPARATION OF POWERS …………………………   5

        B.      PLAINTIFFS ARE SUFFERING IRREPARABLE HARM   ………….   7

        C.      THE BALANCE OF EQUITIES FAVORS ENTRY OF
                THE PRELIMINARY INJUNCTION ………………………….   9

        D.      THE PUBLIC INTEREST FAVORS ENTRY OF
                A PRELIMINARY INJUNCTION …………………………   10

CONCLUSION   ………………………………………………………   12

## TABLE OF AUTHORITIES

Cases                                                                                           Page(s)

*Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984)   …………………………….   4

*Bayer HealthCare, LLC v. U.S. Food & Drug Admin.*, --- F. Supp. 2d ---,
    2013 WL 1777481 (D.D. C. Apr. 17, 2013)   …………………………………   3, 8

*Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553 (Fed. Cir. 1996)   ……   8

*Bowsher v. Synar*, 478 U.S. 714 (1986)   ……………………………………….........   4

*Cortez III Serv. Corp. v. Nat'l Aeronautics & Space Admin.*, 950 F. Supp. 357
    (D.D.C. 1996)   …………………………………………………………………   10

*Elrod v. Burns*, 427 U.S. 347 (1976)   …………………………………………..   7

*Free Enter. Fund v. Pub. Co. Acct'ing Oversight Bd.*, 537 F.3d 667
    (D.C. Cir. 2008)   …………………………………………………………………   4

*Free Enter. Fund v. Pub. Co. Acct'ing Oversight Bd.*, 130 S. Ct. 3138 (2010)   ……..   4, 5

*Gordon v. Holder*, --- F.3d ---, 2013 WL 3239742 (D.C. Cir. June 28, 2013)   ………   3, 10

*Hettinga v. United States*, 560 F.3d 498 (D.C. Cir. 2009)   ………………………….   4

*Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935)   ………………………….   5,6

*Illinois Central R. Co. v. Interstate Commerce Comm'n,* 206 U. S. 441 (1907)   ……   6

*INS v. Chadha*, 462 U.S. 919 (1982)   ………………………………………….   5

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)   …………………….   7

*Mistretta v. United States*, 488 U.S. 361 (1989)   …………………………………   5

*Morrison v. Olson*, 487 U.S. 654 (1988)   ………………………………………….   5

*Myers v. United States*, 272 U.S. 52 (1926)   …………………………………………   5

*N. Mariana Islands v. United States*, 686 F. Supp. 2d 7 (D.D.C. 2009)   …………..   10

*O'Donnell Const. Co. v. District of Columbia,* 963 F.2d 420 (D.C. Cir. 1992)   ……..   10

*Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970 (Fed. Cir. 1996)   …………………..   8

*POM Wonderful LLC* v. FTC, 894 F. Supp. 2d 40 (D.D.C. 2012)   …………………   4

2

## TABLE OF AUTHORITIES (cont'd)

**CASES**                                                                          <u>Page(s)</u>

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359
   (Fed. Cir. 2001) …………………………………………………..        8

*Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37 (D.D.C. 2002) …………………….    7-8, 10

*Standard Oil Co. v. United States,* 283 U. S. 235 (1931) ………………………        6

*Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106 (D.D.C. 2012)  …..    3, 9, 10

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) …………………………        3

**STATUTES**

12 U.S.C. § 5491(a)  …………………………………………………        1

12 U.S.C. § 5491(c) …………………………………………………..       2

12 U.S.C. § 5491(c)(3) …………………………………………………        6

12 U.S.C. § 5497(a)(1) …………………………………………………        1

12 U.S.C. § 5497(a)(2)(B) …………………………………………………..       1

12 U.S.C. § 5497(a)(2)(C) …………………………………………………..       2

12 U.S.C. § 5531(a) …………………………………………………        1

12 U.S.C. § 5531(d) …………………………………………………        1

## INTRODUCTION

This case is about a recently-created federal agency (the Consumer Financial Protection Bureau) ("CFPB") with a novel and unconstitutional structure and which has overstepped its bounds and taken actions which threaten the very existence of the businesses of Morgan Drexen, Inc. ("Morgan Drexen") and Kimberly A. Pisinski ("Pisinski").  CFPB is a recently created agency of federal government that just days ago on July 16, 2013 had its first Director confirmed by the Senate.  CFPB has investigated Morgan Drexen and has demanded that Morgan Drexen turn over a vast collection of personal and sensitive financial data that Morgan Drexen obtained through attorney-client communications.  In addition, CFPB's approach to the investigation is that it may regulate attorneys like Pisinski who are practicing law, a state function performed by state bars.  These examples of overreach are a direct result of the fact that CFPB lacks political accountability and internal checks and balances that are constitutionally required.  Plaintiffs seek a preliminary injunction to halt CFPB's conduct until the constitutional issue can be heard.

## SUMMARY OF FACTUAL BACKGROUND

1.      Congress created CFPB through Title X of the Dodd-Frank Act.  Section 1011(a) of the Dodd-Frank Act established CFPB to regulate the offering and provision of consumer financial products or services under the federal consumer financial laws, by preventing covered persons from engaging in "unfair," "deceptive," or "abusive" practices.  12 U.S.C. § 5491(a).  The Dodd-Frank Act does not define "unfair," or "deceptive," and broadly defines "abusive."  *See* Dodd-Frank Act § 1031(a), (d), 12 U.S.C. § 5531(a), (d).

2.      The Dodd-Frank Act authorizes CFPB to fund itself by unilaterally claiming funds from the Federal Reserve Board.  *See id.* at § 1017(a)(1)-(a)(2)(B), 12 U.S.C. § 5497(a)(1)-(a)(2)(B) (setting CFPB's allotment at an increasing percentage of the Federal Reserve System's operating expenses, reaching 12 percent in 2013, or approximately $597,6000,000).  Congress

4

has no "power of the purse" because Title X bars the House and Senate Appropriations

Committees from attempting to "review" CFPB's self-funded budget.  § 1017(a)(2)(C), 12 U.S.C.

§ 5497(a)(2)(C).

3.     The President has no oversight over CFPB after appointment because CFPB's

Director receives a five-year term in office and may only be removed for "inefficiency, neglect

of duty, or malfeasance in office."  *Id.* at § 1011(c), 12 U.S.C. § 5491(c).

4.     On March 13, 2012, CFPB issued a Civil Investigative Demand ("CID") to

Morgan Drexen.  *See* Declaration of Randal Shaheen ("Shaheen Decl.") ¶ 4.  CFPB's

investigation of Morgan Drexen remains ongoing.  *See* Shaheen Decl. ¶¶ 4-43.

5.     Morgan Drexen is in the business of providing non-attorney paralegal support

services to attorneys in the areas of debt resolution, bankruptcy, personal injury, mass tort

litigation, and tax preparation.  Declaration of Walter Ledda ("Ledda Decl.") ¶ 3.  Pisinski is one

of the attorneys for whom Morgan Drexen provides such services, under Pisinski's supervision

and with Pisinski remaining responsible for all actions taken by Morgan Drexen in accordance

with state ethics rules.  Ledda Decl. ¶ 4.  Pisinski offers clients bankruptcy services.  Declaration

of Kimberly Pisinski ("Pisinski Decl.") ¶ 2.  As part of any bankruptcy engagement, Pisinski's

clients may elect for her to first amicably resolve their debts with creditors prior to filing a

bankruptcy petition.  *Id.*

6.     During CFPB's investigation, it has taken the position that Morgan Drexen cannot

continue to provide services to attorneys such as Pisinski.  Shaheen Decl. ¶ 43.  CFPB has

refused to accept any resolution short of Morgan Drexen refusing to support attorneys engaged

by clients for both bankruptcy counseling and debt settlement.  *Id.* ¶ 43.  CFPB has further

demanded that Morgan Drexen provide confidential information belonging to the bankruptcy

<center>5</center>

clients of the attorneys supported by Morgan Drexen, in violation of the attorney's wishes and their ethical obligations to protect client confidences. *Id.* ¶ 43.

7.      During CFPB's investigation, CFPB has caused Morgan Drexen to divert substantial attention and resources and to incur attorney's fees.  CFPB also has threatened the viability of Morgan Drexen's business.  *See* Ledda Decl. ¶¶ at 13-14.

## ARGUMENT

## I.      LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction because (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief; (3) "the balance of the equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Gordon v. Holder*, --- F.3d ---, 2013 WL 3239742, at *3 (D.C. Cir. June 28, 2013) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)) (affirming grant of preliminary injunction).

This Court has previously balanced the four factors on a "sliding scale" whereby "a lesser showing on one factor could be surmounted by a greater showing on another factor." *See Bayer HealthCare, LLC v. U.S. Food & Drug Admin.*, --- F. Supp. 2d ---, 2013 WL 1777481, *4-5 (D.D.C. Apr. 17, 2013) (granting in part motion for temporary restraining order).  However, the Supreme Court's decision in *Winter* has called this approach into question. *Id.*; *see also Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 113 n.6 (D.D.C. 2012) (employing the pre-*Winter* sliding scale analysis).  Here, Plaintiffs are entitled to a preliminary injunction under either the sliding-scale approach or the *Winter* standard.

6

## II.        PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

### A.        Plaintiffs Are Likely To Succeed On The Merits

#### 1.        The Court Has The Authority to Consider This Case

Targets of agency investigations and enforcement actions are often required to exhaust their administrative remedies before seeking relief or review in federal court.  However, when (as here) there are important constitutional and public interests at stake, the Court may consider the case.  *See Free Enter. Fund v. Pub. Co. Acct'ing Oversight Bd.*, 537 F.3d 667, 670-71 (D.C. Cir. 2008), *aff'd in relevant part*, 130 S. Ct. 3138, 3150-51 (2010) (permitting a party to proceed in federal court on a challenge to the constitutionality of an agency's implementing statute without first exhausting administrative remedies); *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986) (concluding that a separation of powers violation may create a "here-and-now" injury that can be remedied by a court prior to completion of administrative remedies); *Andrade v. Lauer*, 729 F.2d 1475, 1490-93 (D.C. Cir. 1984) (reversing dismissal and holding that plaintiffs could bring their constitutional claim in federal court without first exhausting administrative remedies). *See also Hettinga v. United States*, 560 F.3d 498, 504 (D.C. Cir. 2009) ("Prudential exhaustion is not required where . . . an agency may not be empowered to grant relief, for example because it lacks institutional competence to resolve the particular type of issue presented, such as the constitutionality of a statute") (internal citations and quotations omitted); *but see POM Wonderful LLC* v. FTC, 894 F. Supp. 2d 40, 44-45 (D.D.C. 2012) (considering discretionary factors and declining to permit declaratory relief).

Here, unlike a plaintiff who challenges a typical agency enforcement proceeding, Plaintiffs' constitutional challenge relates to the foundational authority of CFPB as an institution

– a question that has been raised[1] but not passed upon by any court.  The Court should exercise

its discretion to confront these foundational questions now.

### 2.    CFPB Violates The Constitutional Separation of Powers

The structure of CFPB is unprecedented in that CFPB is greatly insulated from the

political branches (the President and Congress) and lacks internal checks and balances.  In fact,

CFPB is so "independent" that it is not sufficiently accountable to the political actors to survive

constitutional scrutiny.  In a series of cases, the Supreme Court has established that the

Constitution – and the basic architecture of federal government power in Articles I, II, and III,

require that federal agencies be subject to oversight by the political branches, with their actions

subject to judicial review.  *See Free Enter. Fund*, 130 S. Ct. at 3151-61 (2010) (invalidating the

double layer of insulation protecting executive branch officials from Presidential removal);

*Myers v. United States*, 272 U.S. 52 (1926) (holding that Congress may not interfere with

Presidential removal of executive branch officials like the postmaster general).  *See also*

*Mistretta v. United States*, 488 U.S. 361, 423-24 (1989) (Scalia, J. dissenting); *Morrison v.*

*Olson*, 487 U.S. 654, 708-09 (1988) (Scalia, J. dissenting); *INS v. Chadha*, 462 U.S. 919, 945

(1982); *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935).

As set forth in the attached Declaration of Law Professor Todd Zywicki, there are four

structural features of CFPB that impermissibly insulates CFPB from required accountability.

First, CFPB is headed by a single director who serves a fixed term of five years and is removable

only for "cause" (and not "at will" by the President).  Second, CFPB is not subject to

Congressional oversight through the budget and appropriations process; instead, CFPB

automatically receives a fixed sum that it can use to carry out its activities – up to a twelve

---

[1] *See State Nat'l Bank of Big Spring v. Gethner*, No. 1:12-cv-01032-ESH (D.D.C.).

percent (12%) cap of the Federal Reserve's total operating expenses.  Third, CFPB is insulated

from accountability from the Federal Reserve Board itself, which does not review or approve

CFPB actions.  Fourth, and finally, the Dodd Frank Act limits judicial review over CFPB

actions.  *See* Zywicki Decl. ¶¶ 13-20.  Such a structure is unprecedented in the federal

government.  CFPB is simply insufficiently accountable to the political branches of government

and therefore the structure of CFPB violates the Constitution.

Cases have established two different types of agency structures that comply with the

Constitution: executive agencies (or departments) and independent agencies. CFPB is not

structured properly as either an executive agency or independent agency.

For executive agencies, the head of the agency typically serves at the pleasure of the

President and is removable at will by the President. This is not the case for CFPB, which limits

removal of its director to "for cause," which Dodd-Frank defines as "inefficiency, neglect of

duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). Thus, it is not properly structured as to

be constitutional as an executive agency.

For so-called "independent agencies," accountability is provided with other features such

as a multi-member bipartisan structure, such as the Federal Trade Commission.  As Professor

Zywicki observes, a multi-member bipartisan commission structure is usually identified as a

defining feature of an independent agency.  *See* Zywicki Decl. ¶ 16; *see also Humphrey's Ex'r*,

295 U.S. at 624 ("The commission is to be *nonpartisan*, and it must from the very nature of its

duties, act with entire impartiality. . .  Like the Interstate Commerce Commission, its members

are called upon to exercise the trained judgment of a *body of experts* 'appointed by law and

informed by experience.'" (quoting *Illinois Central R. Co. v. Interstate Commerce Comm'n,* 206

U. S. 441 (1907); *Standard Oil Co. v. United States,* 283 U. S. 235 (1931)).  In addition,

9

independent agencies typically are accountable to Congress through the appropriations process, but CFPB is not.

CFPB conforms to neither of these models of recognized agency structure and accountability: it is neither an executive agency nor an independent agency. It is effectively an independent agency housed inside another independent agency, isolated from effective accountability to Congress, the President, or the Federal Reserve Board.  Indeed, CFPB lacks even the limited accountability that the PCAOB had to the Securities and Exchange Commission—a structure that was nevertheless held to be unconstitutional. CFPB can spend money, issue regulations, and bring enforcement actions with no accountability to any elected officials or bipartisan agency, a recipe for the sort of abusive and overreaching behavior exhibited in this case.  As Professor Zywicki states, "CFPB [is] one of the most powerful and publicly unaccountable agencies in American history" (Zywicki Decl. ¶ 17) — in fact, wielding so much unaccountable power and discretion as to be unconstitutional.

Accordingly, Plaintiffs are likely to succeed in demonstrating that CFPB's enabling statute should be declared unconstitutional.

### B. Plaintiffs Are Suffering Irreparable Harm

Plaintiffs are subject to an ongoing, invasive, and coercive inquisition by a purported government agency that does not possess the constitutionally-required structure to survive a separation of powers analysis.  Courts have consistently held that a colorable constitutional violation gives rise to a showing of irreparable harm.  *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (a constitutional violation and loss of constitutional protections "'for even minimal periods of time, unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53

(D.D.C. 2002) (deprivation of constitutional protection "is an undeniably substantial and irreparable harm").

As explained in the Declaration of Morgan Drexen's Chief Executive Officer, Walter Ledda, CFPB's conduct, including issuing CIDs to attorneys supported by Morgan Drexen, labeling Morgan Drexen's business model as a violation of law, and demanding information belonging to the clients of attorneys supported by Morgan Drexen, threatens the very existence of Morgan Drexen's business.  *See* Ledda Decl. ¶ 10.  To date, CFPB's actions have caused Morgan Drexen to suffer reputational harm, loss of credit facilities, and significantly increased the costs of doing business.  *Id.* ¶ 14.

In *Bayer HealthCare, LLC*, this Court enjoined the FDA based on the threat of eroding Bayer's market share with respect to a single drug, which would lead to "price erosion, deep drops in revenues, loss of valuable customer relationships, loss of research and development funds, and fewer revenue-generating future products in the pipeline."  --- F. Supp. 2d ---, 2013 WL 1777481, at *7 (citing to Bayer's declarations).  There, this Court observed that "[c]ourts have acknowledged that price erosion and diminished market share can constitute irreparable harm."  *Id.* (citing *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001); *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996); *Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996)).

Here, as explained by Mr. Ledda, Morgan Drexen has far more at stake than the profit on a single drug.  *See* Ledda Decl. ¶ 13 ("[A]ny requirement that Morgan Drexen stop providing these services to attorneys would threaten the viability of Morgan Drexen's business.")

In addition, CFPB's demand for the personal information of clients of the attorneys supported by Morgan Drexen is particularly troubling.  Plaintiffs receive their clients' personal

11

financial data pursuant to the attorney-client privilege.  CFPB has taken the position that Morgan

Drexen must produce such data in violation of the privilege and confidentiality that attorneys

(and by extension, Morgan Drexen) owe to their clients.  Most recently, CFPB has demanded

production of personal financial data that Morgan Drexen's attorney clients have received from

their clients to evaluate potential bankruptcy filings.  *See* Shaheen Decl. Ex. 35 (requesting "data

relating to consumers who entered into bankruptcy contracts with Morgan Drexen-affiliated

attorneys").  CFPB's demand for such information presents Plaintiffs with a Hobson's choice:

either produce the confidential data (thus violating Plaintiffs' ethical obligations) or refuse to

produce the documents and face CFPB retribution.  *See Tyndale House Publishers, Inc.*, 904 F.

Supp. 2d at 122 (holding in connection with the contraceptive mandate "places the plaintiffs in

the untenable position of choosing either to violate their religious beliefs by providing coverage .

. . or to subject their business to the continual risk of the imposition of enormous penalties for

noncompliance.  Such a threat to the very continued existence of the plaintiff's' business

necessarily . . . creates . . . such a Hobson's choice . . . .").

      CFPB should be enjoined until such time as the Court can address the very serious

constitutional issues raised by Plaintiffs' case.

### C.    The Balance of Equities Favors Entry of the Preliminary Injunction

      In contrast to the substantial irreparable harm facing Plaintiffs, there can be no credible

claim of harm to CFPB.  CFPB is already defending against constitutional challenges to its

structure, both in this Court and in Congress.  Unless and until such challenges are resolved,

CFPB should not be permitted to act, particularly where, as here, there are legitimate questions

of agency overreach.  If the Court grants the preliminary injunction, CFPB simply will have to

wait until such challenge is resolved before proceeding against Morgan Drexen.

**D.      The Public Interest Favors Entry Of A Preliminary Injunction**

Given CFPB's fundamental structural defects and likely constitutional violations, the

public interest will be served if this Court preliminarily enjoins CFPB from acting.

Where, as here, there is a new federal agency that has an unconventional and novel

structure that poses legitimate and unaddressed constitutional questions, a preliminary injunction

to allow for the evaluation of such questions serves the public interest.  *See Gordon*, --- F.3d ---,

2013 WL 3239742, at *9 (D.C. Cir. 2013) (affirming district court's determination that the public

interest weighed in favor of an injunction by concluding that "enforcement of a potentially

unconstitutional law that would also have severe economic effects it not in the public interest.");

*Tyndale House Publishers, Inc.*, 904 F. Supp. 2d at 130 (holding that "there is undoubtedly . . . a

public interest in ensuring that the rights secured under the First Amendment . . . are protected");

*O'Donnell Const. Co. v. District of Columbia,* 963 F.2d 420, 429 (D.C. Cir. 1992) (holding that

"issuance of a preliminary injunction would serve the public's interest in maintaining a system of

laws" free of constitutional violations).  *See also Seretse-Khama,* 215 F. Supp. 2d at 54 (holding

that the public interest is served by a court order that avoids "serious constitutional risks"); *N.

Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (noting "the general

public interest served by agencies' compliance with the law"); *Cortez III Serv. Corp. v. Nat'l

Aeronautics & Space Admin.*, 950 F. Supp. 357, 363 (D.D.C. 1996) (public interest served by

enforcing constitutional requirements).

In addition, as evidenced by the uproar over the National Security Agency's data

collection, there is a strong public interest in protecting the personal financial data of consumers

from unjustified government collection and aggregation.  Concerns over CFPB's data-mining and

aggregation have been voiced by United States senators, law professors, and various watchdog

groups.  *See* Letter from Sen. Mike Crapo to Gene Dodaro (July 2, 2013) (attached as Exhibit A)

13

(requesting that the Government Accountability Office review CFPB because "[t]he size and scope of this data collection warrant proper government oversight to both guard consumers' privacy and ensure that the CFPB is acting within its existing authority"); Letter from K. Siggerud to M. Crapo (July 12, 2013) (attached as Exhibit B) stating that GAO "accepts your request" and would "begin the work shortly"); Bobb Unruh, *Now Obama Watching American's Credit Cards*, WND.com (quoting Judicial Watch President Tom Fitton as saying CFPB's actions are "a more direct assault on American citizens' reasonable expectation of privacy than the gathering of general phone records") (available at http://www.wnd.com/2013/06/now-obama-watching-americans-credit-cards/) (last visited July 22, 2013); Letter from David T. Hirschman to R. Cordray at p. 6 (June 19, 2013) (attached as Exhibit C) (stating that "[W]e believe the Bureau's data demands are unlawful"); Brendan Bordelon, *Consumer Financial Protection Bureau compared to NSA*, The Daily Caller (June 26, 2013) (available at http://dailycaller.com/2013/06/26/consumer-financial-protection-bureau-compared-to-nsa/) (last visited July 22, 2013) (quoting scholar John Berlau as saying that CFPB's data collection activities constitute "an NSA-style surveillance program without any serious justification, such as terrorism"); Randy E. Barnett, Editorial, *The NSA's Surveillance is Unconstitutional*, WALL ST. J., Jul 11, 2013, at A13 (NSA and CFPB's activities "dangerously violate[] the most fundamental principles of our republican form of government" and "[t]he secrecy of these programs makes it impossible to hold elected officials and appointed bureaucrats accountable.").

Stopping CFPB from demanding that Morgan Drexen produce consumer financial information (information belonging to attorney bankruptcy clients) furthers the public's privacy interest.

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a

preliminary injunction and for such other relief that the court deems equitable.  A proposed order

is attached.

Respectfully submitted,

Dated:  July 22, 2013                          _____/s/_____

Randall K. Miller
D.C. Bar No. 460682
Nicholas DePalma
D.C. Bar No. 974664
Venable LLP
8010 Towers Crescent Drive, Suite 300
Tysons Corner, VA 22182
(703) 905-1449
(703) 821-8949 (facsimile)
rkmiller@venable.com
nmdepalma@venable.com

*Counsel for Plaintiffs Kimberly A. Pisinski and
Morgan Drexen, Inc.*

<center>15</center>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 22, 2013, a copy of the foregoing document was filed

electronically via the Court's ECF system, through which a notice of the filing will be sent to all

counsel of record.

I further certify that a paper copy of the foregoing document was hand-delivered upon the

following:

Ronald C. Machen, Jr.
United States Attorney for the District of Columbia
c/o Civil Process Clerk, 555 4th Street, N.W.
Washington, D.C. 20530

Eric H. Holder, Jr.
Attorney General of the United States
Department of Justice Room D103950
Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Consumer Financial Protection Bureau
ATTN:  Clerk for Legal Service of Process,
1700 G. Street, N.W.
Washington, D.C. 20552


_____/s/_____
Randall K. Miller

6936084

16

# Exhibit A

TIM JOHNSON, SOUTH DAKOTA, CHAIRMAN

JACK REED, RHODE ISLAND
CHARLES E. SCHUMER, NEW YORK
ROBERT MENENDEZ, NEW JERSEY
SHERROD BROWN, OHIO
JON TESTER, MONTANA
MARK WARNER, VIRGINIA
JEFF MERKLEY, OREGON
KAY HAGAN, NORTH CAROLINA
JOE MANCHIN, WEST VIRGINIA
ELIZABETH WARREN, MASSACHUSETTS
HEIDI HEITKAMP, NORTH DAKOTA

MICHAEL CRAPO, IDAHO
RICHARD C. SHELBY, ALABAMA
BOB CORKER, TENNESSEE
DAVID VITTER, LOUISIANA
MIKE JOHANNS, NEBRASKA
PATRICK J. TOOMEY, PENNSYLVANIA
MARK KIRK, ILLINOIS
JERRY MORAN, KANSAS
TOM COBURN, OKLAHOMA
DEAN HELLER, NEVADA

CHARLES YI, STAFF DIRECTOR
GREGG RICHARD, REPUBLICAN STAFF DIRECTOR



**United States Senate**

COMMITTEE ON BANKING, HOUSING, AND
URBAN AFFAIRS
WASHINGTON, DC 20510–6075

July 2, 2013

The Honorable Gene Dodaro
Comptroller General
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Comptroller Dodaro:

As the Ranking Member of the Senate Committee on Banking, Housing and Urban
Affairs, I recently participated in a hearing to gain insight into the Consumer Financial
Protection Bureau's ("CFPB") actions, including its wide-spread data collection of
consumers' financial information.  I learned through news reports that the CFPB has
allocated more than $20 million for collecting and tracking spending habits of more than
10 million Americans.  Subsequent information I have received indicates the scope of
this data collection may be far greater than this.  The size and scope of this data
collection warrant proper government oversight to both guard consumers' privacy and
ensure that the CFPB is acting within its existing authority.

The law that established the CFPB expressly prohibits gathering or analyzing the
personally identifiable financial information ("PII") of consumers except for very limited
purposes.  While CFPB officials have stated the CFPB is not collecting PII, we do not
know what information it collects, on how many accounts, or how this information is
being used.  We also need to know whether the CFPB is truly not collecting PII from the
data it is collecting or purchasing.  In addition to regulatory and privacy concerns, this
also raises data security issues especially since the CFPB's Inspector General has
already identified deficiencies in this area.  We need to know what safeguards are in
place to prevent the collection or use of the data it is collecting.

For these reasons, I request that the GAO investigate CFPB's data collection to
determine its purpose, scope and intended use; specific legal authority pursuant to
which the CFPB is collecting consumers' data; how the CFPB secures and protects
information it collects; the purchase and use of data from third parties and contractors;
and the cost of this data collection for both the CFPB and the institutions that are

The Honorable Gene Dodaro
Comptroller General
U.S. Government Accountability Office
Page 2

providing information.  For your reference, a non-exclusive list of specific issues for
GAO to consider is attached to this letter.

Thank you for your prompt attention to these important matters. Should you have any
questions, please contact me or Jelena McWilliams or Jared Sawyer of my staff at 224-
7391.

Sincerely,

Mike Crapo

Mike Crapo
Ranking Member

## Attachment

## List of Items for GAO to Consider When Studying CFPB's Data Collection Efforts

### *Statutory limitations / legal authority*

- Under what legal authority is the CFPB requesting and collecting consumer information?

- Does the CFPB differentiate data it obtains through its supervisory authority from data collected vis-a-vis different authority, and if so, how? Does its store data separately?

- What internal policies and procedures has the CFPB adopted to ensure whether data collected pursuant to one authority can be used under a separate authority?

- Does the CFPB inform institutions being examined when data are collected for purposes unrelated to the exam?

- Are there internal firewalls for storing and using consumer data CFPB collects for supervisory, enforcement, research and regulatory purposes, or does the CFPB use data it collects for multiple purposes?

- How does the CFPB plan to utilize the data it collects in each of the following areas: (i) research and analysis, (ii) supervision, (iii) enforcement, and (iv) regulation?

- How does the CFPB plan to ensure that PII obtained through the consumer complaint process is not used contrary to limitations on such information under the CFPB's rulemaking authority?

### *Scope and Purpose*

- How many accounts are being monitored and how many Americans?

- How many financial institutions have been asked to provide consumer data to the CFPB, and how many of them are currently doing so?

- Did any institutions refuse to provide consumer data to the CFPB, and if so, what alternative methods is the CFPB employing to obtain such data?

- How many pieces of information has the CFPB collected to date? How many pieces of information is the CFPB collecting on a monthly basis? How many specific data points has the CFPB requested of the participating banks?

- What data is the CFPB collecting in each category, including but not limited to: mortgages, home equity lines of credit, credit cards, checking accounts,

overdrafts, student lending (private), student lending (government), deposit
advances, payday loans, remittances, prepaid cards, medical debt?

- Who does the CFPB purchase consumer data from and how does CFPB utilize
  vendors and third party contractors for data collection and analysis purposes?

- What is the legal standing of third party contractors with respect to CFPB and to
  the financial institutions from which the data is collected?

- Does the CFPB use Memoranda of Understanding (MOUs) with other federal
  banking regulators to access data that it does not have the ability and/or authority
  to collect directly?

- Are CFPB's data collection efforts subject to the Paperwork Reduction Act (PRA)
  which requires OMB review and does the use of MOUs bypass PRA
  requirements?

- Why is it necessary to demand all consumer account data instead of an
  anonymous representative sample?

- What does the CFPB intend to do with it?

- In what other areas does the CFPB collect, or plan to collect, consumer data?

- Is the amount of data and the frequency of the data collection appropriate for the
  specific stated purposes by CFPB for how the agency intends to use the data?
  Does the CFPB have the authority to collect data for sake of collecting data with
  no intended stated purpose?

- How much does the agency spend annually on this data collection?

- Is the data collected in the course of CFPB's supervision duplicative or
  overlapping with data collected by the institutions' prudential regulators?  If so,
  has the CFPB coordinated with prudential regulators to eliminate or minimize
  such duplication?

- Whether forcing financial institutions to disclose this information would cause
  them to violate their legal obligations to protect the privacy of their customers'
  personal information?

### Privacy

- Is it possible for the CFPB, or any third party vendor working on behalf of the
  CFPB, to reverse engineer raw data to identify individual consumers?

- Does a third party data aggregator, working on behalf of the CFPB, receive any
  PII?

- What are the policies and procedures of a third party data aggregator, working on
  behalf of the CFPB, to aggregate data received from institutions?

- Has the CFPB set a time period for retaining this data, and will the individual consumer transaction information be purged from all federal records after this retention period?

- With regard to medical debt data collected by the CFPB, is the collection related to the supervisory or examination oversight of issuers of debt? Does the type of data collected reveal the type of medical procedures/conditions of consumers?

- Does the CFPB share this information with any outside third parties? Are these outside third parties under contract with the CFPB?

### Data Security

- How is the CFPB ensuring that the consumer information it collects is kept secure?

- Has the CFPB suffered any breaches of data, and has any data breach reached consumer information?

- The CFPB's Office of the Inspector General ("OIG") 2012 Audit of the CFPB's Information Security Program raised concerns with the CFPB's internal data security. What is the progress of the CFPB's implementation of information security recommendations from the OIG?

- What specific measures has the CFPB taken to ensure its third-party vendors are protecting consumers' data?

### Cost-Benefit Analysis

- Has the CFPB conducted any cost-benefit analysis to determine the cost of the data requests and production on the institutions?

- Has the CFPB solicited feedback from any institutions about the cost of these data requests and production? Have any financial institutions volunteered or shared with the CFPB that information? What is the cost of this data production, both initially and on-going, for institutions that are furnishing data to the CFPB?

- With respect to the Paperwork Reduction Act and other laws, Office of Management and Budget has set forth certain parameters for surveys and data collection. Has the CFPB obtained the OMB approval document for this data collection effort? If not, why not?

# Exhibit B

 **GAO**   U.S. GOVERNMENT ACCOUNTABILITY OFFICE

**441 G St. N.W.**
**Washington, DC  20548**

July 12, 2013

The Honorable Mike Crapo
Ranking Member, Committee on Banking, Housing, and Urban Affairs
United States Senate

Dear Senator Crapo:

Thank you for your letter of July 2, 2013, requesting that the Government Accountability Office review the Consumer Financial Protection Bureau's data collection efforts.

GAO accepts your request as work that is within the scope of its authority. Your request has been assigned to Ms. Orice Williams Brown, Managing Director, Financial Markets and Community Investment and staff are available to begin the work shortly. Ms. Brown or a member of her team will contact Ms. Jelena McWilliams or Mr. Jared Sawyer to discuss the request, your needs, and the engagement objectives, scope, and methodology in accordance with GAO's protocols. As applicable, we will also be in contact with the cognizant Inspector General's office to ensure that we are not duplicating efforts. If an issue arises during this coordination, we will consult with you regarding its resolution.

If you have any questions, please contact Ms. Brown at 202-512-5837 or Mr. Paul Thompson, Assistant Director, Congressional Relations, on my staff at 202-512-9867.

Sincerely yours,

Katherine Siggerud
Managing Director for
Congressional Relations

cc:     Ms. Jelena McWilliams
        Mr. Jared Sawyer

Ref:  CCAR 13-0813

# Exhibit C

# CENTER FOR CAPITAL MARKETS
## C O M P E T I T I V E N E S S

**DAVID T. HIRSCHMANN**
PRESIDENT AND CHIEF EXECUTIVE OFFICER

1615 H STREET, NW
WASHINGTON, DC 20062-2000
(202) 463-5609 | (202) 463-3129 FAX

June 19, 2013

The Honorable Richard Cordray
Director
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC  20552

Dear Director Cordray:

I am writing with respect to the increasing number of requests by representatives of the Consumer Financial Protection Bureau (Bureau) that companies subject to the Bureau's regulatory authority provide huge quantities of data regarding individual consumers' financial transactions on an ongoing, real-time basis.  We first raised this issue in our February 14 letter to you.  It has since been the subject of a *Bloomberg News* report and of questions asked by several Senators during your April 23 appearance before the Senate Committee on Banking, Housing, and Urban Affairs.

We agree with you that data is important in determining whether there is a sound basis for regulation and how regulation should be structured, and recognize that Congress conferred specific authority on the Bureau to collect data to inform the Bureau's use of its regulatory authority.  The exercise of this data collection authority, however, requires great care and clear guidelines to ensure all data collection is conducted in a responsible manner, and in full compliance with the law.

To date, the Bureau's lack of transparency around its data collection efforts makes it very difficult to evaluate the prudence and the legality of the collection process; the strength of the security measures the Bureau is taking to protect consumers' data; the extent to which personally identifiable information is being collected, stored, analyzed, or shared; the extent to which such requests are being fully coordinated at senior levels of the Bureau to avoid redundancy; and the cost burden imposed on, and potential liability exposure incurred by companies subject to the Bureau's requests.

The Honorable Richard Cordray
June 19, 2013
Page 2

Based on your public statements, it appears that these demands may violate specific limits on the Bureau's authority set forth in the Dodd-Frank Act:

- The statute requires that the Bureau issue an order or regulation in order to collect this information, but the Bureau has done neither.

- The statute restricts the Bureau's ability to collect consumers' personally-identifiable information, but it is not clear that the Bureau has in place appropriate safeguards to ensure compliance with that limitation.

Moreover, compliance with the Bureau's demands not only imposes significant costs on companies—because the Bureau's specifications require companies to reconfigure existing data files and bear the expense of providing those files to the Bureau on a continuing basis—but also threatens companies with reputational damage, and perhaps litigation exposure, because of significant questions about the Bureau's ability to maintain the confidentiality of this information as well as the Bureau's legal authority to require companies to provide it.

I urge you to address these issues expeditiously, transparently, and in detail.  It is the right thing to do given the concern and confusion about the Bureau's data collection efforts.  Only a full accounting will clear the air.  In addition, because it appears the Bureau is requesting this data during the supervision process—which the statute properly makes confidential—companies are effectively put to the choice of complying with questionable demands by government, and potentially exposing their customers' confidential information to public disclosure, or refusing to comply and running the risk that the Bureau will take formal or informal supervisory or enforcement action against the company for failing to comply.  Moving these data collection programs into the daylight will ensure they are properly overseen and accountable to the Congress and the American people.

The Honorable Richard Cordray
June 19, 2013
Page 3


<u>Background and Questions</u>

       As the *Bloomberg News* article reported, the Bureau has issued multiple demands
for data regarding individual consumer transactions in a variety of different areas.[1]
Most significantly, we understand that the Bureau is directing at least some credit card
issuers to provide—on a real-time, continuous basis—a monthly summary of
cardholder transactions on an account-by-account basis.  We have heard from
companies that the scope may range from dozens to as many as hundreds of pieces of
data for each consumer on at least a monthly (and perhaps more frequent) basis.

       We also understand that the Bureau either has implemented or is planning to
implement a data system that assigns an identifier to each individual and requires all
companies submitting data regarding that individual to tag the data with the same
identifier (the consumer's name is not requested).  If this is true, it will allow the
Bureau to construct a profile of each individual consumer's financial activities by
grouping together all of that consumer's credit card transactions.

       In addition, we are told that the Bureau may be seeking to expand these
requests to include additional categories of financial data, such as mortgage or other
loan transactions.  If the Bureau does take this step, that will enable the Bureau to
construct even more detailed profiles of individuals' financial activities.

       This partial description of the Bureau's data collection program is based on
feedback from regulated companies, published news reports, and limited public
statements from Bureau officials, but the lack of transparency around the Bureau's
data collection efforts leaves unanswered a number of very important questions,
including:

       1.  How many/which data fields are being requested?

       2.  Is each company asked for the same fields?

---

[1] *See* Carter Dougherty, *U.S. Amasses Data on 10 Million Consumers as Banks Object* (Apr. 17, 2013), *available at*
http://www.bloomberg.com/news/print/2013-04-17/u-s-amasses-data-on-10-million-consumers-as-banks-object.html.

The Honorable Richard Cordray
June 19, 2013
Page 4

3. Has there been a process to determine if each of the fields is needed in order to support the Bureau's congressionally authorized functions, and have you reviewed these fields to make sure that they cannot be used to re-identify personally identifiable data?

4. How frequently are companies required to send this data?

5. Has the Bureau implemented a system of identifiers for individual consumers that enable it to aggregate an individual's accounts and thereby construct a profile of all of the individual's borrowing activities?

6. Is the Bureau seeking similar individual account or transaction-level data—again on a continuous, ongoing basis—regarding mortgages and other types of consumer loans and other consumer financial transactions?

7. What is the legal authority for the Bureau's collection of this data?  Why has the Bureau chosen not to use a transparent process—such as issuance of a rule or order—as the statute appears to require, so that the Bureau's data demands and its justification for those demands and security procedures to protect the data would be: (a) available to the public; (b) subject to due process protections, including review by a court if appropriate; and (c) applied equally across similarly-situated businesses?

8. Can the Bureau share this data with other Federal agencies?  State agencies?  Non-government researchers?

9. How is this data being warehoused and at what cost?

10. What policies, procedures and ongoing training has the Bureau put into place to prevent even an attempt at re-identification of depersonalized data and to prevent unauthorized access by Bureau personnel, contractors, or other persons whose job responsibilities do not require access to such data?  What is the third-party oversight mechanism for ensuring that these policies and procedures are adhered to by Bureau employees?  Beyond training and third-party oversight, has the Bureau instituted a whistle-blower program to

The Honorable Richard Cordray
June 19, 2013
Page 5

    ensure that employees can report efforts to re-identify data and if so to whom are such communications sent?

<u>Lack of Statutory Authority</u>

    You testified at the April 23 hearing that the Bureau's reason for collecting this data is to be able "to do the kind of very meticulous cost-benefit analysis [Congress wants] us to do as we write rules, so we can get them right."  You also stated that "[w]e have an interest in making sure that the studies and reports Congress is asking us to do to help inform your policy decisions, which is the law that we follow, are on sound grounds and that we can see over time whether the objectives you're trying to achieve are being achieved."[2]

    The statute specifically addresses the Bureau's authority to collect data for use in connection with rulemaking and the preparation of reports to Congress.  The Bureau may

> "require covered persons and service providers participating in consumer financial services markets to file with the Bureau, under oath or otherwise, ***in such form and within such reasonable period of time as the Bureau may prescribe by rule or order***, annual or special reports, or answers in writing to specific questions, furnishing information [regarding the organization, business conduct, markets, and activities of covered persons and service providers], as necessary for the Bureau to fulfill the monitoring, assessment, and reporting responsibilities imposed by Congress." Section 1022(c)(4)(B),12 U.S.C. § 5512(c)(4)(B) (emphasis added).

    Congress's decision to require the Bureau to issue an order or rule in order to require companies to provide this information has three important purposes:

---

[2] You repeated these explanations several times during the hearing, for example:  "You all want us to write rules where we have careful assessment of costs and benefits. If we don't have data and information about what -- what the impacts in these markets are, we can't do that. We can't do our job.  And I think you would be quite dissatisfied with us and rightly so."

The Honorable Richard Cordray
June 19, 2013
Page 6

(1) businesses burdened by these requirements can obtain judicial review of requests that are beyond the Bureau's authority, unjustifiably burdensome, or otherwise improper; (2) the obligation to provide data will be public, so that Congress and other interested parties may assess the legitimacy of the Bureau's interest and burden imposed by such requirements; and (3) the Bureau must explain, and potentially justify in court, any distinctions in requests targeting specific businesses or types of businesses.[3]

The Bureau has not issued an order or a regulation imposing upon businesses an obligation to provide account-level data on an ongoing basis.  Because it has failed to comply with this statutory requirement, we believe the Bureau's data demands are unlawful.

I hope you will recognize this reality and—to the extent the Bureau wishes to require the provision of this data—that you will utilize the transparent processes specified in the statute for the imposition of such an obligation.[4]

<u>Violation of Prohibition Against Collection of Personally-Identifiable Information</u>

With respect to the collection of information for use in rulemaking and preparing reports to Congress—the purposes identified in your April 23 testimony— the statute flatly bars the Bureau from "obtain[ing] records from covered persons and service providers participating in consumer financial services markets for purposes of

---

[3] The statute also authorizes the Bureau to collect already-available information (including, presumably, by purchasing information) and to request that information be provided voluntarily through "surveys and voluntary interviews" (Section 1022(c)(4(A), 12 U.S.C. § 5512(c)(4)(A))—but the issue here involves data that the Bureau is demanding from companies subject to its regulatory authority, not the Bureau's purchases of information from third parties or its use of information obtained through voluntary participation in surveys.

[4] Even if the Bureau were to try to claim that it is demanding this information pursuant to its supervision authority—in contradiction of your April 23 testimony—it still would lack the statutory authority to do so.  *First*, the Bureau could not avoid the rule/order requirement by asserting that it is also collecting the information for "supervision purposes."  That would render meaningless Congress's requirement of an order or rule, because the Bureau could claim a dual purpose in every case and avoid the transparency and judicial review requirements that Congress intended to impose.  *Second*, to the extent the Bureau requires nondepository institutions "to generate, provide, or retain records for the purposes of facilitating supervision of such persons and assessing and detecting risks to consumers" it must do so by issuing a regulation—the preceding subparagraph states that "[t]he Bureau shall **prescribe rules to facilitate supervision** of [nondepository institutions subject to supervision] and assessment and detection of risks to consumers," making clear that any such requirement must be imposed through a rule.  Section 1024(b)(7) (A) &(B), 12 U.S.C. § 5514(b)(7)(A) & (B) (emphasis added).

The Honorable Richard Cordray
June 19, 2013
Page 7

gathering or analyzing the personally identifiable financial information of consumers."
Section 1022(c)(4)(C), 12 U.S.C. § 5512(c)(4)(C).[5]

You have taken the position that the Bureau is not obtaining personally identifiable information because an individual's name and address are not attached to the information received by the Bureau.  But the critical question is the extent to which the Bureau has protections in place that will prevent the linkage of this information to an individual's personal identity—given the clear restrictions on the Bureau's authority in this area.  Neither you nor the Bureau have given any assurances regarding this extremely important question.

Cost Burden and Potential Risk of Disclosure

The Bureau's data demands will impose very significant costs on the businesses required to provide these huge quantities of information.  As a threshold matter, the Bureau's directives require that information be reformatted to the Bureau's specifications, a process that imposes significant costs on companies.  In addition, the Bureau's requirement that this information be provided on an ongoing basis also produces substantial continuing costs.

Much more importantly, businesses have real concerns about the Bureau's ability to safeguard this data.  As you know, the Government Accountability Office has expressed concern about the security of the Bureau's data and information systems.[6]  Companies that have inquired about the Bureau's security procedures in connection with these data demands have also found that those procedures are below the standards in the industry.

---

[5] The statute contains a second limitation on the Bureau's collection and use of such information that applies to its supervision authority.  Section 1022(c)(9)(A), 12 U.S.C. § 5512(c)(9)(A), provides that "[t]he Bureau may not obtain from a covered person or service provider any personally identifiable financial information about a consumer from the financial records of the covered person or service provider."  That limitation contains two exceptions, neither of which is applicable to these demands. *First*, if the consumer provides written permission for the disclosure—but the Bureau has not obtained such permission. *Second*, if the request is "specifically permitted or required under other applicable provisions of law" and complies with the standards for such government requests set forth in the Right to Financial Privacy Act, 12 U.S.C. § 3401 *et seq.*  There is no such specific authorization for the Bureau's data demands, and even if there were, the Right to Financial Privacy Act limits the Bureau's use of such information to its examination authority, *see* 12 U.S.C. § 3413(r), and your testimony makes clear that the Bureau plans to use this information for other purposes.

[6] GAO, *Management Report: Opportunities for Improvement in the Bureau of Consumer Financial Protection's Internal Controls and Accounting Procedures* (May 21, 2012), *available at* http://gao.gov/assets/600/590993.pdf.

The Honorable Richard Cordray
June 19, 2013
Page 8

Companies that have been entrusted with their customers' confidential data take very seriously their obligation to protect that data against unauthorized release. Moreover, the brand damage and potential liability associated with such releases can be substantial.  Companies often are sued by consumers claiming injury from the disclosure of confidential information—and consumers could argue in such litigation that a company violated the law by delivering data to the Bureau that the Bureau had no legal right to obtain.

The Bureau should not require companies to provide this sensitive data until it demonstrates that it has the legal authority to do so and, in addition, has the necessary security regime in place and obtained confirmation from the GAO that the Bureau's procedures are equivalent to those employed by the federal bank regulatory agencies and other similar government agencies.

Moreover, the governing statute permits the Bureau to impose information-reporting requirements that are "***necessary*** for the Bureau to fulfill the monitoring, assessment, and reporting responsibilities imposed by Congress." Section 1022(c)(4)(B),12 U.S.C. § 5512(c)(4)(B) (emphasis added).  Other agencies do not demand comprehensive data; they use a sampling approach. The Bureau has never explained why it cannot rely on the random-sampling approach utilized by a wide variety of federal agencies, from the SEC to NHTSA, to USDA.

Thank you for your consideration of these concerns.  We would be happy to discuss them further with you or your staff.

Sincerely,

David Hirschmann

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIMBERLY A. PISINSKI, an individual, and MORGAN DREXEN, INC., a Nevada Corporation,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>　　　　　　　Defendant. | Case No.:<br><br>**DECLARATION OF WALTER LEDDA** |

I, Walter Ledda, hereby submit this declaration in support of the motion for preliminary injunction filed by Morgan Drexen, Inc. ("Morgan Drexen") and Kimberly A. Pisinski ("Pisinski") against the Consumer Financial Protection Bureau ("CFPB"), respectfully stating as follows:

1.　　　　I am the Chief Executive Officer of Plaintiff Morgan Drexen.

2.　　　　Morgan Drexen is in the business of licensing its proprietary software to law firms and providing these firms with live paraprofessional and support services.

3.　　　　Specifically, Morgan Drexen provides non-attorney paralegal support services to attorneys in the areas of debt resolution, bankruptcy, personal injury, mass tort litigation, and tax preparation.

4.　　　　Morgan Drexen has contracted with Pisinski to provide such services to support her law practice.  Pisinski supervises Morgan Drexen and remains responsible for all services delegated to Morgan Drexen.

5.　　　　Morgan Drexen has similar relationships with many other attorneys, whereby Morgan Drexen provides non-attorney paralegal services that support their law practices.

6.      As Morgan Drexen's CEO, I have been involved with Morgan Drexen's response to and cooperation with CFPB's investigation.

7.      I understand that CFPB has, among other things, demanded that Morgan Drexen produce documents that contain the personal financial information that belongs to clients of attorneys (like Pisinski) that are supported by Morgan Drexen, and that have been retained with regard to possible bankruptcy.

8.      As Morgan Drexen's CEO, I am concerned with providing to anyone (including the government) personal financial information that belongs to clients of attorneys (like Pisinski) that are supported by Morgan Drexen, and that are considering bankruptcy.

9.      Morgan Drexen does not have authorization from the attorneys to disclose this information, and I understand that the information is otherwise protected by the attorney-client privilege, as well as any applicable state laws that require the safekeeping of client information, including personal financial information.

10.     I am concerned that providing this information to CFPB would cause Morgan Drexen harm because:

  a.      Attorneys who contract with Morgan Drexen will potentially terminate their contracts in favor of other companies that are not being required to produce their clients' personal financial information to CFPB;

  b.      Clients of the attorneys that contract with Morgan Drexen would potentially terminate their attorneys (who would then stop paying Morgan Drexen for its services); and

  c.      Morgan Drexen would potentially be at risk for lawsuits related to the violation of any applicable laws requiring the protection of client

confidences and personal financial data, particularly if Morgan Drexen

produces such data to an unconstitutional entity and one that is under

investigation by the Government Accountability Office.

11.     I further understand that CFPB has stated to our attorney, Randal M. Shaheen,

that the only way Morgan Drexen can comply with CFPB's directives would be to stop

providing non-attorney / paralegal services to attorneys who offer their clients debt settlement

services as a component of the attorneys' bankruptcy services or as a separate engagement along

with the attorneys' bankruptcy services.

12.     Stopping the provision of these services would cause irreparable harm to Morgan

Drexen for several additional reasons:

     a.     The attorneys we support have told Morgan Drexen that they believe that

providing debt settlement services while a bankruptcy petition is being

deliberated and prepared is a component of the attorney's strategy; and

     b.     If Morgan Drexen cannot support such attorneys with regard to such an

engagement (i.e., bankruptcy and debt settlement), they will likely seek

support elsewhere, or, alternatively, be forced to re-evaluate the cost of

their services because they will not benefit from the economies of scale

and efficiencies that Morgan Drexen provides.

13.     In either case, for the reasons stated above, the foregoing engagements comprise a

large percentage of Morgan Drexen's total business, and any requirement that Morgan Drexen

stop providing these services to attorneys would threaten the viability of Morgan Drexen's

business.

14.     In addition to the foregoing, CFPB's investigation of Morgan Drexen has caused us significant harm, including:

a.     We have diverted substantial attention and resources, in terms of paying attorney's fees, as well as the company time necessary to provide officers for depositions, collect and review documents, and otherwise respond to CFPB's demands;

b.     CFPB's investigation has significantly increased our costs with respect to accessing credit.  For example, CFPB sent a Civil Investigative Demand ("CID") to Morgan Drexen's banking partners, which led to the company's losing its credit facilities.  CFPB also sent a CID to US Capital which has impacted Morgan Drexen's ability to obtain reasonable financing.  Morgan Drexen now pays 22% interest where, before the CID, Morgan Drexen was able to obtain financing at 4.5%;

c.     Responding to CFPB's investigation has placed a severe strain on our business operations, and the resources Morgan Drexen has expended to respond is especially concerning to me because I understand that CFPB does not have jurisdiction to regulate attorneys engaged in the practice of law;

d.     CFPB has demanded documents from certain of our attorney business partners, including Howard Law, P.C.  This caused the law firm to retain counsel;

e.     CFPB has demanded documents of Kovel and Fuller, which partners with Morgan Drexen to provide marketing services to the attorneys supported

by Morgan Drexen. We were able to salvage this relationship, but Kovel and Fuller remains apprehensive;

f.  CFPB's investigation, coupled with Morgan Drexen's disclosure of the investigation to its attorney business customers, has been stigmatizing to Morgan Drexen. If CFPB remains unchecked, I have serious concerns that CFPB's actions will harm our reputation; and

g.  During my deposition, CFPB threatened that they would send CIDs to all of Morgan Drexen's attorney customers in order to obtain their clients' bankruptcy information.

15.  Finally, I am aware that the Senate confirmed Richard Cordray as the Director of CFPB on July 16, 2013. I am concerned that this confirmation will embolden CFPB to increase its demands upon Morgan Drexen, including through a lawsuit.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated this 2-\ day of July 2013.

_____
Walter Ledda

5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KIMBERLY A. PISINSKI, an individual, and
MORGAN DREXEN, INC., a Nevada
Corporation

           Plaintiffs

v.

CONSUMER FINANCIAL PROTECTION
BUREAU

           Defendant

Case No.:

**DECLARATION OF
KIMBERLY A. PISINSKI**

    I, Kimberly A. Pisinski, hereby submit this declaration in support of the motion for preliminary injunction filed by Morgan Drexen, Inc. (Morgan Drexen") and Kimberly A. Pisinski ("Pisinski") against the Consumer Financial Protection Bureau ("CFPB"), respectfully stating as follows:

    1.    I am a lawyer admitted to practice law in Connecticut.

    2.    I have been practicing law for 16 years. Among other areas of practice, I offer clients bankruptcy services. As part of any bankruptcy engagement, my clients may elect for me to first amicably resolve their debts with creditors prior to filing the bankruptcy petition.

    3.    I contract with Morgan Drexen to provide non-attorney / paralegal services that support my law practice. I supervise Morgan Drexen and remain responsible for all services delegated to Morgan Drexen.

    4.    Morgan Drexen has notified me that CFPB has demanded that Morgan Drexen produce documents, including documents regarding my clients that I believe are protected from disclosure. CFPB's investigation of Morgan Drexen has been disruptive to my practice and to my clients.

5.    I have not authorized Morgan Drexen to provide my clients' most private financial information  that I received as part of our confidential attorney-client relationship – and which would be covered by the attorney-client communication privilege  to CFPB.

6.    Many of my clients are going through difficult times in their lives. They are contemplating bankruptcy, which is an emotional step for many of my clients, and are going through a confidential consultation process with me to explore that option.

7.    The last thing my clients want is for their privacy to be invaded by the government. Clients have verbalized to me that they worry about the government accessing their information and if they are not completely sure of the security of their information then they will not give me the information that I need to properly counsel them.

8.    For example, many clients ask for assurances as to the protected nature of any information they share with me. I cannot zealously represent my clients as required under our ethics code if they withhold information because they fear that the information will not be protected.

9.    Permitting CFPB to obtain client information through Morgan Drexen puts shackles on me and my law practice. Without complete trust in me as their attorney, clients will be unwilling to hire me to help them. They will then be without any protection from large debt collectors. Many clients suffer from emotional illness and distress due to the actions of these debt collectors, and, without access to counsel, their outcomes are grave and uncertain.

10.    As a lawyer, I have an obligation to honor the attorney-client privilege and to protect my clients' confidences. One of the reasons why I have joined in this lawsuit is to prevent CFPB from intruding into my clients' personal financial information. Another of the

2

- 72 -

reasons is that I depend on Morgan Drexen to assist me in providing my clients with high quality and relatively low cost legal services.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 21 day of July 2013.

Kimberly A. Pisinski

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KIMBERLY A. PISINSKI, an individual, and MORGAN DREXEN, INC., a Nevada Corporation | Case No.: |
| Plaintiffs | **DECLARATION OF PROFESSOR TODD ZYWICKI** |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU | |
| Defendant | |

I, Todd Zywicki, declare under penalty of perjury as follows:

1.  I have been retained by counsel for Plaintiffs to provide expert testimony.

2.  I make this declaration is support of Plaintiffs' motion for preliminary injunction and make this declaration based on personal knowledge.

3.  A copy of my current CV and prior testimony is attached as Exhibit A.

4.  I am a George Mason University Foundation Professor of Law at George Mason University Law School.

5.  I have been a law professor at George Mason University School of Law since 1998. I received tenure and promotion to Associate Professor in 2000. I received promotion to Professor of Law in 2002, and to George Mason University Foundation Professor of Law in2009.

6.  I am a Senior Fellow at the F.A. Hayek Program for Advanced Study in Philosophy, Politics and Economics and Senior Scholar of the Mercatus Center at George Mason University. I am the Editor of the *Supreme Court Economic Review,* which publishes peer reviewed articles in the field of law and economics. I serve as a peer reviewer for the following scholarly journals: *Review of Austrian Economics, Journal of Institutional and Theoretical Economics, Journal of Bioeconomics, Supreme Court Economic Review, Journal of Institutional Economics,* and *Philosophy, Politics, and Economics.* I am the author of over 70 published scholarly articles in leading law journals and economics journals.

7. From May 2003 to August 2004, I served as the Director of the Office of Policy Planning, United States Federal Trade Commission ("FTC"). As Director of the Office of Policy Planning, I reported directly to Chairman Tim Muris and was responsible for helping to conceive and execute policies and priorities of the Commission on issues of Consumer Protection, Competition, and Competition Advocacy. I was heavily involved in interactions between the Chairman's Office and the Bureau of Consumer Protection. Indeed, much of my time at the Federal Trade Commission was spent on issues of consumer credit policies and regulation.

8. I have testified in Congress on several occasions with respect to the structure and effects of the Consumer Financial Protection Bureau, both as initially proposed and as finally enacted into law. *See e.g., "Who's Watching the Watchmen?"* Hearing Before the Subcomm. on TARP, Financial Services and Bailouts of Public and Private Programs of the H. Comm. on Oversight and Gov't Relations, 112th Cong. 112-76,41 (2011); *"The Condition of Small Business and Commercial Real Estate Lending in Local Markets,"* Testimony before United States House of Representatives, Committee on Financial Services and Committee on Small Business (Feb. 26, 2010); *"Banking Industry Perspectives on the Obama Administration's Financial Regulatory Reform Proposals,"* Testimony before United States House of Representatives, Committee on Financial Services (July 15, 2009)..In addition, I have frequently testified before Congress on issues of the economics of consumer credit and consumer protection regulation. *See e.g., Modernizing Consumer Protection in the Financial Regulatory System: Strengthening Credit Card Protections:* Hearing Before the S.Comm. on Banking, Housing, and Urban Affairs, 112th Cong. (2009); *Credit Card Practices: Current Consumer and Regulatory Issues*: Hearing Before the Subcomm. on Financial Institutions and Consumer Credit of the H. Comm. on Financial Services, 110th Cong. 15-30,120-150 (2007); *Oversight of the Implementation of the Bankruptcy Abuse Prevention and Consumer Protection Act:* Hearing Before the Subcomm. on Administrative Oversight and the Courts of the S. Comm. on the Judiciary, 109th Cong. 21-22, 220-32 (2006). I have also provided testimony to the Congressional Subcommittee on Troubled Assets Relief Fund (TARP),Financial Services and Bailouts of Public and Private Programs.

9. My scholarly writing focuses on federal agency structure, consumer credit policy, consumer protection, the economics of consumer credit, and consumer bankruptcy. I have published numerous articles on the topic and have authored/co-authored books on the subject, including CONSUMER CREDIT AND THE AMERICAN ECONOMY (with Thomas Durkin, Gregory Elliehausen, and Michael Staten) (Oxford University Press, Forthcoming 2013)and PUBLIC CHOICE CONCEPTS AND APPLICATIONS IN LAW (with Maxwell Stearns) (West Publishing, 2009).

10. In addition, I annually teach a class on "Public Choice and the Law," which studies the application of economics and political science to the questions of agency design, legislation, and agency deference. On numerous occasions I have lectured on the topic to seminars of judges, law professors, and state attorney general staffs and have on two occasions submitted expert witness reports in lawsuits in District Courts of the United States Courts on the topic of public choice economics and one occasion submitted an *amicus* brief to the United States Court of Appeals on the topic.

11. Attached as Exhibit B is a copy of my article "*The Consumer Financial Protection Bureau: Savior Or Menace*?" which was published in Volume 81 of the George Washington Law Review in April 2013, which discusses issues that I understand will be relevant in this case.  I incorporate the research and views expressed in that article in this declaration.

12. The work I have performed in writing about the Consumer Financial Protection Bureau ("CFPB") and the testimony that I would provide in this case includes an extensive examination of the structure of the CFPB as provided by the Dodd-Frank Act, Title X, 12 U.S.C. § 5481 *et. seq.* and how the structure compares to that of other agencies of federal government, both today and historically.  I have also studied the legislative history of the Dodd-Frank Act and subsequent legislative hearings. As noted, I have been invited to testify several times before Congress to evaluate the Bureau's design and the impact of its regulations. I have been invited to speak at several academic conferences addressing the Bureau's design and the relationship of its structure to its regulatory decisions. In addition, I have published academic several articles and working papers analyzing the agency's structure and regulations as well as numerous newspaper op-eds, blog posts and essays, and other media contributions.

13. In my opinion, there are four structural features of CFPB that distinguishes the CFPB from other government agencies.

14. First, CFPB is headed by a single director who serves a fixed term of five years and is removable only for "cause" (and not "at will" by the President).  Second, CFPB is not subject to Congressional oversight through the budget and appropriations process; instead, CFPB automatically receives a fixed sum that it can use to carry out its activities – up to a twelve percent (12%) cap of the Federal Reserve's total operating expenses.  Third, CFPB is insulated from accountability from the Federal Reserve Board itself, which does not review or approve CFPB actions.  Fourth, the Dodd Frank statute limits judicial review over CFPB actions.

15. Agencies of the federal government are accountable in essentially two ways:  for executive agencies that exercise executive authority, the head of the agency typically serves at the pleasure of the President and is removable at will by the President.  This is not the case for the CFPB, which limits removal of the CFPB director for cause, which Dodd-Frank defines as "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3).

16. For so-called "independent agencies," accountability is provided with other features such as a multi-member bipartisan structure, such as the Federal Trade Commission. Indeed, a multi-member bipartisan commission structure is usually identified as a defining feature of an independent agency. *See* Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 TEX. L. REV. 15, 26 (2010) (identifying multi-member bipartisan governance, for cause removal, and exemption from OIRA oversight the "[t]raditional [l]odestars of [agency] [i]ndependence"); *see also* Humphrey's Executor v. United States, 295 U.S. 602, 624 (1935) ("The commission is to be *nonpartisan*, and it must from the very nature of its duties, act with entire impartiality…. Like the Interstate

Commerce Commission, its members are called upon to exercise the trained judgment of a *body of experts* 'appointed by law and informed by experience.'" (quoting *llinois Central R. Co. v. Interstate Commerce Comm'n,* 206 U. S. 441, 206 U. S. 454; *Standard Oil Co. v. United States,* 283 U. S. 235, 283 U. S. 238-239)).   The bipartisan multimember structure provides public accountability, most notably through internal deliberation, which requires proponents of particular actions to publicly articulate a coherent rationale to support their views, thereby mitigating the threat of biased, ill-considered, or politically-motivated decisions, and provides an opportunity for those who disagree to publicly dissent. Multi-member commissions also can temper any biased, idiosyncratic, or extreme views held by a single member that otherwise might control the agency. Independent agencies also typically are subject to congressional accountability through the appropriations and budgeting process. In addition, even when commissioners serve a fixed term, the current President often retains the authority to name the commission chair. These features are lacking with the CFPB.

17. The effect of these four interlocking provisions has been to make the CFPB one of the most powerful and publicly unaccountable agencies in American history. It is effectively an independent agency housed inside another independent agency—not only largely immune from congressional appropriations, but immune from oversight by the Fed or the President (either directly or via the Office of Information and Regulatory Affairs of the Office of Management and Budget) as well. No other branch or agency can control the CFPB's budgetary appropriations, regulations, or enforcement decisions. Moreover, there is no multimember commission to counterbalance the Director's policy initiatives or to provide the structural checks arising from deliberative processes. Finally, substantive checks on the CFPB can be triggered only by the cumbersome supermajority rule required for the FSOC to act, and even then, only under the extreme circumstance of a severe threat to the safety and soundness of the American financial system. It is likely that this extreme test will rarely be satisfied in practice.

18. Scholars who have studied agency design have found that regulatory agencies are subject to several well-established problems in practice. To counterweight these problems, scholars have identified the above-mentioned characteristics of executive and independent agencies in order to make them responsive to the political system and to improve agency outcomes. These concerns explain why the CFPB's unaccountable structure is novel.

19. In addition, the CFPB lacks many of the informal mechanisms of accountability on its actions that are sometimes identified as providing some degree of accountability of agencies to elected officials. *See Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 130 S. Ct. 3138, 3183 (2010), (Breyer, J., dissenting) (listing informal methods of accountability for Public Company Accounting Oversight Board to a traditional independent agency, the Securities and Exchange Commission, which is a "multimember bipartisan board" that could modify or reject proposed rules and recommended sanctions).

20. Since its establishment, the CFPB has acted as these scholars of regulation and regulatory design would predict in light of the vast power granted to the Bureau and extreme lack of

accountability. *See*, *e.g.*, Todd Zywicki, *Policy-Based Evidence-Making at the Consumer Financial Protection Bureau*, LIBERTY LAW BLOG, http://www.libertylawsite.org/2013/01/21/policy-based-evidence-making-at-the-consumer-financial-protection-bureau-new-mortgage-rules-show-why-heightened-oversight-is-necessary/ (Jan. 21, 2013); Todd Zywicki, *The Revenge of Richard Nixon: The Consumer Financial Protection Bureau Spreads Its Tentacles*, LIBERTY LAW BLOG, http://www.libertylawsite.org/2012/08/10/the-revenge-of-richard-nixon-the-consumer-financial-protection-bureau-spreads-its-tentacles/. For example, concerns have been expressed that CFPB is attempting to regulate the practice of law and also is collecting/mining private financial data of citizens. As such, the Bureau's actions and performance have demonstrated why its unique and unprecedented combination of power and unaccountability is so troubling and why the Bureau's structure and lack of accountability is so novel. These actions are consistent with the tendencies that scholars of regulation and regulatory design have identified as typical of unaccountable bureaucracies, including a tendency to be "imperialistic" by expanding their jurisdiction beyond their authorized scope and to pursue their agency's mission with "tunnel vision" that ignores competing social goals.

21. This declaration is intended as a preliminary disclosure to accompany the initial filing of this lawsuit; I would request the opportunity to supplement this declaration and provide live testimony to elaborate on my opinions.

22. In connection with my work in this matter, I am being compensated at my customary rate of $500 per hour.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 21st day of July 2013.

*Todd J. Zywicki*

_____

Todd Zywicki

6936116

5

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KIMBERLY A. PISINSKI, an individual, and MORGAN DREXEN, INC., a Nevada Corporation,<br><br>    Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>    Defendant. | Case No.:<br><br>**DECLARATION OF RANDAL M. SHAHEEN** |

I, Randal M. Shaheen, hereby submit this declaration in support of the motion for preliminary injunction filed by Morgan Drexen, Inc. ("Morgan Drexen") and Kimberly A. Pisinski ("Pisinski") against the Consumer Financial Protection Bureau ("CFPB"), respectfully stating as follows:

    1.     I am a partner in the law firm of Venable LLP.

    2.     As part of my practice, I represent clients before regulatory agencies such as CFPB.

    3.     I represent Morgan Drexen in connection with the proceedings described below.

    4.     On March 13, 2012, CFPB issued a Civil Investigative Demand ("CID") to Morgan Drexen. A true and correct copy is attached hereto as **Exhibit 1**.

    5.     On March 30, 2012, Kent Markus of CFPB sent a letter to me modifying certain of the document requests set forth in the March 13, 2012 CID. A true and correct copy is attached hereto as **Exhibit 2**.

    6.     On April 13, 2012, Morgan Drexen submitted its First Response to the March 13, 2012 CID. A true and correct copy is attached hereto as **Exhibit 3**.

7.     On April 23, 2012, I sent a letter to CFPB with the re: line "Second Response to[the March 13, 2012] [CID]" enclosing a CD-ROM with information responsive to certain of the March 13, 2012 CID requests.  A true and correct copy is attached hereto as **Exhibit 4**.

8.     On April 24, 2012, Wendy Weinberg of CFPB sent a letter to me alleging certain deficiencies in Morgan Drexen's production.  A true and correct copy is attached hereto as **Exhibit 5**.

9.     On April 27, 2012, I sent a letter to CFPB enclosing Morgan Drexen's Third Response to the March 13, 2012 CID.  A true and correct copy is attached hereto as **Exhibit 6**.

10.     On May 7, 2012, I sent a letter to CFPB responding to CFPB's April 24, 2012 letter. A true and correct copy is attached hereto as **Exhibit 7**.

11.     On May 10, 2012, I sent a letter to CFPB concerning the inadvertent production of privileged material.  A true and correct copy is attached hereto as **Exhibit 8**.  I consider this Morgan Drexen's Fourth Response to the March 13, 2012 CID.

12.     On May 11, 2012, I sent a letter to CFPB enclosing Morgan Drexen's Fifth Response to the March 13, 2012 CID.  A true and correct copy is attached hereto as **Exhibit 9**.

13.     On May 11, 2012, Wendy Weinberg of CFPB sent a letter to me alleging deficiencies in Morgan Drexen's production.  A true and correct copy is attached hereto as **Exhibit 10**.

14.     On May 18, 2012, I sent a letter to CFPB responding to the May 11, 2012 letter.  A true and correct copy is attached hereto as **Exhibit 11**.  I consider this Morgan Drexen's Sixth Response to the March 13, 2012 CID.

15.     On May 29, 2012, I sent a letter to CFPB enclosing Morgan Drexen's Seventh Response to the March 13, 2012 CID.  A true and correct copy is attached hereto as **Exhibit 12**.

2

16.     On June 1, 2012, Wendy Weinberg of CFPB sent a letter to me alleging deficiencies in Morgan Drexen's production.  A true and correct copy is attached hereto as **Exhibit 13**.

17.     On June 1, 2012, I sent a letter to CFPB enclosing Morgan Drexen's Eighth Response to the March 13, 2012 CID.  A true and correct copy is attached hereto as **Exhibit 14**.

18.     On June 6, 2012, Wendy Weinberg of CFPB sent a letter to me alleging deficiencies in Morgan Drexen's production.  A true and correct copy is attached hereto as **Exhibit 15**.

19.     On June 15, 2012, I sent a letter to CFPB responding to the June 1, 2012 letter.  A true and correct copy is attached hereto as **Exhibit 16**.  I consider this Morgan Drexen's Ninth Response to the March 13, 2012 CID.

20.     On June 22, 2012, I sent a letter to CFPB with an additional response to the June 1, 2012 letter.  A true and correct copy is attached hereto as **Exhibit 17**.  I consider this Morgan Drexen's Tenth Response to the March 13, 2012 CID.

21.     On June 26, 2012, I sent a letter to CFPB enclosing Morgan Drexen's Eleventh Response to the March 13, 2012 CID.  A true and correct copy is attached hereto as **Exhibit 18**.

22.     On July 2, 2012, Wendy Weinberg of CFPB sent a letter to me requesting additional information.  A true and correct copy is attached hereto as **Exhibit 19**.

23.     On July 10, 2012, I sent a letter to CFPB enclosing Morgan Drexen's Twelfth Response to the March 13, 2012 CID.  A true and correct copy is attached hereto as **Exhibit 20**.

24.     On July 16, 2012, I sent a letter to CFPB enclosing Morgan Drexen's Thirteenth Response to the March 13, 2012 CID.  A true and correct copy is attached hereto as **Exhibit 21**.

25.     On July 24, 2012, I sent a letter to CFPB enclosing Morgan Drexen's Fourteenth Response to the March 13, 2012 CID.  A true and correct copy is attached hereto as **Exhibit 22**.

26.     On July 27, 2012, I sent a letter to CFPB concerning its request for bankruptcy documents.  A true and correct copy is attached hereto as **Exhibit 23**.

27.     On August 2, 2012, I sent a letter to CFPB enclosing Morgan Drexen's Fifteenth Response to the March 13, 2012 CID.  A true and correct copy is attached hereto as **Exhibit 24**.

28.     On August 7, 2012, I sent a letter to CFPB enclosing Morgan Drexen's Sixteenth Response to the March 13, 2012 CID.  A true and correct copy is attached hereto as **Exhibit 25**.

29.     On August 7, 2012, I sent a letter to CFPB enclosing Morgan Drexen's Seventeenth Response to the March 13, 2012 CID.  A true and correct copy is attached hereto as **Exhibit 26**.

30.     On August 30, 2012, Mark Baute, an attorney representing The Howard Law Group (an attorney supported by Morgan Drexen) sent a letter to CFPB stating that "Morgan Drexen does not have any unilateral right to produce information or documents belonging to the Law Firm or the clients of the Law Firm."  A true and correct copy is attached hereto as **Exhibit 27**.

31.     On September 4, 2012, CFPB sent a letter to Mark Baute stating that it had issued a CID to The Howard Law Firm, and that Mr. Baute "may not interfere with the Bureau's investigation of another entity . . . ."  A true and correct copy is attached hereto as **Exhibit 28**.

32.     On September 7, 2012, I sent a letter to CFPB providing additional information in response to the March 13, 2012 CID.  A true and correct copy is attached hereto as **Exhibit 29**.

33.     On September 11, 2012, I sent a letter to CFPB concerning CFPB's demand that Morgan Drexen produce data for bankruptcy support services Morgan Drexen provides to The Howard Law Firm.  A true and correct copy is attached hereto as **Exhibit 30**.

34.     On October 1, 2012, CFPB issued another CID to Morgan Drexen, this time seeking oral testimony.  A true and correct copy is attached hereto as **Exhibit 31**.

35.     On November 8 and 9, 2012, CFPB deposed Jeffrey Katz, David Walker, and Laura Wiegman of Morgan Drexen.

36.     On February 28, 2013, CFPB issued another CID, this time to Walter Ledda, the Chief Executive Officer of Morgan Drexen.

37.     On April 12, 2013, CFPB deposed Walter Ledda.

38.     On April 22, 2013, CFPB sent a letter to me in accordance with CFPB's Notice and Opportunity to Respond and Advise (NORA) process.  A true and correct copy is attached hereto as **Exhibit 32**.

39.     On May 8, 2013, I sent a letter to CFPB responding to the April 22, 2013 NORA letter.  A true and correct copy is attached hereto as **Exhibit 33**.

40.     On June 12, 2013, CFPB sent a letter to me alleging more deficiencies in Morgan Drexen's production in response to the March 13, 2012 CID.  A true and correct copy is attached hereto as **Exhibit 34**.

41.     On July 8, 2013, CFPB sent me an email alleging deficiencies in Morgan Drexen's production in response to the March 13, 2012 CID.  A true and correct copy is attached hereto as **Exhibit 35**.

42.     The foregoing list is not exhaustive.  I have also exchanged other emails and had other conversations with CFPB not reflected herein.

43.     During my representation of Morgan Drexen, CFPB has informed me that their concern is that the attorneys supported by Morgan Drexen are in violation of the amended Telemarketing Sales Rule because the attorneys charge their clients hourly fees for the preparation of bankruptcy pleadings.  CFPB has refused to accept any resolution of its concerns short of Morgan Drexen refusing to support attorneys engaged by clients for both bankruptcy counseling and debt settlement.  CFPB has also refused to accept Morgan Drexen's position that it will not produce confidential information belonging to the bankruptcy clients of the attorneys supported by Morgan Drexen.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Randal M. Shaheen
Dated: July 21, 2013

6

**Exhibit 1**

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*



United States of America
Consumer Financial Protection Bureau

# Civil Investigative Demand

To:
**Morgan Drexen, Inc.**
**c/o Randall M. Shaheen, Partner**
**575 7th Street, NW, Washington, DC 20004**

This demand is issued pursuant to Section 1052 of the Consumer Financial Protection Act of 2010 and 12 C.F.R. Part 1080 to determine whether there is or has been a violation of any laws enforced by the Bureau of Consumer Financial Protection.

| Location of Investigational Hearing | Date and Time of Investigational Hearing |
|---|---|
|  |  |
|  | Bureau Investigators |
|  |  |

## Action Required (choose all that apply)

☐ Appear and Provide Oral Testimony

☐ Produce Documents and/or Tangible Things as set forth in the attached document by the following date Provide

☐ Written Reports and/or Answers to Questions as set forth in the attached document by the following date

## Notification of Purpose Pursuant to 12 C.F.R. § 1080.5

The purpose of this investigation is to determine whether debt relief providers, lead generators, or other unnamed persons have engaged or are engaging in unlawful acts or practices in the advertising, marketing, or sale of debt relief services or products, including but not limited to debt negotiation, debt elimination, debt settlement, credit counseling, mortgage loan modification and foreclosure rescue, in violation of Section 1031 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, as amended, Public Law 111-203 (July 21, 2010), Title X, 12 U.S.C. § 5481 et seq., the Telemarketing Sales Rule, 16 C.F.R. § 310.1 et seq., the Mortgage Assistance Relief Services Rule, 16 C.F.R. § 322.1 et seq., or any other federal consumer financial law. This investigation is also to determine whether Bureau action to obtain legal or equitable relief would be in the public interest.

| Custodian / Deputy Custodian | Bureau Counsel |
|---|---|
| Custodians Matt Teich, Litigation Deputy<br>Deputy Custodians Matt Teich, Paralegal<br>1750 Pennsylvania Ave NW, 10th Floor, Washington, DC 20220 | Wendy Weinberg 202-435-7688; wendy.weinberg@cfpb.gov |

Service to Regulatory

**Date Issued**

Signature <signature>

Name / Title Kent Markus, Chief of Enforcement

The CFPB is authorized to collect this information pursuant to section 1052 of the Consumer Financial Protection Act of 2010. Your response to this demand is mandatory, and may be used for the compliance and enforcement functions of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

**Travel Expenses**
Request for compensation to which demand recipient is entitled must be made.

**Paperwork Reduction Act**
This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

Issued pursuant to Section 1052 of the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5562.

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

# CIVIL INVESTIGATIVE DEMAND FOR
## PRODUCTION OF DOCUMENTS AND ANSWERS TO INTERROGATORIES

**I. Definitions.** As used in this Civil Investigative Demand, the following definitions shall apply:

**A. "And,"** as well as **"or,"** shall be construed both conjunctively and disjunctively, as necessary, in order to bring within the scope of any request in this Civil Investigative Demand all information that otherwise might be construed to be outside the scope of the request.

**B. "Any"** shall be construed to include **"all,"** and **"all"** shall be construed to include the word **"any.** "

**C. "Associated Attorney"** shall mean an attorney for whom Morgan Drexen states that it provides support services for legal services or Debt Settlement services.

**D. "CID"** shall mean the Civil Investigative Demand, including the Definitions, Instructions, and Requests.

**E. "CFPB"** or **"Bureau"** shall mean the Consumer Financial Protection Bureau.

**F. "Chief of Enforcement"** refers to the Assistant Director of the Division of Enforcement.

**G. "Clients"** shall mean individuals who have made at least one payment to Morgan Drexen or an Associated Attorney to receive Debt Settlement services at any time from January 1, 2010 to the present.

**H. "Debt Settlement"** means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.

**I. "Document"** shall mean any written matter of every type and description, including any book, record, report, memorandum, paper, communication, tabulation, chart, log, electronic file, or other data or data compilation stored in any medium. "Document" shall also mean any non-identical copy (such as a draft or annotated copy) of the foregoing, however and by whomever prepared, produced, disseminated or made, regardless of origin or location. "Document" shall also include **Electronically Stored Information.**

**J. "Each"** shall be construed to include **"every,"** and **"every"** shall be construed to include **"each."**

**K. "Electronically Stored Information," or "ESI,"** shall mean the complete original and any non-identical copy (whether different from the original because of notations, different metadata, or otherwise), regardless of origin or location, of any electronically created or stored information, including but not limited to electronic mail, instant messaging,

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

videoconferencing, SMS, MMS, or other text messaging, and other electronic correspondence

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

(whether active, archived, unsent, or in a deleted items folder), word processing files, spreadsheets, databases, unorganized data, document metadata, presentation files, and sound recordings, whether stored on cards, magnetic or electronic tapes, disks, computer files, computer or other drives, cell phones, Blackberry, or other storage media, and such technical assistance or instructions as will enable conversion of such ESI into a reasonably usable form.

L.  "Identify" or "the identity of shall be construed to require identification of (a) natural persons by name, title or position, present business affiliation, present business address and telephone number, or if a present business affiliation or present business address is not known, the last known business and home addresses; (b) businesses or other organizations by name, address, identities of natural persons who are officers, directors or managers of the business or organization, and contact persons, where applicable and (c) documents by title, date, author(s), recipient(s), type of document or some other means of identifying the document, and its present or last known location or custodian.

M.  **"Morgan Drexen"** or **"You"** or **"Your"** shall mean Morgan Drexen, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all principals, directors, officers, owners, employees, agents, representatives, consultants, attorneys, accountants, independent contractors, including Walter Ledda, and other persons working for or on behalf of the foregoing.

N.  **"Person"** shall mean an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity.

0.  **"Referring to"** or **"relating to"** shall mean discussing, describing, reflecting, containing, analyzing, studying, reporting, commenting, evidencing, constituting, comprising, showing, setting forth, considering, recommending, concerning, or pertaining to, in whole or in part.

## II.   **Instructions.**

A.   **Sharing of Information:** This CID relates to an official, nonpublic, law enforcement investigation currently being conducted by the Consumer Financial Protection Bureau. The Bureau may make its files available to other civil and criminal federal, state, or local law enforcement agencies pursuant to 12 C.F.R. §§ 1070.43(b)(1) and 1070.45(a)(5). Information you provide may be used in any civil or criminal proceeding by the Bureau or other agencies. As stated in 12 C.F.R. § 1080.14, information you provide pursuant to this CID is subject to the requirements and procedures relating to the disclosure of records and information set forth in 12 C.F.R. part 1070.

B.   **Meet and Confer:** You must contact Wendy J. Weinberg at 202-435-7688 as soon as possible to schedule a meeting (telephonic or in person) to be held within **10** calendar days after receipt of this CID in order to confer regarding your production of documents and/or information.

2

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

C. **Applicable Time Period for Responsive Materials:** Unless otherwise directed, the applicable time period for the request shall be from January 1, 2010 until the date of full and complete compliance with this CID.

D. **Claims of Privilege:** If any material called for by this CID is withheld based on a claim of privilege, the claim must be asserted no later than the date set for the production of the material. Any such claim must include a schedule of the items withheld that states, as to each such item, the:

    1.      type, specific subject matter, and date of the withheld item;

    2.      names, addresses, positions, and organizations of all authors and recipients of the item;

    3.      specific grounds for claiming that the item is privileged; and

    4.      interrogatory or request to which the privileged document is responsive.

In addition, the person who submits the schedule and the attorney stating the grounds for a claim that any item is privileged must sign it. In accordance with 12 C.F.R. § 1080.8(b), a person withholding material solely based on a claim of privilege shall comply with these requirements (which are set forth in 12 C.F. R. § 1080.8) in lieu of filing a petition for an order modifying or setting aside a demand under 12 C.F.R. § 1080.6(d), as described below. If only portions of the responsive material are privileged, those portions may be redacted from the responsive material, which must be submitted in a way that makes clear where the redactions were made. If all of the content on a particular page is privileged, a blank, sequentially numbered page should be included in the production where the responsive material, had it not been privileged, would have been located.

E. **Document Retention:** You are required to retain all documentary materials and other tangible things that were relied upon or used in the preparation of the responses to this CID. In addition, during the pendency of this investigation and any related enforcement action, the Bureau may require the submission of additional documentary material or tangible things. <u>Accordingly, during the pendency of this investigation and any related enforcement action you must suspend any routine or non-routine procedures that may result in the destruction of documentary material or tangible things</u> that are in any way potentially relevant to this investigation, as described in the CID's Notification of Purpose Pursuant to 12 C.F.R. § 1080.5. You are required to prevent the unlawful destruction of relevant material irrespective of whether you believe such material is protected from future disclosure or discovery by privilege or otherwise. *See* 18 U.S.C. §§ 1505, 1519.

F. **Modification of Requests:** If you believe that the scope of the search or response required by this CID can be narrowed consistent with the Bureau's need for documents or information, you are encouraged to discuss such possible modifications, including modifications of the requirements of   ₃   these instructions, with Wendy J. Weinberg at

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

202-435-7688. Modifications must be agreed to in writing by the Chief of Enforcement or a Bureau employee to whom the Chief of Enforcement has delegated the authority to act under 12 C.F.R. § 1080.6(c).

**G. Petition for Order Modifying or Setting Aside Demand:** Pursuant to 12 U.S.C. § 5562(f) and 12 C.F.R. § 1080.6(d), you may petition the Bureau for an order modifying or setting aside this CID. The petition must be filed with the Executive Secretary of the Bureau and a copy must be provided to the Chief of Enforcement within twenty calendar days after service of the CID or, if the return date is less than twenty calendar days after service, prior to the return date. The Chief of Enforcement or any employee to whom he or she has delegated authority to act under 12 C.F.R. § 1080.6(d) may rule upon a request for extensions of time to file a petition, but such requests are disfavored.

The petition shall set forth all factual and legal objections to the CM, including all appropriate arguments, affidavits, and other supporting documentation. The petition must also be accompanied by a signed statement representing that you have conferred with Wendy J. Weinberg at 202-435-7688 in a good faith effort to resolve the issues raised by the petition and have been unable to do so. If some of the matters in controversy have been resolved by agreement, the statement shall specify the matters so resolved and the matters remaining unresolved. The statement shall recite the date, time, and place of each such conference, and the names of all parties participating in each such conference. The Director of the Bureau or a person authorized to perform the functions of the Director of the Bureau in accordance with the law will rule upon the petition.

**H. Certification:** The person to whom the CID is directed or, if not a natural person, any person having knowledge of the facts and circumstances relating to the production, shall certify that the response to this CID is complete. This certification shall be made on the form declaration included with this CID, or by a sworn affidavit.

**I. Scope of Search:** This CID covers materials and information in your possession, actual or constructive custody, or control.

**J. Document Production:** All responsive documents available in electronic format must be produced electronically in native file format, including all metadata. We encourage the electronic production of all materials responsive to this CID. Please follow the enclosed Document Submission Standards for further instructions about the production of documents. As stated in the Document Submission Standards, all produced documents shall be clearly marked with unique, sequential numbers on each page, if imaged documents, or as part of the file name, if native documents.

**K. Document Identification:** Documents that may be responsive to more than one request of this CID need not be submitted more than once; however, your response should indicate, for each document submitted, each request to which the document is responsive.

**L. Sensitive Personally Identifiable Information:** If any material called for by these 4

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

requests contains sensitive personally identifiable information, please contact Wendy J. Weinberg at 202-435-7688 before sending those materials to discuss ways to protect such information during production. You must encrypt electronic copies of such material with either TrueCrypt or BitLocker encryption software. When submitting encrypted material, you must clearly designate the type of encryption software used and provide the encryption key, certificate or passcode in a separate communication.

For purposes of this CID, sensitive personally identifiable information includes an individual's Social Security number alone or an individual's name, address or phone number *in combination with* one or more of the following: date of birth, Social Security number, driver's license number or other state identification number, or a foreign country equivalent, passport number, financial account number, credit card number, or debit card number. Sensitive health information includes medical records and other individually identifiable health information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

**M. Information Identification:** Each request for a written report or interrogatory in this CID shall be answered separately and fully in writing under oath. All information submitted shall clearly and precisely identify the request(s) to which it is responsive.

**N. Declaration Certifying Records of Regularly Conducted Business Activity:** Attached is a Declaration Certifying Records of Regularly Conducted Business Activity, which may limit the need to subpoena the Company to testify at future proceedings in order to establish the admissibility of documents produced in response to this CID. You are asked to execute this Declaration and provide it with your response.

## III. REQUESTS.

### Interrogatories

1. Identify all Persons who participated in responding to this CID and the specific tasks performed by each Person.

2. Identify the date and legal purpose for the creation of Morgan Drexen, the Persons who created Morgan Drexen, and each of their roles in creating Morgan Drexen.

3. Describe the complete organizational structure of Morgan Drexen, identifying all parents, subsidiaries, unincorporated divisions, joint ventures, and affiliates. For Morgan Drexen and each identified parent, subsidiary, unincorporated division, joint venture, and affiliate state the following:

    a. the correct legal name and     $_5$   principal place of business;

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

    b.  all trade names under which it has done business;

    c.  the date of organization and jurisdiction where organized;

    d.  the type of business in which it engages;

    e.  the nature of the relationship to Morgan Drexen (e.g., wholly owned subsidiary, partially owned subsidiary, parent, affiliate, etc.);

    f.  the date, if any, that it ceased to operate and the reason(s) for such;

    g.  the names and titles of all officers, directors, and principal stakeholders or owners;

    h.  dates on which any individual became an officer, director, stockholder or owner, or ceased affiliation; and

    i.  for each officer, director, and stockholder, identify the nature of his or her financial interest.

4.  Identify each business, trust or entity related or connected to the provision of Debt Settlement services, in which Walter Ledda, or any of the officers, directors or owners of Morgan Drexen identified above has an ownership or financial interest.

5.  Identify each registration, license, permit or certificate to do business held by Morgan Drexen, as well as the state or jurisdiction that issued such.

6.  Identify every enforcement action or investigation involving Morgan Drexen from January 2007 to the present and describe its current status or outcome.

7.  Describe the function of each division or office within Morgan Drexen (e.g. Office of Legal Liaison).

8.  For all Documents provided in response to Document Request # 8 herein, identify who paid for the development, marketing, or placement of each Document and who wrote, reviewed, and approved each Document, including any advertising agency, media placement service provider, third-party vendor, or consultant.

9.  Identify the Person(s) who records calls between Clients or consumers and Morgan Drexen, Associated Attorneys, or third parties providing services to Morgan Drexen or Associated Attorneys; the method and format of such recordings; where and for how long these recordings are stored; who has access to these recordings after they are stored; and the types of calls recorded.

<div align="center">6</div>

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

10. Identify each category of persons employed by Morgan Drexen. For each category identify the number of persons in the category and their responsibilities, qualifications, and form of compensation, including whether the compensation is provided in the form of a salary or bonus, includes incentives, or is tied to the performance of the employee or Morgan Drexen.

11. Identify all current employees or contractors of Morgan Drexen, provide their dates of employment, titles, or positions and the dates the employee or contractor held each such title or position.

12. Identify all former employees or contractors of Morgan Drexen from January 1, 2007 to the date of your response, and state for each all titles and positions held while with Morgan Drexen, the dates the employee held each such title or position, and the reason for termination of employment.

13. Identify all Associated Attorneys, the dates during which they have transacted business with Morgan Drexen, and the nature of their association with Morgan Drexen (e.g. acted as "engagement attorneys," or "local attorneys").

14. Describe the responsibilities for engagement attorneys and local attorneys and the role of each category of attorneys in providing Debt Settlement or legal services to Clients.

15. Identify who wrote, reviewed or approved the Documents produced in response to Document Requests 3, 4, 5, 9, 11, 12, 13, 14, 15 and 18. State when each of these activities occurred.

16. Identify each Client for whom an Associated Attorney declined to provide services.

17. Identify each bank or trust account from which payments were made from Morgan Drexen to an Associated Attorney; from which payments were made from an Associated Attorney to Morgan Drexen; and in which Clients' funds are deposited. For each such account, identify:

    a.  who is authorized to withdraw funds from the account;

    b.  the name on the account;

    c.  the type of account, including whether it is an interest bearing account; and

    d.  any agreements (other than those with the bank itself) that govern the management of the funds in the account.

7

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

18. Identify and describe each database in which Morgan Drexen has electronic records relating to Debt Settlement, and identify and describe the variables in each such electronic record. Include, but do not limit the response to:

    a. Morgan Drexen's policies and procedures related to document and data retention and data backup;

    b. Morgan Drexen's ability to access data on its primary systems and backed up data;

    c. the technology architecture used by Morgan Drexen for storing its system of records, including but not limited to:

        i.   the size of the architecture;

        ii.  where the archived emails are stored and how they may be accessed;

        iii. details about the systems including - name, system type (e.g. data base, file server, document / contract management repository), the type of database, database version, and history of development;

        iv.  systems for entering, organizing, tracking, and accessing data; and

    d. where Morgan Drexen keeps its Client contracts and what data fields are tracked.

For each database, describe how Morgan Drexen manages and maintains its information, including: the physical location of the data (e.g. - is it kept inside or outside of Morgan Drexen's network); the environment in which the data resides (e.g. - file server, database, document management tool, enterprise content management utility, near-line, off-line media, etc.); the backup and archiving routines; and the retention and disposition routines.

19. Identify the creditors or debt collectors that participate in the "Preferred Creditor Program."

20. Identify the Persons who developed the Preferred Creditor Program and who solicit creditors or debt collectors for participation in that program.

21. State the basis for the claims made by either Morgan Drexen or Associated Attorneys that consumers or Clients:

    a.   will "save thousands";

    b.   "settle for a fraction" or "you'll pay a fraction of what you owe";

    c.   "be debt free in months";

8

    d. "you could qualify for up to $1000 cash advance to settle your debt quickly and legally";

    e. that the criterion to obtain $1000 cash advance are: "Financial Situation changed? $5000 or more in credit card debt? Falling behind your payments?";

    f. that Morgan Drexen and the Associated Attorneys provide a "no cost, no fee" program;

    g. that there are "no outrageous upfront fees or charges" or that "the majority of fees are earned after you settle" or that there are "$0 up-front fees";

    h. that a law firm will "handle ruthless collectors so you can finally get a good night's sleep";

    i. that "After reaching an agreement for settlement, the creditor issues a letter stating that the debt obligation is fulfilled and reports to credit bureaus that the debt has been "paid" or "settled" or "settled for less than full amount."

22. For the research produced in Document Requests #19 and 20, describe the data used in the analysis, including but not limited to, the source of data, how it was collected, and the methodology used in analyzing the data to reach the conclusion drawn.

## Requests for Documents

1. Morgan Drexen's articles of incorporation, by-laws, and charter.

2. Morgan Drexen's financial statements, balance sheets, profit and loss statements, state and federal tax filings, and shareholder distribution information.

3. All Documents relating to Morgan Drexen's policies and procedures relating to the provision of Debt Settlement services to consumers or Clients, including, but not limited to the following:

    a. determining potential Clients' eligibility for Morgan Drexen or an Associated Attorney's services, including the amount or type of debt below which Morgan Drexen or an Associated Attorney's services provides no benefit to a potential Client;

9

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

b.    calculating the amount of money that Morgan Drexen or an Associated Attorney claims a Client will save by working with them, in their communications with a Client or potential Client;

c.    calculating the period of time necessary for a Client to accumulate the funds necessary to start and complete negotiations with all of a Clients' creditors, in its communications with a Client or potential Client;

d.    enrolling, contracting, entering into an agreement for services, or obtaining funds from a Client or potential Client;

e.    calculating each fee assessed by Morgan Drexen or an Associated Attorney;

f.    negotiating with creditors for settlement of a Client's debt including how Morgan Drexen or an Associated Attorney decides which debt to attempt to settle first and determine the specific amount that it will settle for in negotiating with a Client's creditors;

g.    whether Morgan Drexen or an Associated Attorney negotiates on behalf of just one Client at a time, or negotiates for groups of Clients with the same creditor;

h.    how much money must be in a Client's account before Morgan Drexen or an Associated Attorney will initiate contact with a creditor;

i.    how and when Morgan Drexen or an Associated Attorney decides to negotiate a lump sum payment rather than installment payments;

j.    whether any creditors have refused to negotiate with Morgan Drexen or an Associated Attorney;

k.    obtaining an advance of funds from Morgan Drexen or an Associated Attorney; l. monitoring or managing the accounts from which Clients' monthly payments are drawn;

m.    terminating an agreement or contract with a Client; and

n.    seeking remaining fees alleged due from a Client, or refunding fees due to a Client. 4. All training manuals and training materials for Morgan Drexen employees, or Associated Attorneys.

10

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

5. All telemarketing or other scripts used by Morgan Drexen, Associated Attorneys, or third parties providing services to Morgan Drexen or Associated Attorneys relating to Debt Settlement services.

6. Recordings of consumer intake calls.

7. All recordings that are played when a consumer or Client calls Morgan Drexen, Associated Attorneys, or a third party providing services to Morgan Drexen or Associated Attorneys, and is put on hold.

8. All advertisements, articles or other marketing materials that have appeared in any television, radio, print, online, or electronic medium that promote the Debt Settlement services of Morgan Drexen or Associated Attorneys to consumers.

   a. For each of these items, provide copies of any instructions provided to the media outlet informing it of the date, times, or criteria to run the ads.

9. All agreements, contracts, and Documents related to payments between or among Associated Attorneys and Morgan Drexen, or between or among Associated Attorneys.

10. All communications between Morgan Drexen and Associated Attorneys concerning implementation of policies and procedures, Clients, fees, or Morgan Drexen's contracts with attorneys.

11. All agreements, contracts, or correspondence between either Morgan Drexen or an Associated Attorney and third parties providing services to either Morgan Drexen or an Associated Attorney related to Debt Settlement services, including but not limited to materials relating to:

   a.  acquiring, providing services to, or terminating services for consumers or Clients;

   b.  providing or acquiring consumer or Client leads;

   c.  receiving or processing payments from Clients;

   d.  tracking transactions or otherwise processing accounts for Clients; or

   e.  receiving phone calls or making phone calls to consumers or Clients.

12. Exemplars of contracts or agreements between Morgan Drexen and all Clients.

13. Exemplars of contracts or agreements between Associated Attorneys and all Clients.

14. Exemplars of all Documents Morgan Drexen or Associated Attorneys provide to Clients in the provision or offering of$_{11}$ services to Clients.

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

15. Exemplars of each Document provided by Morgan Drexen to each Associated Attorney, including, but not limited to pleadings, questionnaires, and forms.

16. All welcome letters and Documents with individualized information on Client debt provided by Morgan Drexen or an Associated Attorney to a Client.

17. All consumer or Client complaints about Morgan Drexen or Associated Attorneys and any responses to the complaints.

18. Contracts, agreements, or correspondence with creditors that participate in the "Preferred Creditor Program."

19. All research conducted, financed, or sponsored by Morgan Drexen measuring the impact that the use of Morgan Drexen's or Associated Attorneys' services has on Clients' credit scores.

20. All research studies, analyses, or other materials on which Morgan Drexen relies to provide a reasonable basis for the claims identified in Interrogatory #21.

21. The database of information relating to each Client, including:

    a.  the Client's name and contact information;

    b.  the creditors to which the Client owes money;

    c.  the amount of each debt owed by the Client at the time of enrollment;

    d.  the name of the entity seeking to collect the debt, if different from the creditor;

    e.  the Client's source and amount of income;

    f.  any additional debts or monthly financial obligations for each Client;

    g.  if the debt was settled, the amount of each debt owed by the Client at the time of debt settlement (including late fees assessed by creditor or debt collector, but not including any fees assessed by Morgan Drexen or an Associated Attorney);

    h.  if the debt was not settled, the amount of each debt owed by the Client at the time Client ceased making payments to Morgan Drexen or an Associated Attorney through Morgan Drexen (including late fees assessed by creditor or debt collector, but not including any fees assessed by Morgan Drexen or an Associated Attorney);

    i.  the APR and monthly penalty fee(s) for each debt at time of enrollment and at time of settlement or termination of services;

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

j.  each fee that Morgan Drexen or an Associated Attorney charged the Client prior to attempting negotiation or settlement of a debt (a.k.a. "engagement fee");

k.  all fees other than the engagement fee that were directly or indirectly charged to the Client by Morgan Drexen or Associated Attorneys (e.g. monthly fees, enrollment fee, check fee, settlement fee), including charges by third parties assessed to the Client's account, and a description of the type of fee, the identity of the payor and payee, and the date of payment);

1.  the total number of months that Morgan Drexen or an Associated Attorney told Client that it would take to settle his or her debts;

m.  each payment made by the Client to Morgan Drexen or an Associated Attorney, the date of payment, and how the payment was credited or applied;

n.  the terms of all offers of settlement made to or by each creditor, including whether the settlement was for a lump sum or installments, the date of the offer, and whether the offer was accepted;

o.  for each proposed settlement from a creditor that was rejected or modified by an Associated Attorney, the stated reasons for rejecting or modifying such settlement.

p.  date and amount of each settlement payment;

q.  date, amount, and source of all advances made to Clients by Morgan Drexen or an Associated Attorney;

r.  refunds made to Client;

s.  date and content of complaints from the Client about Morgan Drexen or Associated Attorneys;

t.  whether the Client was sued by a creditor;

u.  whether the Client filed for bankruptcy, and if so, when;

v.  date of each Client contact with an Associated Attorney, form of the meeting (e.g. phone, in-person, etc.), and length of meeting;

w.  name of any Associated Attorney who provided services to Client, including the attorney who opened the account in which the Client's funds are held;

x.  notes field connected with Client account.

13

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

## CERTIFICATE OF COMPLIANCE

_____ , pursuant to 28 U.S.C. § 1746, declare that:

1.      All of the documents and information required by the enclosed Civil Investigative Demand

which are in the possession, custody, control and knowledge of the person to whom the

demand is directed have been submitted to Lucy Morris or Matt Teich.

2.      If a document or tangible item responsive to this Civil Investigative Demand has not been

submitted, a claim of privilege in compliance with 12 C.F.R. § 1080.8 has been submitted.

3.      If an interrogatory or a portion of an interrogatory has not been fully answered or a report

or a portion of a report has not been completed, a claim of privilege in compliance with 12

C.F.R. § 1080.8 has been submitted.

I certify under penalty of perjury that the foregoing is true and correct. Executed on

_____

_____ , 2012.

Signature

_____

Title

_____

14

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

# DECLARATION CERTIFYING RECORDS OF
# REGULARLY CONDUCTED BUSINESS ACTIVITY
### Pursuant to 28 U.S.C. § 1746

_____ , pursuant to 28 U.S.C. § 1746, declare that:

1.    I am employed by _____ as _____ and by reason of my position am authorized and qualified to certify the authenticity of the records produced by Morgan Drexen and submitted with this Declaration.

2.    The documents produced and submitted with this Declaration by Morgan Drexen are true copies of records of regularly conducted activity that were:

a.    made at or near the time of the occurrence of the matters set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.    kept in the course of the regularly conducted business activity; and

c.    made by the regularly conducted business activity as a regular practice.

I certify under penalty of perjury that the foregoing is true and correct. Executed on _____ _____, 2012.

_____
Signature

15

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

## CID **Document Submission Standards**

These standards must be followed for all documents you submit in response to the CID.

### I. Standards for Submission of Electronically Stored Information ("ESI") and Any Other Documents Submitted in Electronic Form

Before submitting any ESI that does not conform completely to the specifications listed below, you must confirm with the Bureau that the proposed formats and media types that contain such ESI will be acceptable. In any event, you are encouraged to discuss your specific form of submission, and any related questions, at the meet-and-confer required by the CID, or as soon as is practicable.

a. <u>Media.</u> The following magnetic and other electronic media types are accepted:

1. CD-R CD-ROMs formatted to ISO 9660 specifications;
2. DVD-ROM for Windows-compatible personal computers;
3. USB 2.0 thumb drives for Windows-compatible personal computers;
4. USB 3.0 or USB 3.0/eSATA external hard disk drives, formatted in a Microsoft Windows-compatible file system (FAT32 or NTFS), uncompressed data; and
5. the following media will be accepted *only with prior approval:* other types of tape media used for archival backup or other purposes such as 4mm and 8mm DAT and other cassette, mini-cartridge, cartridge, DAT/helical scan tapes, and DLT.

In addition, the following guidelines on media must be observed:

- If more than 5 CDs, DVDs, or thumb drives are required in any combination, an external hard disk shall be used to submit all ESI; and
- All media sent to the Bureau should be accompanied by appropriate chain of custody documentation.

b. <u>File and record formats.</u> Any Clearwell 6.6 compatible file types are accepted, and the below are recommended:

1. *Email:* The Bureau accepts MS Outlook PST files, MS Outlook MSG files and Lotus Notes NSF files. Any other format for the electronic submission of email will be accepted *only with prior approval.*
2. Scanned Documents: For cases that include imaged files, such as scanned paper documents or converted Native files, the Bureau will accept searchable PDF or Group IV Tagged Image File Format (TIF or TIFF) files. OCR generated Text files can also be paired with their TIFF files and loaded so that the TIFF images will be searchable.

The preferred method of delivery for imaged files is document-level Adobe PDF files that are text-searchable. If the imaged files are not available in PDF, the Bureau will accept TIFF/text pairs and other production data sets via an EDRM

1

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

XML-compatible load file import. Data from other litigation support databases such as Concordance or Summation will be accepted *only with prior approval.*

For TIFF files that are not accompanied by extracted metadata, the preferred format is for the TIFF and text files to be produced on a **document level** where each document has one TIFF file and one Text file. The TIFF file and Text file shall have the same file name with the requisite extension of ".tif" or ".txt". Example: ABC000001.tif and ABC000001.txt. These files can be in the same directory or in separate directories; but the format must be consistent throughout a case.

If images are delivered in single page TIFF files, where each page of a document has a separate ".tif" file, then an image load file is required. The preferred format is Opticon (OPT).

For TIFF files that are accompanied by extracted metadata, the data must be loaded in the EDRM XML file format.

3.   Other ESI files: The Bureau accepts word processing Documents in ASCII text, WordPerfect version X3 or earlier, or Microsoft Word 2010 version or earlier. Spreadsheets should be in MS Excel 2010 (*.xls) version or earlier. Database files should be in MS Access 2010 or earlier. PowerPoint presentations may be submitted in MS PowerPoint 2010 or earlier. Other proprietary formats for PC files should not be submitted without prior approval. Files may be submitted using the compressed ZIP format to reduce size and ease portability. Adobe Acrobat PDF (*.pdf) may be submitted where the normal business practice storage method is PDF.

4.   Database files: Database files may be submitted *only with with prior approval* as delimited ASCII text files, with field names as the first record, or as fixed-length flat files with appropriate record layout. For ASCII text files, field-level documentation should also be provided and care taken so that delimiters and quote characters do not appear in the data. The Bureau may require a sample of the data to be sent for testing.

c. File collections organization. Files should be organized by custodian folders. Within the custodian folder all collected data should be further organized within 'Email,' `Native Files,' and 'Images' subfolders whenever possible.

You can place the individual custodian folders directly underneath a top level folder (as shown in Figure 1). In this example the top level folder is CaseName, but it can be anything that clearly indicates what request the data is submitted in response to. The top level CaseName folder should contain no data apart from the other folders.

An interim folder may be added if you plan to submit data in response to the CID in batches, *i.e.,* not all on the same day. Create an intermediate folder between the case

2

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

and custodians based on the collection date (as shown in Figure 2). In this example,
the top level folder is CaseName but may be anything that clearly indicates what the
data is in response to. The interim folder is CollectionDate, but it may be anything
that clearly indicates when or where the data was collected. The top level CaseName
and interim CollectionDate folders should
contain no data other than the folders.

0 CaseName
  Custodian Name
  Custodian2Name
  Custodian3Name
  Custodian4Name
  🗎 Custodian5Name
  Custodian6Name

Ca  CaseName
      0 Collett/xi:tate
            Custodian1Name
            Custodan2Nante
            Custocion3Narne
            Custochan4Name
            Custochan5Name

**Figure 1**                                    **Figure 2**

It is recommended that you use the format LastName FirstName for custodian
names to make it simple to identify each custodian alphabetically.

d. <u>Document identification and deduplication.</u>

   1. You are encouraged to perform deduplication of identical ESI documents.

   2. All ESI must be submitted with its corresponding metadata, if any.

   3. Where only one copy of an identical document is submitted, sufficient metadata
      must be submitted, if it exists, to indicate all custodians in possession of each such
      document.

   4. All documents shall have unique, sequential numbers clearly marked on each
      page, if image documents, or as part of the file name, if native documents.

e. <u>Security.</u>

   1. All submissions of ESI to the Bureau must be scanned and free of computer
      viruses. In addition, any passwords protecting documents or files must be
      removed or provided to the Bureau.

   2. Magnetic media shall be carefully packed to avoid damage and must be
      clearly marked on the outside of the shipping container:

            MAGNETIC MEDIA — DO NOT X-RAY

            MAY BE OPENED FOR POSTAL INSPECTION

   3. Encryption

      A. Data deliveries should be encrypted at the disc level. Encrypted
         media or encrypted containers are acceptable.

      B. Decryption keys should be provided separately from the data delivery. For
         encrypted hard drives, decryption keys should be provided via email or phone.

3

*Privileged & Confidential*
*Attorney Work Product*
*Attorney Client Communication*

For encrypted data delivered via email, decryption keys should at minimum be sent in a separate email, and preferably by phone or letter.

C. Encryption methods can include TrueCrypt and BitLocker.

f. If any certified submission containing ESI does not conform fully to the requirements set forth in the foregoing paragraphs a. through e. of this Standard, and the non-conforming elements of the submission have not been pre-approved by the Bureau, the company's response to this CID shall be deemed materially defective and non-responsive, as of the date of the submission.

### IL Standards for Submission of Hard Copy Documents

The Bureau strongly encourages you to submit all documents in electronic form. **All documents kept as ESI in the ordinary course of business, or otherwise currently held in electronic form, must be submitted in electronic form.**

For any documents submitted in hard copy form:

a. original documents shall not be submitted;

b. documents shall be produced in the order in which they appear in your files, without being shuffled or otherwise rearranged;

c. documents shall have unique, sequential numbers clearly marked on each page; and

d. if documents are removed from their original folders, binders, covers, or containers in order to be produced, the documents shall be identified in a manner so as clearly to specify the folder, binder, cover, or container from which such documents came.

4

**Exhibit 2**

 **cfpb** Consumer Financial
Protection Bureau

1801 L Street NW, Washington, DC 20036

VIA ELECTRONIC AND FIRST CLASS MAIL

March 30, 2012

Randal M. Shaheen
Venable LLP
575 7th Street, NW
Washington, DC 20004

Dear Mr. Shaheen:

This letter memorializes the negotiated terms of satisfactory compliance
with the Civil Investigative Demand issued to Morgan Drexen by the
Consumer Financial Protection Bureau (the "Bureau") on March 13, 2012.
The terms in this letter reflect our discussion at the March 28, 2012 meet
and confer.  The production of information and documents in accordance
with the modifications described below constitutes compliance with the
CID.

Document Request # 6 is modified so that Morgan Drexen may provide
the Bureau with a sample of recordings of consumer intake calls.
Specifically, Morgan Drexen should produce the first 50 calls recorded
during the week of January 9, 2012.  Document Request #6 is also
modified to reflect that Morgan Drexen has agreed to provide the script of
prompts that populate the telephone intake tree for all inbound calls to
Morgan Drexen. We reserve our right, if we later deem it necessary, to
seek full compliance with this request as written.

In light of the modifications to Document Request # 6, Interrogatory # 9 is
modified to additionally request that Morgan Drexen identify what
portions of consumer intake calls are recorded and the reason(s) for
recording or not recording the identified portions. Additionally,
Document Request #3 is modified to request Documents supporting
Morgan Drexen's claim that it only records the disclaimer portion of
consumer intake calls.

Document Request #18 is modified so that, to the extent that a contract or
agreement with a creditor that participates in the "Preferred Creditor



Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

Program" is identical to one already being produced, Morgan Drexen can
refer to the contract or agreement produced, and provide: (1) the name(s)
of the additional creditor(s) that signed the contract or agreement, (2) the
name(s) of the signatories, and (3) the date(s) of signature.

You indicated that some information responsive to Document Request
# 21(o) and 21(x) may contain a communication providing legal advice
between an attorney and his or her client. As we discussed, Morgan
Drexen may withhold information based on privilege by producing a
privilege log in accordance with the procedures set forth in Bureau Rule of
Investigation 1080.8 (Withholding Requested Material). *See* 12 CFR
1080.8. This log is due by the final CID production date of May 11, 2012.

We agree to extend the time within which Morgan Drexen must respond
to certain Interrogatories and Document Requests from the April 13, 2012
date originally set by the CID. The dates for compliance with the CID are
modified as follows:

| Due Date | Interrogatories | Document Requests |
|---|---|---|
| April 13, 2012 | 9, 12, 13, 14, 17 | 3, 4, 5, 9, 11(except for correspondence), 12, 13, 16, 21 |
| April 27, 2012 | 3, 4, 7, 11, 18, 19 | 2, 6, 7, 8, 10, 11 (correspondence only), 14, 15, 17, 18, 19 |
| May 11, 2012 | 2, 5, 6, 8, 10, 15, 16, 20, 21, 22 | 1, 20 |

Finally, you had asked the Bureau to limit the timeframe of Document
Request #3 to a date after the amendment of the Telemarketing Sales
Rule. The Bureau is not willing to modify the timeframe of the request,
and therefore Morgan Drexen should produce the requested documents
for the stated time period beginning January 1, 2010.

2



If you would like to discuss any of these matters further, please call Wendy
Weinberg at 202-435-7688.

Sincerely,

Kent Markus
Chief of Enforcement

3

**Exhibit 3**

## FIRST RESPONSE OF MORGAN DREXEN, INC.
## TO CIVIL INVESTIGATIVE DEMAND

Morgan Drexen, Inc. ("Morgan Drexen" or the "Company") hereby responds to the Civil Investigative Demand ("CID") issued to it by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012. In accordance with previous discussions with Bureau staff and subject to the letter dated March 30, 2012 from Kent Markus of the Bureau to Randal M. Shaheen, attorney for Morgan Drexen, ("March 30 Letter"), the First CID Response provides responses to Interrogatories 9, 12, 13, 14, and 17 and Document Requests 3, 4, 5, 9, 11 (except for correspondence), 12, 13, 16, and 21.

Morgan Drexen is providing the information contained in the First CID Response set forth herein in accordance with the provisions and intent of the Bureau's practice and procedure rules (the "Rules"). To the extent that an objection is made to any interrogatory or request for documents, such objection is noted therein; further, each response is subject to the general objections set forth in the "General Objections" section below. Any claims of privilege will be identified in a separate privilege log to be produced at a later date.

The responses set forth herein are based upon information that has been collected and/or reviewed for the purpose of responding to these Interrogatories and Requests for Documents. Morgan Drexen reserves the right to supplement or modify its responses in the event that it obtains additional, better, or different information, or should additional facts come to light which alter or supplement the facts currently known. All information and documents are submitted pursuant to the confidentiality protections available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

CONFIDENTIAL

## GENERAL OBJECTIONS

1.　　Morgan Drexen objects to each and all of the Interrogatories and Requests for Documents to the extent they seek information and documents which are protected from disclosure by the attorney-client privilege, work-product doctrine, and/or other applicable privilege. Morgan Drexen does not waive any protections or privileges by responding to these Interrogatories and Requests for Documents.

2.　　Morgan Drexen objects to these Interrogatories and Requests for Documents to the extent that they seek information that is not relevant to the issues in this matter. Any inadvertent provision of information or production of documents not related to the issues raised by this action shall not waive this objection.

3.　　Morgan Drexen objects to these Interrogatories and Requests for Documents to the extent that they are unreasonably broad, repetitious, or unduly burdensome.

2

CONFIDENTIAL

## RESPONSES TO
## INTERROGATORIES

**Interrogatory 9:**  **Identify the Person(s) who records calls between Clients or consumers and Morgan Drexen, Associated Attorneys, or third parties providing services to Morgan Drexen or Associated Attorneys; the method and format of such recordings; where and for how long these recordings are stored; who has access to these recordings after they are stored; and the types of calls recorded.**

**Response to Interrogatory 9:**  Morgan Drexen hereby adopts and incorporates by reference its previous General Objections as if stated fully herein.  Furthermore, Morgan Drexen objects to this Interrogatory on the grounds that it calls for speculation as to whether third parties, such as Associated Attorneys, record calls with their clients or consumers.  Without waiving any of its general objections, and subject to them, Morgan Drexen hereby responds as follows:

Per company policy, Morgan Drexen records the following portions of calls with clients of Associated Attorneys:

- *Recording of quality control disclosures by legal intake specialists*:  Pursuant to the instructions of Associated Attorneys, Morgan Drexen's legal intake specialists record the giving of a quality control questionnaire to potential clients of Associated Attorneys.  The questionnaire contains disclosures that are designed by the Associated Attorneys to ensure that the potential clients are adequately informed of the terms and risks of legal representation before they make the decision to engage the Associated Attorneys.

- *Recording of requests for termination of legal representation by client services representatives*:  Pursuant to the instructions of Associated Attorneys, Morgan

3

CONFIDENTIAL

Drexen's client services representatives record all requests for termination of legal representation by clients of the Associated Attorneys.

- *Recordings of requests by the clients of Associated Attorneys to alter the terms of legal representation by client services representations*: Pursuant to the instructions of Associated Attorneys, when a client of an Associated Attorney requests to modify the terms and conditions of legal representation (*i.e.*, add/remove accounts, permanently lower/increase monthly Automated Clearing House ("ACH") payments, add/remove co-clients, add/remove authorized persons, *etc.*), Morgan Drexen's client services representatives record the request for modification.

- *Recordings of an Associated Attorney client's decision to decline an in-person consultation with the Associated Attorney by client services representatives*: For Associated Attorneys who offer the option for an in-person consultation with their clients, and pursuant to the instructions of Associated Attorneys, Morgan Drexen records an Associated Attorney client's statement declining the option of an in-person consultation.

- *Recordings of an Associated Attorney client's decision to settle a non-legal account when there is an outstanding legal account by client services representatives*: Pursuant to the instructions of Associated Attorneys, an account against which a creditor has initiated legal proceedings is generally prioritized for settlement purposes; however, if a creditor for a non-legal account approaches Morgan Drexen, the Associated Attorney, or the Associated Attorney's client with an offer of settlement, Morgan Drexen's client services representatives record the Associated

4

CONFIDENTIAL

Attorney client's agreement to move forward with settling the account despite the
fact that legal proceedings have been initiated to collect on another account.

- *Recordings of an Associated Attorney client's decision to include a secured account
  by client services representatives*:  Pursuant to the instructions of Associated
  Attorneys, Morgan Drexen's client services representatives record an Associated
  Attorney client's request for his or her Associated Attorney to assist with a secured
  debt. (Associated Attorneys generally only assist their clients with settling
  unsecured debt.)  Morgan Drexen forwards the recording, along with the
  information for the secured debt, to the Associated Attorney for their decision on
  whether to represent the client in the settlement of the secured debt.

- *Recordings of an Associated Attorney client's decision to continue with legal
  representation by the Associated Attorney by client services representatives*:
  Pursuant to the instructions of Associated Attorneys, if a former client of an
  Associated Attorney, or a current client whose termination request is still being
  processed, changes his or her mind and wishes to resume the legal representation by
  the Associated Attorney, Morgan Drexen's client services representatives record the
  confirmation that the Associated Attorney's client wishes to resume his or her legal
  representation by the Associated Attorney.

- *Recording of an Associated Attorney client's consent to settle an account by client
  services representatives*:  Once an offer of settlement from a creditor is reviewed
  and accepted by an Associated Attorney, Morgan Drexen is required by the
  Associated Attorney to inform his or her client of the terms of the offer of

5

CONFIDENTIAL

settlement and record the Associated Attorney client's acceptance of the terms of settlement.

- *Recordings of transfer of legal representation by client services representatives*: Morgan Drexen's client services representatives are required by the Associated Attorneys to record when an Associated Attorney client transfers legal representation from one attorney to another, whether at the request of the Associated Attorney client or the Associated Attorney.

- *Recordings of Associated Attorney clients who terminate legal representation while there is an ongoing installment settlement under way by client services representatives*: If an Associated Attorney client wishes to terminate legal representation while there is an installment settlement underway, the Associated Attorneys require Morgan Drexen's client services representatives to administer a recording to the Associated Attorney client that he or she may lose the installment settlement if he or she proceeds with the termination of legal representation.

Morgan Drexen does not record calls with clients of Associated Attorneys in their entirety. Rather, Morgan Drexen records only those portion of calls with clients of Associated Attorneys described above. By way of example, if an Associated Attorney client calls Morgan Drexen to request the lowering of his or her monthly ACH payment, Morgan Drexen records only the portion of the call where the client services representative confirms the lowering of the monthly ACH payment. If, during the same call, the Associated Attorney client requests a copy of the Attorney/Client Agreement, Morgan

6

CONFIDENTIAL

Drexen does not record that portion of the call.  All recordings are performed with the

knowledge and consent of the Associated Attorney client.  *See* Response to Document

Request No. 5 for a copy of the scripts used during these recorded calls.

All of the recordings described above are recorded telephonically in .vox format.

The recordings are uploaded to the Associated Attorney clients' file in Morgan Drexen's

proprietary software – Morgan Drexen Integrated Systems ("MDIS") – and stored

indefinitely.  The recordings are available for review by agents of Morgan Drexen and the

Associated Attorney(s) responsible for the legal representation of the client.

**Interrogatory 12:   Identify all former employees or contractors of Morgan Drexen from January 1, 2007 to the date of your response, and state for each all titles and positions held while with Morgan Drexen, the dates the employee held each such title or position, and the reason for termination of employment.**

**Response to Interrogatory 12:** Morgan Drexen hereby adopts and incorporates by

reference its previous General Objections as if stated fully herein.  Without waiving any of its

general objections, and subject to them, Morgan Drexen hereby responds as follows:

*See* Exhibit 1 for an excel spreadsheet containing the names, title, date of hire and date of

termination (where applicable) for former and current employees of Morgan Drexen from

January 1, 2007 through April 6, 2012.

**Interrogatory 13:   Identify all Associated Attorneys, the dates during which they have transacted business with Morgan Drexen, and the nature of their association with Morgan Drexen (e.g. acted as "engagement attorneys," or "local attorneys").**

**Response to Interrogatory 13:** Morgan Drexen hereby adopts and incorporates by

reference its previous General Objections as if stated fully herein.  Morgan Drexen further

7

CONFIDENTIAL

objects to this Interrogatory on the grounds that the phrase "transacted business" is vague and ambiguous and requires subjective judgment, speculation, and/or legal interpretation as to its meaning. Without waiving any of its general objections, and subject to them, and assuming that the Interrogatory refers to all Associated Attorneys irrespective of whether the Company is in a contractual relationship with the Associated Attorneys, Morgan Drexen hereby responds as follows:

See Exhibit 2 for an excel spreadsheet containing the names of all Associated Attorneys, their last known address, the dates during which Morgan Drexen provided support services to the Associated Attorneys, and whether the Associated Attorneys contractually engaged the services of Morgan Drexen or served only as a local counsel contracted with Howard Law, P.C.

**Interrogatory 14:   Describe the responsibilities for engagement attorneys and local attorneys and the role of each category of attorneys in providing Debt Settlement or legal services to Clients.**

**Response to Interrogatory 14:** Morgan Drexen hereby adopts and incorporates by reference its previous General Objections as if stated fully herein. Morgan Drexen further objects to this Interrogatory on the grounds that the phrase "legal services" is vague and ambiguous, and requires subjective judgment, speculation, and/or legal interpretation as to its meaning. All services to be performed by the Associated Attorneys pursuant to the terms of the Attorney/Client Agreement executed between the Associated Attorneys and their clients, including "debt settlement" services as defined by the CID, are provided within an attorney-client relationship and constitute "legal services." Furthermore, Morgan Drexen objects to this Interrogatory on the grounds that it calls for speculation as to the meaning of the terms "role"

8

CONFIDENTIAL

and/or "responsibilities" with respect to the Associated Attorneys.  Morgan Drexen provides

back office support services to the Associated Attorneys; the Company does not dictate the

"role" and/or "responsibilities" of the Associated Attorneys.  Without waiving any of its general

objections, and subject to them, Morgan Drexen hereby responds as follows:

With respect to the Associated Attorneys' relationship to Morgan Drexen, an

"engagement attorney" is an attorney who enters into a contractual relationship with the

Company for support services.  The "engagement attorney" pays Morgan Drexen for all services

rendered by the Company.  Morgan Drexen does not have a contractual relationship with "local

attorneys."  The Company provides back office support services to "local attorneys" only on

matters in which "local attorneys" are providing assistance to "engagement attorneys."

The Company understands that the Attorney/Client Agreement is executed between the

"engagement attorneys" and their clients; therefore, the "engagement attorneys" determine

whether or not to represent the client.  Moreover, in states where the "engagement attorneys" are

not licensed to practice law, the "engagement attorneys" associate with "local attorneys" licensed

to practice law in the state.  The "local attorneys" assist the "engagement attorneys" in

performing all services that the state bar would require a licensed attorney to perform.  It is

Morgan Drexen's understanding that, in those circumstances, both the "engagement attorneys"

and "local attorneys" are equally responsible for the legal representation of their clients and both

are responsible for supervising Morgan Drexen.  Those responsibilities are governed by the

terms of the agreement with the law firm client and the applicable state supreme court's Rules of

Professional Conduct.

<div align="center">9</div>

CONFIDENTIAL

**Interrogatory 17:** Identify each bank or trust account from which payments were made from Morgan Drexen to an Associated Attorney; from which payments were made from an Associated Attorney to Morgan Drexen; and in which Clients' funds are deposited. For each such account, identify:

      a.     who is authorized to withdraw funds from the account;

      b.     the name on the account;

      c.     the type of account, including whether it is an interest bearing account; and

      d.     any agreements (other than those with the bank itself) that govern the management of the funds in the account.

**Response to Interrogatory 17:** Morgan Drexen hereby adopts and incorporates by reference its previous General Objections as if stated fully herein. Without waiving any of its general objections, and subject to them, Morgan Drexen hereby responds as follows:

Morgan Drexen does not make payments to Associated Attorneys. *See* Exhibit 3 for an excel spreadsheet containing the information on various bank accounts opened by "engagement attorneys."

10

CONFIDENTIAL

## RESPONSES TO
## REQUESTS FOR DOCUMENTS

**Document Request 3:**  All Documents relating to Morgan Drexen's policies and procedures relating to the provision of Debt Settlement services to consumers or Clients, including, but not limited to the following:

    a.  determining potential Clients' eligibility for Morgan Drexen or an Associated Attorney's services, including the amount or type of debt below which Morgan Drexen or an Associated Attorney's services provides no benefit to a potential Client;

    b.  calculating the amount of money that Morgan Drexen or an Associated Attorney claims a Client will save by working with them, in their communications with a Client or potential Client;

    c.  calculating the period of time necessary for a Client to accumulate the funds necessary to start and complete negotiations with all of a Clients' creditors, in its communications with a Client or potential Client;

    d.  enrolling, contracting, entering into an agreement for services, or obtaining funds from a Client or potential Client;

    e.  calculating each fee assessed by Morgan Drexen or an Associated Attorney;

    f.  negotiating with creditors for settlement of a Client's debt including how Morgan Drexen or an Associated Attorney decides which debt to attempt to settle first and determine the specific amount that it will settle for in negotiating with a Client's creditors;

    g.  whether Morgan Drexen or an Associated Attorney negotiates on behalf of just one Client at a time, or negotiates for groups of Clients with the same creditor;

    h.  how much money must be in a Client's account before Morgan Drexen or an Associated Attorney will initiate contact with a creditor;

    i.  how and when Morgan Drexen or an Associated Attorney decides to negotiate a lump sum payment rather than installment payments;

    j.  whether any creditors have refused to negotiate with Morgan Drexen or an Associated Attorney;

    k.  obtaining an advance of funds from Morgan Drexen or an Associated Attorney;

    l.  monitoring or managing the accounts from which Clients' monthly payments are drawn;

    m.  terminating an agreement or contract with a Client; and

    n.  seeking remaining fees alleged due from a Client, or refunding fees due to a Client.

**Response to Document Request 3:**  Attached, please find a copy of the requested

policies and procedures -- documents bates labeled MD000001 – MD000840.  Morgan Drexen's

11

CONFIDENTIAL

discovery into this matter is continuing and the Company reserves the right to supplement this

response at a later date.

**Document Request 4: All training manuals and training materials for Morgan Drexen employees, or Associated Attorneys.**

     **Response to Document Request 4:** Attached, please find the requested documents bates

labeled MD000841 – MD000961.  The Company respectfully requests that the Bureau also refer

to the documents produced in response to Document Request No. 3.  Morgan Drexen's discovery

into this matter is continuing and the Company reserves the right to supplement this response at a

later date.

**Document Request 5:  All telemarketing or other scripts used by Morgan Drexen, Associated Attorneys, or third parties providing services to Morgan Drexen or Associated Attorneys relating to Debt Settlement services.**

     **Response to Document Request 5**With respect to "telemarketing" scripts, after a

diligent search and reasonable inquiry into this matter, the Company is not in possession of, nor

has the Company ever been in possession of the requested documents.

     With respect to all other scripts, please find attached a copy of the scripts utilized by

Morgan Drexen bates labeled MD000962 – MD000986.  The Company respectfully requests that

the Bureau refer also to the documents provided in response to Document Request No. 3.

Discovery on this matter is continuing and Morgan Drexen reserves the right to supplement this

response at a later date.

12

CONFIDENTIAL

**Document Request 9:**  All agreements, contracts, and Documents related to payments between or among Associated Attorneys and Morgan Drexen, or between or among Associated Attorneys.

**Response to Document Request 9:** Attached, please find a copy of the following

documents: (1) Engagement Agreements executed between Engagement Counsels and Morgan

Drexen bates labeled MD000987 – MD001002, and (2) Local Counsel Agreements executed

between Local Counsels and Howard Law, P.C. (formerly Howard | Nassiri, P.C.), bates labeled

MD001003 – MD001008.  Discovery on this matter is continuing and Morgan Drexen reserves

the right to supplement this response.

**Document Request 11:  All agreements, contracts, or correspondence between either Morgan Drexen or an Associated Attorney and third parties providing services to either Morgan Drexen or an Associated Attorney related to Debt Settlement services, including but not limited to materials relating to:**
   a.  **acquiring, providing services to, or terminating services for consumers or Clients;**
   b.  **providing or acquiring consumer or Client leads;**
   c.  **receiving or processing payments from Clients;**
   d.  **tracking transactions or otherwise processing accounts for Clients; or**
   e.  **receiving phone calls or making phone calls to consumers or Clients.**

**Response to Document Request 11:**

Neither Morgan Drexen, nor to the best of its knowledge, any Associated Attorneys

engages third parties to acquire or provide services for consumer or Associated Attorney clients

or consumer or Associated Attorney client leads; to terminate services for consumers or

Associated Attorney clients; to receive or process payments from Associated Attorney clients; or

to track transactions or process accounts for Associated Attorney clients.  Discovery on this

matter is continuing and Morgan Drexen reserves the right to supplement this response.

13

**CONFIDENTIAL**

**Document Request 12:  Exemplars of contracts or agreements between Morgan Drexen and all Clients.**

     **Response to Document Request 12:**  Morgan Drexen has no documents responsive to

this Request.

✓ **Document Request 13:  Exemplars of contracts or agreements between Associated Attorneys and all Clients.**

     **Response to Document Request 13:** Attached, please find a copy of the requested

documents bates labeled, MD001009 – MD001030.

✓ **Document Request 16:  All welcome letters and Documents with individualized information on Client debt provided by Morgan Drexen or an Associated Attorney to a Client.**

     **Response to Document Request 16:**  Morgan Drexen objects to this request inasmuch as

the request seeks information protected by the attorney-client privilege.  Without waiving this

objection, the Company will provide an exemplar of the welcome kit sent by Morgan Drexen on

behalf of the Associated Attorneys.  Attached, please find a copy of the document bates labeled,

MD001031 – MD001042.

✓ **Document Request 21:  The database of information relating to each Client, including:**
      **a.  the Client's name and contact information;**
      **b.  the creditors to which the Client owes money;**
      **c.  the amount of each debt owed by the Client at the time of enrollment;**
      **d.  the name of the entity seeking to collect the debt, if different from the creditor;**
      **e.  the Client's source and amount of income;**
      **f.  any additional debts or monthly financial obligations for each Client;**

14

CONFIDENTIAL

g.  if the debt was settled, the amount of each debt owed by the Client at the time of debt settlement (including late fees assessed by creditor or debt collector, but not including any fees assessed by Morgan Drexen or an Associated Attorney);

h.  if the debt was not settled, the amount of each debt owed by the Client at the time Client ceased making payments to Morgan Drexen or an Associated Attorney through Morgan Drexen (including late fees assessed by creditor or debt collector, but not including any fees assessed by Morgan Drexen or an Associated Attorney);

i.  the APR and monthly penalty fee(s) for each debt at time of enrollment and at time of settlement or termination of services;

j.  each fee that Morgan Drexen or an Associated Attorney charged the Client prior to attempting negotiation or settlement of a debt (a.k.a. "engagement fee");

k.  all fees other than the engagement fee that were directly or indirectly charged to the Client by Morgan Drexen or Associated Attorneys (e.g. monthly fees, enrollment fee, check fee, settlement fee), including charges by third parties assessed to the Client's account, and a description of the type of fee, the identity of the payor and payee, and the date of payment);

l.  the total number of months that Morgan Drexen or an Associated Attorney told Client that it would take to settle his or her debts;

m.  each payment made by the Client to Morgan Drexen or an Associated Attorney, the date of payment, and how the payment was credited or applied;

n.  the terms of all offers of settlement made to or by each creditor, including whether the settlement was for a lump sum or installments, the date of the offer, and whether the offer was accepted;

o.  for each proposed settlement from a creditor that was rejected or modified by an Associated Attorney, the stated reasons for rejecting or modifying such settlement;

p.  date and amount of each settlement payment;

q.  date, amount, and source of all advances made to Clients by Morgan Drexen or an Associated Attorney;

r.  refunds made to Client;

s.  date and content of complaints from the Client about Morgan Drexen or Associated Attorneys;

t.  whether the Client was sued by a creditor;

u.  whether the Client filed for bankruptcy, and if so, when;

v.  date of each Client contact with an Associated Attorney, form of the meeting (e.g. phone, in-person, etc.), and length of meeting;

w.  name of any Associated Attorney who provided services to Client, including the attorney who opened the account in which the Client's funds are held;

x.  notes field connected with Client account.

15

CONFIDENTIAL

**Response to Document Request No. 21:** Morgan Drexen objects to this request inasmuch as the request seeks information protected by the attorney-client and attorney work product privileges. As the back office support for the Associated Attorneys, Morgan Drexen is under a duty to protect the confidentiality of clients of the Associated Attorneys. Without waiving these objections, Morgan Drexen will comply with this request to the extent permissible by law. *See* Exhibits 4, 5 and 6 which contain the non-privileged information required under subparts (a), (e) and (f), bates labeled MD001043 – MD001045. With regard to subpart (a) Morgan Drexen has provided a unique identifier for each Associated Attorney client in its database. Morgan Drexen is in the process of consulting with its Associated Attorneys regarding this subpart and any potential privilege objection that may apply. At an appropriate time the Company will assert a privilege objection by means of a privilege log entry or produce the requested information in whole or in part. With regard to the remaining subparts of this request, Morgan Drexen intends to supplement its response on an ongoing basis.

Dated: April 13, 2012

Respectfully submitted,

/s/ Randal M. Shaheen

Randal M. Shaheen
Andrew E. Bigart
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4488

*Counsel for Morgan Drexen, Inc.*

16

**Exhibit 4**

# VENABLE®LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
T 202.344.4000   F 202.344.8300   www.Venable.com

April 23, 2012

*VIA ELECTRONIC AND HAND DELIVERY*

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
1500 Pennsylvania Avenue, N.W.
Attn: 1750 Pennsylvania Avenue, N.W., 10th Floor
Washington, D.C. 20220

   **Re:    Second Response to Civil Investigative Demand Issued to Morgan Drexen, Inc.**

Dear Ms. Weinberg:

   On behalf of our client, Morgan Drexen, Inc., please find enclosed a CD-ROM with information responsive to Interrogatories 21(b), (c), and (d) of the Civil Investigative Demand ("CID") issued to Morgan Drexen by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012, as amended by your letter dated March 30, 2012.

   Any communications relating to this inquiry, as well as the documents accompanying or related to those communications and the information contained in the accompanying materials, constitute sensitive and proprietary business information of Morgan Drexen and are confidential. All such materials are intended only for review by Bureau staff. Accordingly, we request that they receive the highest level of protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

   Morgan Drexen reserves the right to change, amend, or supplement the enclosed information or documents if it becomes aware of additional information, and hereby preserves all evidentiary and other objections incident to this investigation. Morgan Drexen does not by this reservation undertake any obligation of supplementation or amendment.

# VENABLE LLP

---

Wendy Weinberg, Esq.
April 23, 2012
Page 2

Morgan Drexen and its counsel are committed to cooperating with the Bureau in connection with the CID and addressing any issues raised by the Bureau. To that end, please do not hesitate to contact us should you have any questions about the enclosed materials.

Respectfully submitted,

Randal M. Shaheen
Andrew E. Bigart
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
202.344.4488
202.344.4323

*Counsel for Morgan Drexen, Inc.*

**Exhibit 5**

**cfpb**  Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

April 24, 2012

Randal M. Shaheen, Partner
Venable LLP
575 7th Street, NW
Washington, DC 20004

Re: Morgan Drexen

Dear Randy:

I am writing to address several deficiencies in Morgan Drexen's April 13th
and April 16th responses to the Bureau's March 13, 2012 Civil
Investigative Demand ("CID"). The production does not comply with the
CID or the production schedule we agreed to at our meeting of March 28,
2012, as memorialized in the March 30, 2012 letter from Enforcement
Director Markus. Specifically, Morgan Drexen's production has the
following deficits:

Document Requests:

1. **Document Request 21**: The most fundamental failure in Morgan
Drexen's production concerns its response to Document Request 21.
During our March 28th meeting you expressed privilege concerns only
about the following subparts of Document Request 21:

> (a) the Client's name and contact information;
> (o) for each proposed settlement from a creditor that was
> rejected or modified by an Associated Attorney, the stated
> reasons for rejecting or modifying such settlement; and
> (x) notes field connected with Client account.

You also stated that if Morgan Drexen was going to have any difficulty
responding to this request, you would let me know by March 30th.
You did not contact me by that date with any concerns. On the April
13 due date, however, rather than producing material responsive to the
21 remaining subparts, Morgan Drexen produced only a partial



Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

response to three subparts of Document Request 21. On Friday evening, April 20, 2012, you indicated via email that you would be sending three additional fields on Monday, April 23rd and another two to three fields by the end of this week. We did not agree to this piecemeal production schedule, and you have provided no explanation for your failure to comply with the production schedule. If there is some technical reason that Morgan Drexen cannot comply with the originally agreed to timeline, I would renew our request to have Morgan Drexen's technical team explain this to our technical team. Otherwise, the Bureau requests production of the remaining subparts by April 27, 2012.

2. **Document Request 16**: Document Request 16 requests "All welcome letters and Documents with individualized information on Client debt provided by Morgan Drexen or an Associated Attorney to a Client." Morgan Drexen has produced only an exemplar of a welcome packet with no individualized client information. The Bureau requests that Morgan Drexen produce the individualized welcome packets and any other materials responsive to this request by April 27, 2012.

3. **Document Request 9:** Document Request 9 asks for "All agreements, contracts, and Documents related to payments between or among Associated Attorney and Morgan Drexen, or between or among Associated Attorneys." You have produced some form contracts but no other relevant documents. Further, the document that begins with Bates number 000987 refers to "Exhibit A" and "Exhibit B," neither of which Morgan Drexen provided in the production. The Bureau requests production of the missing documents by April 27, 2012.

4. **Document Request 6:** At the March 28th meeting, you indicated that Morgan Drexen only records the disclaimers that it recites to consumers. Based upon that representation, the Bureau modified its Document Request 6, which originally asked for all recordings of consumer intake calls, to seek only a sample of such recordings (the first 50 recorded during the week of January 9, 2012), and the script of prompts that populate the telephone intake tree for all inbound calls to Morgan Drexen. In your response you now indicate that Morgan Drexen records nine other categories of calls as well. Accordingly, the Bureau now seeks the first 50 calls recorded during the week of



Consumer Financial
Protection Bureau

1700 G Street NW Washington, DC 20552

January 9, 2012 for each of the additional nine categories as well. The time period for these calls should be from January 9, 2012 onward, as necessary to aggregate 50 calls in each category. Morgan Drexen should produce these with the other recordings on April 27, 2012.

5. **Document Request 5:** Document Request 5 asks for "All telemarketing scripts used by Morgan Drexen, Associated Attorneys, or third parties providing services to Morgan Drexen or Associated Attorneys relating to Debt Settlement Services." In your response, you only provide disclaimer scripts, and fail to provide any telemarketing scripts. The Bureau requests that you remedy this deficiency by April 27, 2012.

6. **Document Request 4:** In the PowerPoint presentation that you provided in response to Document Request 4, which asks for training manuals and materials, much of the presentation is obscured by large black shapes. These appear to be unrelated to any redaction based on an assertion of privilege. The Bureau requests that Morgan Drexen produce a readable version of this presentation by April 27, 2012.

Interrogatories:

7. **Interrogatory 17:** Interrogatory 17 asks that you identify "each bank or trust account from which payments were made from Morgan Drexen to an Associated Attorney; from which payments were made from an Associated Attorney to Morgan Drexen; and in which Clients' funds are deposited." Morgan Drexen has indicated in its response that "Morgan Drexen does not make payments to Associated Attorneys." You have not responded to that portion of the Interrogatory seeking information on payments from Associated Attorneys to Morgan Drexen. Further, you failed to respond to subpart (d), which requests information on agreements that govern the management of funds in the identified bank accounts. Finally, you have failed to respond to subpart (a), which requires you to identify who is authorized to withdraw funds from the account.

8. **Interrogatory 13:** Interrogatory 13 requires Morgan Drexen to "Identify all Associated Attorneys, the dates during which they have transacted business with Morgan Drexen, and the nature of their

 Consumer Financial
Protection Bureau

1700 G Street NW, Washington DC 20552

association with Morgan Drexen (e.g. acted as "engagement attorneys"
or "local attorneys")." Based upon preliminary research we have
undertaken, your response to Interrogatory 13 appears to be incomplete.
For instance Tammy Zoppo, an attorney who publicly lists herself as
having worked for Morgan Drexen, was not on the list provided by
Morgan Drexen.

9. **Interrogatory 12:** Finally, in your response to Interrogatory 12 you
failed to provide the last known home address for former employees,
and failed to identify the reason for termination of employment, as
required per the definition of "identify" in the CID.

In light of Morgan Drexen's unacceptable failure to provide the materials
described above, it is critical that you produce them immediately and in
any event by the close of business on Friday, April 27, 2012. The
deficiencies identified by the Bureau are based on our initial review and
we reserve the right to amend this list as necessary in the future.

Sincerely,

Wendy J. Weinberg
Enforcement Attorney

**Exhibit 6**

# VENABLE® LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
T 202.344.4000   F 202.344.8300   www.Venable.com

April 27, 2012

*VIA ELECTRONIC AND HAND DELIVERY*

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
1500 Pennsylvania Avenue, N.W.
Attn: 1750 Pennsylvania Avenue, N.W., 10th Floor
Washington, D.C. 20220

**Re:   Third Response to Civil Investigative Demand Issued to Morgan Drexen, Inc.**

Dear Ms. Weinberg:

On behalf of our client, Morgan Drexen, Inc., we submit the enclosed information and materials in response to the Civil Investigative Demand ("CID") issued to Morgan Drexen by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012, as amended by your letter dated March 30, 2012. In accordance with previous discussions with you, and as set forth in your March 30 letter, the enclosed materials respond to Interrogatories 3, 4, 7, 11, 18, and 19 and Document Requests 2, 6, 7, 8, 10, 11, 14, 15, 17, 18, 19, and 21.

Any communications relating to this inquiry, as well as the documents accompanying or related to those communications and the information contained in the accompanying materials, constitute sensitive and proprietary business information of Morgan Drexen and are confidential. All such materials are intended only for review by Bureau staff. Accordingly, we request that they receive the highest level of protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

Morgan Drexen reserves the right to change, amend, or supplement the enclosed information or documents if it becomes aware of additional information, and hereby preserves all evidentiary and other objections incident to this investigation. Morgan Drexen does not by this reservation undertake any obligation of supplementation or amendment.

Wendy Weinberg, Esq.
April 27, 2012
Page 2

    Morgan Drexen and its counsel are committed to cooperating with the Bureau in
connection with the CID and addressing any issues raised by the Bureau.  To that end, please do
not hesitate to contact us should you have any questions about the enclosed materials.

                               Respectfully submitted,

                               Randal M. Shaheen
                               Andrew E. Bigart
                               Venable LLP
                               575 7th Street, N.W.
                               Washington, D.C. 20004
                               202.344.4488
                               202.344.4323

                               *Counsel for Morgan Drexen, Inc.*

## THIRD RESPONSE OF MORGAN DREXEN, INC.
## TO CIVIL INVESTIGATIVE DEMAND

Morgan Drexen, Inc. ("Morgan Drexen" or the "Company") hereby responds to the Civil Investigative Demand ("CID") issued to it by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012. In accordance with previous discussions with Bureau staff and subject to the letter dated March 30, 2012 from Kent Markus of the Bureau to Randal M. Shaheen, attorney for Morgan Drexen, ("March 30 Letter"), the Third CID Response provides responses to Interrogatories 3, 4, 7, 11, 18, and 19 and Document Requests 2, 6, 7, 8, 10, 11, 14, 15, 17, 18, 19, and 21.

In addition, the Company is in receipt of your April 24, 2012 letter. The Company is working diligently and with all reasonable efforts to respond to the Bureau's voluminous requests, including responding in part to various requests where it has discovered that it is not reasonably possible to fully respond on the timetable contemplated by the Bureau. The Company intends to continue to cooperate with this inquiry and expend best efforts to respond to the Bureau's requests in as timely and as fulsome a manner as is reasonably possible. The Company believes that the timeliness and speed of its response likely equals or exceeds that of other similarly situated companies that the Bureau may be investigating. If that is not the case, we would appreciate your letting us know. To the extent that your April 24, 2012 letter highlights deficiencies or incompleteness in some of the Company's responses to date, the Company intends to correct those deficiencies or complete its responses as soon as is reasonably possible. With regard to Document Request No. 5, however, your letter states that the Company failed to provide any telemarketing scripts. The Company's April 12 Response stated that after a "diligent search and reasonable inquiry" the Company had not been able to locate any such scripts.

Morgan Drexen is providing the information contained in the Third CID Response set forth herein in accordance with the provisions and intent of the Bureau's practice and procedure rules (the "Rules"). To the extent that an objection is made to any interrogatory or request for documents, such objection is noted therein; further, each response is subject to the general objections set forth in the "General Objections" section below. Any claims of privilege will be identified in a separate privilege log to be produced at a later date.

The responses set forth herein are based upon information that has been collected and/or reviewed for the purpose of responding to these Interrogatories and Requests for Documents. Morgan Drexen reserves the right to supplement or modify its responses in the event that it obtains additional, better, or different information, or should additional facts come to light which alter or supplement the facts currently known. All information and documents are submitted pursuant to the confidentiality protections available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

## GENERAL OBJECTIONS

1.      Morgan Drexen objects to each and all of the Interrogatories and Requests for Documents to the extent they seek information and documents which are protected from disclosure by the attorney-client privilege, work-product doctrine, and/or other applicable privilege. Morgan Drexen does not waive any protections or privileges by responding to these Interrogatories and Requests for Documents.

2

    2.    Morgan Drexen objects to these Interrogatories and Requests for Documents to the extent that they seek information that is not relevant to the issues in this matter. Any inadvertent provision of information or production of documents not related to the issues raised by this action shall not waive this objection.

    3.    Morgan Drexen objects to these Interrogatories and Requests for Documents to the extent that they are unreasonably broad, repetitious, or unduly burdensome.

3

**CONFIDENTIAL**

## RESPONSES TO
## INTERROGATORIES

**Interrogatory 3:** Describe the complete organizational structure of Morgan Drexen, identifying all parents, subsidiaries, unincorporated divisions, joint ventures, and affiliates. For Morgan Drexen and each identified parent, subsidiary, unincorporated division, joint venture, and affiliate state the following:

    a.  the correct legal name and principal place of business;
    b.  all trade names under which it has done business;
    c.  the date of organization and jurisdiction where organized;
    d.  the type of business in which it engages;
    e.  the nature of the relationship to Morgan Drexen (e.g., wholly owned subsidiary, partially owned subsidiary, parent, affiliate, etc.);
    f.  the date, if any, that it ceased to operate and the reason(s) for such;
    g.  the names and titles of all officers, directors, and principal stakeholders or owners;
    h.  dates on which any individual became an officer, director, stockholder or owner, or ceased affiliation; and
    i.  for each officer, director, and stockholder, identify the nature of his or her financial interest.

    **Response to Interrogatory 3:** Morgan Drexen, Inc. is an independent company with no subsidiaries, unincorporated divisions, joint ventures, or affiliates.

    a.  Morgan Drexen, Inc.  675 Anton Boulevard, Costa Mesa, CA 92626.
    b.  Morgan Drexen, Inc, Morgan Drexen, Morgan Drexen Integrated Systems, and Morgan Drexen V.C.
    c.  March 20, 2007, Nevada.
    d.  Morgan Drexen is a software development company that integrates its proprietary software, Morgan Drexen Integrated Systems with paraprofessional and administrative support services to generate greater efficiencies and productivity.
    e.  Not applicable.
    f.  Not applicable.
    g.  The names and titles of all officers, directors and principal stakeholders or owners of Morgan Drexen are as follows:
        i.  Board of Director:
            1.  Walter Ledda – President (May 21, 2007 – Present)
            2.  Rita Augusta – Secretary (May 21, 2007 – Present)
        ii.  Officers:

4

CONFIDENTIAL

      1.  Walter Ledda – President and Chief Executive Officer (May 21, 2007 – Present)
      2.  David Walker – Chief Financial Officer (November 8, 2010 – Present)
      3.  Rita Augusta – Chief Operating Officer (May 18, 2007 – Present)
  iii.    Shareholders:
      1.  Walter Ledda: 76.4%
      2.  Avi Gupta: 14.4%
      3.  Mark Kruitbosch: 5.2%
      4.  Rita Augusta: 4.1%
h.  Please refer to the dates provided in subsections (g) above.
i.  See response to 3(g)(iii).

**Interrogatory 4:** **Identify each business, trust or entity related or connected to the provision of Debt Settlement services, in which Walter Ledda, or any of the officers, directors or owners of Morgan Drexen identified above has an ownership or financial interest.**

**Response to Interrogatory 4:** Morgan Drexen objects to this interrogatory to the extent that the interrogatory creates the inference that Morgan Drexen, Inc. acts as a provider of Debt Settlement services. Without waiving this objection, Morgan Drexen responds as follows: Neither Walter Ledda nor any of the officers, directors, or owners of Morgan Drexen has an ownership or financial interest in any business, trust or entity related or connected to the provision of Debt Settlement services.

**Interrogatory 7:** **Describe the function of each division or office within Morgan Drexen (e.g. Office of Legal Liaison).**

**Response to Interrogatory 7:**

**Accounting:** The Accounting Department is responsible for performing all general accounting functions for Morgan Drexen, such as payroll and processing payments to outside vendors. Additionally, the Accounting Department provides accounting support to the engagement counsels with whom Morgan Drexen contracts. By way of example, the Accounting

5

Department is responsible for performing trust reconciliations to ensure that all funds belonging to law firm clients are properly accounted for. Moreover, the Accounting Department assists law firm clients with their questions and/or concerns regarding the balance of their attorney-client trust accounts, fees assessed by the attorneys, and payments made to creditors.

**Client Services:** The Client Services Department staff function as receptionists and secretaries for the attorneys that Morgan Drexen supports. The Client Services Department is the initial point of contact for law firm clients and directs law firm clients to the proper departments and/or personnel to answer any non-legal questions or concerns the law firm clients may have. By way of example, if a law firm client has a legal question and wishes to speak with his or her attorney, the client services representative will transfer the law firm client over to the Law Firm Liaison Department, which then sets up an appointment for the law firm client to speak with his or her attorney. The Client Services Department also assists the law firm clients with non-legal requests, such as mailing out copies of the attorney-client agreements and self-addressed envelopes.

**Corporate Legal:** The Corporate Legal Department is responsible for handling the Company's legal matters.

**Creditor Relations:** The Creditor Relations Department staff act as paralegals for the attorneys that Morgan Drexen supports. The Creditor Relations Department is responsible for receiving inquiries from creditors of the law firm clients. Additionally, the Creditor Relations Department, at the request or instruction of the law firm clients, engagement counsels, or local counsels, will reach out to creditors to verify the balance owed and the entity responsible for collecting a debt. The Creditor Relations Department communicates with creditors to advise

6

them of legal representation by the attorney and to relay any messages between the creditors and attorney (*i.e.*, offers of settlement or refusals to honor an ongoing settlement agreement). The Creditor Relations Department also monitors the settlement trends of the creditors and reports any changes in trends to the attorneys that Morgan Drexen supports.

**Human Resources:** The Human Resources Department is responsible for all employment-related processes within Morgan Drexen. By way of example, the Human Resources Department is responsible for the hiring and terminating processes and mediating disputes among employees.

**Information Technology:** The Information Technology Department is responsible for Morgan Drexen's information technology needs (*i.e.*, telephone systems, internet use, *etc.*).

**Law Firm Liaisons:** The Law Firm Liaison Department acts as the file clerk for the attorneys supported by Morgan Drexen. If a law firm client calls with a legal question and requests to speak with his or her attorney, the law firm liaison is responsible for setting up a consultation between the law firm client and the attorney. In situations where a law firm client has been sued by the creditor, aside from setting up the consultation, the law firm liaison is also responsible for ensuring that all legal documents that the attorney will need to review are properly uploaded to the attorney's case docket.

**Legal Intake:** The Legal Intake Department is responsible for gathering information from prospective clients of law firms. The legal intake specialists, using pre-approved criteria set forth by the attorneys, gather the attorney-requested information from the prospective law firm clients so the engagement counsel can evaluate whether the prospective law firm clients meet the parameters set forth by the attorneys.

7

**Marketing:** The Marketing Department is responsible for drafting advertisements for attorney review and running the advertisements on behalf of the attorneys that Morgan Drexen supports.

**Media and Corporate Relations:** The Media and Corporate Relations Department is responsible for managing the Company's public relations.

**Facilities:** The Facilities Department at Morgan Drexen is responsible for keeping an inventory of the Company's office equipments/supplies. Furthermore, the department is responsible for addressing the office supplies needs of the Company's employees.

**Mailroom:** The Mailroom scans, uploads, and bar codes documents belonging to a law firm client to the Company's proprietary software, to be viewed by the employees at Morgan Drexen and the attorneys responsible for the law firm client's file. Additionally, the Mailroom mails form documents as requested by other departments within Morgan Drexen or as set forth per the instructions of the attorneys. Internally, the Mailroom delivers documents to addressees and is responsible for assisting the employees within Morgan Drexen in mailing correspondences.

**Preferred Creditors:** The Preferred Creditors Department is responsible for communicating with creditors who participate in the attorneys' Preferred Creditor Program. The department performs a weekly update with the preferred creditor to determine whether or not the creditor or collection agency is collecting on a debt owed by the clients of attorneys supported by Morgan Drexen. If so, pending the review and acceptance of the attorneys and their clients, the creditor or collection agency will settle the debt at the agreed upon preferred rate.

8

**Processing:** The Processing Department at Morgan Drexen is responsible for ensuring that all documents required to be kept by the attorneys supported by Morgan Drexen are available in the law firm client's file. Additionally, once the Mailroom uploads a document, the Processing Department is responsible for properly naming the document in the law firm client's file in accordance with the nomenclature utilized by Morgan Drexen to ensure uniformity and easy access by Morgan Drexen and by the attorneys who utilize the Company's services.

**Quality Control:** The Quality Control Department is responsible for reviewing the quality control recordings to ensure that prospective clients of the attorneys are adequately informed of the significant terms and conditions of legal representation by the attorneys and the known risks associated with the legal representation. Additionally, after the initial intake is completed, the Quality Control Department is responsible for ensuring that all documents and information required to be kept by the attorney (*i.e.*, an attorney-client agreement executed by the client, the prospective law firm client's financial situation, total amount of engaged debt, name of creditors, *etc.*) are available for the attorney to review. The Quality Control Department also performs random audits of other departments within Morgan Drexen by listening to phone conversations in order to assure that the information relayed to the law firm clients, creditors, or third parties is accurate and in line with the parameters permitted by the attorneys.

**Trust Services:** The Trust Services Department at Morgan Drexen is responsible for processing payments to creditors and law firm clients as instructed by the attorneys. By way of example, if a settlement offer made by a creditor is accepted, the attorney will instruct the Trust Services Department to process payments as delineated by the terms of the settlement agreement between the creditor and the law firm client. Additionally, upon termination of legal

9

CONFIDENTIAL

representation, the attorney will instruct the Trust Services Department to return all funds in the

attorney-client trust account, after fees are deducted, to the law firm client.

**Interrogatory 11:   Identify all current employees or contractors of Morgan Drexen, provide their dates of employment, titles, or positions and the dates the employee or contractor held each such title or position.**

**Response to Interrogatory 11:** Morgan Drexen respectfully requests that the Bureau

refer to Exhibit 1 previously provided by the Company in response to Interrogatory No. 12.

**Interrogatory 18:   Identify and describe each database in which Morgan Drexen has electronic records relating to Debt Settlement, and identify and describe the variables in each such electronic record. Include, but do not limit the response to:**

    a.  **Morgan Drexen's policies and procedures related to document and data retention and data backup;**

    b.  **Morgan Drexen's ability to access data on its primary systems and backed up data;**

    c.  **the technology architecture used by Morgan Drexen for storing its system of records, including but not limited to:**
        i.   **the size of the architecture;**
        ii.  **where the archived emails are stored and how they may be accessed;**
        iii. **details about the systems including - name, system type (e.g. data base, file server, document / contract management repository), the type of database, database version, and history of development;**
        iv.  **systems for entering, organizing, tracking, and accessing data; and**

    d.  **where Morgan Drexen keeps its Client contracts and what data fields are tracked. For each database, describe how Morgan Drexen manages and maintains its information, including: the physical location of the data (e.g. - is it kept inside or outside of Morgan Drexen's network); the environment in which the data resides (e.g. - file server, database, document management tool, enterprise content management utility, near-line, off-line media, etc.); the backup and archiving routines; and the retention and disposition routines.**

**Response to Interrogatory 18:** Morgan Drexen objects to request 18(c)(i) on the

grounds that the request is vague as to the meaning of the phrase "the size of the architecture."

10

CONFIDENTIAL

To the extent that the Bureau provides additional clarification, the Company will supplement this response as appropriate at a later date. Otherwise, Morgan Drexen responds as follows:

Morgan Drexen's MDIS system has 4 databases:
- AllCustomer, DebtNego, TeleMkt and, TeleDNC

Each database can have numerous tables, each containing hundreds of variables.

(a) Client files for MDIS are stored on md-filefs. Client files are never deleted from MDIS. Filefs is backed up daily using Symantec Backup Exec. MDIS databases are backed up using SQL Backup throughout the day. SQL backup files are then backed up to tape using Symantec backup exec.

Weekly Backups are sent offsite to Iron Mountain, and returned on a 2 week rotation schedule.

Quarterly backups are taken and sent to Iron Mountain for storage.

(b) The Company has full access to hardware and data on its primary system. Backup up data is either onsite or stored offsite at Iron Mountain.

(ii) Users are responsible for archiving messages to PST files.
   a. User archives are stored in their personal home folder which resides on md-filefs.
   b. There is no policy regarding archiving requirements, this is done on a per user basis.
   c. Deleted mail that is emptied from the deleted items folder is retained in the system for 14 days

(iii) SQLCLUSTER
   a. This is a 2 server SQL cluster with all data stored on a fiber channel SAN.
   b. MS SQL 2008 on Windows Server 2008 x64 - 32gb

   File Servers Md-filefs
      1. This is a 2 server file server cluster with all data stored on a fiber channel SAN
      2. Windows Server 2008 x64

(iv) MDIS is the system we use to enter, organize and access data.

11

       (a)  Client contracts are stored as PDF documents on our
file server. These are then accessed by the MDIS
application.

The Company manages and maintains its information for each database in the following manner:

    a. MDIS is run on a clustered SQL server, SQL databases are stored on a Fiber
Channel SAN.
    b. Client files for MDIS are stored on md-filefs, Client files are not deleted from
MDIS. Filefs is backed up daily using Symantec Backup Exec.
    c. MDIS databases are backed up using SQL Backup throughout the day. SQL
backup files are then backed up to tape using Symantec backup exec.
    d. Weekly Backups are sent offsite to Iron Mountain, and returned on a 2 week
rotation schedule.
    e. Quarterly backups are taken and sent to Iron Mountain for storage.

**Interrogatory 19:**  **Identify the creditors or debt collectors that participate in the
"Preferred Creditor Program."**

        **Response to Interrogatory 19:**  The following creditors or debt collectors who

currently have access to utilize the "Preferred Creditor Program" portal:

(1) Aargon Agency
(2) AFNI, Inc.
(3) Alliance One
(4) American Express
(5) Apex Financial
(6) Arsi
(7) Asset Acceptance
(8) Associated Recovery Systems
(9) Brachfeld & Associates
(10) Capital Management Systems
(11) Capital One Bank
(12) Cardworks Servicing
(13) Cash Call
(14) Cavalry Portfolio Services
(15) Chase Bank USA, N.A.
(16) Citibank USA, N.A.
(17) Client Services, Inc.
(18) CollectCorp
(19) Couch, Stillman, Blitt & Conville

12

**CONFIDENTIAL**

(20) Credit Control
(21) Creditors Financial Group
(22) Creditors Interchange
(23) Delanore, Kemper & Associates, LLC
(24) Dynamic Recovery Solutions, Inc.
(25) First Asset Recovery Group, LLC
(26) First Capital Recovery, LLC
(27) First Financial Asset Management
(28) Firstsource Advantage, LLC
(29) Forster & Garbus
(30) Frontier Financial Group, Inc.
(31) Full Circle Financial Services
(32) GE Money Bank.
(33) Global Acceptance Credit Company
(34) GMC Credit Services, LLC
(35) GT Services
(36) HFC Beneficial
(37) HP Debt Exchange
(38) HSBC
(39) Icon Equities, LLC
(40) Jefferson Capital Systems
(41) Judgment Enforcement Law Firm, PLLC
(42) Kramer & Associates
(43) Leading Edge Recovery Solutions
(44) LHR, Inc.
(45) Matthew Thomas & Associates, LLC
(46) Mattia Debt Management
(47) MCM
(48) Merrick Bank
(49) Michael Andrews & Associates
(50) MRS Associates
(51) National Credit Adjusters
(52) National Credit Solutions
(53) National Enterprise Systems
(54) National Recovery Solutions, LLC
(55) Nationwide Credit, Inc.
(56) NCO Financial Systems, Inc.
(57) Northland Group, Inc.
(58) P & B Capital Group, LLC
(59) Palisades Collection, LLC
(60) Phillips & Cohen Associates, Ltd.
(61) Portfolio Asset Group
(62) Portfolio Recovery Associates

13

CONFIDENTIAL

(63) Portfolio Recovery Services
(64) Resurgent Capital Services, LP
(65) Richard J. Boudreau & Associates, LLC
(65) RJM Acquisitions
(66) Second Round, LP
(67) Settlement Collections, LLC
(68) Stoneleigh Recovery Associates, LLC
(69) Target National Bank
(70) US Bank
(71) Valentine & Kebartas, Inc.
(72) Washington Mutual
(73) Wells Fargo Financial Bank
(74) Weltman, Weinberg & Reis Co., L.P.A.
(75) West Asset Management
(76) World Financial Network National Bank
(77) Zwicker & Associates, P.C.

## RESPONSES TO
## DOCUMENT REQUESTS

**Document Request 2:  Morgan Drexen's financial statements, balance sheets, profit and loss statements, state and federal tax filings, and shareholder distribution information.**

**Response to Document Request 2:**  Attached, please find a copy of the requested documents bates labeled MD005390 – MD005453.

**Document Request 6.  Recordings of consumer intake calls.**

**Response to Document Request 6:**  Morgan Drexen will comply with this request by providing one hundred and fifty (150) recordings that occurred during the week of January 9, 2012, made in support of the attorneys' debt settlement legal representations.  Please find the recordings attached as MD005239 – MD005389.  Additionally, the Company respectfully requests that the Bureau refer to the scripts provided in response to Document Request No. 5, bates labeled MD000962 – MD000986, and the Company's response to Interrogatory No. 9.

14

Discovery on this request is continuing and the Company will supplement its response at a later date.

**Document Request 7. All recordings that are played when a consumer or Client calls Morgan Drexen, Associated Attorneys, or a third party providing services to Morgan Drexen or Associated Attorneys, and is put on hold.**

**Response to Document Request 7:** Morgan Drexen objects to this request on the grounds that the request calls for speculation by Morgan Drexen. The Company does not have knowledge as to the recordings, if any, played by the Associated Attorneys and/or third parties providing services to Morgan Drexen when a law firm client calls into and is placed on hold by the Associated Attorneys and/or third parties providing services to Morgan Drexen. Without waiving this objection, Morgan Drexen responds as follow: With respect to the recordings played by Morgan Drexen when a law firm client calls into the Company and is placed on hold, attached as MD001043, please find a copy of the recordings that are played.

**Document Request 8. All advertisements, articles or other marketing materials that have appeared in any television, radio, print, online, or electronic medium that promote the Debt Settlement services of Morgan Drexen or Associated Attorneys to consumers.**

   **a. For each of these items, provide copies of any instructions provided to the media outlet informing it of the date, times, or criteria to run the ads.**

**Response to Document Request 8:** Morgan Drexen objects to this document request to the extent that it creates the inference that Morgan Drexen, Inc. acts as a provider of Debt Settlement services. Attached, please find a copy of the advertisements and/or other marketing materials, bates labeled MD001044 – MD001715 and MD005173 – MD005238, promoting the legal services offered by the Associated Attorneys supported by Morgan Drexen.

15

a.  The Company is currently in the process of drafting a statement detailing the

Company's "ad placement strategy" and obtaining email correspondence between the Company

and media buyers for the month of January 2012.  Upon receipt, a copy will be forwarded to the

Bureau under separate cover.

**Document Request 10.  All communications between Morgan Drexen and Associated
Attorneys concerning implementation of policies and procedures, Clients, fees, or Morgan
Drexen's contracts with attorneys.**

**Response to Document Request 10:**  Morgan Drexen objects to this request on the

grounds that the request is vague, ambiguous, overbroad and burdensome.  Additionally, the

request seeks information protected by the attorney-client privilege.  As agents of attorneys,

Morgan Drexen is not permitted to produce to the Bureau communications between Morgan

Drexen and Associated Attorneys concerning the Associated Attorney's Clients.  Moreover,

Morgan Drexen is not in possession of any communications with Associated Attorneys

concerning the fees assessed by the Associated Attorneys to their clients.  Without waiving these

objections, Morgan Drexen will comply with this request by providing the following non-

privileged correspondences from Associated Attorneys directing Morgan Drexen to utilize

certain form documents, bates labeled MD001716 – MD001760.  Additionally, the Company is

in the process of searching for e-mails between Morgan Drexen and Associated Attorneys

concerning Morgan Drexen's contracts with the Associated Attorneys.  Morgan Drexen will

provide the Bureau with these documents under separate cover.

16

**Document Request 11.** All agreements, contracts, or correspondence between either Morgan Drexen or an Associated Attorney and third parties providing services to either Morgan Drexen or an Associated Attorney related to Debt Settlement services, including but not limited to materials relating to:

     a.     acquiring, providing services to, or terminating services for consumers or Clients;

     b.     providing or acquiring consumer or Client leads;

     c.     receiving or processing payments from Clients;

     d.     tracking transactions or otherwise processing accounts for Clients; or

     e.     receiving phone calls or making phone calls to consumers or Clients.

**Response to Document Request 11:** Please see bates labels MD001761 – MD002071.

**Document Request 14.** Exemplars of all Documents Morgan Drexen or Associated Attorneys provide to Clients in the provision or offering of services to Clients.

**Response to Document Request 14:** Morgan Drexen objects to this request inasmuch as the request calls for speculation by Morgan Drexen. Assuming that the Request only seeks exemplars of Documents Morgan Drexen provides to Clients, attached as bates label MD005454 – MD005504, are copies of all the form documents utilized by Morgan Drexen in connection with the support services provided by Morgan Drexen to the Associated Attorneys. These form documents have been pre-approved by the Associated Attorneys for use by Morgan Drexen. For a copy of the approval letter sent by the Associated Attorneys to Morgan Drexen, please refer to MD001716 – MD001760 provided in response to Document Request No. 10. Morgan Drexen's discovery into this matter is continuing and the Company reserves the right to supplement this response at a later date.

17

CONFIDENTIAL

**Document Request 15. Exemplars of each Document provided by Morgan Drexen to each Associated Attorney, including, but not limited to pleadings, questionnaires, and forms.**

**Response to Document Request 15:** Aside from the form documents provided in response to Document Request No. 14, which were drafted and/or pre-approved for use by the attorneys, Morgan Drexen does not provide the attorneys supported by the Company with any other form documents. All legal documents utilized by the Associated Attorneys (*i.e.*, pleadings, motions, discovery, *etc.*) are prepared by the Associated Attorneys on a case-by-case basis as the Associated Attorneys consult with their clients.

**Document Request 17. All consumer or Client complaints about Morgan Drexen or Associated Attorneys and any responses to the complaints.**

**Response to Document Request 17:** Morgan Drexen objects to this request inasmuch as the request is overbroad, burdensome and fails to reasonably particularize the category of document sought to be produced. Furthermore, the request seeks information protected by the attorney-client privilege. Without waiving these objects, the Company will comply with this request by providing the Bureau with a copy of all known consumer complaints submitted by law firm clients engaged from January 1, 2010 to the present. The Company is in the process of obtaining these documents. Upon receipt, Morgan Drexen will provide the Bureau with these documents under separate cover.

**Document Request 18. Contracts, agreements, or correspondence with creditors that participate in the "Preferred Creditor Program."**

**Response to Document Request 18:** Attached, please find a copy of the requested documents bates labeled MD002072 – MD005172. The Company's discovery into this matter is continuing and the Company will supplement this response at a later date.

18

**Document Request 19. All research conducted, financed, or sponsored by Morgan Drexen measuring the impact that the use of Morgan Drexen's or Associated Attorneys' services has on Clients' credit scores.**

**Response to Document Request 19:** After a diligent search and reasonable inquiry into

this matter, the Company is not in possession of, nor has the Company ever been in possession

of, the requested documents.

**Document Request 21:** The database of information relating to each Client, including:
    a.  the Client's name and contact information;
    b.  the creditors to which the Client owes money;
    c.  the amount of each debt owed by the Client at the time of enrollment;
    d.  the name of the entity seeking to collect the debt, if different from the creditor;
    e.  the Client's source and amount of income;
    f.  any additional debts or monthly financial obligations for each Client;
    g.  if the debt was settled, the amount of each debt owed by the Client at the time of debt settlement (including late fees assessed by creditor or debt collector, but not including any fees assessed by Morgan Drexen or an Associated Attorney);
    h.  if the debt was not settled, the amount of each debt owed by the Client at the time Client ceased making payments to Morgan Drexen or an Associated Attorney through Morgan Drexen (including late fees assessed by creditor or debt collector, but not including any fees assessed by Morgan Drexen or an Associated Attorney);
    i.  the APR and monthly penalty fee(s) for each debt at time of enrollment and at time of settlement or termination of services;
    j.  each fee that Morgan Drexen or an Associated Attorney charged the Client prior to attempting negotiation or settlement of a debt (a.k.a. "engagement fee");
    k.  all fees other than the engagement fee that were directly or indirectly charged to the Client by Morgan Drexen or Associated Attorneys (e.g. monthly fees, enrollment fee, check fee, settlement fee), including charges by third parties assessed to the Client's account, and a description of the type of fee, the identity of the payor and payee, and the date of payment);
    l.  the total number of months that Morgan Drexen or an Associated Attorney told Client that it would take to settle his or her debts;
    m.  each payment made by the Client to Morgan Drexen or an Associated Attorney, the date of payment, and how the payment was credited or applied;
    n.  the terms of all offers of settlement made to or by each creditor, including whether the settlement was for a lump sum or installments, the date of the offer, and whether the offer was accepted;

19

o.   for each proposed settlement from a creditor that was rejected or modified by an Associated Attorney, the stated reasons for rejecting or modifying such settlement;

p.   date and amount of each settlement payment;

q.   date, amount, and source of all advances made to Clients by Morgan Drexen or an Associated Attorney;

r.   refunds made to Client;

s.   date and content of complaints from the Client about Morgan Drexen or Associated Attorneys;

t.   whether the Client was sued by a creditor;

u.   whether the Client filed for bankruptcy, and if so, when;

v.   date of each Client contact with an Associated Attorney, form of the meeting (e.g. phone, in-person, etc.), and length of meeting;

w.   name of any Associated Attorney who provided services to Client, including the attorney who opened the account in which the Client's funds are held;

x.   notes field connected with Client account.

**Response to Document Request No. 21:**  Morgan Drexen objects to this request

inasmuch as the request seeks information protected by the attorney-client and attorney work

product privileges.  As the back office support for the Associated Attorneys, Morgan Drexen is

under a duty to protect the confidentiality of clients of the Associated Attorneys.  Without

waiving these objections, Morgan Drexen will comply with this request to the extent permissible

by law. *See* Exhibits 10 and 11 which contain the non-privileged information required under

subparts (g) and (t).  With regard to the remaining subparts of this request, Morgan Drexen

intends to supplement its response on an ongoing basis.

\* \* \* \* \*

20

Dated:  April 27, 2012

Respectfully submitted,

/s/ Randal M. Shaheen

Randal M. Shaheen
Andrew E. Bigart
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4488

*Counsel for Morgan Drexen, Inc.*

21

**Exhibit 7**

# VENABLE®LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
**T** 202.344.4000   **F** 202.344.8300   www.Venable.com

CONFIDENTIAL

May 7, 2012

*VIA ELECTRONIC AND HAND DELIVERY*

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
Office of Enforcement
1700 G St., NW
Washington, DC 20552

   **Re: Response to April 24, 2012 Letter**

Dear Ms. Weinberg:

   On behalf of our client, Morgan Drexen, Inc., this letter responds to your April 24, 2012 letter, in which you set forth several alleged deficiencies in Morgan Drexen's April 13 and April 16 responses to the Civil Investigative Demand ("CID") issued to Morgan Drexen by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012, as amended by your letter dated March 30, 2012. In addition, we respond to several issues you raised in emails dated April 25, 2012 (Document Request 8) and April 26, 2012 (Document Requests 18 and 12). As explained below, Morgan Drexen is working diligently to respond to your concerns and produce documents in response to most of the outstanding CID specifications by or around May 11, 2012.

   This letter and any accompanying documents constitute sensitive and proprietary business information of Morgan Drexen and are confidential. All such materials are intended only for review by Bureau staff. Accordingly, we request that they receive the highest level of protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

Wendy Weinberg, Esq.                                CONFIDENTIAL
May 7, 2012
Page 2

## I.    APRIL 24, 2012 LETTER

### Document Requests

**Document Request 21:** The most fundamental failure in Morgan Drexen's production concerns its response to Document Request 21. During our March 28th meeting you expressed privilege concerns only about the following subparts of Document Request 21:

(a) the Client's name and contact information;
(o) for each proposed settlement from a creditor that was rejected or modified by an Associated Attorney, the stated reasons for rejecting or modifying such settlement; and
(x) notes field connected with Client account.

You also stated that if Morgan Drexen was going to have any difficulty responding to this request, you would let me know by March 30th. You did not contact me by that date with any concerns. On the April 13 due date, however, rather than producing material responsive to the 21 remaining subparts, Morgan Drexen produced only a partial response to three subparts of Document Request 21. On Friday evening, April 20, 2012, you indicated via email that you would be sending three additional fields on Monday, April 23rd and another two to three fields by the end of this week. We did not agree to this piecemeal production schedule, and you have provided no explanation for your failure to comply with the production schedule. If there is some technical reason that Morgan Drexen cannot comply with the originally agreed to timeline, I would renew our request to have Morgan Drexen's technical team explain this to our technical team. Otherwise, the Bureau requests production of the remaining subparts by April 27, 2012.

**Response**: To date, Morgan Drexen has produced documents in response to Document

Request 21 subparts (a), (b), (c), (d), (e), (f), (g), and (t). The Company anticipates that it will

not have information responsive to several other subparts. Subject to the schedule restraints of

the individuals assisting on this project, Morgan Drexen is working diligently to produce

documents in response to the remaining subparts by or around May 18, 2012.

Wendy Weinberg, Esq.                                    CONFIDENTIAL
May 7, 2012
Page 3

**Document Request 16:** Document Request 16 requests "All welcome letters and
Documents with individualized information on Client debt provided by Morgan Drexen or an
Associated Attorney to a Client." Morgan Drexen has produced only an exemplar of a welcome
packet with no individualized client information. The Bureau requests that Morgan Drexen
produce the individualized welcome packets and any other materials responsive to this request
by April 27, 2012.

**Response**:  On April 13, Morgan Drexen produced to the Bureau a copy of the welcome

packet template that it sends to law firm clients.  Other than inserting the name of the law firm

client and the name of the Morgan Drexen contact assigned to the law firm client, all welcome

letters sent by Morgan Drexen are substantially identical to the template provided to the Bureau

and do not contain any individualized information on law firm client debt.

**Document Request 9:** Document Request 9 asks for "All agreements, contracts, and
Documents related to payments between or among Associated Attorney and Morgan Drexen, or
between or among Associated Attorneys." You have produced some form contracts but no other
relevant documents. Further, the document that begins with Bates number 000987 refers to
"Exhibit A" and "Exhibit B," neither of which Morgan Drexen provided in the production. The
Bureau requests production of the missing documents by April 27, 2012.

**Response**:  Morgan Drexen is reviewing its files and will produce any additional

responsive documents that it identifies by or around May 11, 2012.  The Company will also

produce the Exhibits A and B to the document that begins with Bates number MD000987.

Wendy Weinberg, Esq.                                          CONFIDENTIAL
May 7, 2012
Page 4

**Document Request 6:** At the March 28th meeting, you indicated that Morgan Drexen only records the disclaimers that it recites to consumers. Based upon that representation, the Bureau modified its Document Request 6, which originally asked for all recordings of consumer intake calls, to seek only a sample of such recordings (the first 50 recorded during the week of January 9, 2012), and the script of prompts that populate the telephone intake tree for all inbound calls to Morgan Drexen. In your response you now indicate that Morgan Drexen records nine other categories of calls as well. Accordingly, the Bureau now seeks the first 50 calls recorded during the week of January 9, 2012 for each of the additional nine categories as well. The time period for these calls should be from January 9, 2012 onward, as necessary to aggregate 50 calls in each category. Morgan Drexen should produce these with the other recordings on April 27, 2012.

**Response**: Morgan Drexen does not catalogue its call recordings by the nine categories

set forth in the Company's April 13 response.  The Company is therefore unable to provide 50

calls for each of the nine categories without listening to hundreds, if not thousands, of random

calls in an effort to identify 50 calls for each category.

On April 27, 2012, Morgan Drexen provided the Bureau with 150 recordings that

occurred during the week of January 9, 2012, made in support of the attorneys' debt settlement

legal representations.  *See* MD005239 – MD005389.  The Company proposes to provide the

Bureau with an additional 350 recordings from the week of January 9, 2012 onward.  In addition

to the 150 call recordings already provided to the Bureau, the 350 recordings will give the

Bureau a representative picture of the Company's recorded calls.

**Document Request 5:** Document Request 5 asks for "All telemarketing scripts used by Morgan Drexen, Associated Attorneys, or third parties providing services to Morgan Drexen or Associated Attorneys relating to Debt Settlement Services." In your response, you only provide disclaimer scripts, and fail to provide any telemarketing scripts. The Bureau requests that you remedy this deficiency by April 27, 2012.

**Response**: On April 13, Morgan Drexen produced to the Bureau a copy of the scripts

utilized by Morgan Drexen bates labeled MD000962 – MD000986.  As noted in its response,

"[w]ith respect to 'telemarketing' scripts, after a diligent search and reasonable inquiry into this

Wendy Weinberg, Esq.                                                    CONFIDENTIAL
May 7, 2012
Page 5

matter, the Company is not in possession of, nor has the Company ever been in possession of the

requested documents."

**Document Request 4:** In the PowerPoint presentation that you provided in response to
Document Request 4, which asks for training manuals and materials, much of the presentation is
obscured by large black shapes. These appear to be unrelated to any redaction based on an
assertion of privilege. The Bureau requests that Morgan Drexen produce a readable version of
this presentation by April 27, 2012.

**Response**: Attached as MD000841 – MD000961 is a readable version of the

presentation.

## Interrogatories

**Interrogatory 17:** Interrogatory 17 asks that you identify "each bank or trust account
from which payments were made from Morgan Drexen to an Associated Attorney; from which
payments were made from an Associated Attorney to Morgan Drexen; and in which Clients'
funds are deposited." Morgan Drexen has indicated in its response that "Morgan Drexen does not
make payments to Associated Attorneys." You have not responded to that portion of the
Interrogatory seeking information on payments from Associated Attorneys to Morgan Drexen.
Further, you failed to respond to subpart (d), which requests information on agreements that
govern the management of funds in the identified bank accounts. Finally, you have failed to
respond to subpart (a), which requires you to identify who is authorized to withdraw funds from
the account.

**Response**: Discovery on this matter is continuing and Morgan Drexen is working

diligently to collect and produce any responsive materials to the Bureau on or around May 11,

2012. With respect to subpart (d), Morgan Drexen has produced all agreements between the

Company and Associated Attorneys. As explained in response to Document Request 9, the

company provided a "copy of the following documents: (1) Engagement Agreements executed

between Engagement Counsels and Morgan Drexen bates labeled MD000987 – MD001002, and

(2) Local Counsel Agreements executed between Local Counsels and Howard Law, P.C.

(formerly Howard | Nassiri, P.C.), bates labeled MD001003 – MD001008."

Wendy Weinberg, Esq.                                    CONFIDENTIAL
May 7, 2012
Page 6

**Interrogatory 13:** Interrogatory 13 requires Morgan Drexen to "Identify all Associated Attorneys, the dates during which they have transacted business with Morgan Drexen, and the nature of their association with Morgan Drexen (e.g. acted as "engagement attorneys" or "local attorneys")." Based upon preliminary research we have undertaken, your response to Interrogatory 13 appears to be incomplete. For instance Tammy Zoppo, an attorney who publicly lists herself as having worked for Morgan Drexen, was not on the list provided by Morgan Drexen.

**Response:** On April 13, Morgan Drexen produced an excel spreadsheet identifying all of

the Associated Attorneys who transacted business with Morgan Drexen from 2010 to the present.

With respect to Tammy Zoppo, the Interrogatory requests information on "all Associated

Attorneys," defined by the CID as "an attorney for whom Morgan Drexen states that it provides

support services for legal services or Debt Settlement services." *See* Definition C.  Ms. Zoppo, a

former independent contract employee in Morgan Drexen's legal department, does not meet the

definition of an Associated Attorney, and therefore was not included in the Company's response

to Interrogatory 13.

**Interrogatory 12:** Finally, in your response to Interrogatory 12 you failed to provide the last known home address for former employees, and failed to identify the reason for termination of employment, as required per the definition of "identify" in the CID.

**Response:** Discovery on this matter is continuing.  Morgan Drexen is working diligently

to collect and produce any responsive materials to the Bureau on or around May 11, 2012.

## II.    APRIL 25 AND 26 EMAILS

**Document Request 8:**  In your April 25, 2012 email, you stated that the Bureau was "willing to accept a statement about Morgan Drexen's ad placement strategy, plus all emails sent during the month of January, 2012."

**Response:**  Ad placements made by Morgan Drexen, on behalf of the Associated

Attorneys the Company supports, focus on rates and frequency versus media placement.  The

Wendy Weinberg, Esq.                                   CONFIDENTIAL
May 7, 2012
Page 7

demographic is wide, with an age range of 24-54, for both males and females. All media

placement and stations are relative to rates and media clearance availability per the rates. The

preferred all day part rotators are 5am- 10pm PST. The marketing plan includes core stations,

however, the placement of ads on those stations is reduced when rates increase or the response

does not pay out. Discovery on this matter is continuing. Morgan Drexen is working diligently

to collect and produce any responsive materials to the Bureau on or around May 11, 2012.


**Document Request 13:**[1] In your April 25, 2012 email, you requested "additional
relevant contracts" and that Morgan Drexen "designate the time period that each contract was in
effect."

**Response:** The two contracts produced to the Bureau (MD001009 – MD001030) were

implemented by Morgan Drexen on or around October 2010. *See* MD005454 – MD5459 for a

copy of the attorney-client fee agreement used prior to that date.


**Document Request 18:** In your April 26, 2012 email, you agreed that the Bureau would
"accept a subset of the emails for production tomorrow. The subset should contain all emails
from the three persons whom you have identified, from the months of December 2010, January
2011, February 2011, August 2011, September 2011 and October 2011." In addition, you
requested that Morgan Drexen produce unredacted copies of any emails containing the client's
name or social security number.

**Response:** On April 27, 2012, Morgan Drexen produced emails (MD002072 –

MD005172) from the three persons identified in the April 26 email exchange noted above.

Discovery on this matter is continuing and the Company will produce any additional responsive

materials to the Bureau on or around May 11, 2012.

---

[1] In your email, you refer to the "two attorney-client fee agreements" produced in response to Document Request 12.
These documents were produced in response to Document Request 13. *See* Morgan Drexen's April 13, 2012
response to the Bureau's CID.

Wendy Weinberg, Esq.                                CONFIDENTIAL
May 7, 2012
Page 8


\*   \*   \*   \*   \*


Morgan Drexen reserves the right to change, amend, or supplement the information
provided herein if it becomes aware of additional information, and hereby preserves all
evidentiary and other objections incident to this investigation.  Morgan Drexen does not by this
reservation undertake any obligation of supplementation or amendment.

The Company is working diligently to complete its responses to most of the CID
specifications by or around May 11, 2012, as set forth in your letter dated March 30, 2012.
Morgan Drexen and its counsel are committed to cooperating with the Bureau in connection with
the CID and addressing any issues raised by the Bureau.  Please do not hesitate to contact us
should you have any questions about the enclosed materials.

Respectfully submitted,

Randal M. Shaheen
Andrew E. Bigart
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
202.344.4488
202.344.4323
*Counsel for Morgan Drexen, Inc.*

**Exhibit 8**

# VENABLE® LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
T 202.344.4000  F 202.344.8300  www.Venable.com

CONFIDENTIAL

May 10, 2012

## VIA ELECTRONIC AND HAND DELIVERY

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
Office of Enforcement
1700 G St., NW
Washington, DC 20552

> **RE:   Inadvertent Production of Privileged Material**

Dear Ms. Weinberg:

Per your email dated May 10, 2012, we have discovered that the CD-ROM submitted in connection with Morgan Drexen's May 7, 2012 letter contained two inadvertently produced privileged emails. Thank you for bringing this matter to our attention. Enclosed please find a replacement CD-ROM without the inadvertently produced documents. Please return the original CD production to me, and destroy or return any other copies of the document in your possession. We apologize for the inconvenience and would be happy to arrange a pick-up from your office.

In addition, Morgan Drexen's May 7, 2012 letter mistakenly refers to the document produced in response to Document Request 13 as bates number MD005454 – MD5459. The correct bates number, as designated in the enclosed CD-ROM, is MD005506 – MD005511.

This letter and any accompanying documents constitute sensitive and proprietary business information of Morgan Drexen and are confidential. All such materials are intended only for review by Bureau staff. Accordingly, we request that they receive the highest level of protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

Respectfully submitted,

Randal M. Shaheen
Andrew E. Bigart
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
202.344.4488
202.344.4323
*Counsel for Morgan Drexen, Inc.*

Enclosure

**Exhibit 9**

# VENABLE® LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
**T** 202.344.4000   **F** 202.344.8300   www.Venable.com

May 11, 2012

***VIA ELECTRONIC AND HAND DELIVERY***

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
Office of Enforcement
1700 G St., NW
Washington, DC 20552

      **Re:**    **Fifth Response to Civil Investigative Demand Issued to Morgan Drexen, Inc.**

Dear Ms. Weinberg:

      On behalf of our client, Morgan Drexen, Inc., we submit the enclosed information and materials in response to the Civil Investigative Demand ("CID") issued to Morgan Drexen by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012, as amended by your letter dated March 30, 2012. In accordance with previous discussions with you, and as set forth in your March 30 letter, the enclosed materials respond to Interrogatories 2, 5, 6, 8, 10, 12, 15, 16, 20, 21, and 22 and Document Requests 1, 6, 9, 20, and 21(p), (q), (j), (k), and (n).

      Any communications relating to this inquiry, as well as the documents accompanying or related to those communications and the information contained in the accompanying materials, constitute sensitive and proprietary business information of Morgan Drexen and are confidential. All such materials are intended only for review by Bureau staff. Accordingly, we request that they receive the highest level of protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

      Morgan Drexen reserves the right to change, amend, or supplement the enclosed information or documents if it becomes aware of additional information, and hereby preserves all evidentiary and other objections incident to this investigation. Morgan Drexen does not by this reservation undertake any obligation of supplementation or amendment.

Wendy Weinberg, Esq.
May 11, 2012
Page 2

     Morgan Drexen and its counsel are committed to cooperating with the Bureau in connection with the CID and addressing any issues raised by the Bureau.  To that end, please do not hesitate to contact us should you have any questions about the enclosed materials.

                         Respectfully submitted,

                         Randal M. Shaheen
                         Andrew E. Bigart
                         Venable LLP
                         575 7th Street, N.W.
                         Washington, D.C. 20004
                         202.344.4488
                         202.344.4323

                         *Counsel for Morgan Drexen, Inc.*

## FIFTH RESPONSE OF MORGAN DREXEN, INC.
## TO CIVIL INVESTIGATIVE DEMAND

Morgan Drexen, Inc. ("Morgan Drexen" or the "Company") hereby responds to the Civil Investigative Demand ("CID") issued to it by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012. In accordance with previous discussions with Bureau staff and subject to the letter dated March 30, 2012 from Kent Markus of the Bureau to Randal M. Shaheen, attorney for Morgan Drexen, ("March 30 Letter"), the Fifth CID Response provides responses to Interrogatories 2, 5, 6, 8, 10, 12, 15, 16, 20, 21, and 22 and Document Requests 1, 6, 9, 20, and 21(p), (q), (j), (k), and (n).

Morgan Drexen is providing the information contained in the Fifth CID Response set forth herein in accordance with the provisions and intent of the Bureau's practice and procedure rules (the "Rules"). To the extent that an objection is made to any interrogatory or request for documents, such objection is noted therein; further, each response is subject to the general objections set forth in the "General Objections" section below. Any claims of privilege will be identified in a separate privilege log to be produced at a later date.

The responses set forth herein are based upon information that has been collected and/or reviewed for the purpose of responding to these Interrogatories and Requests for Documents. Morgan Drexen reserves the right to supplement or modify its responses in the event that it obtains additional, better, or different information, or should additional facts come to light which alter or supplement the facts currently known. All information and documents are submitted pursuant to the confidentiality protections available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

CONFIDENTIAL

## GENERAL OBJECTIONS

1.    Morgan Drexen objects to each and all of the Interrogatories and Requests for Documents to the extent they seek information and documents which are protected from disclosure by the attorney-client privilege, work-product doctrine, and/or other applicable privilege. Morgan Drexen does not waive any protections or privileges by responding to these Interrogatories and Requests for Documents.

2.    Morgan Drexen objects to these Interrogatories and Requests for Documents to the extent that they seek information that is not relevant to the issues in this matter. Any inadvertent provision of information or production of documents not related to the issues raised by this action shall not waive this objection.

3.    Morgan Drexen objects to these Interrogatories and Requests for Documents to the extent that they are unreasonably broad, repetitious, or unduly burdensome.

2

**CONFIDENTIAL**

## RESPONSES TO
## INTERROGATORIES

**Interrogatory 2:  Identify the date and legal purpose for the creation of Morgan Drexen, the Persons who created Morgan Drexen, and each of their roles in creating Morgan Drexen.**

**Response to Interrogatory No. 2:**  Morgan Drexen was founded in March 2007 by Walter J. Ledda, Avi Gupta, Rita August, and Mark Kruitbosch.  Mr. Ledda is Morgan Drexen's President and Chief Executive Officer.  The Company is a software development company that seeks to improve the efficiency of the practice of law (and businesses) by automating procedures that do not require the independent legal judgment and training of attorneys.

**Interrogatory 5:  Identify each registration, license, permit or certificate to do business held by Morgan Drexen, as well as the state or jurisdiction that issued such.**

**Response to Interrogatory No. 5:**  Morgan Drexen has been licensed to do business in the State of California as a foreign corporation since August 13, 2007.

**Interrogatory 6:  Identify every enforcement action or investigation involving Morgan Drexen from January 2007 to the present and describe its current status or outcome.**

**Response to Interrogatory No. 6:**  Since January 2007, Morgan Drexen has been involved in enforcement actions or investigations in the following states:

(1)  Colorado – Morgan Drexen initiated a declaratory relief action.

(2)  Connecticut – This investigation was resolved favorably.

(3)  Georgia – This investigation was resolved favorably and no action taken.

(4)  Kansas – No action taken following Morgan Drexen's response to the subpoena.

3

**CONFIDENTIAL**

(5)   Minnesota – This lawsuit concluded with a favorable settlement.

(6)   New Hampshire – This matter is pending while Morgan Drexen and the Banking Commission discuss a resolution.

(7)   North Carolina – This matter was resolved with Morgan Drexen continuing to serve clients.

(8)   Ohio – No action taken following Morgan Drexen's response to a subpoena.

(9)   Utah – This matter was resolved favorably.

(10)  Vermont – No action taken following Morgan Drexen's response to a subpoena.

(11)  Virginia – This matter was resolved favorably.

(12)  Washington – No action taken following Morgan Drexen's response to a subpoena.

(13)  West Virginia – The resolution of this matter is outstanding following a September 7, 2011 hearing.

(14)  Wisconsin – This matter is pending before the Department of Financial Institutions.


**Interrogatory 8:  For all Documents provided in response to Document Request # 8 herein, identify who paid for the development, marketing, or placement of each Document and who wrote, reviewed, and approved each Document, including any advertising agency, media placement service provider, third-party vendor, or consultant.**

**Response to Interrogatory No. 8:**  All advertisements provided in response to

Document Request No. 8 are paid for by the Associated Attorneys who contract with Morgan

Drexen.  The Company respectfully requests that the Bureau refer to Exhibit 2 provided by the

Company in response to Interrogatory No. 13 for the identities of the aforementioned Associated

Attorneys.  Morgan Drexen employs a marketing team to assist the attorneys in developing

advertisements for the attorney's services.  For a list of the individuals employed by Morgan

4

Drexen's Marketing Department, please refer to Exhibit 18 provided herein in response to Interrogatory No. 12.

With respect to the television and radio advertisements, during the period of February 23, 2009, through August 8, 2010, the advertisements were primarily created by Nicholas Lester, Morgan Drexen's Creative Director. In early 2011, Mr. Lester's position was eliminated, and Carl Dawson, Morgan Drexen's current Vice President of Marketing, took primary responsibility for the creation of all television and radio advertisements.

With respect to the print advertisements, including all websites, during the period of October 15, 2007, through July 22, 2010, the print advertisements were created by Feridoni Farhad Esmaili, Morgan Drexen's Creative Director. Shortly after Mr. Esmaili's departure, Steven Schebesch, the Company's current Visual Design Director, took over Mr. Esmaili's responsibility with respect to creating print advertisements.

The advertisements are reviewed by Morgan Drexen's Compliance Counsel, Jessica Tincopa, and approved by the General Counsel, Jeffrey Katz. Furthermore, advertisements are forwarded to the Associated Attorneys who are named in the advertisement for their review and approval.

**Interrogatory 10: Identify each category of persons employed by Morgan Drexen. For each category identify the number of persons in the category and their responsibilities, qualifications, and form of compensation, including whether the compensation is provided in the form of a salary or bonus, includes incentives, or is tied to the performance of the employee or Morgan Drexen.**

**Response to Interrogatory No. 10:** Morgan Drexen respectfully requests that the Bureau refer to the Company's response to Interrogatory No. 7 which identifies the various

5

departments within Morgan Drexen and the responsibility of each department.  Additionally,

Exhibit 18, provided herein in response to Interrogatory No. 12, lists the department in which

each employee worked.  Of the departments listed in response to Interrogatory No. 7, the

following departments receive commission-based compensation: Creditor Relations, Legal

Intake, Marketing, Preferred Creditors, and Processing.  All other employees and employees in

management positions are compensated based upon an annual salary or hourly rate.  Lastly, most

employees at Morgan Drexen are eligible for a performance-based bonus.  The performance-

based bonus takes into consideration the individual's performance as well as the performance of

the Company as a whole.

     **Interrogatory 12:**  **Identify all former employees or contractors of Morgan Drexen from January 1, 2007 to the date of your response, and state for each all titles and positions held while with Morgan Drexen, the dates the employee held each such title or position, and the reason for termination of employment.**

     **Response to Interrogatory 12:**  Morgan Drexen hereby adopts and incorporates by

reference its previous General Objections as if stated fully herein.  Without waiving any of its

general objections, and subject to them, Morgan Drexen hereby responds as follows:

     *See* Exhibit 18 for an updated excel spreadsheet containing the names, title, date of hire

and date of termination (where applicable) for former and current employees of Morgan Drexen

from January 1, 2007 through April 6, 2012.  The spreadsheet has been updated to include the

last known address for all current and former employees as well as the reason for termination for

former employees.

<div align="center">6</div>

**Interrogatory 15: Identify who wrote, reviewed or approved the Documents produced in response to Document Requests 3, 4, 5, 9, 11, 12, 13, 14, 15 and 18. State when each of these activities occurred.**

**Response to Interrogatory No. 15:**

*Document Requests 3 – 5:* The policies and procedures, training manuals and scripts utilized by employees at Morgan Drexen are generally written by or with the input of the managers and supervisors of the department which utilizes the materials. The managers and supervisors are required to forward all policies, procedures, training manuals and scripts to the Company's Chief Operating Officer, Rita Augusta, for her review and approval. Additionally, the materials will be forwarded to Morgan Drexen's Corporate Legal Department for their approval, as needed. Lastly, if an Associated Attorney has requirements that are specific to their clients, any policies, procedures, training manuals and scripts created by the Company to address the requests of the Associated Attorney will be forwarded to the Associated Attorney for his / her review.

*Document Request 9:* The Engagement Counsel Agreement executed between the Associated Attorneys and Morgan Drexen was drafted by Morgan Drexen's Corporate Legal Department with feedback from the Company's Chief Executive Officer, Walter J. Ledda, and former Chief Legal Officer, Stephen Nagin. The Local Counsel Agreement executed between the Associated Attorneys and Howard Law, P.C. [formerly, Howard | Nassiri, P.C.] was drafted by Vincent Howard.

*Document Request 11:* The contract executed between Morgan Drexen, Inc. and Seevian Solutions, Inc., was provided to the Company by Seevian Solutions. The Company does not have knowledge as to who drafted the agreement.

7

- 180 -

*Document Request 12:* The Company is not in possession of any documents responsive to Document Request 12.

*Document Request 13 – 15:* All documents authorized for use by Morgan Drexen were drafted, reviewed and/or approved by the Associated Attorneys.

*Document Request 18:* The correspondences between Morgan Drexen and the preferred creditors were written by Cris Signorino, Tod Stokes and Leandro de Amaral. The Company respectfully requests that the Bureau refer to the documents produced in order to identify the agent of the preferred creditor who corresponded with Morgan Drexen.

**Interrogatory 16:** **Identify each Client for whom an Associated Attorney declined to provide services.**

**Response to Interrogatory No. 16:** Morgan Drexen objects to this interrogatory inasmuch as the interrogatory seeks information protected by the attorney-client privilege. Without waiving this objection, the Company does not classify termination of legal representation based upon whether an Associated Attorney or a law firm client initiated the request for termination. However, in a good faith effort to comply with this request, the Company will provide the Bureau with a list of files known by the Company to have been terminated at the instruction of an Associated Attorney. The Company is currently in the process of compiling this list, upon completion, a copy will be forwarded to the Bureau.

**Interrogatory 20:** **Identify the Persons who developed the Preferred Creditor Program and who solicit creditors or debt collectors for participation in that program.**

**Response to Interrogatory No. 20:** The idea for the Preferred Creditor Program was originally conceived by Walter J. Ledda, Morgan Drexen's Chief Executive Officer. The

8

CONFIDENTIAL

program was thereafter presented to the Associated Attorneys for their thoughts and

authorization for implementation with their clients.  Since the creation of the program, Cris

Signorino, the Preferred Creditor Relations Manager, and Tod Stokes, the Preferred Creditor

Account Executive, have been responsible for approaching creditors and debt collectors for

participation in the program.


**Interrogatory 21:  State the basis for the claims made by either Morgan Drexen or Associated Attorneys that consumers or Clients:**

- a. will "save thousands";
- b. "settle for a fraction" or "you'll pay a fraction of what you owe";
- c. "be debt free in months";
- d. "you could qualify for up to $1000 cash advance to settle your debt quickly and legally";
- e. that the criterion to obtain $1000 cash advance are: "Financial Situation changed? $5000 or more in credit card debt? Falling behind your payments?";
- f. that Morgan Drexen and the Associated Attorneys provide a "no cost, no fee" program;
- g. that there are "no outrageous upfront fees or charges" or that "the majority of fees are earned after you settle" or that there are "$0 up-front fees";
- h. that a law firm will "handle ruthless collectors so you can finally get a good night's sleep";
- i. that "After reaching an agreement for settlement, the creditor issues a letter stating that the debt obligation is fulfilled and reports to credit bureaus that the debt has been "paid" or "settled" or "settled for less than full amount."

**Response to Interrogatory No. 21:**  Discovery on this matter is continuing and Morgan

Drexen is working diligently to respond to this Interrogatory on or before May 18, 2012.

9

**Interrogatory 22:** **For the research produced in Document Requests #19 and 20, describe the data used in the analysis, including but not limited to, the source of data, how it was collected, and the methodology used in analyzing the data to reach the conclusion drawn.**

**Response to Interrogatory No. 22:** Morgan Drexen did not identify any documents in response to Document Request No. 19. With respect to Document Request No. 20 the Company's discovery into that Document Request is continuing.

## RESPONSES TO
## DOCUMENT REQUESTS

**Document Request 1:** **Morgan Drexen's articles of incorporation, by-laws, and charter.**

**Response to Document Request No. 1:** Attached, please find a copy of the requested documents bates labeled MD009576 – MD009589.

**Document Request 6.** **Recordings of consumer intake calls.**

**Response to Document Request 6:** In addition to the one hundred and fifty (150) recordings that Morgan Drexen produced on April 27, 2012, please find enclosed as MD005512 – MD005811 three hundred and fifty (350) additional recordings from the week of January 9, 2012, onward, made in support of the attorneys' debt settlement legal representations.

**Document Request 9:** **All agreements, contracts, and Documents related to payments between or among Associated Attorneys and Morgan Drexen, or between or among Associated Attorneys.**

**Response to Document Request 9:** Attached as MD005812 – MD009305, please find copies of all agreements executed between Morgan Drexen and the Associated Attorneys.

10

**Document Request 20:**  All research studies, analyses, or other materials on which Morgan Drexen relies to provide a reasonable basis for the claims identified in Interrogatory #21.

**Response to Document Request No. 20:**  Discovery on this matter is continuing and

Morgan Drexen is working diligently to collect and produce any responsive materials to the

Bureau on or around May 18, 2012.

**Document Request 21:**  The database of information relating to each Client, including:

    a.  the Client's name and contact information;
    b.  the creditors to which the Client owes money;
    c.  the amount of each debt owed by the Client at the time of enrollment;
    d.  the name of the entity seeking to collect the debt, if different from the creditor;
    e.  the Client's source and amount of income;
    f.  any additional debts or monthly financial obligations for each Client;
    g.  if the debt was settled, the amount of each debt owed by the Client at the time of debt settlement (including late fees assessed by creditor or debt collector, but not including any fees assessed by Morgan Drexen or an Associated Attorney);
    h.  if the debt was not settled, the amount of each debt owed by the Client at the time Client ceased making payments to Morgan Drexen or an Associated Attorney through Morgan Drexen (including late fees assessed by creditor or debt collector, but not including any fees assessed by Morgan Drexen or an Associated Attorney);
    i.  the APR and monthly penalty fee(s) for each debt at time of enrollment and at time of settlement or termination of services;
    j.  each fee that Morgan Drexen or an Associated Attorney charged the Client prior to attempting negotiation or settlement of a debt (a.k.a. "engagement fee");
    k.  all fees other than the engagement fee that were directly or indirectly charged to the Client by Morgan Drexen or Associated Attorneys (e.g. monthly fees, enrollment fee, check fee, settlement fee), including charges by third parties assessed to the Client's account, and a description of the type of fee, the identity of the payor and payee, and the date of payment);
    l.  the total number of months that Morgan Drexen or an Associated Attorney told Client that it would take to settle his or her debts;
    m.  each payment made by the Client to Morgan Drexen or an Associated Attorney, the date of payment, and how the payment was credited or applied;

11

n.  the terms of all offers of settlement made to or by each creditor, including whether the settlement was for a lump sum or installments, the date of the offer, and whether the offer was accepted;

o.  for each proposed settlement from a creditor that was rejected or modified by an Associated Attorney, the stated reasons for rejecting or modifying such settlement;

p.  date and amount of each settlement payment;

q.  date, amount, and source of all advances made to Clients by Morgan Drexen or an Associated Attorney;

r.  refunds made to Client;

s.  date and content of complaints from the Client about Morgan Drexen or Associated Attorneys;

t.  whether the Client was sued by a creditor;

u.  whether the Client filed for bankruptcy, and if so, when;

v.  date of each Client contact with an Associated Attorney, form of the meeting (e.g. phone, in-person, etc.), and length of meeting;

w.  name of any Associated Attorney who provided services to Client, including the attorney who opened the account in which the Client's funds are held;

x.  notes field connected with Client account.

**Response to Document Request No. 21:**  Morgan Drexen objects to this request

inasmuch as the request seeks information protected by the attorney-client and attorney work

product privileges.  As the back office support for the Associated Attorneys, Morgan Drexen is

under a duty to protect the confidentiality of clients of the Associated Attorneys.  Without

waiving these objections, Morgan Drexen will comply with this request to the extent permissible

by law.  *See* Exhibits 12, 13, 14, 15, 16, and 17 for the Company's response to subparts (p), (q),

(j), (k), (n), and (n). respectively.

\* \* \* \* \*

12

- 185 -

CONFIDENTIAL

Dated: May 11, 2012

Respectfully submitted,

/s/ Randal M. Shaheen

Randal M. Shaheen
Andrew E. Bigart
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4488

*Counsel for Morgan Drexen, Inc.*

13

**Exhibit 10**

**cfpb** Consumer Finance
Protection Bureau

1700 G Street NW, Washington, D.C. 20552

May 11, 2012

Randal M. Shaheen, Partner
Venable LLP
575 7th Street, NW
Washington, DC 20004

Re: Morgan Drexen

Dear Mr. Shaheen:

I am writing to address several deficiencies in Morgan Drexen's April 27th and
April 30th responses to the Bureau's March 13, 2012 Civil Investigative
Demand ("CID"). All of the responses referenced below were due by April 27,
2012, except for Document Request 21, which was due on April 13, 2012. The
production does not comply with the CID or the production schedule we
agreed to at our meeting of March 28, 2012, as memorialized in the March 30,
2012 letter from Enforcement Director Markus. Specifically, Morgan
Drexen's production has the following deficits:

      <u>Document Requests:</u>

1. **Document Request 21**: The Bureau has repeatedly expressed its
   dissatisfaction with Morgan Drexen's response to this request.
   Although you have stated that Morgan Drexen is attempting to comply,
   you have provided no substantive explanation for Morgan Drexen's
   continued delay. Instead, you have unilaterally and repeatedly
   extended the time within which Morgan Drexen intends to comply.

   You have refused to allow our IT team to talk to Morgan Drexen's IT
   team to help us understand the reason for the delay. You are now
   claiming that the delay is caused in part by Walter Ledda's role in
   personally either reviewing the production or actually downloading the
   data. Please provide a full explanation of Mr. Ledda's role in this
   production and how it has caused Morgan Drexen to need an additional
   five weeks to provide this data.



Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

2. **Document Request 18:** Document Request 18 asks for "Contracts,
agreements, or correspondence with creditors that participate in the
'Preferred Creditor Program.'" You have provided only
administrative/non-substantive emails. You have failed to either
provide contracts or agreements or, once again, provide any
explanation for this delay, simply stating that "the Company will
supplement this response at a later date." We can conceive of no
reason why Morgan Drexen has been unable to provide a timely
response to this request, particularly the contracts. The Bureau requests
full production of this request by May 18, 2012.

3. **Document Request 17:** Document Request 17 asks for "All consumer
or Client complaints about Morgan Drexen or Associated Attorneys
and any responses to the complaints." Your only response was that the
Company is in the process of obtaining these documents and will
provide them at an unidentified time.

Morgan Drexen is obviously already in possession of the Client and
consumer complaints that it has received directly, and Morgan Drexen
specifically represented that it would produce all of these materials by
April 27th. The Bureau requests full production of this request by May
18, 2012.

4. **Document Request 11:** Document Request 11 asks for all agreements,
contracts, or correspondence with third-party service providers to
Morgan Drexen or Associated Attorneys. Morgan Drexen has provided
only one contract and no other documents.

The Bureau is requesting that you confirm that it is Morgan Drexen's
position that the only third-party service provider to either Morgan
Drexen or Associated Attorneys, as those terms are defined in the CID,
is with Seevian Solutions.

The Bureau further requests all requested correspondence with Seevian
Solutions by May 18, 2012.

5. **Document Request 10:** Document Request 10 requests "All
communications between Morgan Drexen and Associated Attorneys
concerning implementation of policies and procedures, Clients, fees, or

 Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

Morgan Drexen's contracts with attorneys."  In response you have
stated "Morgan Drexen is not in possession of any communications
with Associated Attorneys concerning the fees assessed by the
Associated Attorneys to their clients."  Please confirm that it is Morgan
Drexen's position that it is not in possession of any such documents.

Finally, the Bureau requests confirmation that it is Morgan Drexen's
position that the only correspondence between Morgan Drexen and the
Associated Attorneys concerning policies and procedures, or fees
charged between Morgan Drexen and the Associated Attorneys, are the
form letters apparently signed by Associated Attorneys dated January
and February 2012, provided as Bates 001716-001760, as well as the
other materials already produced.

Document Submission Standards

The Bureau's Document Submission Standards concerning emails state that:
"The Bureau accepts MS Outlook PST files, MS Outlook MSG files and Lotus
Notes NSF files.  Any other format for the electronic submission of email will
be accepted *only with prior approval*."  Morgan Drexen has submitted emails
only in pdf format.  The Bureau requests that Morgan Drexen remedy this
deficiency by May 18, 2012 by resubmitted emails submitted in pdf format,
and that it submit all further emails in the requested format.

Claims of Privilege

The instructions to the CID state specifically what Morgan Drexen must do to
assert a claim of privilege in its response.  Although Morgan Drexen has
claimed privilege throughout its responses, it has failed to comply in any way
with the instructions for such assertion set forth in the CID.

The deficiencies identified by the Bureau are based on our initial review and
we reserve the right to amend this list as necessary in the future.

Sincerely,

Wendy J. Weinberg
Shirley Chiu
Enforcement Attorneys

**Exhibit 11**

# VENABLE® LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
**T** 202.344.4000   **F** 202.344.8300   www.Venable.com

CONFIDENTIAL

May 18, 2012

*VIA ELECTRONIC AND HAND DELIVERY*

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
Office of Enforcement
1700 G St., NW
Washington, DC 20552

   **Re: Response to May 11, 2012 Letter**

Dear Ms. Weinberg:

   On behalf of our client, Morgan Drexen, Inc., this letter responds to your May 11, 2012,

letter, in which you set forth several alleged deficiencies in Morgan Drexen's April 27 and April

30 responses to the Civil Investigative Demand ("CID") issued to Morgan Drexen by the

Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012, as amended

by your letter dated March 30, 2012.  In addition, please find enclosed as MD009590 –

MD009954 documents in response to Document Request No. 9.

   As explained below, Morgan Drexen is working diligently to respond to your concerns

and complete its response to the CID.  To date the Company has responded in whole or in part to

over 85% of the CID.  We recognize that the Company's response has not matched precisely the

schedule envisioned in your letter of March 30, 2012.  However, the Company has been working

diligently to respond while at the same time juggling the day to day demands of the business and

the inevitable unforeseen issues that arise once the actual process of collecting and reviewing

potentially responsive materials is underway.  (Just as we assume unforeseen issues also delayed

Wendy Weinberg, Esq.                                    CONFIDENTIAL
May 18, 2012
Page 2

staff's issuance of the CID.)  It is the Company's desire to continue to work cooperatively and

transparently with you and the other members of your team in this matter.

This letter and any accompanying documents constitute sensitive and proprietary

business information of Morgan Drexen and are confidential.  All such materials are intended

only for review by Bureau staff.  Accordingly, we request that they receive the highest level of

protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070

and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-

1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other

applicable statutes, regulations, and rules.

### Document Requests

**Document Request 21:** The Bureau has repeatedly expressed its dissatisfaction with
Morgan Drexen's response to this request.  Although you have stated that Morgan Drexen is
attempting to comply, you have provided no substantive explanation for Morgan Drexen's
continued delay.  Instead, you have unilaterally and repeatedly extended the time within which
Morgan Drexen intends to comply.

You have refused to allow our IT team to talk to Morgan Drexen's IT team to help us
understand the reason for the delay.  You are now claiming that the delay is caused in part by
Walter Ledda's role in personally either reviewing the production or actually downloading the
data.  Please provide a full explanation of Mr. Ledda's role in this production and how it has
caused Morgan Drexen to need an additional five weeks to provide this data.

**Response:**  To date, Morgan Drexen has produced documents in response to Document

Request 21 subparts (a), (b), (c), (d), (e), (f), (g), (j), (k), (n), (p), (q) and (t).  Please find attached

as Exhibits 18, 19, and 20 responses to subparts (m), (u), and (w).

The Company anticipates that it will not have information responsive to some or all parts

of subparts (h), (i), (l), (o), and (s).  The Company also anticipates asserting a privilege claim

with respect to subpart (x).  While the Company believes it has not been unreasonably slow in its

Wendy Weinberg, Esq.                                                CONFIDENTIAL
May 18, 2012
Page 3

response to this Request, the timing of its response has been dictated by scheduling demands on

the time of the Company's in-house counsel and others involved in the collection and review of

the data prior to its production.  Because the issues are not "technical" in nature, a conversation

between IT specialists does not seem likely to facilitate the Company's response to this Request.

Subject to the schedule restraints of the individuals assisting on this project, Morgan Drexen is

working diligently to produce documents in response to the remaining subparts.

**Document Request 18:**  Document Request 18 asks for "Contracts, agreements, or
correspondence with creditors that participate in the 'Preferred Creditor Program.'"  You have
provided only administrative/non-substantive emails.  You have failed to either provide contracts
or agreements or, once again, provide any explanation for the delay, simply stating that "the
Company will supplement this response at a later date."  We can conceive of no reason why
Morgan Drexen has been unable to provide a timely response to this request, particularly the
contracts.  The Bureau requests full production of this request by May 18, 2012.

**Response:**  In Morgan Drexen's April 27 response, the Company produced responsive

documents bates labeled MD002072 – MD005172, and explained that its discovery into this

matter was continuing.  Please find attached as MD009955 – MD9959 a copy of the standard

non-disclosure agreement entered into between Morgan Drexen and some creditors that

participate in the Preferred Creditor Program.  Other than the non-disclosure agreement, the

Company does not enter into agreements with creditors that have access to the Preferred Creditor

Program.  As a precautionary measure, Morgan Drexen asserts that discovery into this matter is

continuing.  Subject to the schedule restraints of the individuals assisting on this project, Morgan

Drexen is working diligently to produce additional responsive correspondence with creditors to

the Bureau, if any.

Wendy Weinberg, Esq.                                    CONFIDENTIAL
May 18, 2012
Page 4

**Document Request 17:** Document Request 17 asks for "All consumer or Client complaints about Morgan Drexen or Associated Attorneys and any responses to the complaints." Your only response was that the Company is in the process of obtaining these documents and will provide them at an unidentified time.

Morgan Drexen is obviously already in possession of the Client and consumer complaints that it has received directly, and Morgan Drexen specifically represented that it would produce all of these materials by April 27th. The Bureau requests full production of this request by May 18, 2012.

**Response:** Discovery into this matter is continuing. Subject to the schedule restraints of

the individuals assisting on this project, Morgan Drexen is working diligently to redact client

names from these documents and produce them to the Bureau.

**Document Request 11:** Document Request 11 asks for all agreements, contracts, or correspondence with third-party service providers to Morgan Drexen or Associated Attorneys. Morgan Drexen has provided only one contract and no other documents.

The Bureau is requesting that you confirm that it is Morgan Drexen's position that the only third-party service provider to either Morgan Drexen or Associated Attorneys, as those terms are defined in the CID, is with Seevian Solutions.

The Bureau further requests all requested correspondence with Seevian Solutions by May 18, 2012.

**Response:** Discovery into this matter is continuing. Subject to the schedule restraints of

the individuals assisting on this project, Morgan Drexen is working diligently to produce

responsive documents, including all requested correspondence with Seevian Solutions. Morgan

Drexen is not aware of any other third-party service provider that has provided the services set

forth in Document Request 11 to either Morgan Drexen or Associated Attorneys.

Wendy Weinberg, Esq.                                  CONFIDENTIAL
May 18, 2012
Page 5

**Document Request 10:** Document Request 10 requests "All communications between Morgan Drexen and Associated Attorneys concerning implementation of policies and procedures, Clients, fees, or Morgan Drexen's contracts with attorneys." In response you have stated "Morgan Drexen is not in possession of any communications with Associated Attorneys concerning the fees assessed by the Associated Attorneys to their clients." Please confirm that it is Morgan Drexen's position that it is not in possession of any such documents.

Finally, the Bureau requests confirmation that it is Morgan Drexen's position that the only correspondence between Morgan Drexen and the Associated Attorneys concerning policies and procedures, or fees charged between Morgan Drexen and the Associated Attorneys, are the form letters apparently signed by Associated Attorneys dated January and February 2012, provided as Bates 001716-001760, as well as the other materials already produced.

**Response:** Morgan Drexen is not in possession of any additional documents that represent communications between itself and associated attorneys concerning the implementation of the fee structure assessed by Associated Attorneys to their debt settlement clients. On occasion, an Associated Attorney will decide to waive or reduce his or her standard fees. This information is typically conveyed verbally to Morgan Drexen and then communicated to the Company's accounting department.

*   *   *   *   *

Finally, there are several other issues that you have inquired about. First, you asked why there are no phone numbers in the advertisements the Company has produced. We undertook a random review of some of the advertisements and found that they do contain phone numbers. If you could direct our attention to the specific advertisements that you are concerned about we will inquire and respond back to you. Second, with regard to the production and formatting of emails, the Company has in many instances found it necessary to redact privileged and/or confidential client names from email communications and can only do so in PDF format. In other instances, PDF format was the most expeditious manner to produce responsive materials to the Bureau.

Wendy Weinberg, Esq.                                  CONFIDENTIAL
May 18, 2012
Page 6

    Morgan Drexen reserves the right to change, amend, or supplement the information

provided herein if it becomes aware of additional information, and hereby preserves all

evidentiary and other objections incident to this investigation.  Morgan Drexen does not by this

reservation undertake any obligation of supplementation or amendment.

    The Company is working diligently to complete its responses to the CID specifications.

Morgan Drexen and its counsel are committed to cooperating with the Bureau in connection with

the CID and addressing any issues raised by the Bureau.  Please do not hesitate to contact us

should you have any questions about the enclosed materials.

                                Respectfully submitted,

                                _Randy Shaheen/AB_

                                Randal M. Shaheen
                                Andrew E. Bigart
                                Venable LLP
                                575 7th Street, N.W.
                                Washington, D.C. 20004
                                202.344.4488
                                202.344.4323
                                *Counsel for Morgan Drexen, Inc.*

**Exhibit 12**

# VENABLE® LLP

575 SEVENTH STREET NW    WASHINGTON, DC 20004
**T** 202.344.4000  **F** 202.344.8300  www.Venable.com

May 29, 2012

*VIA ELECTRONIC AND HAND DELIVERY*

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
1750 Pennsylvania Avenue, N.W., 10th Floor
Washington, D.C. 20220

>    **Re:    Seventh Response to Civil Investigative Demand Issued to Morgan Drexen, Inc.**

Dear Ms. Weinberg:

On behalf of our client, Morgan Drexen, Inc., please find enclosed a CD-ROM with information responsive to Document Requests 21(v) and (r) of the Civil Investigative Demand ("CID") issued to Morgan Drexen by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012, as amended by your letter dated March 30, 2012.

Any communications relating to this inquiry, as well as the documents accompanying or related to those communications and the information contained in the accompanying materials, constitute sensitive and proprietary business information of Morgan Drexen and are confidential. All such materials are intended only for review by Bureau staff. Accordingly, we request that they receive the highest level of protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

Morgan Drexen reserves the right to change, amend, or supplement the enclosed information or documents if it becomes aware of additional information, and hereby preserves all evidentiary and other objections incident to this investigation. Morgan Drexen does not by this reservation undertake any obligation of supplementation or amendment.

Wendy Weinberg, Esq.
May 29, 2012
Page 2

    Morgan Drexen and its counsel are committed to cooperating with the Bureau in connection with the CID and addressing any issues raised by the Bureau.  To that end, please do not hesitate to contact us should you have any questions about the enclosed materials.

                       Respectfully submitted,

                       Randal M. Shaheen
                       Andrew E. Bigart
                       Venable LLP
                       575 7th Street, N.W.
                       Washington, D.C. 20004
                       202.344.4488
                       202.344.4323

                       *Counsel for Morgan Drexen, Inc.*

**Exhibit 13**

**cfpb**  Consumer Financial
         Protection Bureau

1700 G Street NW, Washington, DC 20552

June 1, 2012

Randal M. Shaheen, Partner
Venable LLP
575 7th Street, NW
Washington, DC  20004

Re: Morgan Drexen

Dear Mr. Shaheen:

I am writing to address several deficiencies in Morgan Drexen's responses to
the Bureau's March 13, 2012 Civil Investigative Demand ("CID"), including
its most recent productions of May 11th, May 14th and May 29th.  Complete
responses to the entire CID were due by May 11th.  There are still numerous
items that have not been addressed at all. The production does not comply with
the CID or the production schedule we agreed to at our meeting of March 28,
2012, as memorialized in the March 30, 2012 letter from Enforcement Director
Markus.  Specifically, Morgan Drexen's production has the following deficits:

> Document Requests:

1. **Document Request 21**: In your correspondence of May 7, 2012 you
   indicated that Morgan Drexen "is working diligently to produce
   documents in response to the remaining subparts by May 18, 2012."

   To date we have received no response at all to subparts (h), (i), (l), (o),
   (s), and (x).  We have also neither received a privilege log as required
   under the CID, nor a response to the privilege case-law citations that I
   sent to you on March 29, 2012.

   Further, as I mentioned in our conversation of May 29th, we need
   individual account identifiers each time an account for a Client is noted
   in one of the subparts, so that we can match accounts across tables.

   Additionally, some of the tables that you have provided have
   inconsistent data.  For example, there are 792 Clients identified in



**Consumer Financial Protection Bureau**

1700 G Street NW, Washington, DC 20552

response to 21(j) who are not present in 21(a).  At the same time, there are 6 Clients identified in 21(a), who are not present in 21(j).

There is also some questionable data.  One Client is identified in 21(d) as having 188 creditors.  Although this is certainly possible, it seems unlikely.

More fundamentally, Morgan Drexen has stated in its response to request 21(j) that it has not charged any fees to Clients prior to attempting negotiation or settlement of a debt since January 1, 2011.  Please confirm that it is Morgan Drexen's position that it has not charged any such fees, including but not limited to those that may have been charged pursuant to an "Attorney/Client Bankruptcy Fee Agreement," since January 1, 2011.

2. **Document Request 20:** We have received no response to this request, which asks for "All research studies, analyses, or other materials on which Morgan Drexen relies to provide a reasonable basis for the claims identified in Interrogatory #21."

3. **Document Request 18:** This request asks for "Contracts, agreements, or correspondence with creditors that participate in the 'Preferred Creditor Program.'"  Confirm that it is Morgan Drexen's position that there are no relevant contracts or agreements.  Further, you have stated that the requested correspondence related to this program is forthcoming, but have neither produced it nor even provided a date by which you intend to produce it.

4. **Document Request 17:**  Document Request 17 asks for "All consumer or Client complaints about Morgan Drexen or Associated Attorneys and any responses to the complaints."  You have stated that this production is forthcoming, but have neither produced it nor even provided a date by which you intend to produce it.

5. **Document Request 11:** Document Request 11 asks for, *inter alia,* correspondence between Morgan Drexen and third parties providing services to Morgan Drexen. The Request details five different types of correspondence including: (a) acquiring, providing services to, or

**cfpb** Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

terminating services for consumers or Clients; (b) providing or
acquiring consumer or Client leads; (c) receiving or processing
payments from Clients; (d) tracking transactions or otherwise
processing accounts for Clients; or (e) receiving phone calls or making
phone calls to consumers or Clients.

First, as I noted previously, you have provided emails between Morgan
Drexen and Seevian Solutions, Inc. in response to this request in a pdf
format, which is not permitted under the CID's document submission
standards without prior permission. Second, the emails that you have
provided have focused almost exclusively on administrative matters
such as holiday schedules and attendance, not the subjects requested in
the CID.  You have provided no other correspondence between Morgan
Drexen or the Associated Attorneys and Seevian Solutions, Inc.,
concerning any of the requested topics.

6. **Document Request 10:**  Document Request 10 requests "All
communications between Morgan Drexen and Associated Attorneys
concerning implementation of policies and procedures, Clients, fees, or
Morgan Drexen's contracts with attorneys."  You have stated that
Morgan Drexen is in possession of no documents reflecting
communications regarding fees, other than those already produced, but
have not addressed documents reflecting communications regarding the
implementation of policies and procedures, attorney contracts, or
Clients.

7. **Document Request 9**: Document Request 9 asks for "All agreements,
contracts, and Documents related to payments between or among
Associated Attorneys and Morgan Drexen, or between or among
Associated Attorneys." You have produced only contracts and no other
documents related to payments, such as bank statements, invoices, or
agreements with the bank.

8. **Document Request 8**: Several of the ads you supplied are missing
telephone numbers.  Those ads can be found at MD 005216-
MD005238.

9. **Document Request 6**: This request seeks recordings of consumer
intake calls from January 1, 2010 until the date of complete compliance

consumerfinance.gov



Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

with the CID. The Bureau had previously modified this request for
recordings of Client calls to seek only those from the first two weeks of
January 2012, reserving its right to seek full compliance. The Bureau
now seeks all recordings of calls made on or after October 27, 2010.

10. **Document Request 4**: Document Request 4 asks for "All training
manual and training materials for Morgan Drexen employees or
Associated Attorneys".

First, you have only supplied training materials for legal intake
specialists, attorneys, and settlement officers. Please confirm that you
have no training materials or manuals for the other categories of
employees that you identified in response to Interrogatory 7. Second,
please confirm that you have no training materials or manuals on other
topics such as determining the time that you tell Clients it will take to
pay off debt, or the fees that will be assessed for Client services.

11. **Document Request 3**: This Request asks for policies and procedures
related to 14 items. You have not addressed subsections (b), (c), (e), (f),
(g), (i), (j), (l), or (n).

Interrogatories

1. **Interrogatory 1**: You have not responded to this Interrogatory.

2. **Interrogatory 11**: This Interrogatory asks Morgan Drexen to identify
all current employees or contractors of Morgan Drexen. You have
identified only employees and no contractors. Please either confirm
that it is Morgan Drexen's position that it is no longer using contractors
(as identified in its response to Interrogatory 13) and the date that it
ceased to use contractors, or provide the requested information.

3. **Interrogatory 16**: You have stated that the requested information on
Clients for whom an Associated Attorney declined to provide services,
is forthcoming, but have neither produced it nor even provided a date
by which you intend to produce it.



Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

4. **Interrogatory 21**: You have stated that the requested basis for claims made by Morgan Drexen is forthcoming, but have neither produced it nor even provided a date by which you intend to produce it.

5. **Interrogatory 22**: You have stated that you are looking for documents related to Document Request 20, concerning the substantiation for claims made by Morgan Drexen, but have neither produced any documents nor even provided a date by which you intend to produce them.

Please be prepared to discuss all of these issues at our meeting next week. Further, the Bureau seeks full compliance with these outstanding issues by June 25, 2012. We look forward to resolving these matters promptly. Thank you.

Sincerely,

Wendy L. Weinberg
Shirley Chiu
Enforcement Attorneys

**Exhibit 14**

# VENABLE®LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
T 202.344.4000   F 202.344.8300   www.Venable.com

June 1, 2012

*VIA ELECTRONIC AND HAND DELIVERY*

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
1750 Pennsylvania Avenue, N.W., 10th Floor
Washington, D.C. 20220

> **Re:** **Eighth Response to Civil Investigative Demand Issued to Morgan Drexen, Inc.**

Dear Ms. Weinberg:

On behalf of our client, Morgan Drexen, Inc., please find enclosed a CD-ROM with information responsive to Interrogatory 16 of the Civil Investigative Demand ("CID") issued to Morgan Drexen by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012, as amended by your letter dated March 30, 2012.

Any communications relating to this inquiry, as well as the documents accompanying or related to those communications and the information contained in the accompanying materials, constitute sensitive and proprietary business information of Morgan Drexen and are confidential. All such materials are intended only for review by Bureau staff. Accordingly, we request that they receive the highest level of protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

Morgan Drexen reserves the right to change, amend, or supplement the enclosed information or documents if it becomes aware of additional information, and hereby preserves all evidentiary and other objections incident to this investigation. Morgan Drexen does not by this reservation undertake any obligation of supplementation or amendment.

Wendy Weinberg, Esq.
June 1, 2012
Page 2

     Morgan Drexen and its counsel are committed to cooperating with the Bureau in connection with the CID and addressing any issues raised by the Bureau.  To that end, please do not hesitate to contact us should you have any questions about the enclosed materials.

               Respectfully submitted,

               Randal M. Shaheen
               Andrew E. Bigart
               Venable LLP
               575 7th Street, N.W.
               Washington, D.C. 20004
               202.344.4488
               202.344.4323

               *Counsel for Morgan Drexen, Inc.*



**Exhibit 15**



Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

June 6, 2012

Randal M. Shaheen, Partner
Venable LLP
575 7th Street, NW
Washington, DC  20004

Re: Morgan Drexen

Dear Mr. Shaheen:

I am writing to memorialize our meeting of June 5, 2012, regarding the
remaining items Morgan Drexen needs to produce pursuant to the Civil
Investigative Demand ("CID") issued by the Consumer Financial Protection
Bureau (the "Bureau") on March 13, 2012.

Missing Information on Bankruptcy Services

The most fundamental issue that we discussed at the meeting concerned
Morgan Drexen's failure to produce pursuant to the CID any information
regarding the services provided by Associated Attorneys pursuant to
"Attorney/Client Bankruptcy Fee Agreements" ("Bankruptcy Agreement").
You stated that most Clients sign both a Bankruptcy Agreement and an
"Attorney/Client Fee Agreement for Debt Resolution Representation" ("Debt
Resolution Agreement"). You further indicated that Morgan Drexen was
willing to supplement its production to reflect the Bankruptcy Agreement
information.

Specifically, Morgan Drexen agreed to review its production to date for
Interrogatories 10, 11, 12, 13, 14, 15, 16, 17, 18, and Document Requests 3, 4,
5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, and 21, and amend the
production to the extent necessary to add information, data, or documents
related to the Bankruptcy Agreements and the Clients who signed Bankruptcy
Agreements.

Additionally, concerning DR 21, Morgan Drexen will reproduce 21(l) related
to how long Morgan Drexen or an Associated Attorney told a Client it would
take before it would file a bankruptcy petition, to the extent that Morgan
Drexen has access to that information. Finally, Morgan Drexen will add a new

1

**cfpb** Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

subsection (y) to Document Request 21 pursuant to which it will provide
information about whether the Client signed a Bankruptcy Agreement, a Debt
Settlement Agreement, or both. Morgan Drexen will also indicate the dates of
those Agreements to the extent that it has access to that information.

Morgan Drexen will also answer the following questions:

1. When fees are collected under a Bankruptcy Agreement, are
   they called "engagement fees"? If not, what are they called?
2. Are two separate trust accounts opened for Clients when a
   Client signs both a Bankruptcy Agreement and a Debt
   Settlement Agreement? Are two separate trust accounts
   opened for Clients who have different attorneys representing
   them under the Bankruptcy Agreement and the Debt
   Settlement Agreement?
3. Are there other classes or types of Clients, other than those
   receiving debt resolution or bankruptcy services, for whom
   Morgan Drexen provides support services to Associated
   Attorneys?

Finally, you agreed to send the Bureau the Bankruptcy Code provision which
you contend requires debtors to attempt debt settlement prior to filing a
bankruptcy petition.

Document Requests:

1. **Document Request 8**: This request seeks marketing materials used by
   Morgan Drexen. Morgan Drexen will explain why the phone numbers
   are missing from the commercials already produced and previously
   identified in the Bureau's letter dated June 1, 2012. These commercials
   can be found at MD005216-MD005238.

2. **Document Request 9**: This request sought all agreements, contracts
   and Documents related to payments between or among Associated
   Attorneys and Morgan Drexen, or between or among Associated
   Attorneys. The Bureau explained that it had received no documents
   reflecting, among other things, any of the following: payments,
   invoices, bank statements, or terms related to payments. Morgan
   Drexen will supplement its response to more fully address this request.

2



1700 G Street NW, Washington, DC 20552

3. **Document Request 10**: This request seeks "All communications between Morgan Drexen and Associated Attorneys concerning implementation of policies and procedures, Clients, fees, or Morgan Drexen's contracts with attorneys." Morgan Drexen will provide the mathematical formula underlying the software program used to generate information related to a Client's fees, monthly payments, and the amount of time that it will take the Client to settle his or her debts.

4. **Document Request 11**: This request seeks information on third parties providing services to Morgan Drexen or Associated Attorneys. Morgan Drexen will confirm that it is no longer using lead generators, and provide the date by which it ceased to use lead generators. Morgan Drexen will also supply additional emails exchanged between Morgan Drexen and Seevian Solutions, Inc.

5. **Document Request 17**: This request seeks all consumer or Client complaints about Morgan Drexen or Associated Attorneys and the responses to the complaints. Morgan Drexen will include Client names and addresses in its production of the Client complaints and Morgan Drexen's responses to those complaints. The complaints will include those submitted to Morgan Drexen, the Better Business Bureau, and any law enforcement or regulatory agency.

6. **Document Request 18**: This request seeks contracts, agreements, or correspondence with creditors of the "Preferred Creditor Program." Morgan Drexen will supply the requested correspondence related to the Preferred Creditor Program. Morgan Drexen has already stated that there are no contracts or agreements that set forth any terms for the potential settlement of Clients' debts for the creditors in this program.

7. **Document Request 21**: This request seeks database information regarding each Client. Morgan Drexen will amend its production to include the specific creditor account identification numbers in its responses to any subpart where it provides creditor account information or the amount of fees paid to a creditor.

3

**cfpb** Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

Additionally, Morgan Drexen will either supply the data responsive to the remaining missing subparts or explain why it is not able to supply it.

Interrogatories

1. **Interrogatory 11:** This request seeks information on employees or contractors. Morgan Drexen will confirm that it is not using contractors. If it is using contractors, it will amend its production to supply the requested information unless those contractors are used solely within its General Counsel's office for matters that do not concern Clients or the delivery of services to Clients.

2. **Interrogatory 16:** This request seeks the identity of consumers for whom an Associated Attorney declined to provide services. Morgan Drexen will provide this information to the extent that it retains it, or will state that it does not retain this information.

3. **Interrogatory 17:** This request asks Morgan Drexen to "identify each bank account from which payments were made from Morgan Drexen to an Associated Attorney; from which payments were made from an Associated Attorney to Morgan Drexen; and in which Clients' funds are deposited." Morgan Drexen will supply additional identifying information regarding these bank accounts. (Note: This discussion arose primarily in the context of the addition of information on bankruptcy services.)

PDFs of Emails

Several of the documents Morgan Drexen has produced pursuant to the CID do not conform to the Bureau's Document Submission Standards. For example, Morgan Drexen produced emails in PDF format rather than native format. Morgan Drexen will review the Bureau's Document Submissions Standards and remedy its production in accordance with those standards. If it has questions about compliance, counsel for the parties will arrange a conference call between the technology teams at the Bureau and Morgan Drexen.

4

consumerfinance.gov



Consumer Financial
Protection Bureau

1700 G Street NW, Washington DC 20552

### Identifying Client Information

Morgan Drexen previously stated that it has concerns with producing
Client identification information, such as name and address, because
that information is protected by the attorney-client privilege. Morgan
Drexen has apparently now withdrawn this objection, but now claims it
is obligated to withhold this information under certain state bar ethics
statutes and rules. Counsel for Morgan Drexen will provide the Bureau
with the citations to the statutes and ethics opinions that purportedly
prohibit it from providing Client identification information.

### Timeline for Compliance

Except as provided below, Morgan Drexen and its counsel will provide
the information identified above by June 15, 2012. Morgan Drexen will
also remedy the additional deficiencies outlined in the Bureau's letter
of June 1, 2012, by June 15, 2012.

Counsel for Morgan Drexen and the Bureau will talk later this week to
establish a timeline to update all of Morgan Drexen's production to
reflect the missing bankruptcy services information detailed in the first
section of this letter. During that call, counsel will also discuss: 1) a
timeline to update the production to include the individualized credit
account identification numbers missing from Document Request 21
and, 2) the remaining production for Document Request 6, the
recordings of consumer calls.

Sincerely,

Wendy J. Weinberg
Shirley Chiu
Enforcement Attorneys

**Exhibit 16**

# VENABLE®LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
**T** 202.344.4000  **F** 202.344.8300  www.Venable.com

CONFIDENTIAL

June 15, 2012

*VIA ELECTRONIC AND HAND DELIVERY*

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
1750 Pennsylvania Avenue, N.W., 10th Floor
Washington, D.C. 20220

   **Re:    Response to June 1, 2012 Letter**

Dear Ms. Weinberg:

   On behalf of our client, Morgan Drexen, Inc., this letter provides a partial response to your June 1, 2012, letter, in which you set forth several alleged deficiencies in Morgan Drexen's May 11, May 14, and May 29 responses to the Civil Investigative Demand ("CID") issued to Morgan Drexen by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012, as amended by your letter dated March 30, 2012.  In addition, please note that Morgan Drexen is working diligently to follow up on the issues we discussed during our June 5, 2012 meeting.

   This letter and any accompanying documents constitute sensitive and proprietary business information of Morgan Drexen and are confidential.  All such materials are intended only for review by Bureau staff.  Accordingly, we request that they receive the highest level of protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-

Wendy Weinberg, Esq.                                        CONFIDENTIAL
June 15, 2012
Page 2

1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other

applicable statutes, regulations, and rules.

### Document Requests

Document Request 21: In your correspondence of May 7, 2012 you indicated that Morgan Drexen "is working diligently to produce documents in response to the remaining subparts by May 18, 2012."

To date we have received no response at all to subparts (h), (i), (1), (o), (s), and (x). We have also neither received a privilege log as required under the CID, nor a response to the privilege case-law citations that I sent to you on March 29, 2012.

Further, as I mentioned in our conversation of May 29th, we need individual account identifiers each time an account for a Client is noted in one of the subparts, so that we can match accounts across tables.

Additionally, some of the tables that you have provided have inconsistent data. For example, there are 792 Clients identified in response to 21(j) who are not present in 21(a). At the same time, there are 6 Clients identified in 21(a), who are not present in 21(j).

There is also some questionable data. One Client is identified in 21(d) as having 188 creditors. Although this is certainly possible, it seems unlikely.

More fundamentally, Morgan Drexen has stated in its response to request 21(j) that it has not charged any fees to Clients prior to attempting negotiation or settlement of a debt since January 1, 2011. Please confirm that it is Morgan Drexen's position that it has not charged any such fees, including but not limited to those that may have been charged pursuant to an "Attorney/Client Bankruptcy Fee Agreement," since January 1, 2011.

Response: Morgan Drexen has produced documents in response to Document Request 21

subparts (a), (b), (c), (d), (e), (f), (g), (j), (k), (m), (n), (p), (q), (r) (t), (u), (v), and (w).  As

explained below, Morgan Drexen objects or does not have non-privileged or non-confidential

information responsive to the remaining subparts (h), (i), (l), (o), (s), and (x).

Wendy Weinberg, Esq.                                                CONFIDENTIAL
June 15, 2012
Page 3

     *Subpart (h)*:  Morgan Drexen does not regularly update balances for accounts; therefore, the database does not contain the balance of the debt(s) owed by the Associated Attorneys' Clients at the time he/she ceases to make payments to the Associated Attorneys.

     *Subpart (i)*:  Morgan Drexen does not maintain information regarding the annual percentage rate and monthly penalty fee(s) for each Associated Attorney's Clients' debt at the time of enrollment, time of settlement, or termination of services.

     *Subpart (l)*:  Morgan Drexen does not maintain information responsive to this request. The projected duration of legal representation varies based on numerous factors (*i.e.*, skipped payments, adding/dropping accounts, decreasing payments, *etc.*) and is therefore not a data point maintained within the Company's database.

     *Subpart (o)*:  Morgan Drexen's database does not track each Associated Attorney's reasons for rejecting, modifying, or accepting an offer of settlement.  Please refer to the report provided in response to Subpart (n) for information on offers of settlement that were accepted.

     *Subpart (s)*:  Morgan Drexen does not maintain information in its database regarding complaints made by law firm clients against Morgan Drexen or Associated Attorneys.  Please refer to the response to Document Request No. 17 for copies of consumer or Client complaints in Morgan Drexen's possession.

     *Subpart (x)*:  Morgan Drexen objects to this request on grounds that it seeks information and documents that are protected from disclosure by the attorney-client privilege, work-product doctrine, and/or Rule 3-100 of the California Bar's Rules of Professional Conduct, which prohibits Morgan Drexen (on behalf of its Associated Attorneys) from disclosing the confidential information of an Associated Attorney Client.  *See* Attachment 1 (copies of Cal. Bus. & Prof.

Wendy Weinberg, Esq.                                    CONFIDENTIAL
June 15, 2012
Page 4

Code § 6068(e) (2012); Cal. Rules of Prof. Conduct, Rule 3-100 (2012); and Los Angeles

County Bar Opinion No. 267 (January 26, 1960)).  The database field containing information

potentially responsive to subpart (x) contains both privileged and confidential communications

between Morgan Drexen, Associated Attorneys, and the Clients of the Associated Attorneys.

Morgan Drexen further objects to the request on the grounds that it is unduly

burdensome.  We have conducted a sampling of the notes fields and found that more than half of

the entries contain privileged and/or confidential information, with the other half containing

mostly non-responsive information (such as notes regarding the transfer of communications

between departments, notes on verification of client address, and other routine administrative

functions).

For the time period covered by the CID, Morgan Drexen's database contains millions

upon millions of field entries with information potentially responsive to subpart (x).  Identifying

any responsive information that is not privileged and/or confidential would require Morgan

Drexen's employees to spend significant time outside of their daily responsibilities collecting

and processing huge swaths of data with little if any relevance to this inquiry.  Then, Morgan

Drexen's attorneys would be required to conduct an exhaustive, time consuming, and expensive

review of the documents for relevance and privilege.  In light of these burdens, and the fact that

any responsive information contained in the fields is likely privileged and/or confidential,

Morgan Drexen objects to any request that the company review and redact the database fields

potentially responsive to subpart (x).

Wendy Weinberg, Esq.                                            CONFIDENTIAL
June 15, 2012
Page 5


**Document Request 18:  This request asks for "Contracts, agreements, or correspondence with creditors that participate in the 'Preferred Creditor Program.'" Confirm that it is Morgan Drexen's position that there are no relevant contracts or agreements. Further, you have stated that the requested correspondence related to this program is forthcoming, but have neither produced it nor even provided a date by which you intend to produce it.**

**Response**:  Morgan Drexen does not enter into any "relevant" contracts or agreements

with creditors that participate in the "Preferred Creditor Program."  Discovery on

correspondence related to the program is continuing and Morgan Drexen is working diligently to

collect and produce any responsive materials to the Bureau on or about June 29, 2012.


**Document Request 17:  Document Request 17 asks for "All consumer or Client complaints about Morgan Drexen or Associated Attorneys and any responses to the complaints." You have stated that this production is forthcoming, but have neither produced it nor even provided a date by which you intend to produce it.**

**Response**:  Please find attached as Bates No. MD009960 to MD010768 copies of the

requested consumer complaints.

Wendy Weinberg, Esq.                                             CONFIDENTIAL
June 15, 2012
Page 6

**Document Request 11:  Document Request 11 asks for, inter alia, correspondence between Morgan Drexen and third parties providing services to Morgan Drexen. The Request details five different types of correspondence including: (a) acquiring, providing services to, or terminating services for consumers or Clients; (b) providing or acquiring consumer or Client leads; (c) receiving or processing payments from Clients; (d) tracking transactions or otherwise processing accounts for Clients; or (e) receiving phone calls or making phone calls to consumers or Clients.**

**First, as I noted previously, you have provided emails between Morgan Drexen and Seevian Solutions, Inc. in response to this request in a pdf format, which is not permitted under the CID's document submission standards without prior permission. Second, the emails that you have provided have focused almost exclusively on administrative matters such as holiday schedules and attendance, not the subjects requested in the CID. You have provided no other correspondence between Morgan Drexen or the Associated Attorneys and Seevian Solutions, Inc., concerning any of the requested topics.**

**Response**:  Morgan Drexen has contracted with Seevian Solutions, Inc. ("Seevian") to provide administrative call routing and related functions.  Seevian does not provide Morgan Drexen with any services related to the activities set forth in subparts (a) through (e), other than handling overflow phone calls from the Clients of Associated Attorneys.  This role is administrative in nature, and explains why the email communications previously provided by Morgan Drexen "have focused almost exclusively on administrative matters."  Please advise if the Bureau would like Morgan Drexen to search for and produce any additional administrative communications between Morgan Drexen and Seevian.  Finally, Morgan Drexen does not contract with any other third party service providers for the types of services set forth in subparts (a) through (e).

Wendy Weinberg, Esq.                                                    CONFIDENTIAL
June 15, 2012
Page 7

**Document Request 10:  Document Request 10 requests "All communications between Morgan Drexen and Associated Attorneys concerning implementation of policies and procedures, Clients, fees, or Morgan Drexen's contracts with attorneys." You have stated that Morgan Drexen is in possession of no documents reflecting communications regarding fees, other than those already produced, but have not addressed documents reflecting communications regarding the implementation of policies and procedures, attorney contracts, or Clients.**

**Response**: On April 27, 2012, Morgan Drexen produced documents bates labeled

MD001716 – MD001760 that contained the form letters sent by Morgan Drexen to Associated

Attorneys regarding the implementation of policies and procedures.  Morgan Drexen objects to

this request to the extent it seeks information and documents that are protected from disclosure

by the attorney-client privilege, work-product doctrine, and/or Rule 3-100 of the California Bar's

Rules of Professional Conduct, which prohibits Morgan Drexen (on behalf of its Associated

Attorneys) from disclosing the confidential information of an Associated Attorney Client. *See*

Attachment 1 (copies of Cal. Bus. & Prof. Code § 6068(e) (2012); Cal. Rules of Prof. Conduct,

Rule 3-100 (2012); and Los Angeles County Bar Opinion No. 267 (January 26, 1960)).

Discovery on this matter is continuing and Morgan Drexen is working diligently to

collect and produce any responsive materials to the Bureau.


**Document Request 9:  Document Request 9 asks for "All agreements, contracts, and Documents related to payments between or among Associated Attorneys and Morgan Drexen, or between or among Associated Attorneys." You have produced only contracts and no other documents related to payments, such as bank statements, invoices, or agreements with the bank.**

**Response**: Based on our meeting on June 5, 2012, we understand that the Bureau is

seeking documents and communications between Morgan Drexen and Associated Attorneys

concerning the terms of payment, as well as any documents that relate to actual payments (such

Wendy Weinberg, Esq.                                    CONFIDENTIAL
June 15, 2012
Page 8

as invoices, bank statements, etc.).  Discovery on this matter is continuing and Morgan Drexen is

working diligently to collect and produce any responsive materials to the Bureau.

**Document Request 8:  Several of the ads you supplied are missing telephone numbers. Those ads can be found at MD 005216- MD005238.**

**Response**:  On April 27, 2012, Morgan Drexen provided the Bureau with copies of

advertisements in its possession that promote the legal services offered by the Associated

Attorneys supported by Morgan Drexen.  The advertisements bates labeled MD005216-

MD005238 do not contain telephone numbers because Morgan Drexen worked with a third party

media placement company to distribute these advertisements.  The third party was responsible

for inserting phone numbers into the advertisements prior to dissemination.  Morgan Drexen

does not maintain final copies of the advertisements with phone numbers.

**Document Request 6:  This request seeks recordings of consumer intake calls from January 1, 2010 until the date of complete compliance with the CID. The Bureau had previously modified this request for recordings of Client calls to seek only those from the first two weeks of January 2012, reserving its right to seek full compliance. The Bureau now seeks all recordings of calls made on or after October 27, 2010.**

**Response**:  On May 11, 2012, Morgan Drexen produced to the Bureau 500 sample

recordings of consumer intake calls.  Morgan Drexen respectfully suggests that these recordings

provide a sufficient sampling because the vast majority of consumer intake calls are based on the

same script.  Moreover, producing all recordings would require Morgan Drexen's employees to

spend significant time outside of their daily responsibilities collecting and processing thousands

of calls.  In light of these burdens, and the fact that any responsive information contained in the

fields is likely duplicative of the information provided in the 500 sample calls already produced,

Wendy Weinberg, Esq.                                              CONFIDENTIAL
June 15, 2012
Page 9

Morgan Drexen would appreciate an opportunity to discuss with the Bureau potential

modifications to this request.

**Document Request 4:  Document Request 4 asks for "All training manual and
training materials for Morgan Drexen employees or Associated Attorneys".**

**First, you have only supplied training materials for legal intake specialists,
attorneys, and settlement officers. Please confirm that you have no training materials or
manuals for the other categories of employees that you identified in response to
Interrogatory 7. Second, please confirm that you have no training materials or manuals on
other topics such as determining the time that you tell Clients it will take to pay off debt, or
the fees that will be assessed for Client services.**

**Response**: On April 13, 2012, Morgan Drexen produced to the Bureau all of the

Company's standalone training manuals and materials bates labeled MD000841 – MD000961.

In addition, please refer to the policies and procedures produced in response to Document

Request 3 for additional training information provided to Morgan Drexen employees.

**Document Request 3:  This Request asks for policies and procedures related to 14
items. You have not addressed subsections (b), (c), (e), (f), (g), (i), (j), (l), or (n).**

**Response**: On April 13, 2012, Morgan Drexen produced all copies of the Company's

policies and procedures bates labeled MD000001 – MD000840.

**Interrogatory 1:  You have not responded to this Interrogatory.**

**Response**: To date, the following persons have participated in responding to this CID:

- Jeffrey A. Katz, General Counsel – Collect and review documents for production and
  responses to interrogatories.

- Erich Schiefelbine, Assistant General Counsel – Collect and review documents for
  production.

- Linh T. Tran, Staff Counsel – Collect and review documents for production and
  responses to interrogatories.

Wendy Weinberg, Esq.                                           CONFIDENTIAL
June 15, 2012
Page 10

- Jessica Tincopa – Compliance Counsel – Collect and review documents for production.

- Randall Shaheen, Venable LLP -- Collect and review documents for production and responses to interrogatories.

- Andrew Bigart, Venable LLP – Collect and review documents for production and responses to interrogatories.

*   *   *   *   *

Morgan Drexen reserves the right to change, amend, or supplement the information provided herein if it becomes aware of additional information, and hereby preserves all evidentiary and other objections incident to this investigation.  Morgan Drexen does not by this reservation undertake any obligation of supplementation or amendment.

The Company is working diligently to complete its responses to the CID specifications. Morgan Drexen and its counsel are committed to cooperating with the Bureau in connection with the CID and addressing any issues raised by the Bureau.  Please do not hesitate to contact us should you have any questions about the enclosed materials.

Respectfully submitted,

*Randy Shaheen /AB*

Randal M. Shaheen
Andrew E. Bigart
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
202.344.4488
202.344.4323
*Counsel for Morgan Drexen, Inc.*

# ATTACHMENT 1

# BUSINESS AND PROFESSIONS CODE
# SECTION 6060-6069

6068. It is the duty of an attorney to do all of the following:
 (a) To support the Constitution and laws of the United States and of this state.
 (b) To maintain the respect due to the courts of justice and judicial officers.
 (c) To counsel or maintain those actions, proceedings, or defenses only as appear to him or her legal or just, except the defense of a person charged with a public offense.
 (d) To employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.
 (e) (1) To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client.
 (2) Notwithstanding paragraph (1), an attorney may, but is not required to, reveal confidential information relating to the representation of a client to the extent that the attorney reasonably believes the disclosure is necessary to prevent a criminal act that the attorney reasonably believes is likely to result in death of, or substantial bodily harm to, an individual.
 (f) To advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which he or she is charged.
 (g) Not to encourage either the commencement or the continuance of an action or proceeding from any corrupt motive of passion or interest.
 (h) Never to reject, for any consideration personal to himself or herself, the cause of the defenseless or the oppressed.
 (i) To cooperate and participate in any disciplinary investigation or other regulatory or disciplinary proceeding pending against himself or herself. However, this subdivision shall not be construed to deprive an attorney of any privilege guaranteed by the Fifth Amendment to the Constitution of the United States, or any other constitutional or statutory privileges. This subdivision shall not be construed to require an attorney to cooperate with a request that requires him or her to waive any constitutional or statutory privilege or to comply with a request for information or other matters within an unreasonable period of time in light of the time constraints of the attorney's practice. Any exercise by an attorney of any constitutional or statutory privilege shall not be used against the attorney in a regulatory or disciplinary proceeding against him or her.
 (j) To comply with the requirements of Section 6002.1.
 (k) To comply with all conditions attached to any disciplinary probation, including a probation imposed with the concurrence of the attorney.
 (l) To keep all agreements made in lieu of disciplinary prosecution with the agency charged with attorney discipline.
 (m) To respond promptly to reasonable status inquiries of clients and to keep clients reasonably informed of significant developments in matters with regard to which the attorney has agreed to provide legal services.
 (n) To provide copies to the client of certain documents under time limits and as prescribed in a rule of professional conduct which the board shall adopt.
 (o) To report to the agency charged with attorney discipline, in writing, within 30 days of the time the attorney has knowledge of any

of the following:

(1) The filing of three or more lawsuits in a 12-month period against the attorney for malpractice or other wrongful conduct committed in a professional capacity.

(2) The entry of judgment against the attorney in a civil action for fraud, misrepresentation, breach of fiduciary duty, or gross negligence committed in a professional capacity.

(3) The imposition of judicial sanctions against the attorney, except for sanctions for failure to make discovery or monetary sanctions of less than one thousand dollars ($1,000).

(4) The bringing of an indictment or information charging a felony against the attorney.

(5) The conviction of the attorney, including any verdict of guilty, or plea of guilty or no contest, of a felony, or a misdemeanor committed in the course of the practice of law, or in a manner in which a client of the attorney was the victim, or a necessary element of which, as determined by the statutory or common law definition of the misdemeanor, involves improper conduct of an attorney, including dishonesty or other moral turpitude, or an attempt or a conspiracy or solicitation of another to commit a felony or a misdemeanor of that type.

(6) The imposition of discipline against the attorney by a professional or occupational disciplinary agency or licensing board, whether in California or elsewhere.

(7) Reversal of judgment in a proceeding based in whole or in part upon misconduct, grossly incompetent representation, or willful misrepresentation by an attorney.

(8) As used in this subdivision, "against the attorney" includes claims and proceedings against any firm of attorneys for the practice of law in which the attorney was a partner at the time of the conduct complained of and any law corporation in which the attorney was a shareholder at the time of the conduct complained of unless the matter has to the attorney's knowledge already been reported by the law firm or corporation.

(9) The State Bar may develop a prescribed form for the making of reports required by this section, usage of which it may require by rule or regulation.

(10) This subdivision is only intended to provide that the failure to report as required herein may serve as a basis of discipline.


6069.  (a) Every member of the State Bar shall be deemed by operation of this law to have irrevocably authorized the disclosure to the State Bar and the Supreme Court pursuant to Section 7473 of the Government Code of any and all financial records held by financial institutions as defined in subdivisions (a) and (b) of Section 7465 of the Government Code pertaining to accounts which the member must maintain in accordance with the Rules of Professional Conduct; provided that no such financial records shall be disclosed to the State Bar without a subpoena therefor having been issued pursuant to Section 6049 of this code, and further provided that the board of trustees shall by rule provide notice to the member similar to that notice provided for in subdivision (d) of Section 7473 of the Government Code. Such notice may be sent by mail addressed to the member's current office or other address for State Bar purposes as shown on the member's registration records of the State Bar.

The State Bar shall, by mail addressed to the member's current office or other address for State Bar purposes as shown on the member's registration records of the State Bar, notify its members annually of the provisions of this subdivision.

(b) With regard to the examination of all financial records other than those mentioned in subdivision (a), held by financial institutions as defined in subdivisions (a) and (b) of Section 7465 of the Government Code, no such financial records shall be disclosed to the State Bar without a subpoena therefor having been issued pursuant to Section 6049 of this code and the board of trustees shall by rule provide for service of a copy of the subpoena on the customer as defined in subdivision (d) of Section 7465 of the Government Code and an opportunity for the customer to move the board or committee having jurisdiction to quash the subpoena prior to examination of the financial records. Review of the actions of the board or any committee on such motions shall be had only by the Supreme Court in accordance with the procedure prescribed by the court. Service of a copy of any subpoena issued pursuant to this subdivision (b) may be made on a member of the State Bar by mail addressed to the member's current office or other address for State Bar purposes as shown on the member's registration records of the State Bar. If the customer is other than a member, service shall be made pursuant to Chapter 4 (commencing with Section 413.10) of Title 5 of Part 2 of the Code of Civil Procedure, except that service may be made by an employee of the State Bar.

(c) For purposes of this section, "member of the State Bar" or "member" means every member of the State Bar, law firm in California of which a member of the State Bar is a member, and law corporation within the meaning of Article 10 of Chapter 4 of Division 3 of this code.

# CALIFORNIA RULES OF PROFESSIONAL CONDUCT

*(Current rules as of January 1, 2012. The operative dates of select rule amendments are shown at the end of relevant rules.)*

## CHAPTER 1.
## PROFESSIONAL INTEGRITY IN GENERAL

### Rule 1-100    Rules of Professional Conduct, in General

(A)  Purpose and Function.

The following rules are intended to regulate professional conduct of members of the State Bar through discipline. They have been adopted by the Board of Governors of the State Bar of California and approved by the Supreme Court of California pursuant to Business and Professions Code sections 6076 and 6077 to protect the public and to promote respect and confidence in the legal profession. These rules together with any standards adopted by the Board of Governors pursuant to these rules shall be binding upon all members of the State Bar.

For a willful breach of any of these rules, the Board of Governors has the power to discipline members as provided by law.

The prohibition of certain conduct in these rules is not exclusive. Members are also bound by applicable law including the State Bar Act (Bus. & Prof. Code, §6000 et seq.) and opinions of California courts. Although not binding, opinions of ethics committees in California should be consulted by members for guidance on proper professional conduct. Ethics opinions and rules and standards promulgated by other jurisdictions and bar associations may also be considered.

These rules are not intended to create new civil causes of action. Nothing in these rules shall be deemed to create, augment, diminish, or eliminate any substantive legal duty of lawyers or the non-disciplinary consequences of violating such a duty.

(B)  Definitions.

(1)  "Law Firm" means:

(a)  two or more lawyers whose activities constitute the practice of law, and who share its profits, expenses, and liabilities; or

(b)  a law corporation which employs more than one lawyer; or

(c)  a division, department, office, or group within a business entity, which includes more than one lawyer who performs legal services for the business entity; or

(d)  a publicly funded entity which employs more than one lawyer to perform legal services.

(2)  "Member" means a member of the State Bar of California.

(3)  "Lawyer" means a member of the State Bar of California or a person who is admitted in good standing of and eligible to practice before the bar of any United States court or the highest court of the District of Columbia or any state, territory, or insular possession of the United States, or is licensed to practice law in, or is admitted in good standing and eligible to practice before the bar of the highest court of, a foreign country or any political subdivision thereof.

(4)  "Associate" means an employee or fellow employee who is employed as a lawyer.

(5)  "Shareholder" means a shareholder in a professional corporation pursuant to Business and Professions Code section 6160 et seq.

(C)  Purpose of Discussions.

Because it is a practical impossibility to convey in black letter form all of the nuances of these disciplinary rules, the comments contained in the Discussions of the rules, while they do not add independent basis for imposing discipline, are

---

NOTE: *Operative January 1, 2012, Business and Professions Code section 6010, in part, provides that the State Bar is governed by a board known as the board of trustees of the State Bar and that any provision of law referring to the "board of governors" shall be deemed to refer to the "board of trustees." In accordance with this law, references to the "board of governors" included in the current Rules of Professional Conduct are deemed to refer to the "board of trustees."*

## CALIFORNIA RULES OF PROFESSIONAL CONDUCT

jurisdiction, other than a disciplinary tribunal, shall have first adjudicated a complaint of alleged discrimination and found that unlawful conduct occurred. Upon such adjudication, the tribunal finding or verdict shall then be admissible evidence of the occurrence or non-occurrence of the alleged discrimination in any disciplinary proceeding initiated under this rule. In order for discipline to be imposed under this rule, however, the finding of unlawfulness must be upheld and final after appeal, the time for filing an appeal must have expired, or the appeal must have been dismissed.

*Discussion:*

In order for discriminatory conduct to be actionable under this rule, it must first be found to be unlawful by an appropriate civil administrative or judicial tribunal under applicable state or federal law. Until there is a finding of civil unlawfulness, there is no basis for disciplinary action under this rule.

A complaint of misconduct based on this rule may be filed with the State Bar following a finding of unlawfulness in the first instance even though that finding is thereafter appealed.

A disciplinary investigation or proceeding for conduct coming within this rule may be initiated and maintained, however, if such conduct warrants discipline under California Business and Professions Code sections 6106 and 6068, the California Supreme Court's inherent authority to impose discipline, or other disciplinary standard. (Added by order of Supreme Court, effective March 1, 1994.)

### CHAPTER 3.
### PROFESSIONAL RELATIONSHIP WITH CLIENTS

**Rule 3-100   Confidential Information of a Client**

(A) A member shall not reveal information protected from disclosure by Business and Professions Code section 6068, subdivision (e)(1)

without the informed consent of the client, or as provided in paragraph (B) of this rule.

(B) A member may, but is not required to, reveal confidential information relating to the representation of a client to the extent that the member reasonably believes the disclosure is necessary to prevent a criminal act that the member reasonably believes is likely to result in death of, or substantial bodily harm to, an individual.

(C) Before revealing confidential information to prevent a criminal act as provided in paragraph (B), a member shall, if reasonable under the circumstances:

    (1) make a good faith effort to persuade the client: (i) not to commit or to continue the criminal act or (ii) to pursue a course of conduct that will prevent the threatened death or substantial bodily harm; or do both (i) and (ii); and

    (2) inform the client, at an appropriate time, of the member's ability or decision to reveal information as provided in paragraph (B).

(D) In revealing confidential information as provided in paragraph (B), the member's disclosure must be no more than is necessary to prevent the criminal act, given the information known to the member at the time of the disclosure.

(E) A member who does not reveal information permitted by paragraph (B) does not violate this rule.

*Discussion:*

[1] *Duty of confidentiality.* Paragraph (A) relates to a member's obligations under Business and Professions Code section 6068, subdivision (e)(1), which provides it is a duty of a member: "To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." A member's duty to preserve the confidentiality of client information involves public policies of paramount importance. (*In Re Jordan* (1974) 12 Cal.3d 575, 580 [116 Cal.Rptr. 371].) Preserving the confidentiality of client information contributes to the trust that is the hallmark of the

---

*NOTE: Operative January 1, 2012, Business and Professions Code section 6010, in part, provides that the State Bar is governed by a board known as the board of trustees of the State Bar and that any provision of law referring to the "board of governors" shall be deemed to refer to the "board of trustees." In accordance with this law, references to the "board of governors" included in the current Rules of Professional Conduct are deemed to refer to the "board of trustees."*

2012                          **CURRENT RULES**                          14

## CALIFORNIA RULES OF PROFESSIONAL CONDUCT

client-lawyer relationship. The client is thereby encouraged to seek legal assistance and to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter. The lawyer needs this information to represent the client effectively and, if necessary, to advise the client to refrain from wrongful conduct. Almost without exception, clients come to lawyers in order to determine their rights and what is, in the complex of laws and regulations, deemed to be legal and correct. Based upon experience, lawyers know that almost all clients follow the advice given, and the law is upheld. Paragraph (A) thus recognizes a fundamental principle in the client-lawyer relationship that, in the absence of the client's informed consent, a member must not reveal information relating to the representation. (See, e.g., *Commercial Standard Title Co. v. Superior Court* (1979) 92 Cal.App.3d 934, 945 [155 Cal.Rptr. 393].)

[2] *Client-lawyer confidentiality encompasses the attorney-client privilege, the work-product doctrine and ethical standards of confidentiality.* The principle of client-lawyer confidentiality applies to information relating to the representation, whatever its source, and encompasses matters communicated in confidence by the client, and therefore protected by the attorney-client privilege, matters protected by the work product doctrine, and matters protected under ethical standards of confidentiality, all as explained in law, rule and policy. (See *In the Matter of Johnson* (Rev. Dept. 2000) 4 Cal. State Bar Ct. Rptr. 179; *Goldstein v. Lees* (1975) 46 Cal.App.3d 614 [120 Cal.Rptr. 253].) The attorney-client privilege and work-product doctrine apply in judicial and other proceedings in which a member may be called as a witness or be otherwise compelled to produce evidence concerning a client. A member's ethical duty of confidentiality is not so limited in its scope of protection for the client-lawyer relationship of trust and prevents a member from revealing the client's confidential information even when not confronted with such compulsion. Thus, a member may not reveal such information except with the consent of the client or as authorized or required by the State Bar Act, these rules, or other law.

[3] *Narrow exception to duty of confidentiality under this Rule.* Notwithstanding the important

public policies promoted by lawyers adhering to the core duty of confidentiality, the overriding value of life permits disclosures otherwise prohibited under Business & Professions Code section 6068, subdivision (e)(1). Paragraph (B), which restates Business and Professions Code section 6068, subdivision (e)(2), identifies a narrow confidentiality exception, absent the client's informed consent, when a member reasonably believes that disclosure is necessary to prevent a criminal act that the member reasonably believes is likely to result in the death of, or substantial bodily harm to an individual. Evidence Code section 956.5, which relates to the evidentiary attorney-client privilege, sets forth a similar express exception. Although a member is not permitted to reveal confidential information concerning a client's past, completed criminal acts, the policy favoring the preservation of human life that underlies this exception to the duty of confidentiality and the evidentiary privilege permits disclosure to prevent a future or ongoing criminal act.

[4] *Member not subject to discipline for revealing confidential information as permitted under this Rule.* Rule 3-100, which restates Business and Professions Code section 6068, subdivision (e)(2), reflects a balancing between the interests of preserving client confidentiality and of preventing a criminal act that a member reasonably believes is likely to result in death or substantial bodily harm to an individual. A member who reveals information as permitted under this rule is not subject to discipline.

[5] *No duty to reveal confidential information.* Neither Business and Professions Code section 6068, subdivision (e)(2) nor this rule imposes an affirmative obligation on a member to reveal information in order to prevent harm. (See rule 1-100(A).) A member may decide not to reveal confidential information. Whether a member chooses to reveal confidential information as permitted under this rule is a matter for the individual member to decide, based on all the facts and circumstances, such as those discussed in paragraph [6] of this discussion.

[6] *Deciding to reveal confidential information as permitted under paragraph (B).* Disclosure permitted under paragraph (B) is ordinarily a last resort, when no other available action is reasonably likely to

---

NOTE: Operative January 1, 2012, Business and Professions Code section 6010, in part, provides that the State Bar is governed by a board known as the board of trustees of the State Bar and that any provision of law referring to the "board of governors" shall be deemed to refer to the "board of trustees." In accordance with this law, references to the "board of governors" included in the current Rules of Professional Conduct are deemed to refer to the "board of trustees."

## CALIFORNIA RULES OF PROFESSIONAL CONDUCT

prevent the criminal act. Prior to revealing information as permitted under paragraph (B), the member must, if reasonable under the circumstances, make a good faith effort to persuade the client to take steps to avoid the criminal act or threatened harm. Among the factors to be considered in determining whether to disclose confidential information are the following:

(1) the amount of time that the member has to make a decision about disclosure;

(2) whether the client or a third party has made similar threats before and whether they have ever acted or attempted to act upon them;

(3) whether the member believes the member's efforts to persuade the client or a third person not to engage in the criminal conduct have or have not been successful;

(4) the extent of adverse effect to the client's rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and analogous rights and privacy rights under Article 1 of the Constitution of the State of California that may result from disclosure contemplated by the member;

(5) the extent of other adverse effects to the client that may result from disclosure contemplated by the member; and

(6) the nature and extent of information that must be disclosed to prevent the criminal act or threatened harm.

A member may also consider whether the prospective harm to the victim or victims is imminent in deciding whether to disclose the confidential information. However, the imminence of the harm is not a prerequisite to disclosure and a member may disclose the information without waiting until immediately before the harm is likely to occur.

[7] *Counseling client or third person not to commit a criminal act reasonably likely to result in death of substantial bodily harm.* Subparagraph (C)(1) provides that before a member may reveal

confidential information, the member must, if reasonable under the circumstances, make a good faith effort to persuade the client not to commit or to continue the criminal act, or to persuade the client to otherwise pursue a course of conduct that will prevent the threatened death or substantial bodily harm, or if necessary, do both. The interests protected by such counseling is the client's interest in limiting disclosure of confidential information and in taking responsible action to deal with situations attributable to the client. If a client, whether in response to the member's counseling or otherwise, takes corrective action – such as by ceasing the criminal act before harm is caused – the option for permissive disclosure by the member would cease as the threat posed by the criminal act would no longer be present. When the actor is a nonclient or when the act is deliberate or malicious, the member who contemplates making adverse disclosure of confidential information may reasonably conclude that the compelling interests of the member or others in their own personal safety preclude personal contact with the actor. Before counseling an actor who is a nonclient, the member should, if reasonable under the circumstances, first advise the client of the member's intended course of action. If a client or another person has already acted but the intended harm has not yet occurred, the member should consider, if reasonable under the circumstances, efforts to persuade the client or third person to warn the victim or consider other appropriate action to prevent the harm. Even when the member has concluded that paragraph (B) does not permit the member to reveal confidential information, the member nevertheless is permitted to counsel the client as to why it may be in the client's best interest to consent to the attorney's disclosure of that information.

[8] *Disclosure of confidential information must be no more than is reasonably necessary to prevent the criminal act.* Under paragraph (D), disclosure of confidential information, when made, must be no more extensive than the member reasonably believes necessary to prevent the criminal act. Disclosure should allow access to the confidential information to only those persons who the member reasonably believes can act to prevent the harm. Under some circumstances, a member may determine that the best course to pursue is to make an anonymous disclosure

---

NOTE: *Operative January 1, 2012, Business and Professions Code section 6010, in part, provides that the State Bar is governed by a board known as the board of trustees of the State Bar and that any provision of law referring to the "board of governors" shall be deemed to refer to the "board of trustees." In accordance with this law, references to the "board of governors" included in the current Rules of Professional Conduct are deemed to refer to the "board of trustees."*

## CALIFORNIA RULES OF PROFESSIONAL CONDUCT

to the potential victim or relevant law-enforcement authorities. What particular measures are reasonable depends on the circumstances known to the member. Relevant circumstances include the time available, whether the victim might be unaware of the threat, the member's prior course of dealings with the client, and the extent of the adverse effect on the client that may result from the disclosure contemplated by the member.

[9] *Informing client of member's ability or decision to reveal confidential information under subparagraph (C)(2).* A member is required to keep a client reasonably informed about significant developments regarding the employment or representation. Rule 3-500; Business and Professions Code, section 6068, subdivision (m). Paragraph (C)(2), however, recognizes that under certain circumstances, informing a client of the member's ability or decision to reveal confidential information under paragraph (B) would likely increase the risk of death or substantial bodily harm, not only to the originally-intended victims of the criminal act, but also to the client or members of the client's family, or to the member or the member's family or associates. Therefore, paragraph (C)(2) requires a member to inform the client of the member's ability or decision to reveal confidential information as provided in paragraph (B) only if it is reasonable to do so under the circumstances. Paragraph (C)(2) further recognizes that the appropriate time for the member to inform the client may vary depending upon the circumstances. (See paragraph [10] of this discussion.) Among the factors to be considered in determining an appropriate time, if any, to inform a client are:

(1) whether the client is an experienced user of legal services;

(2) the frequency of the member's contact with the client;

(3) the nature and length of the professional relationship with the client;

(4) whether the member and client have discussed the member's duty of confidentiality or any exceptions to that duty;

(5) the likelihood that the client's matter will involve information within paragraph (B);

(6) the member's belief, if applicable, that so informing the client is likely to increase the likelihood that a criminal act likely to result in the death of, or substantial bodily harm to, an individual; and

(7) the member's belief, if applicable, that good faith efforts to persuade a client not to act on a threat have failed.

[10] *Avoiding a chilling effect on the lawyer-client relationship.* The foregoing flexible approach to the member's informing a client of his or her ability or decision to reveal confidential information recognizes the concern that informing a client about limits on confidentiality may have a chilling effect on client communication. (See Discussion paragraph [1].) To avoid that chilling effect, one member may choose to inform the client of the member's ability to reveal information as early as the outset of the representation, while another member may choose to inform a client only at a point when that client has imparted information that may fall under paragraph (B), or even choose not to inform a client until such time as the member attempts to counsel the client as contemplated in Discussion paragraph [7]. In each situation, the member will have discharged properly the requirement under subparagraph (C)(2), and will not be subject to discipline.

[11] *Informing client that disclosure has been made; termination of the lawyer-client relationship.* When a member has revealed confidential information under paragraph (B), in all but extraordinary cases the relationship between member and client will have deteriorated so as to make the member's representation of the client impossible. Therefore, the member is required to seek to withdraw from the representation (see rule 3-700(B)), unless the member is able to obtain the client's informed consent to the member's continued representation. The member must inform the client of the fact of the member's disclosure unless the member has a compelling interest in not informing the client, such as to protect the member, the member's family or a third person from the risk of death or substantial bodily harm.

---

*NOTE: Operative January 1, 2012, Business and Professions Code section 6010, in part, provides that the State Bar is governed by a board known as the board of trustees of the State Bar and that any provision of law referring to the "board of governors" shall be deemed to refer to the "board of trustees." In accordance with this law, references to the "board of governors" included in the current Rules of Professional Conduct are deemed to refer to the "board of trustees."*

## CALIFORNIA RULES OF PROFESSIONAL CONDUCT

[12] *Other consequences of the member's disclosure.* Depending upon the circumstances of a member's disclosure of confidential information, there may be other important issues that a member must address. For example, if a member will be called as a witness in the client's matter, then rule 5-210 should be considered. Similarly, the member should consider his or her duties of loyalty and competency (rule 3-110).

[13] *Other exceptions to confidentiality under California law.* Rule 3-100 is not intended to augment, diminish, or preclude reliance upon, any other exceptions to the duty to preserve the confidentiality of client information recognized under California law. (Added by order of the Supreme Court, operative July 1, 2004.)

### Rule 3-110   Failing to Act Competently

(A)   A member shall not intentionally, recklessly, or repeatedly fail to perform legal services with competence.

(B)   For purposes of this rule, "competence" in any legal service shall mean to apply the 1) diligence, 2) learning and skill, and 3) mental, emotional, and physical ability reasonably necessary for the performance of such service.

(C)   If a member does not have sufficient learning and skill when the legal service is undertaken, the member may nonetheless perform such services competently by 1) associating with or, where appropriate, professionally consulting another lawyer reasonably believed to be competent, or 2) by acquiring sufficient learning and skill before performance is required.

### *Discussion:*

The duties set forth in rule 3-110 include the duty to supervise the work of subordinate attorney and non-attorney employees or agents. (See, e.g., *Waysman v. State Bar* (1986) 41 Cal.3d 452; *Trousil v. State Bar* (1985) 38 Cal.3d 337, 342 [211 Cal.Rptr. 525]; *Palomo v. State Bar* (1984) 36 Cal.3d 785 [205 Cal.Rptr. 834]; *Crane v. State Bar* (1981) 30 Cal.3d 117, 122; *Black v.*

*State Bar* (1972) 7 Cal.3d 676, 692 [103 Cal.Rptr. 288; 499 P.2d 968]; *Vaughn v. State Bar* (1972) 6 Cal.3d 847, 857-858 [100 Cal.Rptr. 713; 494 P.2d 1257]; *Moore v. State Bar* (1964) 62 Cal.2d 74, 81 [41 Cal.Rptr. 161; 396 P.2d 577].)

In an emergency a lawyer may give advice or assistance in a matter in which the lawyer does not have the skill ordinarily required where referral to or consultation with another lawyer would be impractical. Even in an emergency, however, assistance should be limited to that reasonably necessary in the circumstances. (Amended by order of Supreme Court, operative September 14, 1992.)

### Rule 3-120   Sexual Relations With Client

(A)   For purposes of this rule, "sexual relations" means sexual intercourse or the touching of an intimate part of another person for the purpose of sexual arousal, gratification, or abuse.

(B)   A member shall not:

> (1)   Require or demand sexual relations with a client incident to or as a condition of any professional representation; or

> (2)   Employ coercion, intimidation, or undue influence in entering into sexual relations with a client; or

> (3)   Continue representation of a client with whom the member has sexual relations if such sexual relations cause the member to perform legal services incompetently in violation of rule 3-110.

(C)   Paragraph (B) shall not apply to sexual relations between members and their spouses or to ongoing consensual sexual relationships which predate the initiation of the lawyer-client relationship.

(D)   Where a lawyer in a firm has sexual relations with a client but does not participate in the representation of that client, the lawyers in the firm shall not be subject to discipline under this rule

---

NOTE: *Operative January 1, 2012, Business and Professions Code section 6010, in part, provides that the State Bar is governed by a board known as the board of trustees of the State Bar and that any provision of law referring to the "board of governors" shall be deemed to refer to the "board of trustees." In accordance with this law, references to the "board of governors" included in the current Rules of Professional Conduct are deemed to refer to the "board of trustees."*

USCA Case #13-5342    Document #1484126

sent would yet be effective. Further, while the lawyer continues to hold the shares in escrow, it would appear that the lawyer would be acting in an unprofessional manner if he were to proceed to levy an attachment thereon as Y's attorney. We interpret Rule 5 to encompass this matter since, in our opinion, the ownership of the shares by X is confidential information obtained by the lawyer while employed by X, his former client, regardless of the fact that the ownership of the shares and the escrow might be "a public record." Canon 37, American Bar Association, provides that the confidences of a client or former client may not be disclosed or used by a lawyer to the disadvantage of the client or former client, even though there are other available sources of such information. (See also Drinker, Legal Ethics, page 135.) Further, Canon 6, A.B.A., prohibits acceptance of subsequent employment "in matters adversely affecting any interest of the client with respect to which confidence has been reposed." While it may be that the exception in Canon 6 "by express consent of all concerned given after a full disclosure of the facts" applies to the clause therein immediately above quoted, we are of the opinion that the lawyer would violate Canon 6 if he were to accept the new employment wherein an attachment of the shares is contemplated or might occur, even if another were the escrow holder, unless in obtaining

his consent the lawyer were to explain to X, his former client, that such an attachment was contemplated. Otherwise there would be no "full disclosure of the facts" under Canon 6.

In conclusion, the Committee is of the opinion that it would be unwise for a lawyer to accept employment to file such an action under the circumstances in question. Assuming the lawyer honestly believes, as we assume this lawyer does, that there are and will be no conflicting interests between the former and the new client as to any matter as to which the lawyer had obtained confidential information during the former employment, or, that if such be the case, the lawyer intends to rely on the former client's "consent," unforeseen circumstances might thereafter alter the picture. The lawyer might subsequently be put in a position where the purported "consent" of the former client would not cover some matter which was unforeseen or not contemplated by anyone when the consent was given, in which case the lawyer might well be required to withdraw from further participation in the action in order not to be guilty of unprofessional conduct.

EDITOR'S NOTE: See Opinion No. 31, supra, and note thereto, in connection with possible use by attorney of information he has obtained concerning assets of former client; see also ABA Supp. Opinions 297 (p. 70), Opinion 310 (p. 71); N.Y. City 88 (p. 40). Cf. Opinion No. 159, supra. See Opinion No. 109, supra, and note, for opinions on adverse and conflicting interests. See Drinker, Legal Ethics, p. 111, et seq. on taking cases against interest of client or former client.

## Opinion No. 267 (January 26, 1960)

**CONFIDENTIAL COMMUNICATIONS. Disclosure by guardian to attorney; disclosure of probable misuse of ward's funds by guardian to attorney; attorney's right and obligation to report to court and related problems.**

The Committee has been asked to render an opinion on the following facts and question:

In 1952, G, the natural mother of W, was appointed the guardian of the person and estate of W. The ward's estate consisted principally of a personal injury recovery. The guardian's bonding company required all disbursements to be by check signed by G and approved by the bonding company. These procedures were properly followed and a proper account was filed and approved in 1953. Thereafter, disbursements were made in the same manner but no further accounting has been filed. Under the original order of court, G was entitled to withdraw a sum each month for the support and maintenance of W, whose custody G had. Several years after 1953, the custody of W was transferred from G to W's father, F, in another state and thereafter F wholly supported W. G, however, continued to make the monthly withdrawals, co-signed by the bonding company, but used the money for her own purposes and not to support W. No one knows of these facts except G.

In 1959, the bonding company demanded that an account be filed. G's original attorney withdrew from the case. G has now gone to attorney B, has made a full disclosure of the facts and has asked attorney B to render an account on her behalf and to protect her interests. Attorney B desires to know the following:

(1) May attorney B prepare an account for the guardian's signature and after signing, file the same, which account does not specifically mention or specify the defalcation on the guardian's part.

(2) Is attorney B under an obligation to call the situation to the court's attention in the absence of express consent on the part of G, the guardian.

(3) May attorney B call the situation to the court's attention in the absence of express consent on the part of the guardian.

(4) What steps can the lawyer ethically take to minimize the exposure of the guardian to criminal or other liability for her actions, if any.

The problem presented by these questions is not without difficulty and presents, as in many cases of confidential communications, a situation where different interests conflict. At least in related circumstances, the matter has been previously considered by this Committee and other ethics committees in the United States.

The duty of nondisclosure of information confidentially communicated from client to attorney is treated by Canon 37 of the Canons of the American Bar Association. This Canon reads, in pertinent part:

"It is the duty of a lawyer to preserve his client's confidences . . . The announced intention of a client to commit a crime is not included within the confidence which he (the law-

USCA Case #13-5342     Document #1484126     Filed: 03/17/2014     Page 245 of 403

yer) is bound to respect. He may properly make disclosures as may be necessary to prevent the act or protect those against whom it is threatened."

The rule of this Canon was a rule of the common law (6 Holdsworth, History of English Law, 433) and is in substance enacted as a rule of privilege in California (Cal. Code Civ. Proc., Section 1881 (2)). The rule is widespread in effect and applies even though the disclosure of the confidence is highly important and relevant to the trial of an issue (Taft, Ethics in Service, 31-32). The rule applies even where the facts are already part of a public record or where there are other sources of information (Michigan Bar Association, Ethics Opinion No. 45); New York County Bar Association, Ethics Opinion No. 401). However, there are exceptions to the rule. A non-exclusive exception is stated in the Canon itself.

Generally, the right and duty to disclosure has been principally recognized when the disclosure is necessary to prevent a potential crime. The duty to keep silent is most clearly established when the crime or fraud has already been committed. There is not total agreement among all authorities. Difficult situations are specially presented where the acts of the crime or fraud have already been committed but the effect or ramifications are continuing. The California courts appear to have adopted an extremely strict rule in favor of the privilege. In People vs. Singh (1932) 123 Cal. App. 365, Singh and others were accused of assault with a deadly weapon with intent to commit murder. The defense was based upon an alibi.

Bennington, who had been Singh's attorney during the preliminary phases of the case, was called as a witness by the prosecution and testified that during a conference in jail shortly after the arrest, the defendant had confessed the crime and had disclosed plans to bribe witnesses to support an alibi and had suggested the plan of bribing one or two jurors at the trial. Singh was convicted and appealed upon the ground that this communication to Bennington was confidential and that the witness should not have been permitted so to testify. After castigating the lawyer's conduct as unethical, Mr. Presiding Justice Preston, speaking for an unanimous court, reversed the conviction, stating in conclusion:

"In permitting the judgments herein to stand, we would be sacrificing a part of the body of the law itself in the fatuous hope of preserving the social fabric through a process of destroying the fibre." (123 Cal. App., at 372).

Thus, the California law protects the client's confidences where the communication relates to future crimes if the same is made in connection with the confession of past crime. People vs. Singh, supra, has recently been cited by the Supreme Court without disapproval. (People vs. Linden, 52 A.C. 1, 23.)

In addition to the authority of People vs. Singh, supra, a most persuasive argument is derived from the circumstances that in 1928, the State Bar proposed a rule which would have required a member of the Bar, upon learning confidentially of misconduct, to disclose the fact to the presiding judge or judicial officer before

whom the matter was pending even against the consent of his client. The proposed rule further provided that such disclosure was not a violation of the rule pertaining to confidential communications (The State Bar Journal, April 1928, p. 205). The Supreme Court failed to adopt the rule. See: Radin, The Privilege of Confidential Communication Between Lawyer and Client, 16 Cal. Law Review 487, 494 et seq.

In this connection, American Bar Association Opinion 268 holds:

"While ordinarily it is the duty of a lawyer, as an officer of the court, to disclose to the court any fraud that he believes is being practiced on the court, this duty does not transcend that to preserve the client's confidences."

It is clear that a client who is a guardian or an administrator is entitled to the same protection of the rule against disclosure of confidential communications as is a client who retains counsel purely in a personal capacity (Magee vs. Brenneman, 188 Cal. 562). This Committee recognizes that the implications of its prior opinion (Opinion No. 132, September 17, 1940) are in basic principle contrary to this opinion. To the extent that there is anything in Opinion No. 132 contrary to this opinion, Opinion No. 132 is disapproved.

It is clear at the same time that the attorney should use every effort to cause the client to rectify the malappropriation without violating the confidential communication rule and, of course, that the attorney may not prepare or file an account which is false, either by reason of positive misstatement or significant nondis-

closure.

The Committee, therefore, is of the opinion that the answers to the questions posed above are as follows:

(1) No.
(2) No.
(3) No.

(4) Ordinarily, this Committee does not render legal advice as to the course of conduct to be followed by either clients or attorneys; however, in this case, the intimate relationship of the course of conduct to be followed and the ethical question involved are such that the Committee feels it appropriate to state that in its opinion the attorney should advise the client to prepare and sign a true account in which the malappropriation is revealed and in which the guardian treats herself as liable, to the extent of the amount misused, to the estate. The attorney should further advise the client to repay to the estate the amount so misused at once. If the client has no funds with which to pay, she may use such portion of the fee, if any, to which she is entitled for such repayment. In the event there is either no fee allowed or an insufficient fee and there are no other funds available, the attorney should advise the client to file an account in which the malappropriation is disclosed and the surcharge or debt as the case may be remains as an unsatisfied debt. This, the Committee feels, follows as a matter of necessity in the nature of things. If the client refuses to sign a true account as suggested hereinabove, the attorney has no option except to refuse to file any account. In such case, it will appear that the client will be cited for failure to file an account in due course with

Case 1:13-cv-01112-CKK   Document 3-5   Filed 07/22/13   Page 161 of 253

such consequences as the law provides in such cases.

EDITOR'S NOTE: See Opinion No. 264, supra, and note thereto.

## Opinion No. 268 (February 16, 1960)

ADVERTISING. It is improper for an attorney for an organization to permit the use of his picture and biography to be included in advertisements of the organization.

A member of the Association asks the Committee's opinion on the following:

A federal savings and loan association issued a four page pamphlet advertising the institution and mailed copies to the public at large. Across two of the four columns of the inside two pages appears the pictures and description of some of the experience of two attorneys for the institution. The brochure states:

"A & B
LEGAL COUNSEL FOR OUR ASSOCIATION
The firm of A & B serves Federal as legal counsel together with our own C, Executive Vice President, who is also an attorney. Their combined legal astuteness assures the Association constant awareness of every legal change and influencing event."

Following the descriptions of the experience of the two attorneys is a list of directors of the institution and their business or professional association. Following this list there is the legend:

"COUNSEL
A & B
C"

C is also identified as an Executive Vice President of the association. It is assumed that so much of the pamphlet as relates to the attorneys was prepared and published with their knowledge and consent.

The question presented is whether it is unethical for an attorney to permit the use of his picture and name in such an advertisement.

The Rules of Professional Conduct of the State Bar of California prohibit an attorney from soliciting professional employment by advertising or otherwise (Rule 2). The rule includes the prohibition against using pamphlets or any medium of communication to advertise the name of the lawyer or his law firm or the fact that he is a member of the State Bar or the Bar of any jurisdiction. This rule and Rule 2a mention several practices such as the use of professional cards, telephone directory listings and listings in law lists which are not deemed to be in violation of Rule 2. Prior to its amendment, effective January 5, 1960, Rule 2 did not specifically refer to advertising the name of a lawyer in pamphlets or in other media. Since the publication here involved was made before January 5, 1960, the Committee bases its opinion on the rules as they existed before 1960. However, the Committee's conclusion would be the same if the matter was considered under Rule 2a.

The Canons of Professional Ethics of the American Bar Association provide that it is unprofessional to solicit professional employment by circulars and the like (Canon 27). This canon also lists certain practices which are not deemed to be in violation of the canon.

The Committee on Professional Ethics and Grievances of the American Bar Association has held that it is in violation of Canon 27 for law firms engaged in general practice to permit a manufacturing association to specify their names as general counsel on letterheads used for correspondence with the general public or on bulletins sent out from time to time by the association (Opinion 285).

This Committee has held that an attorney may not ethically permit a corporation, trade organization or collection agency represented by him to advertise his employment as such counsel in newspapers, circulars or upon a letterhead (Opinion 43).

There is no possible justification for the advertisement under consideration. Neither A nor B is a director or officer of the institution. The pamphlet is not sent to members only. The purpose may be to get business for the institution, but generally it is not the function of lawyers to promote a client's business through advertisements and particularly through advertisements which advertise the experience of the lawyer.

The facts here presented differ considerably from those where an attorney is a director of a financial institution and his name with a designation of his profession appears with the names and business or professional connection of the other directors of the institution. In the latter case, the purpose is to identify the directors, not to advertise their legal experiences.

The A.B.A. Committee, in Opinion 285, referred to above, said:

"The purpose of the provisions of Canon 27 condemning advertising is emphatically to discourage all forms of self-laudation by lawyers, not only direct, but also indirect. The latter include any suggestion or encouragement of commendatory statements by others designed to call attention to the lawyer for the purpose of promoting his professional employment. In every case, of course, the situation must be wholly free from any actual or apparent suggestion or connivance on the part of the lawyers in their own interest."

In the opinion of this Committee, the publication of the pamphlet with the knowledge or consent of the attorneys is a decided violation of Rule 2 and of Canon 27 on the part of the attorneys. It is also improper to even carry the names of the attorneys on such a pamphlet.

EDITOR'S NOTE: See Opinion No. 288, infra; cf. Opinions Nos. 241, 256, supra.

## Opinion No. 269 (January 17, 1962)

ATTORNEY-CLIENT — ADVERSE INTERESTS — CONFIDENTIAL COMMUNICATIONS. An attorney who formerly was co-counsel for executors of a decedent's estate and for the testamentary

**Exhibit 17**



575 SEVENTH STREET NW   WASHINGTON, DC 20004
**T** 202.344.4000   **F** 202.344.8300   www.Venable.com

CONFIDENTIAL

June 22, 2012

***VIA ELECTRONIC AND HAND DELIVERY***

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
1750 Pennsylvania Avenue, N.W., 10th Floor
Washington, D.C. 20220

**Re:    Response to June 1, 2012 Letter**

Dear Ms. Weinberg:

On behalf of our client, Morgan Drexen, Inc., this letter responds to several issues raised

in your June 1, 2012, letter, in which you set forth several alleged deficiencies in Morgan

Drexen's May 11, May 14, and May 29 responses to the Civil Investigative Demand ("CID")

issued to Morgan Drexen by the Consumer Financial Protection Bureau (the "Bureau") on or

about March 13, 2012, as amended by your letter dated March 30, 2012.  In addition, this letter

responds to several points raised in our June 5, 2012 meeting.

This letter and any accompanying documents constitute sensitive and proprietary

business information of Morgan Drexen and are confidential.  All such materials are intended

only for review by Bureau staff.  Accordingly, we request that they receive the highest level of

protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070

and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-

1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other

applicable statutes, regulations, and rules.

Wendy Weinberg, Esq.                                              CONFIDENTIAL
June 22, 2012
Page 2

## Document Requests

**Document Request 11:  Document Request 11 asks for, inter alia, correspondence between Morgan Drexen and third parties providing services to Morgan Drexen. The Request details five different types of correspondence including: (a) acquiring, providing services to, or terminating services for consumers or Clients; (b) providing or acquiring consumer or Client leads; (c) receiving or processing payments from Clients; (d) tracking transactions or otherwise processing accounts for Clients; or (e) receiving phone calls or making phone calls to consumers or Clients.**

**First, as I noted previously, you have provided emails between Morgan Drexen and Seevian Solutions, Inc. in response to this request in a pdf format, which is not permitted under the CID's document submission standards without prior permission. Second, the emails that you have provided have focused almost exclusively on administrative matters such as holiday schedules and attendance, not the subjects requested in the CID. You have provided no other correspondence between Morgan Drexen or the Associated Attorneys and Seevian Solutions, Inc., concerning any of the requested topics.**

**Response:**  Please find attached as MD012627 – MD013494 additional correspondence

between Morgan Drexen or the Associated Attorneys and Seevian Solutions, Inc.  Morgan

Drexen's discovery into this matter is continuing and the company reserves the right to

supplement this response at a later date.

**Document Request 8:  All advertisements, articles or other marketing materials that have appeared in any television, radio, print, online, or electronic medium that promote the Debt Settlement services of Morgan Drexen or Associated Attorneys to consumers.**

**a. For each of these items, provide copies of any instructions provided to the media outlet informing it of the date, times, or criteria to run the ads.**

**Response:**  Please find attached as MD012210 – MD012626 additional advertisements,

articles or other marketing materials responsive to your request.

Wendy Weinberg, Esq.                                    CONFIDENTIAL
June 22, 2012
Page 3

**Interrogatory 11:  This Interrogatory asks Morgan Drexen to identify all current employees or contractors of Morgan Drexen. You have identified only employees and no contractors. Please either confirm that it is Morgan Drexen's position that it is no longer using contractors (as identified in its response to Interrogatory 13) and the date that it ceased to use contractors, or provide the requested information.**

**Response**:  Please find attached as MD010769 – MD010806 an updated spreadsheet that

identifies all current Morgan Drexen employees and contractors.

**Interrogatory 16:  You have stated that the requested information on Clients for whom an Associated Attorney declined to provide services, is forthcoming, but have neither produced it nor even provided a date by which you intend to produce it.**

**Response**:  On June 1, 2012, Morgan Drexen produced information to the Bureau

responding to Interrogatory 16's request for "each Client for whom an Associated Attorney

declined to provide services." Specifically, Morgan Drexen identified Associated Attorney

Clients whose termination of legal representation is known by Morgan Drexen to have been

initiated at the instruction of Associated Attorneys.  In an email later that day, you clarified that

Interrogatory 16 was intended "to find out the names of *potential* Clients for whom [an

Associated Attorney] declined to provide services." (emphasis added).  Please find attached as

MD010807 – MD012209 a list of potential Clients for whom an Associated Attorney declined to

provide services.

\*   \*   \*   \*   \*

Morgan Drexen reserves the right to change, amend, or supplement the information

provided herein if it becomes aware of additional information, and hereby preserves all

evidentiary and other objections incident to this investigation.  Morgan Drexen does not by this

reservation undertake any obligation of supplementation or amendment.

Wendy Weinberg, Esq.                                    CONFIDENTIAL
June 22, 2012
Page 4

The Company is working diligently to complete its responses to the CID specifications.

Morgan Drexen and its counsel are committed to cooperating with the Bureau in connection with

the CID and addressing any issues raised by the Bureau. Please do not hesitate to contact us

should you have any questions about the enclosed materials.

Respectfully submitted,

Randal M. Shaheen
Andrew E. Bigart
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
202.344.4488
202.344.4323
*Counsel for Morgan Drexen, Inc.*

**Exhibit 18**

# VENABLE® LLP

June 26, 2012

*VIA ELECTRONIC AND HAND DELIVERY*

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
Office of Enforcement
1700 G St., NW
Washington, DC 20552

**Re:    Eleventh Response to Civil Investigative Demand Issued to Morgan Drexen, Inc.**

Dear Ms. Weinberg:

On behalf of our client, Morgan Drexen, Inc., we submit the enclosed information and materials in response to the Civil Investigative Demand ("CID") issued to Morgan Drexen by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012, as amended by your letter dated March 30, 2012. In accordance with previous discussions with you, please find enclosed updated spreadsheets in response to Document Request 21 subparts (b), (c), (d), (g), and (n).

Any communications relating to this inquiry, as well as the documents accompanying or related to those communications and the information contained in the accompanying materials, constitute sensitive and proprietary business information of Morgan Drexen and are confidential. All such materials are intended only for review by Bureau staff. Accordingly, we request that they receive the highest level of protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

Morgan Drexen reserves the right to change, amend, or supplement the enclosed information or documents if it becomes aware of additional information, and hereby preserves all evidentiary and other objections incident to this investigation. Morgan Drexen does not by this reservation undertake any obligation of supplementation or amendment.

5817136-v1

Wendy Weinberg, Esq.
June 26, 2012
Page 2

     Morgan Drexen and its counsel are committed to cooperating with the Bureau in connection with the CID and addressing any issues raised by the Bureau.  To that end, please do not hesitate to contact us should you have any questions about the enclosed materials.

               Respectfully submitted,

               Randal M. Shaheen
               Andrew E. Bigart
               Venable LLP
               575 7th Street, N.W.
               Washington, D.C. 20004
               202.344.4488
               202.344.4323

               *Counsel for Morgan Drexen, Inc.*

5817136-v1

**Exhibit 19**

**cfpb** Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

July 2, 2012

Randal M. Shaheen, Partner
Andrew Bigart
Venable LLP
575 7th Street, NW
Washington, DC 20004

Re: Morgan Drexen

Dear Mr. Shaheen:

I am writing to memorialize our conversations of June 18 and June 28, 2012,
as well as to summarize our previous outstanding agreements noted in the
Consumer Financial Protection Bureau's (the "Bureau") letter dated June 6,
2012, (memorializing our meeting of June 5, 2012) regarding the remaining
deficiencies in Morgan Drexen responses to the Civil Investigative Demand
("CID") issued by the Bureau on March 13, 2012.

Missing Information on Bankruptcy Services

Morgan Drexen agreed to amend its production under the CID to include all
relevant information regarding the services provided by Associated Attorneys
pursuant to "Attorney/Client Bankruptcy Fee Agreements" ("Bankruptcy
Agreement").

Specifically, Morgan Drexen agreed to review its production to date for
Interrogatories 10, 11, 12, 13, 14, 15, 16, 17, 18, and Document Requests 3, 4,
5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, and 21, and amend the
production to the extent necessary to add information, data, or documents
related to the Bankruptcy Agreements and the Clients who signed Bankruptcy
Agreements.

Additionally, concerning DR 21, Morgan Drexen agreed to reproduce 21(l)
related to how long Morgan Drexen or an Associated Attorney told a Client it
would take before an Associated Attorney would file a bankruptcy petition, to
the extent that Morgan Drexen has access to that information. Morgan Drexen
will also add a new subsection (y) to Document Request 21 pursuant to which
it will provide information about whether the Client signed a Bankruptcy

1

**cfpb** Consumer Financial
Protection Bureau

1700 G Street NW. Washington, DC 20552

Agreement, a Debt Settlement Agreement, or both. Morgan Drexen will also indicate the dates of those Agreements to the extent that it has access to that information.

Morgan Drexen has stated that it will supply this amended production regarding Bankruptcy Services in full by July 20, 2012.

Finally, you had previously agreed to send the Bureau the Bankruptcy Code provision which you contend requires debtors to attempt debt settlement prior to filing a bankruptcy petition.

Supplemental Questions:

In our meeting of June 5th, Morgan Drexen agreed to answer the following questions by June 15th:

1. When fees are collected under a Bankruptcy Agreement, are they called "engagement fees"? If not, what are they called?
2. Are two separate trust accounts opened for Clients when a Client signs both a Bankruptcy Agreement and a Debt Settlement Agreement? Are two separate trust accounts opened for Clients who have different attorneys representing them under the Bankruptcy Agreement and the Debt Settlement Agreement?
3. Are there other classes or types of Clients, other than those receiving debt resolution or bankruptcy services, for whom Morgan Drexen provides support services to Associated Attorneys?

To date Morgan Drexen has not provided answers to those questions. In our phone conversation of June 18th, Morgan Drexen agreed to provide answers to the questions above, as well as the following question, by July 2nd:

4. Under what circumstances do Associated Attorneys and/or Morgan Drexen have Clients sign a) the Bankruptcy Agreement, b) the Debt Settlement Agreement, or c) both?

2



Consumer Finance
Protection Bureau

1700 G Street NW, Washington, DC 20552

Document Requests:

1. **Document Request 6**: This request seeks recordings of consumer
   intake calls from January 1, 2010 until the date of complete compliance
   with the CID. The Bureau has agreed to put compliance with this
   document request in abeyance until after it reviews Morgan Drexen's
   updated production as set forth herein.

2. **Document Request 9**: This request sought all agreements, contracts
   and Documents related to payments between or among Associated
   Attorneys and Morgan Drexen, or between or among Associated
   Attorneys.  The Bureau explained that it had received no documents
   reflecting, among other things, any of the following: payments,
   invoices, bank statements, or terms related to payments.

   In our meeting of June 5th, you agreed to provide this information by
   June 15th.  You did not.  Instead, in your letter dated June 15th, you
   wrote "Discovery on this matter is continuing and Morgan Drexen is
   working diligently to collect and produce any responsive materials to
   the Bureau".

3. **Document Request 10**: This request seeks "All communications
   between Morgan Drexen and Associated Attorneys concerning
   implementation of policies and procedures, Clients, fees, or Morgan
   Drexen's contracts with attorneys."

   - In our meeting of June 5th, Morgan Drexen agreed to provide
     the mathematical formula underlying the software program used
     to generate information related to a Client's fees, monthly
     payments, and the amount of time that it will take the Client to
     settle his or her debts, <u>by June 15th</u>. Morgan Drexen did not do
     so.
   - Instead, in your letter dated June 15, 2012, you wrote:
     "Discovery on this matter is continuing and Morgan Drexen is
     working diligently to collect and produce any responsive
     materials to the Bureau".

3



1700 G Street NW, Washington, DC 20552

- In our phone conversation of June 18th, you indicated that you anticipated that some of the material produced in response to DR 10 would be privileged, but that you would be able to redact the privileged portions. During that phone conversation you indicated that you would provide this response <u>by July 2nd</u>.
- Additionally, in our phone conversation of June 28th, you expressed concern that updates to DR 10 to reflect information on bankruptcy services and clients, as identified above, would be too burdensome. During that conversation the Bureau stated that it did not need solely administrative, non-substantive emails. You stated that you would provide us with the names of the custodians of substantive, managerial emails <u>in the next couple of days</u> in an attempt for the Bureau to narrow this request.

4. **Document Request 11**: This request seeks information on third parties providing services to Morgan Drexen or Associated Attorneys. Morgan Drexen has stated that it is no longer using lead generators but has not provided the date by which it ceased to use lead generators.

   On June 5th, Morgan Drexen agreed to supply additional emails between Seevian Solutions, Inc. and Morgan Drexen, by June 15th. It did not do so. In our June 18th call, the Bureau stated that it was seeking only emails between management at Morgan Drexen and management at Seevian Solutions concerning or referring to the implementation of policies and procedures, the contract between the parties, or other management concerns. The Bureau distinguished these from administrative emails concerning matters such as the scheduling of individual workers, or phone outages at the facility. Nonetheless, on June 22, 2012, Morgan Drexen supplied additional emails between Seevian Solutions and Morgan Drexen that were predominantly administrative, and non-substantive. Production on this request is therefore outstanding.

5. **Document Request 16:** This request sought welcome letters with individualized information on Client debt provided by Morgan Drexen or an Associated Attorney to a Client. Morgan Drexen had previously indicated that no such individualized letters existed. Morgan Drexen subsequently produced MD 010413, MD 010527, and MD 010645,

4



which contain this information. However, the Bureau is willing to hold full compliance with this request in abeyance until it has reviewed Morgan Drexen's updated production on DR 21(l).

6. **Document Request 18**: This request seeks contracts, agreements, or correspondence with creditors of the "Preferred Creditor Program." In its letter dated June 15, 2012, Morgan Drexen agreed to supply the requested correspondence related to the Preferred Creditor Program on or about June 29, 2012.  To date, the Bureau has not received this correspondence.

7. **Document Request 20:** We have received no response to this request, which asks for "All research studies, analyses, or other materials on which Morgan Drexen relies to provide a reasonable basis for the claims identified in Interrogatory #21."

8. **Document Request 21**: This request seeks database information regarding each Client. On June 18th, Morgan Drexen agreed to amend its production to provide account identification numbers for each subpart of DR 21 that refers to individual creditor accounts, by June 22nd.  Instead, on or about June 26th, Morgan Drexen supplied only amendments to DR 21 (b), (c), (d), (g) and (n). Not including the fields for which Morgan Drexen states that it has no information (h, i, l, o, s, and x), the remaining fields requiring this update are 21 (k) and (p), which are also missing the names of the creditors.

   As noted above, 21(l) seeks information on how long an Associated Attorney told a Client it would take to settle his or her debts. You had previously questioned whether Morgan Drexen had access to that information for debt settlement services Clients. As noted in my email of June 22nd, if you look at MD 010413, MD 010527, and MD 010645, you will see examples of letters that set forth this information. The Bureau therefore seeks an additional production to reflect this information for debt settlement Clients in 21(l).

Interrogatories

1. **Interrogatory 17**:  This request asks Morgan Drexen to "identify each bank account from which payments were made from Morgan Drexen to

5

**cfpb** Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

an Associated Attorney; from which payments were made from an
Associated Attorney to Morgan Drexen; and in which Clients' funds
are deposited." On June 5th, Morgan Drexen agreed to supply additional
identifying information regarding these bank accounts by June 15th. It
did not do so.

2. **Interrogatory 21**: You have stated that the requested basis for claims
made by Morgan Drexen is forthcoming, but have neither produced it
nor provided a date by which you intend to produce it.

3. **Interrogatory 22**: You have stated that you are looking for documents
related to Document Request 20, concerning the substantiation for
claims made by Morgan Drexen, but have neither produced any
documents nor provided a date by which you intend to produce them.

<u>PDFs of Emails</u>

The Bureau's June 5th letter noted: "Several of the documents Morgan
Drexen has produced pursuant to the CID do not conform to the
Bureau's Document Submission Standards ("DSS"). For example,
Morgan Drexen produced emails in PDF format rather than native
format. Morgan Drexen will review the Bureau's Document
Submissions Standards and remedy its production in accordance with
those standards." Morgan Drexen has not supplemented its responses
to bring them into compliance with the Bureau's DSS.

<u>Privilege Log</u>

Morgan Drexen has not supplied a privilege log for those requests for
which it has failed to supply complete information, under claims of
privilege.

6



cfpb  Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

## Timeline for Updated Production

On June 18th, Morgan Drexen agreed to respond to all outstanding requests except those related to Bankruptcy Services, by July 2nd. As noted above, on June 28th, Morgan Drexen agreed to address the remaining deficiencies, related to Bankruptcy Services, by July 20th.

Sincerely,

Wendy J. Weinberg
Shirley Chiu
Enforcement Attorneys

7

**Exhibit 20**

# VENABLE® LLP

575 SEVENTH STREET NW  WASHINGTON, DC 20004
**T** 202.344.4000  **F** 202.344.8300  www.Venable.com

July 10, 2012

*VIA ELECTRONIC AND HAND DELIVERY*

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
Office of Enforcement
1700 G St., NW
Washington, DC 20552

**Re:    Twelfth Response to Civil Investigative Demand Issued to Morgan Drexen, Inc.**

Dear Ms. Weinberg:

On behalf of our client, Morgan Drexen, Inc., we submit the enclosed materials in response to the Civil Investigative Demand ("CID") issued to Morgan Drexen by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012, as amended by your letter dated March 30, 2012.  In accordance with previous discussions with you, please find enclosed additional email correspondence responsive to Document Request 18.

Any communications relating to this inquiry, as well as the documents accompanying or related to those communications and the information contained in the accompanying materials, constitute sensitive and proprietary business information of Morgan Drexen and are confidential. All such materials are intended only for review by Bureau staff.  Accordingly, we request that they receive the highest level of protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

Morgan Drexen reserves the right to change, amend, or supplement the enclosed information or documents if it becomes aware of additional information, and hereby preserves all evidentiary and other objections incident to this investigation.  Morgan Drexen does not by this reservation undertake any obligation of supplementation or amendment.

5868862-v1

Wendy Weinberg, Esq.
July 10, 2012
Page 2

     Morgan Drexen and its counsel are committed to cooperating with the Bureau in connection with the CID and addressing any issues raised by the Bureau.  To that end, please do not hesitate to contact us should you have any questions about the enclosed materials.

                              Respectfully submitted,

                              Randal M. Shaheen
                              Andrew E. Bigart
                              Venable LLP
                              575 7th Street, N.W.
                              Washington, D.C. 20004
                              202.344.4488
                              202.344.4323

                              *Counsel for Morgan Drexen, Inc.*

5868862-v1

**Exhibit 21**

# VENABLE® LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
**T** 202.344.4000   **F** 202.344.8300   www.Venable.com

July 16, 2012

*VIA ELECTRONIC AND HAND DELIVERY*

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
Office of Enforcement
1700 G St., NW
Washington, DC 20552

> **Re:  Thirteenth Response to Civil Investigative Demand Issued to Morgan Drexen, Inc.**

Dear Ms. Weinberg:

On behalf of our client, Morgan Drexen, Inc., we submit the enclosed materials in response to the Civil Investigative Demand ("CID") issued to Morgan Drexen by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012, as amended by your letter dated March 30, 2012.  In accordance with previous discussions with you, please find enclosed the following documents:

*Document Request 9*:  Copy of the exhibits attached to the document that begins with Bates number MD000987.

*Document Request 11*:  The last batch of email correspondence between Morgan Drexen and Seevian Solutions, Inc.  In addition, Morgan Drexen confirms that it stopped using lead generators between October and December 2010.

Any communications relating to this inquiry, as well as the documents accompanying or related to those communications and the information contained in the accompanying materials, constitute sensitive and proprietary business information of Morgan Drexen and are confidential.  All such materials are intended only for review by Bureau staff.  Accordingly, we request that they receive the highest level of protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

Morgan Drexen reserves the right to change, amend, or supplement the enclosed information or documents if it becomes aware of additional information, and hereby preserves all evidentiary and other objections incident to this investigation.  Morgan Drexen does not by this reservation undertake any obligation of supplementation or amendment.

5882581-v1

Wendy Weinberg, Esq.
July 16, 2012
Page 2


     Morgan Drexen and its counsel are committed to cooperating with the Bureau in connection with the CID and addressing any issues raised by the Bureau.  To that end, please do not hesitate to contact us should you have any questions about the enclosed materials.

                      Respectfully submitted,

                      Randal M. Shaheen
                      Andrew E. Bigart
                      Venable LLP
                      575 7th Street, N.W.
                      Washington, D.C. 20004
                      202.344.4488
                      202.344.4323

                      *Counsel for Morgan Drexen, Inc.*

5882581-v1

**Exhibit 22**

# VENABLE® LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
**T** 202.344.4000   **F** 202.344.8300   www.Venable.com

July 24, 2012

*VIA ELECTRONIC AND HAND DELIVERY*

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
Office of Enforcement
1700 G St., NW
Washington, DC 20552

>      **Re:    Fourteenth Response to Civil Investigative Demand Issued to Morgan Drexen, Inc.**

Dear Ms. Weinberg:

On behalf of our client, Morgan Drexen, Inc., we submit the enclosed materials in response to the Civil Investigative Demand ("CID") issued to Morgan Drexen by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012, as amended by your letter dated March 30, 2012. In accordance with previous discussions with you, please find enclosed in response to Document Request 4 training documents (MD017779 – MD017853) that relate to Morgan Drexen's bankruptcy services.

We understand that the Bureau has issued a related CID to Howard Law, P.C., one of the engagement law firms for which Morgan Drexen provides paralegal and related services. They have now engaged outside counsel. Because the materials produced by Morgan Drexen relate to services being provided to the clients of Howard Law, P.C. and associated attorneys on retainer in other jurisdictions, their counsel, as we understand it, have become actively involved in decisions regarding the review and production of potentially responsive, nonprivileged materials. As a result, we have not been able to adhere to the original production schedule we had proposed. We expect that counsel for Howard Law, P.C. will continue to review Morgan Drexen's responses to ensure that any information provided to the Bureau complies with the law firm's ethical obligations, including the attorney client privilege and duty of confidentiality. As a result, we are uncertain as to the timeline for production of any remaining materials. If you have any questions regarding this process, please contact counsel for Howard Law, P.C.

Any communications relating to this inquiry, as well as the documents accompanying or related to those communications and the information contained in the accompanying materials, constitute sensitive and proprietary business information of Morgan Drexen and are confidential. All such materials are intended only for review by Bureau staff. Accordingly, we request that they receive the highest level of protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. §

5905522-v3

Wendy Weinberg, Esq.
July 24, 2012
Page 2

552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

Morgan Drexen reserves the right to change, amend, or supplement the enclosed information or documents if it becomes aware of additional information, and hereby preserves all evidentiary and other objections incident to this investigation. Morgan Drexen does not by this reservation undertake any obligation of supplementation or amendment.

Morgan Drexen and its counsel are committed to cooperating with the Bureau in connection with the CID and addressing any issues raised by the Bureau. To that end, please do not hesitate to contact us should you have any questions about the enclosed materials.

Respectfully submitted,

R. Shaheen/AB

Randal M. Shaheen
Andrew E. Bigart
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
202.344.4488
202.344.4323

*Counsel for Morgan Drexen, Inc.*

5905522-v3

**Exhibit 23**

# VENABLE®LLP

575 SEVENTH STREET NW WASHINGTON, DC 20004
T 202.344.4000 F 202.344.8300 www.Venable.com

July 27, 2012

*VIA ELECTRONIC AND U.S. MAIL*
Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
1500 Pennsylvania Avenue, N.W.
Attn: 1750 Pennsylvania Avenue, N.W., 10th Floor
Washington, D.C. 20220

**Re: Production Timetable for Bankruptcy Documents**

Dear Ms. Weinberg:

Pursuant to our conversation on Monday, we have conferred with counsel for Howard Law, P.C., and have agreed upon the following production dates relating to your request that Morgan Drexen update its CID response to include documents relating to Morgan Drexen's support for associated attorneys who provide bankruptcy advice to their clients. As noted in our July 24, 2012 letter, Morgan Drexen provides paralegal and related services to Howard Law (and other associated attorneys on retainer in other jurisdictions). Morgan Drexen must therefore abide by Howard Law's directives regarding the review and production of any potentially responsive materials as the law firm works to ensure that it complies with its ethical obligations, including the attorney client privilege and duty of confidentiality.

Further, in voluntarily agreeing to the timetable below, the Company is not waiving its position that the CID, as written, does not cover bankruptcy support services. First, Definition H of the CID, defining the term "debt settlement" (and thereby the scope of the CID), does not include the term "bankruptcy" or describe the type of activities involved in providing bankruptcy-related services. (In fact, the entire CID only mentions the term "bankruptcy" once – Document Request 21(u) requests data on whether any Associated Attorney Clients filed for bankruptcy). Second, the cover sheet to the CID, as required by 12 C.F.R. § 1080.5, explains that the focus of the investigation is on "debt relief providers, lead generators, or other unnamed persons . . . in the advertising, marketing, or sale of debt relief services or products, including but not limited to debt negotiation, debt elimination, debt settlement, credit counseling, mortgage loan modification and foreclosure rescue . . . ." As with the substance of the CID, the 12 C.F.R. § 1080.5 notice does not mention bankruptcy. Similarly, none of the legal authorities cited in the notice authorize the Bureau to conduct an investigation into bankruptcy-related activities.

5927778-v2

Wendy Weinberg, Esq.
July 27, 2012
Page 2

## 1. Requests for Which No Additional Documents Exist

- Document Request 1. Morgan Drexen's articles of incorporation, by-laws, and charter.

  o Produced on May 11, 2012. *See* MD009576 – MD009589.

- Document Request 2. Morgan Drexen's financial statements, balance sheets, profit and loss statements, state and federal tax filings, and shareholder distribution information.

  o Produced on April 27, 2012. *See* MD005390 – MD005453.

- Document Request 5. All telemarketing or other scripts used by Morgan Drexen, Associated Attorneys, or third parties providing services to Morgan Drexen or Associated Attorneys relating to Debt Settlement services.

  o Produced on April 13, 2012. *See* MD000962 – MD000986.

- Document Request 7. All recordings that are played when a consumer or Client calls Morgan Drexen, Associated Attorneys, or a third party providing services to Morgan Drexen or Associated Attorneys, and is put on hold.

  o Produced on April 27, 2012. *See* MD001043.

- Document Request 9. All agreements, contracts, and Documents related to payments between or among Associated Attorneys and Morgan Drexen, or between or among Associated Attorneys.

  o Produced on May 11, 2012 and July 16, 2012, respectively. *See* MD005812 – MD009305; MD017757 – MD017778. Discovery into this matter is continuing. Any additional responsive materials, including bank statements and similar documents, will be produced by August 6, 2012.

- Document Request 12. Exemplars of contracts or agreements between Morgan Drexen and all Clients.

  o On May 11, 2012, Morgan Drexen explained to the Bureau that it "is not in possession of any documents responsive to Document Request 12."

5927778-v2

Wendy Weinberg, Esq.
July 27, 2012
Page 3

- Document Request 15. Exemplars of each Document provided by Morgan Drexen to each Associated Attorney, including, but not limited to pleadings, questionnaires, and forms.

  o On April 27, 2012, Morgan Drexen explained to the Bureau that "Aside from the form documents provided in response to Document Request No. 14, which were drafted and/or pre-approved for use by the attorneys, Morgan Drexen does not provide the attorneys supported by the Company with any other form documents. All legal documents utilized by the Associated Attorneys (*i.e.*, pleadings, motions, discovery, *etc.*) are prepared by the Associated Attorneys on a case-by-case basis as the Associated Attorneys consult with their clients."

- Document Request 17. All consumer or Client complaints about Morgan Drexen or Associated Attorneys and any responses to the complaints.

  o Produced on June 15, 2012. *See* MD009960 to MD010768.

- Document Request 18. Contracts, agreements, or correspondence with creditors that participate in the "Preferred Creditor Program."

  o The Preferred Creditor Program does not involve any bankruptcy services.

- Document Request 19. All research conducted, financed, or sponsored by Morgan Drexen measuring the impact that the use of Morgan Drexen's or Associated Attorneys' services has on Clients' credit scores.

  o On April 27, 2012, Morgan Drexen informed the Bureau that "After a diligent search and reasonable inquiry into this matter, the Company is not in possession of, nor has the Company ever been in possession of, the requested documents."

- Document Request 20. All research studies, analyses, or other materials on which Morgan Drexen relies to provide a reasonable basis for the claims identified in Interrogatory #21.

  o The claims referenced in Interrogatory 21 are limited to debt settlement services. There are no responsive documents that relate to bankruptcy services.

Wendy Weinberg, Esq.
July 27, 2012
Page 4

## 2.   **Documents Already Produced**

- Document Request 4.  All training manuals and training materials for Morgan Drexen employees, or Associated Attorneys.

  - Produced on July 24, 2012. *See* MD017779 – MD017853.

- Document Request 6.  Recordings of consumer intake calls.

  - Morgan Drexen produced 500 recordings of consumer intake calls on April 27, 2012 and May 11, 2012, respectively. *See* MD005239 – MD005389; MD005512 – MD005811.  Per your July 2, 2012 letter, the Bureau has "agreed to put compliance with this document request in abeyance until after it reviews Morgan Drexen's updated production as set forth herein."

## 3.   **Timetable for Voluntary Responses to Supplemental Requests**

- **July 30, 2012**

  - Document Request 3.   All Documents relating to Morgan Drexen's policies and procedures relating to the provision of Debt Settlement services to consumers or Clients.

  - Document Request 8.  All advertisements, articles or other marketing materials that have appeared in any television, radio, print, online, or electronic medium that promote the Debt Settlement services of Morgan Drexen or Associated Attorneys to consumers.

  - Document Request 10.  All communications between Morgan Drexen and Associated Attorneys concerning implementation of policies and procedures, Clients, fees, or Morgan Drexen's contracts with attorneys.

    - This production will include all responsive documents other than emails.  Morgan Drexen will provide the Bureau with a proposal for conducting an email search in early August.

  - Document Request 13.  Exemplars of contracts or agreements between Associated Attorneys and all Clients.

  - Document Request 14.  Exemplars of all Documents Morgan Drexen or Associated Attorneys provide to Clients in the provision or offering of services to Clients.

5927778-v2

Wendy Weinberg, Esq.
July 27, 2012
Page 5

      o  Document Request 16.  All welcome letters and Documents with
          individualized information on Client debt provided by Morgan Drexen or an
          Associated Attorney to a Client.

- **August 6, 2012**

  o  Document Request 9.  All agreements, contracts, and Documents related to
  payments between or among Associated Attorneys and Morgan Drexen, or
  between or among Associated Attorneys.

  o  Document Request 11.  All agreements, contracts, or correspondence between
  either Morgan Drexen or an Associated Attorney and third parties providing
  services to either Morgan Drexen or an Associated Attorney related to Debt
  Settlement services.

- **August 17, 2012**

  o  Document Request 21(a) – (f) and the Bankruptcy portion for (y).  To be
  produced after review by counsel for Howard Law, P.C.

- **August 24, 2012**

  o  Document Request 21(j), (k), (m), (r), and (v).  To be produced after review
  by counsel for Howard Law, P.C.

<div align="center">*  *  *  *  *</div>

Any communications relating to this inquiry, as well as the documents accompanying or
related to those communications and the information contained in the accompanying materials,
constitute sensitive and proprietary business information of Morgan Drexen and are confidential.
All such materials are intended only for review by Bureau staff.  Accordingly, we request that
they receive the highest level of protection for confidentiality available under the Bureau's Rules
of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. §
552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. §
5512(c)(6), and any other applicable statutes, regulations, and rules.

Morgan Drexen reserves the right to change, amend, or supplement the enclosed
information or documents if it becomes aware of additional information, and hereby preserves all
evidentiary and other objections incident to this investigation.  Morgan Drexen does not by this
reservation undertake any obligation of supplementation or amendment.

5927778-v2

Wendy Weinberg, Esq.
July 27, 2012
Page 6

Please do not hesitate to contact us should you have any questions about the enclosed materials.

Respectfully submitted,

Andrew Bigart

Randal M. Shaheen
Andrew E. Bigart
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
202.344.4488
202.344.4323

*Counsel for Morgan Drexen, Inc.*

**Exhibit 24**

# VENABLE® LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
**T** 202.344.4000   **F** 202.344.8300   www.Venable.com

August 2, 2012

***VIA ELECTRONIC AND HAND DELIVERY***

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
Office of Enforcement
1700 G St., NW
Washington, DC 20552

>        **Re:    Fifteenth Response to Civil Investigative Demand Issued to Morgan Drexen, Inc.**

Dear Ms. Weinberg:

As an effort and expression of continued cooperation on behalf of our client, Morgan Drexen, Inc., we voluntarily submit the enclosed materials relating to the Company's support of bankruptcy services provided by Associated Attorneys. As we have agreed, the Company is responding to questions identical to those contained in the Civil Investigative Demand ("CID") issued to Morgan Drexen by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012. Please find enclosed the following documents:

- ***Document Request 8***: Advertisements, articles or other marketing materials that have appeared in any television, radio, print, online, or electronic medium that promote the Associated Attorney bankruptcy services. *See* MD017908 – MD017909.

- ***Document Request 13***: Exemplars of bankruptcy-related contracts or agreements between Associated Attorneys and Clients. *See* MD017854 – MD017907.

- ***Document Request 14***: Exemplars of all documents Morgan Drexen or Associated Attorneys provide to Associated Attorney Clients in the provision or offering of bankruptcy services by Associated Attorneys to Clients. *See* MD017854 – MD017907.

- ***Document Request 16***: Welcome letters and documents with individualized information on Client debt provided to Associated Attorney Clients. *See* MD017854 – MD017907.

<p align="center">* * * * *</p>

Any communications relating to this inquiry, as well as the documents accompanying or related to those communications and the information contained in the accompanying materials, constitute sensitive and proprietary business information of Morgan Drexen and are confidential.

5943768-v2

Wendy Weinberg, Esq.                                              CONFIDENTIAL
August 2, 2012
Page 2

All such materials are intended only for review by Bureau staff.  Accordingly, we request that
they receive the highest level of protection for confidentiality available under the Bureau's Rules
of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. §
552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. §
5512(c)(6), and any other applicable statutes, regulations, and rules.

     Morgan Drexen reserves the right to change, amend, or supplement the enclosed
information or documents if it becomes aware of additional information, and hereby preserves all
evidentiary and other objections incident to this investigation.  Morgan Drexen does not by this
reservation undertake any obligation of supplementation or amendment.

     Morgan Drexen and its counsel are committed to cooperating with the Bureau in
connection with the CID and addressing any issues raised by the Bureau.  To that end, please do
not hesitate to contact us should you have any questions about the enclosed materials.

                                      Respectfully submitted,

                                      Randal M. Shaheen
                                      Andrew E. Bigart
                                      Venable LLP
                                      575 7th Street, N.W.
                                      Washington, D.C. 20004
                                      202.344.4488
                                      202.344.4323

                                      *Counsel for Morgan Drexen, Inc.*

5943768-v2

**Exhibit 25**

# VENABLE®LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
**T** 202.344.4000  **F** 202.344.8300  www.Venable.com

August 7, 2012

***VIA ELECTRONIC DELIVERY***
Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
Office of Enforcement
1700 G St., NW
Washington, DC 20552

**Re:      Sixteenth Response to Civil Investigative Demand Issued to Morgan Drexen, Inc.**

Dear Ms. Weinberg:

As an effort and expression of continued cooperation on behalf of our client, Morgan Drexen, Inc., we voluntarily provide the information below relating to the Company's support of bankruptcy services provided by Associated Attorneys in response to the questions set forth in your July 30, 2012, email.

**1.      When fees are collected under a Bankruptcy Agreement, are they called "engagement fees"?  If not, what are they called?**

Please refer to the documents produced by Morgan Drexen in response to Document Request No. 13 for information on the terminology used to describe the fees assessed by the Associated Attorneys for their bankruptcy services.

**2.      Are two separate trust accounts opened for Clients when a Client signs both a Bankruptcy Agreement and a Debt Settlement Agreement?  Are two separate trust accounts opened for Clients who have different attorneys representing them under the Bankruptcy Agreement and the Debt Settlement Agreement?**

The Associated Attorneys supported by Morgan Drexen utilize a pooled interest bearing attorney-client trust account for funds belonging to their Clients.  The trust accounts are compliant with the Associated Attorney's ethical requirements.  The accounts may be used by an Associated Attorney to deposit funds regardless of the nature of the services provided to the client by the Associated Attorney.

**3.      Are there other classes or types of Clients, other than those receiving debt resolution or bankruptcy services, for whom Morgan Drexen provides support services to Associated Attorneys?**

Morgan Drexen provides paralegal services to Associated Attorneys who provide services for their clients other than debt resolution or bankruptcy services.

Wendy Weinberg, Esq.                                          CONFIDENTIAL
August 7, 2012
Page 2

>    **4.**    **Under what circumstances do Associated Attorneys and/or Morgan Drexen**
>    **have Clients sign a) the Bankruptcy Agreement, b) the Debt Settlement**
>    **Agreement, or c) both?**

The decision as to the variety of agreements offered is made by the Associated Attorney. Ultimately, prospective clients of the Associated Attorneys decide which contract to sign within the subset of agreements offered by the Associated Attorney.

### Question Regarding Document 21 Subparts

In my July 27, 2012, letter, I informed you that Morgan Drexen was willing to voluntarily submit responses to Document Request 21 subparts (a) – (f), (j), (k), (m), (r), (v), and (y) to include bankruptcy-related information. Morgan Drexen hereby agrees to provide the Bureau with a response to Document Request 21(w) (this response was inadvertently left out of the July 27th letter).

In your July 30 email, you replied that the "Bureau is not willing to accept updates to only the subsections that you have proposed . . . ." The reason that Morgan Drexen offered to update only the subparts listed above is because those are the only subparts for which the database contains bankruptcy-related information and/or the information requested is not privileged or confidential. On June 15, 2012, Morgan Drexen informed the Bureau that the Company objects or does not have non-privileged or non-confidential information responsive to the subparts (h), (i), (l), (o), (s), and (x). *See* Morgan Drexen's June 15 submission for a detailed explanation. The remaining subparts (g), (n), (p), (q), (t), and (u) request information that is not maintained for the bankruptcy services offered by the Associated Attorneys supported by Morgan Drexen.

In sum, Morgan Drexen will voluntarily submit responses to Document Request 21 subparts (a) – (f), (j), (k), (m), (r), (v), (w) and (y) to include bankruptcy-related information. These documents will be produced after review by counsel for Howard Law, P.C. in order to protect confidential or privileged information in relation to their clients.

<p style="text-align:center">* * * * *</p>

Any communications relating to this inquiry, as well as the documents accompanying or related to those communications and the information contained in the accompanying materials, constitute sensitive and proprietary business information of Morgan Drexen and are confidential. All such materials are intended only for review by Bureau staff. Accordingly, we request that they receive the highest level of protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

Wendy Weinberg, Esq.                                                CONFIDENTIAL
August 7, 2012
Page 3

     Morgan Drexen reserves the right to change, amend, or supplement the enclosed
information or documents if it becomes aware of additional information, and hereby preserves all
evidentiary and other objections incident to this investigation.  Morgan Drexen does not by this
reservation undertake any obligation of supplementation or amendment.

     Morgan Drexen and its counsel are committed to cooperating with the Bureau in
connection with the CID and addressing any issues raised by the Bureau.  To that end, please do
not hesitate to contact us should you have any questions about the enclosed materials.

Respectfully submitted,

Randal M. Shaheen
Andrew E. Bigart
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
202.344.4488
202.344.4323

*Counsel for Morgan Drexen, Inc.*

**Exhibit 26**

# VENABLE® LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
T 202.344.4000   F 202.344.8300   www.Venable.com

August 7, 2012

***VIA ELECTRONIC AND OVERNIGHT DELIVERY***
Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
Office of Enforcement
1700 G St., NW
Washington, DC 20552

> **Re:**   **Seventeenth Response to Civil Investigative Demand Issued to Morgan Drexen, Inc.**

Dear Ms. Weinberg:

As an effort and expression of continued cooperation on behalf of our client, Morgan Drexen, Inc., we voluntarily submit the enclosed materials relating to the Company's support of bankruptcy services provided by Associated Attorneys. As we have agreed, the Company is responding to questions identical to those contained in the Civil Investigative Demand ("CID") issued to Morgan Drexen by the Consumer Financial Protection Bureau (the "Bureau") on or about March 13, 2012. Please find enclosed the following documents:

- ***Document Request 11***: Agreements, contracts, or correspondence between either Morgan Drexen or an Associated Attorney and third parties providing services to either Morgan Drexen or an Associated Attorney related to Debt Settlement services. *See* MD017910 – MD017926.

\* \* \* \* \*

Any communications relating to this inquiry, as well as the documents accompanying or related to those communications and the information contained in the accompanying materials, constitute sensitive and proprietary business information of Morgan Drexen and are confidential. All such materials are intended only for review by Bureau staff. Accordingly, we request that they receive the highest level of protection for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080; the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes, regulations, and rules.

Morgan Drexen reserves the right to change, amend, or supplement the enclosed information or documents if it becomes aware of additional information, and hereby preserves all evidentiary and other objections incident to this investigation. Morgan Drexen does not by this reservation undertake any obligation of supplementation or amendment.

5943768-v2

Wendy Weinberg, Esq.                                    CONFIDENTIAL
August 7, 2012
Page 2

     Morgan Drexen and its counsel are committed to cooperating with the Bureau in connection with the CID and addressing any issues raised by the Bureau.  To that end, please do not hesitate to contact us should you have any questions about the enclosed materials.

                    Respectfully submitted,

                    Randal M. Shaheen
                    Andrew E. Bigart
                    Venable LLP
                    575 7th Street, N.W.
                    Washington, D.C. 20004
                    202.344.4488
                    202.344.4323

                    *Counsel for Morgan Drexen, Inc.*

5943768-v2

**Exhibit 27**


## BAUTE
## CROCHETIERE
## & WANG LLP

Direct Dial: 213-630-5001
mbaute@bautelaw.com

CONFIDENTIAL COMMUNICATIONS

August 30, 2012

### _VIA ELECTRONIC & OVERNIGHT DELIVERY_

Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
Office of Enforcement
1700 G St., NW
Washington, DC 20552

   Re: **Morgan Drexen Civil Investigative Demand**

Dear Ms. Weinberg:

  Two recent document productions were mailed to you, with the following Bates stamp numbers: HOW/CFPB 387-781, and HOW/CFPB 752-1202. You should have them shortly.

  I am presently engaged in a two week trial in downtown Los Angeles in front of Judge Brazile, which should conclude on or about September 14th.

  I wanted to bring to your attention that I am highly likely to object and/or move to quash all or portions of a subpoena (or CID, I'm not sure which at this point) that I was recently informed may inadvertently invade and/or violate either or both the attorney-client privilege and the work-product doctrine and client confidentiality constraints, with respect to the clients of The Howard Law Group (hereafter, the "Law Firm"). Due to the other trial, I will make this brief, based on my current limited understanding of a different proceeding in Washington D.C. In short, I was informed by counsel for Morgan Drexen, that the Consumer Financial Protection Bureau ("Bureau") has asked Morgan Drexen to produce a number of confidential client documents, for clients of the Law Firm. Simply put, Morgan Drexen does not have any unilateral right to produce information or documents belonging to the Law Firm or the clients of the Law Firm.

  For the time being, I have instructed counsel for Morgan Drexen to NOT produce documents which contain any information that is confidential concerning clients of the Law Firm. Further, because I am engaged in trial and have not scrutinized the subpoena or CID served on Morgan Drexen, I do not want anyone to be "guessing" as to what they should or should not produce, and to err on the side of protecting from disclosure any and all information that is confidential, and/or protected from disclosure by the attorney-client privilege or work-product doctrine. Morgan Drexen is a service entity that the Law Firm uses to assist clients -- as

777 S. FIGUEROA STREET · SUITE 4900
LOS ANGELES, CALIFORNIA 90017
TEL: 213 630 5000 · FAX: 213 683 1225   WWW.BAUTELAW.COM



**BAUTE
CROCHETIERE
& WANG LLP**

Wendy Weinberg, Esq.
August 30, 2012
Page 2

CONFIDENTIAL COMMUNICATIONS

such, its role is limited, and its discretion to make decisions relating to the Law Firm's clients is even more limited.

What I'd like to request for now is for you  to send me whatever subpoena or CID it is that Morgan Drexen has been asked to respond to in Washington D.C., so that we can review it closely while our trial is happening and schedule a meet and confer on limiting the scope to ensure client confidentiality.

Candice will likely follow up with you while I am engaged in trial with a letter that explains at some length what our concerns are vis a vis the Law Firm and its clients.

Very truly yours,

Mark D. Baute

MDB:ch

149832.1

**Exhibit 28**



1700 G Street NW, Washington, DC 20552

September 4, 2012

Mark Baute
Baute Crochetiere & Wang LLP
777 S. Figueroa Street Suite 4900
Los Angeles, CA 90017

Dear Mr. Baute:

I am writing in response to your letter dated August 30, 2012.

First, you write that you intend to "object and/or move to quash all or
portions" of a CID issued to Morgan Drexen.  You ask that the Bureau
share "whatever subpoena or CID it is that Morgan Drexen has been asked
to respond to in Washington D.C. so that we can review it closely while our
trial is happening and schedule a meet and confer on limiting the scope to
ensure client confidentiality."  Finally, you state that you have "instructed
counsel for Morgan Drexen to NOT produce documents which contain any
information that is confidential concerning clients of the Law Firm."

Civil Investigative Demands ("CIDs") issued by the Bureau are generally
kept confidential.  12 C.F.R. 1080.14(b) ("Bureau investigations are
generally nonpublic"); *see also* 12 C.F.R. §§ 1070.40-1070.47.  The Bureau
does not typically discuss CIDs issued to one entity with other entities.  If
you believe that Morgan Drexen has received a CID from the Bureau and
you want to discuss that with Morgan Drexen or its counsel, you are of
course free to do so.  However, you may not interfere with the Bureau's
investigation of another entity, as you are apparently attempting to do.
Unless you are now representing Morgan Drexen, the Bureau will not
discuss any CID that may have been issued to that entity with you.

Second, Howard Law has failed to timely comply with the CID the Bureau
issued to it on June 12, 2012.  The CID required production of specified
documents and responses to questions by July 12, 2012, but Howard Law
did not provide any responses by that date.  It did not even seek a meet
and confer as directed in the CID.  On July 13th, I contacted Vincent
Howard to inquire about Howard Law's response to the CID.  He indicated
that I should hear from his attorney.  I did not hear from you until July
18th.  The Bureau received its first, limited response from Howard Law via



Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

email on July 27th.  On August 6th, I sent an email to you and your associate Candice Hyon clarifying that the Bureau requires all responses to CIDs to be sent via Federal Express or UPS.  Ms. Hyon agreed on that date to send any further responses by Federal Express.  Nonetheless, after that date your firm apparently sent two additional responses to the Bureau by U.S. mail.  On August 29th, I spoke with Ms. Hyon, who agreed to resend Howard Law's second and third responses.

It is unclear from your letter whether you have resent those responses via Federal Express as requested and agreed, or whether you are relying on an earlier, U.S. Postal Service mailing.  Howard Law's production is well past due.  If you have not resent its responses by Federal Express, please do so immediately.  If you do not intend to do so, please let me know as soon as possible so that the Bureau may respond as necessary.

Sincerely,

Wendy J. Weinberg
Shirley Chiu
Enforcement Attorneys

**Exhibit 29**

# VENABLE® LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
**T** 202.344.4000   **F** 202.344.8300   www.Venable.com

CONFIDENTIAL

September 7, 2012

*VIA OVERNIGHT DELIVERY*
Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
Office of Enforcement
1700 G St., NW
Washington, DC 20552

> Re:   **Bankruptcy-Related Interrogatories**

Dear Ms. Weinberg:

We are writing to confirm that with respect to bankruptcy services, Morgan Drexen does not have any additional information to provide the Consumer Financial Protection Bureau (the "Bureau") for Interrogatories 10-16, and 18. The responses previously provided to the Bureau for these Interrogatories cover both debt settlement and bankruptcy services.

For Interrogatory 17, Morgan Drexen is working diligently to collect and produce any additional responsive information to the Bureau for both debt settlement and bankruptcy services.

We also respond to your August 24 email, in which you raised several questions regarding data that Morgan Drexen produced in response to Document Request 21.

1. **Why is Morgan Drexen listed as the creditor at settlement in 238 instances in DR 21(g)?**

At times, Morgan Drexen will be instructed by the Associated Attorneys and/or Clients of the Associated Attorneys to refrain from generating payments to a creditor despite a settlement being in place. To prevent the Morgan Drexen system from automatically generating a check to the creditor in these circumstances, the company is required to enter the "creditor name" into the database as "Morgan Drexen." Once the system identifies "Morgan Drexen" as the creditor, no payments/checks will be generated.

2. **Why did Morgan Drexen enroll 34,451 debts for which the balance was $0 at engagement? (DR 21(c))**

As requested in 21(c), the report generated contains "each debt owed by the Client at the time of enrollment." In order to assure that the Bureau is provided with accurate information, report 21(c) contains all debts listed on an Associated Attorney Client's credit report. The credit reports are pulled at the time the Client initially contacted the Associated Attorneys and engaged

Wendy Weinberg, Esq.                                    CONFIDENTIAL
September 7, 2012
Page 2

the Associated Attorneys for legal representation. The credit report will list the names of all
creditors and the balance owed.

**3.   Why was the balance listed at settlement less than the balance listed at engagement
     in 2839 instances?**

The balance at engagement listed in 21(c) is the balance listed on the Associated Attorney
Client's credit report. The credit report may not be accurate. After an Associated Attorney
commences representation of a Client, the Associated Attorney verifies the amount of debt owed
by the Client. This validation may result in an amount listed at settlement that is less than the
amount listed on the credit report and at the time of engagement.

**4.   How do you reconcile 21(g), which shows a balance owed at settlement for 15,193
     consumers, with 21(k), which shows settlement fees incurred for 14,607 consumers?**

Per the CFPB's request, 21(g) was updated in June of 2012 to include the account
identification number for all accounts. Due to the update, 21(g) would have included additional
settlements that occurred from the time 21(k) was pulled in April of 2012.

*   *   *   *   *

Any communications relating to this inquiry constitute sensitive and proprietary business
information of Morgan Drexen and are confidential. All such materials are intended only for
review by Bureau staff. Accordingly, we request that they receive the highest level of protection
for confidentiality available under the Bureau's Rules of Practice, 12 C.F.R. Pts. 1070 and 1080;
the Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B), 12 C.F.R. § 1070.10-1070.23; the
Consumer Financial Protection Act, 12 U.S.C. § 5512(c)(6), and any other applicable statutes,
regulations, and rules.

Morgan Drexen reserves the right to change, amend, or supplement this information if it
becomes aware of additional information, and hereby preserves all evidentiary and other
objections incident to this investigation. Morgan Drexen does not by this reservation undertake
any obligation of supplementation or amendment.

Please do not hesitate to contact us should you have any questions about this letter.

Respectfully submitted,

Randal M. Shaheen
Andrew E. Bigart
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
*Counsel for Morgan Drexen, Inc.*

**Exhibit 30**

# VENABLE® LLP

575 SEVENTH STREET NW   WASHINGTON, DC 20004
**T** 202.344.4000  **F** 202.344.8300   www.Venable.com

September 11, 2012

***VIA ELECTRONIC AND OVERNIGHT DELIVERY***
Wendy Weinberg, Esq.
Consumer Financial Protection Bureau
Office of Enforcement
1700 G St., NW
Washington, DC 20552

**Re:    Morgan Drexen Civil Investigative Demand**

Dear Ms. Weinberg:

As you know, Morgan Drexen is currently awaiting direction from counsel for The Howard Law Firm regarding production of data for bankruptcy support services Morgan Drexen provides to clients of The Howard Law Firm. While that information has traditionally been accessible to Morgan Drexen, it legally belongs to The Howard Law Firm, its partners and their clients.

We understand that Mr. Baute has a busy trial schedule but are nevertheless concerned that this process has taken a considerable amount of time. We are confident that the bankruptcy services and other legal services that Morgan Drexen supports are fully compliant with the Telemarketing Sales Rule and all other federal, state and state bar requirements and do not wish for this issue to unduly delay your investigation.

As you know, with respect to the data relating to support of debt settlement services, Morgan Drexen provided all non-privileged fields with the exception of personally identifying information for the clients of the law firms it supports. Morgan Drexen believed at the time that this was a reasonable compromise between the CFPB's need to conduct a full and complete investigation and the obligations imposed upon it and the law firms it supports to maintain the confidentiality of client information under the California Rules of Professional Conduct. This includes Los Angeles County Bar Opinion No. 267 (January 26, 1960), which requires attorneys to keep information given to them by their clients in strict confidence even if that information is publicly available elsewhere. *See also* Cal. Bus. & Prof. Code § 6068(e) (2012); Cal. Rules of Prof. Conduct, Rule 3-100 (2012). However, reasonable minds can differ with regard to many legal questions and counsel for The Howard Law Firm may have the same or a different view as to what constitutes compliance with the California Rules of Professional Conduct. Ultimately, direction must come from the attorneys supported by Morgan Drexen.

Wendy Weinberg, Esq.                                    CONFIDENTIAL
September 11, 2012
Page 2


     We have already provided Mr. Baute with all nonprivileged database fields relating to the support of bankruptcy services, absent any personally identifying information.  So as to not further delay resolution of this issue, we have also strongly urged Mr. Baute that upon conclusion of his trial he move forward expeditiously with his stated plan to place before a California court the question as to whether producing data related to the support of bankruptcy legal services without personally identifying information complies with Opinion No. 267.  It is then our hope that whatever the court decides, all parties will proceed in accordance with the court's direction.


     Sincerely,

     Randy Shaheen/AB

     Randal M. Shaheen
     Venable LLP
     575 7th Street, N.W.
     Washington, D.C. 20004
     *Counsel for Morgan Drexen, Inc.*

**Exhibit 31**



**cfr**

Consumer Financial
Protection Bureau

United States of America
Consumer Financial Protection Bureau

# Civil Investigative Demand

To   Morgan Drexen, Inc.
c/o Randal M. Shaheen, Partner
Venable LLP
575 7th Street, NW, Washington, DC 20004

This demand is issued pursuant to Section 1052 of the Consumer Financial Protection
Act of 2010 and 12 C.F.R. Part 1080 to determine whether there is or has been a
violation of any laws enforced by the Bureau of Consumer Financial Protection.

---

## Action Required

✓   **Appear and Provide Oral Testimony**

Location of Investigational Hearing

Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

Date and Time of Investigational Hearing

October 17, 2012, 9:00 a.m. and October 18, 2012, 9:00 a.m.

Bureau Investigators

Wendy Weinberg and Shirley Chiu

**Produce Documents and/or Tangible Things, as set forth in the attached document, by the following date**

**Provide Written Reports and/or Answers to Questions, as set forth in the attached document, by the following date**

---

## Notification of Purpose Pursuant to 12 C.F.R. § 1080.5

The purpose of this investigation is to determine whether debt relief providers, lead generators, or other unnamed persons have engaged or are engaging in unlawful acts or practices in the advertising, marketing, or sale of debt relief services or products, including but not limited to debt negotiation, debt elimination, debt settlement, credit counseling, mortgage loan modification and foreclosure rescue, in violation of Section 1031 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, as amended, Public Law 111-203 (July 21, 2010), Title X, 12 U.S.C. § 5481 et seq., the Telemarketing Sales Rule, 16 C.F.R. § 310.1 et seq., the Mortgage Assistance Relief Services Rule, 16 C.F.R. § 322.1 et seq., or any other federal consumer financial law. This investigation is also to determine whether Bureau action to obtain legal or equitable relief would be in the public interest

---

| Custodian / Deputy Custodian | Bureau Counsel |
|---|---|
| Lucy Morris/Matt Teich<br>Consumer Financial Protection Bureau, Attn: Office of Enforcement<br>1700 G Street, NW<br>Washington, DC 20552 | Wendy Weinberg/Shirley Chiu<br>Consumer Financial Protection Bureau, Attn: Office of Enforcement<br>1700 G Street, NW<br>Washington, DC 20552 |

| Date Issued | Signature |
|---|---|
| 10/1/12 | *[signature]* |
| | Name / Title   Kent Markus, Enforcement Director |

---

### Service

The delivery of this demand to you by any method prescribed by the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5562, is legal service. If you fail to comply with this demand, the Bureau may seek a court order requiring your compliance.

### Travel Expenses

Request a travel voucher to claim compensation to which you are entitled as a witness before the Bureau pursuant to Section 1052 of the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5562.

### Right to Regulatory Enforcement Fairness

The CFPB is committed to fair regulatory enforcement. If you are a small business under Small Business Administration standards, you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

### Paperwork Reduction Act

This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

# CIVIL INVESTIGATIVE DEMAND FOR
## ORAL TESTIMONY

I. **Definitions.**   As used in this Civil Investigative Demand, the following definitions shall apply:

A. "**And**," as well as "**or**," shall be construed both conjunctively and disjunctively, as necessary, in order to bring within the scope of any request in this Civil Investigative Demand all information that otherwise might be construed to be outside the scope of the request.

B. "**Any**" shall be construed to include "**all**," and "**all**" shall be construed to include the word "**any**."

C. "**Associated Attorney**" shall mean an attorney for whom Morgan Drexen states that it provides support services for legal services or Debt Settlement services.

D. "**Bankruptcy Services**" refers to services provided by Morgan Drexen or an Associated Attorney purportedly pursuant to an "Attorney/Client Bankruptcy Fee Agreement" signed by an Associated Attorney.

E. "**CID**" shall mean the Civil Investigative Demand, including the Definitions, Instructions, and Rider.

F. "**CFPB**" or "**Bureau**" shall mean the Bureau of Consumer Financial Protection.

G. "**Clients**" shall mean individuals who have made at least one payment to Morgan Drexen or an Associated Attorney to receive Debt Settlement services at any time from January 1, 2010 to the present.

H. "**Deputy Enforcement Director**" refers to a Deputy Assistant Director of the Office of Enforcement.

I. "**Each**" shall be construed to include "**every**," and "**every**" shall be construed to include "**each**."

J. "**Enforcement Director**" refers to the Assistant Director of the Division of Enforcement.

K. "**Morgan Drexen**" or "**You**" or "**Your**" shall mean Morgan Drexen, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all principals, directors, officers, owners, employees, agents, representatives, consultants, attorneys, accountants, independent contractors, including Walter Ledda, and other persons working for or on behalf of the foregoing.

II. **Instructions.**

A. **Sharing of Information:**   This CID relates to an official, nonpublic, law enforcement investigation currently being conducted by the Bureau.   The Bureau may make its files available to other civil and criminal federal, state, or local law enforcement agencies pursuant

to 12 C.F.R. §§ 1070.43(b)(1) and 1070.45(a)(5).   Information you provide may be used in any civil or criminal proceeding by the Bureau or other agencies. As stated in 12 C.F.R. § 1080.14, information you provide pursuant to this CID is subject to the requirements and procedures relating to the disclosure of records and information set forth in 12 C.F.R. part 1070.

B. **Meet and Confer:**   As stated in 12 C.F.R. § 1080.6(c), you must contact Enforcement Attorney Wendy J. Weinberg at (202) 435-7688 as soon as possible to schedule a meeting (telephonic or in person) to be held within **10** calendar days after receipt of this CID or before the deadline for filing a petition to modify or set aside the demand, whichever is earlier, in order to confer regarding your production of oral testimony.

C. **Applicable Time Period for Responsive Materials:**   Unless otherwise directed, the applicable time period for the information sought shall be from June 1, 2010 until the date of the investigational hearing.

D. **Modification of Requests:**   If you believe that the scope of the search or response required by this CID can be narrowed consistent with the Bureau's need for information, you are encouraged to discuss such possible modifications, including modifications of the requirements of these instructions, with Enforcement Attorney Wendy J. Weinberg at (202) 435-7688.   Modifications must be agreed to in writing by the Enforcement Director or a Deputy Enforcement Director.   12 C.F.R. § 1080.6(d).

E. **Petition for Order Modifying or Setting Aside Demand:**   Pursuant to 12 U.S.C. § 5562(f) and 12 C.F.R. § 1080.6(e), you may petition the Bureau for an order modifying or setting aside this CID.   To file a petition, you must send it by electronic mail to the Executive Secretary of the Bureau at ExecSec@cfpb.gov, copying the Enforcement Director at Enforcement@cfpb.gov, within twenty calendar days after service of the CID or, if the return date is less than twenty calendar days after service, prior to the return date.   The subject line of the electronic mail must include the phrase "Petition to Modify or Set Aside Civil Investigative Demand."   If a request for confidential treatment is filed, you must file a redacted public petition in addition to the unredacted petition.

F. **Procedures Governing Hearing:** This CID is issued under section 1052 of the Consumer Financial Protection Act, 12 U.S.C. §§5562 et seq. The taking of oral testimony pursuant to this CID will be conducted in conformity with that section and 12 C.F.R. §§ 1080.6(a)(4), 1080.7 and 1080.9.

G. **Scope of Investigative Hearing**: This CID covers materials and information in your possession, actual or constructive custody, or control, including, but not limited to, documents in the possession, custody, or control of your attorneys, accountants, other agents or consultants, directors, officers, and employees.

H. **Designation of a Witness**: This CID requires oral testimony from an entity. Under 12 C.F.R. 1080.6(a)(4)(ii), you must designate one or more officers, directors, or managing agents, or

2

designate other persons who consent to testify on your behalf. The individuals designated must testify about information known or reasonably available to you, and their testimony shall be binding on you. Your failure to designate a witness who is competent to testify about the topics described in the rider below will be considered a failure to comply with this CID.

## III.   **CID Rider**.

The Bureau will take oral testimony on the following topics:

1. Practices of Morgan Drexen and Associated Attorneys in enrolling Clients, serving Clients, and terminating relationships with Clients, regardless of whether they have signed an agreement for debt settlement services, an agreement for bankruptcy services, or both, including but not limited to:
   a. making disclosures,
   b. providing attorney-client agreements,
   c. charging fees to Clients, and
   d. accounting for payments made by Clients and fees charged to Clients.

2. Practices of Morgan Drexen and Associated Attorneys in implementing the Preferred Creditor Program, including but not limited to:
   a. soliciting new creditors and debt collectors for the program through Morgan Drexen, or through other entities, such as Collection First,
   b. settling Client debt, and
   c. identifying Clients mutual to Morgan Drexen or Associated Attorneys and Preferred Creditors.

3. Practices of Morgan Drexen and Associated Attorneys in providing services and products for and to each other, including but not limited to:
   a. invoicing for services and products,
   b. making payments and transferring funds between Morgan Drexen and Associated Attorneys, and
   c. setting up and operating bank accounts for receipt or transfer of Client payments and for payments between Morgan Drexen and Associated Attorneys.

4. Practices of Morgan Drexen and Associated Attorneys in providing cash advances to Clients (the Emergency Direct Assistance Fund a.k.a. "EDAF"), including but not limited to:
   a. determining Clients' eligibility for funds,
   b. accounting for Clients' receipt of funds,
   c. obtaining reimbursement from Clients of funds received from Associated Attorneys, and
   d. providing incentives to Morgan Drexen employees for enrollment of Clients in EDAF program.

3

5.  Representations made by Morgan Drexen on results obtainable by Clients who engage the services of Morgan Drexen or Associated Attorneys.

6.  Relationships with third parties, including lead generators, who conduct business with Morgan Drexen, including but not limited to:
    a.  services or products provided, and
    b.  compensation for services or products.

7.  Roles of principals of Morgan Drexen, including but not limited to:
    a.  setting policies and procedures,
    b.  overseeing operations, and
    c.  responding to the Bureau's CID.

## § 1081.405 Decision of the Director.

(a) Upon appeal from or upon further review of a recommended decision, the Director will consider such parts of the record as are cited or as may be necessary to resolve the issues presented and, in addition, will, to the extent necessary or desirable, exercise all powers which he or she could have exercised if he or she had made the recommended decision. In proceedings before the Director, the record shall consist of all items part of the record below in accordance with § 1081.306; any notices of appeal or order directing review; all briefs, motions, submissions, and other papers filed on appeal or review; and the transcript of any oral argument held. Review by the Director of a recommended decision may be limited to the issues specified in the notice(s) of appeal or the issues, if any, specified in the order directing further briefing. On notice to all parties, however, the Director may, at any time prior to issuance of his or her decision, raise and determine any other matters that he or she deems material, with opportunity for oral or written argument thereon by the parties.

(b) Decisional employees may advise and assist the Director in the consideration and disposition of the case.

(c) In rendering his or her decision, the Director will affirm, adopt, reverse, modify, set aside, or remand for further proceedings the recommended decision and will include in the decision a statement of the reasons or basis for his or her actions and the findings of fact upon which the decision is predicated.

(d) At the expiration of the time permitted for the filing of reply briefs with the Director, the Office of Administrative Adjudication will notify the parties that the case has been submitted for final Bureau decision. The Director will issue and the Office of Administrative Adjudication will serve the Director's final decision and order within 90 days after such notice, unless within that time the Director orders that the adjudication proceeding or any aspect thereof be remanded to the hearing officer for further proceedings.

(e) Copies of the final decision and order of the Director shall be served upon each party to the proceeding, upon other persons required by statute, and, if directed by the Director or required by statute, upon any appropriate State or Federal supervisory authority. The final decision and order will also be published on the Bureau's Web site or as otherwise deemed appropriate by the Bureau.

## § 1081.406 Reconsideration.

Within 14 days after service of the Director's final decision and order, any party may file with the Director a petition for reconsideration, briefly and specifically setting forth the relief desired and the grounds in support thereof. Any petition filed under this section must be confined to new questions raised by the final decision or final order and upon which the petitioner had no opportunity to argue, in writing or orally, before the Director. No response to a petition for reconsideration shall be filed unless requested by the Director, who will request such response before granting any petition for reconsideration. The filing of a petition for reconsideration shall not operate to stay the effective date of the final decision or order or to toll the running of any statutory period affecting such decision or order unless specifically so ordered by the Director.

## § 1081.407 Effective date; stays pending judicial review.

(a) Other than consent orders, which shall become effective at the time specified therein, an order to cease and desist or for other affirmative action under section 1053(b) of the Dodd-Frank Act becomes effective at the expiration of 30 days after the date of service pursuant to § 1081.113(d)(2), unless the Director agrees to stay the effectiveness of the order pursuant to this section.

(b) Any party subject to a final decision and order, other than a consent order, may apply to the Director for a stay of all or part of that order pending judicial review.

(c) A motion for stay shall state the reasons a stay is warranted and the facts relied upon, and shall include supporting affidavits or other sworn statements, and a copy of the relevant portions of the record. The motion shall address the likelihood of the movant's success on appeal, whether the movant will suffer irreparable harm if a stay is not granted, the degree of injury to other parties if a stay is granted, and why the stay is in the public interest.

(d) A motion for stay shall be filed within 30 days of service of the order on the party. Any party opposing the motion may file a response within five days after receipt of the motion. The movant may file a reply brief, limited to new matters raised by the response, within three days after receipt of the response.

(e) The commencement of proceedings for judicial review of a final decision and order of the Director does not, unless specifically ordered by the Director or a reviewing court, operate as a stay of any order issued by the Director. The Director may, in his or her discretion, and on such terms as he or she finds just, stay the effectiveness of all or any part of an order pending a final decision on a petition for judicial review of that order.

Dated: June 4, 2012.

**Richard Cordray,**

*Director, Bureau of Consumer Financial Protection.*

[FR Doc. 2012–14061 Filed 6–28–12; 8:45 am]

**BILLING CODE 4810–AM–P**

## BUREAU OF CONSUMER FINANCIAL PROTECTION

## 12 CFR Part 1080

**[Docket No.: CFPB–2011–0007]**

**RIN 3170–AA03**

## Rules Relating to Investigations

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Final rule.

**SUMMARY:** After considering the public comments on its interim final rule for the Rules Relating to Investigations, the Bureau of Consumer Financial Protection (Bureau), pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act), is making revisions to its procedures for investigations under section 1052 of the Dodd-Frank Act.

**DATES:** The final rule is effective June 29, 2012.

**FOR FURTHER INFORMATION CONTACT:** Peter G. Wilson, Office of the General Counsel, Consumer Financial Protection Bureau, 1700 G Street NW., Washington, DC 20552, (202) 435–7585.

**SUPPLEMENTARY INFORMATION:**

## I. Background

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act) was signed into law on July 21, 2010. Title X of the Dodd-Frank Act established the Bureau of Consumer Financial Protection (Bureau) to regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws. The Dodd-Frank Act transferred to the Bureau the consumer financial protection functions formerly carried out by the Federal banking agencies, as well as certain authorities formerly carried out by the Department of Housing and Urban Development (HUD) and the Federal Trade Commission (FTC). As required by section 1062 of the Dodd-Frank Act, 12 U.S.C. 5582, the Secretary of the Treasury selected a

designated transfer date and the Federal banking agencies' functions and authorities transferred to the Bureau on July 21, 2011.

The Dodd-Frank Act authorizes the Bureau to conduct investigations to ascertain whether any person is or has been engaged in conduct that, if proved, would constitute a violation of any provision of Federal consumer financial law. Section 1052 of the Dodd-Frank Act sets forth the parameters that govern these investigations. 12 U.S.C. 5562. Section 1052 became effective immediately upon transfer on July 21, 2011 and did not require rules to implement its provisions. On July 28, 2011, the Bureau issued the interim final rule for the Rules Relating to Investigations (Interim Final Rule) to provide parties involved in Bureau investigations with clarification on how to comply with the statutory requirements relating to Bureau investigations.

## II. Summary of the Final Rule

Consistent with section 1052 of the Dodd-Frank Act, the final rule for the Rules Relating to Investigations (Final Rule) describes a number of Bureau policies and procedures that apply in an investigational, nonadjudicative setting. Among other things, the Final Rule sets forth (1) the Bureau's authority to conduct investigations, and (2) the rights of persons from whom the Bureau seeks to compel information in investigations.

Like the Interim Final Rule, the Final Rule is modeled on investigative procedures of other law enforcement agencies. For guidance, the Bureau reviewed the procedures currently used by the FTC, the Securities and Exchange Commission (SEC), and the prudential regulators, as well as the FTC's recently proposed amendments to its nonadjudicative procedures. In light of the similarities between section 1052 of the Dodd-Frank Act and section 20 of the Federal Trade Commission Act (FTC Act), 15 U.S.C. 41 *et seq.*, the Bureau drew most heavily from the FTC's nonadjudicative procedures in constructing the rules.

The Final Rule lays out the Bureau's authority to conduct investigations before instituting judicial or administrative adjudicatory proceedings under Federal consumer financial law. The Final Rule authorizes the Director, the Assistant Director of the Office of Enforcement, and the Deputy Assistant Directors of the Office of Enforcement to issue civil investigative demands (CIDs) for documentary material, tangible things, written reports, answers to questions, or oral testimony. The

demands may be enforced in district court by the Director, the General Counsel, or the Assistant Director of the Office of Enforcement. The Final Rule also details the authority of the Bureau's investigators to conduct investigations and hold investigational hearings pursuant to civil investigative demands for oral testimony.

Furthermore, the Final Rule sets forth the rights of persons from whom the Bureau seeks to compel information in an investigation. Specifically, the Final Rule describes how such persons should be notified of the purpose of the Bureau's investigation. It also details the procedures for filing a petition for an order modifying or setting aside a CID, which the Director is authorized to rule upon. And it describes the process by which persons may obtain copies of or access to documents or testimony they have provided in response to a civil investigative demand. In addition, the Final Rule describes a person's right to counsel at investigational hearings.

## III. Legal Authority

As noted above, section 1052 of the Dodd-Frank Act outlines how the Bureau will conduct investigations and describes the rights of persons from whom the Bureau seeks information in investigations. This section became effective immediately upon the designated transfer date, July 21, 2011, without any requirement that the Bureau first issue procedural rules. Nevertheless, the Bureau believes that the legislative purpose of section 1052 will be furthered by the issuance of rules that specify the manner in which persons can comply with its provisions.

Section 1022 of the Dodd-Frank Act authorizes the Director to prescribe rules as may be necessary or appropriate for the Bureau to administer and carry out the purposes and objectives of Federal consumer financial laws and to prevent evasion of those laws. 12 U.S.C. 5512. The Bureau believes that the Final Rule will effectuate the purpose of section 1052 and facilitate compliance with Bureau investigations.

## IV. Overview of Public Comments on the Interim Final Rule

After publication of the Interim Final Rule on July 28, 2011, the Bureau accepted public comments until September 26, 2011. During the comment period, the Bureau received seven comments. Two of the comments were submitted by individual consumers. Four trade associations and a mortgage company also submitted comments. The trade associations represent credit unions, banks, consumer credit companies, members of

the real estate finance industry, and other financial institutions.

The commenters generally support the Interim Final Rule. Most sections of the Interim Final Rule received no comment and are being finalized without change. The comments did, however, contain questions and recommendations for the Bureau.

Several of the commenters expressed concern that the Interim Final Rule appeared to provide staff-level Bureau employees with unchecked authority to initiate investigations and issue CIDs, or that the Interim Final Rule otherwise did not provide sufficient oversight for particular actions.

A number of commenters expressed concern about sections of the Interim Final Rule that relate to CIDs. One trade association recommended that a statement of "the purpose and scope" of a Bureau investigation—in addition to a notification of the nature of the conduct constituting the alleged violation under investigation and the applicable provisions of law—be included in CIDs. A commenter suggested that the Bureau require a conference between CID recipients and the Assistant Director of the Office of Enforcement to negotiate the terms of compliance with the demand. Three of the trade associations noted concern with the statement that extensions of time are disfavored for petitions to modify or set aside CIDs. Two commenters questioned who would rule on such petitions without a confirmed Director. One trade association commented that witnesses should be permitted to object to questions demanding information outside of the scope of the investigation during an investigational hearing pursuant to a CID for oral testimony.

A number of commenters expressed concern about maintaining the confidentiality of demand material, sharing information with other State and Federal agencies, and the duties of the custodians of those materials. For example, one trade association and the mortgage company recommended that investigations should remain confidential in all circumstances. Another trade association asserted that the Bureau is not permitted to engage in joint investigations with State attorneys general.

The Bureau reviewed all of the comments on its Interim Final Rule thoroughly and addresses the significant issues they raise herein. Although most sections of the Interim Final Rule received no comment and are being finalized without change, the Bureau has made several changes to the Interim Final Rule based on the comments it received. The comments and these

Case 1:13-cv-01112-CKK Document 3-5 Filed 07/22/13 Page 225 of 253

USCA Case #14-5112 Federal Register / Vol. 77, No. 124 / Thursday, June 29, 2012 / Rules and Regulations Page 309 of 403 36103

changes are discussed in more detail in parts V and VI of the **SUPPLEMENTARY INFORMATION**.

## V. General Comments

Some comments on the Interim Final Rule were not directed at a specific section but rather concerned issues of general applicability. The Bureau addresses those comments in this section and addresses comments related to specific sections of the Interim Final Rule in part VI.

One commenter asked the Bureau to specify who would rule on petitions to set aside or modify CIDs while the Bureau lacked a Director. This commenter also asked who would review requests to the Attorney General under § 1080.12 for authority to immunize witnesses and to order them to testify or provide other information. The President appointed a Director of the Bureau on January 4, 2012. Therefore, both questions posed by this commenter are moot. The Director or any official to whom the Director has delegated his authority pursuant to 12 U.S.C. 5492(b) will rule on petitions to set aside or modify CIDs. Furthermore, the Bureau has revised § 1080.12 to clarify that only the Director has the authority to request approval from the Attorney General for the issuance of an order immunizing witnesses.

A commenter asserted that section 1052(c)(1) of the Dodd-Frank Act prohibits the Bureau from issuing CIDs after the institution of any proceedings under Federal consumer financial laws, including proceedings initiated by a State or a private party. The commenter argued that a CID should be accompanied by a certification that the demand will have no bearing on any ongoing proceeding. Section 1052(c)(1) provides, in relevant part, that "the Bureau may, before the institution of any proceedings under the Federal consumer financial law, issue in writing, and cause to be served upon such person, a civil investigative demand." The language "before the institution of any proceeding under Federal consumer financial law" refers to the institution of proceedings by the Bureau. It does not limit the Bureau's authority to issue CIDs based upon the commencement of a proceeding by other parties.

Another commenter requested that the Bureau exempt all credit unions from Bureau investigations. The Bureau believes that granting an exemption from the Bureau's enforcement authority through the Final Rule would be inappropriate and that there is an insufficient record to support such an exemption.

A commenter recommended that covered persons be allowed to recover attorneys' fees and costs incurred by defending against an investigation that is shown to be without merit. The Dodd-Frank Act does not provide the right to recover fees and costs by defending against an investigation. Further, as explained below, the Bureau believes that the procedures for petitioning to modify or set aside a CID set forth in § 1080.6(d) of the Interim Final Rule (now 1080.6(e) of the Final Rule) provide sufficient protections to a recipient of a demand it believes lacks merit.

## VI. Section-by-Section Summary

### Section 1080.1   Scope

This section describes the scope of the Interim Final Rule. It makes clear that these rules only apply to investigations under section 1052 of the Dodd-Frank Act. The Bureau received no comment on § 1080.1 of the Interim Final Rule and is adopting it as the Final Rule without change.

### Section 1080.2   Definitions

This section of the Interim Final Rule defines several terms used throughout the rules. Many of these definitions also may be found in section 1051 of the Dodd-Frank Act.

A commenter questioned the breadth of the definition of the term "Assistant Director of the Division of Enforcement." The commenter argued that because that term was defined to include "any Bureau employee to whom the Assistant Director of the Division of Enforcement has delegated authority to act under this part," the Interim Final Rule could give Bureau employees inappropriately broad authority to take certain actions, such as issuing CIDs.

The Bureau has revised the Final Rule in response to these comments. The Final Rule identifies those with authority to take particular actions under each section of the Final Rule. Sections 1080.4 (initiating and conducting investigations) and 1080.6 (civil investigative demands) of the Final Rule clarify that the authority to initiate investigations and issue CIDs cannot be delegated by the identified officials. The Final Rule also changes the defined term "Division of Enforcement" to "Office of Enforcement" to reflect the Bureau's current organizational structure.

### Section 1080.3   Policy as to Private Controversies

This section of the Interim Final Rule states the Bureau's policy of pursuing investigations that are in the public

interest. Section 1080.3 is consistent with the Bureau's mission to protect consumers by investigating potential violations of Federal consumer financial law. The Bureau received no comments on § 1080.3 of the Interim Final Rule and is adopting it as the Final Rule without change.

### Section 1080.4   Initiating and Conducting Investigations

This section of the Interim Final Rule explains that Bureau investigators are authorized to conduct investigations pursuant to section 1052 of the Dodd-Frank Act.

A commenter observed that this section of the Interim Final Rule did not explicitly provide a procedure for senior agency officials to authorize the opening of an investigation. The commenter argued that only senior agency officials should decide whether to initiate investigations. The commenter questioned whether staff-level employees could open investigations and issue CIDs without sufficient supervision, and noted that the FTC's analogous rule specifically lists the senior officials to whom the Commission has delegated, without power of redelegation, the authority to initiate investigations.

A commenter also expressed concern that the FTC's analogous rule explicitly provides that FTC investigators must comply with the laws of the United States and FTC regulations. According to the commenter, such language is necessary to ensure that the Bureau complies with the Right to Financial Privacy Act (RFPA) to the extent that statute applies to the Bureau. The commenter also believes that this language is needed to guard against investigations undertaken for what the commenter characterized as the impermissible purpose of aiding State attorneys general or State regulators. The commenter suggested that the Bureau add a statement to this section of the Interim Final Rule similar to the FTC's rule requiring compliance with Federal law and agency regulations.

The Final Rule clarifies that only the Assistant Director or any Deputy Assistant Director of the Office of Enforcement has the authority to initiate investigations. The Bureau has significant discretion to determine whether and when to open an investigation, and the public benefits from a process whereby the Bureau can open and close investigations efficiently. But the Bureau did not intend its rules to be interpreted so broadly as to suggest that any staff-level employee could unilaterally open an investigation or issue a CID. The Final

Rule also provides that Bureau investigators will perform their duties in accordance with Federal law and Bureau regulations.

### Section 1080.5    Notification of Purpose

This section of the Interim Final Rule specifies that a person compelled to provide information to the Bureau or to testify in an investigational hearing must be advised of the nature of the conduct constituting the alleged violation under investigation and the applicable provisions of law. This section of the Interim Final Rule implements the requirements for CIDs described in section 1052(c)(2) of the Dodd-Frank Act.

Commenters noted that although the Dodd-Frank Act and the FTC Act both require CIDs to state "the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation," the two agencies' implementing regulations on this topic differ. Both agencies' regulations require a statement of the nature of the conduct at issue and the relevant provisions of law, but the FTC rule also requires that the recipient of the CID be advised of "the purpose and scope" of the investigation. Commenters argued that the Bureau should add this phrase to its rule because excluding it would lead to requests for materials outside the scope of an investigation. One commenter argued that only senior agency officials should authorize investigations to ensure that CIDs are relevant to the purpose and scope of the Bureau's investigations.

The language in § 1080.5 of the Interim Final Rule mirrors the language of the Dodd-Frank Act, which provides that "[e]ach civil investigative demand shall state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation." The Bureau believes that the information covered by this statutory language provides sufficient notice to recipients of CIDs. As discussed above, § 1080.4 (initiating and conducting investigations) of the Final Rule limits the authority to open investigations to the Assistant Director or any Deputy Assistant Director of the Office of Enforcement. Similarly, § 1080.6 of the Final Rule (civil investigative demands) limits the authority to issue CIDs to the Director of the Bureau, the Assistant Director of the Office of Enforcement, and the Deputy Assistant Directors of the Office of Enforcement. Thus, one of these identified officials will review and approve the initiation of all investigations and the issuance of all

CIDs. In addition, to the extent recipients of CIDs consider the demands to be for an unauthorized purpose or outside the scope of the investigation, they will have an opportunity to negotiate the terms of compliance pursuant to § 1080.6(c) of the Interim Final Rule (now § 1080.6(d) of the Final Rule) or to petition to set aside or modify the demand pursuant to § 1080.6(d) of the Interim Final Rule (now § 1080.6(e) of the Final Rule).

The Bureau therefore adopts this section of the Interim Final Rule as the Final Rule without change.

### Section 1080.6    Civil Investigative Demands

This section of the Interim Final Rule lays out the Bureau's procedures for issuing CIDs. It authorizes the Assistant Director of the Office of Enforcement to issue CIDs for documentary material, tangible things, written reports, answers to questions, and oral testimony. This section of the Interim Final Rule details the information that must be included in CIDs and the requirement that responses be made under a sworn certificate. Section 1080.6 of the Interim Final Rule also authorizes the Assistant Director of the Office of Enforcement to negotiate and approve the terms of compliance with CIDs and grant extensions for good cause. Finally, this section of the Interim Final Rule describes the procedures for seeking an order to modify or set aside a CID, which the Director is authorized to rule upon.

One commenter argued that § 1080.6(a) permits almost any Bureau employee to issue CIDs without sufficient supervision. The commenter stated that this lack of oversight is problematic and does not reflect Congress' intent when it enacted the Act.

Section 1080.6(a) of the Final Rule limits the authority to issue CIDs to the Director, the Assistant Director of the Office of Enforcement, and the Deputy Assistant Directors of the Office of Enforcement. This change to the Final Rule balances the efficiency of the Bureau's investigative process with appropriate supervision and oversight.

A commenter suggested that the Bureau require a conference between the CID recipient and the Assistant Director of the Office of Enforcement within ten days of service of the CID to negotiate and approve the terms of compliance. The commenter envisioned a conference analogous to a discovery planning conference under the Federal Rules of Civil Procedure, during which the parties could discuss requests for information, appropriate limitations on

the scope of requests, issues related to electronically stored information (ESI), issues related to privilege and confidential information, and a reasonable time for compliance. The commenter stated that this type of conference would better ensure prompt and efficient production of material and information related to the investigation.

The Bureau agrees that a conference between the parties within ten calendar days of serving a CID is likely to improve the efficiency of investigations, and § 1080.6(c) of the Final Rule provides for such a conference. The Final Rule does not, however, adopt the suggestion that the Assistant Director of the Office of Enforcement preside over all such conferences.

Several commenters also noted concern with the statement in § 1080.6(d) of the Interim Final Rule disfavoring extensions of time for petitioning for an order modifying or setting aside CIDs. One commenter argued that the 20-day period to file petitions, for which extensions of time are disfavored, is inconsistent with the "reasonable" period of time for compliance with the CID set forth in § 1080.6(a). The commenter also argued that this timeframe leaves a short period for the CID recipient to decide which documents are privileged or otherwise protected and to file a petition articulating privilege and scope objections. Another commenter noted that the analogous FTC rules do not include a provision disfavoring extensions for petitions to modify or set aside a CID. These commenters recommended that the Bureau delete the sentence related to disfavoring extensions. One commenter recommended that the rules be corrected to provide an independent review if a covered person believes a CID is without merit.

Like the Interim Final Rule, the Final Rule includes a provision disfavoring extensions of time for petitions to modify or set aside a CID. The Bureau believes its policy of disfavoring extensions is appropriate in light of its significant interest in promoting an efficient process for seeking materials through CIDs. By disfavoring extensions, the Bureau means to prompt recipients to decide within 20 days whether they intend to comply with the CID. The Final Rule also clarifies that this 20-day period should be computed with calendar days.

The Bureau notes that § 1080.6(d) of the Interim Final Rule (now § 1080.6(e) of the Final Rule) only provides the due date for a petition for an order modifying or setting aside a CID. It does not require recipients to comply fully

with CIDs within 20 days. In addition, the Final Rule provides several options to recipients of CIDs that need additional time to respond. For example, the recipient may negotiate for a reasonable extension of time for compliance or a rolling document production schedule pursuant to § 1080.6(c) of the Interim Final Rule (now § 1080.6(d) of the Final Rule).

Section 1080.6(e) of the Final Rule clarifies that recipients of CIDs should not assert claims of privilege through a petition for an order modifying or setting aside a CID. Instead, when privilege is the only basis for withholding particular materials, they should utilize the procedures set forth in § 1080.8 (withholding requested material) of the Final Rule. Section 1080.6(e) of the Final Rule also lays out the authority of Bureau investigators to provide to the Director a reply to a petition seeking an order modifying or setting aside a CID. Specifically, the Final Rule states that Bureau investigators may provide the Director with a statement setting forth any factual and legal responses to a petition. The Bureau will not make these statements or any other internal deliberations part of the Bureau's public records. Section 1080.6(g) of the Final Rule clarifies that the Bureau, however, will make publicly available both the petition and the Director's order in response. Section 1080.6(g) of the Final Rule also clarifies that if a CID recipient wants to prevent the Director from making the petition public, any showing of good cause must be made no later than the time the petition is filed. The Final Rule also adds a provision clarifying how the Bureau will serve the petitioner with the Director's order.

Finally, the Bureau believes the procedures for petitions to modify or set aside a CID set forth in the Final Rule adequately protect a covered person who believes a CID is without merit, and that an additional independent review is unnecessary.

*Section 1080.7   Investigational Hearings*

This section of the Interim Final Rule describes the procedures for investigational hearings initiated pursuant to a CID for oral testimony. It also lays out the roles and responsibilities of the Bureau investigator conducting the investigational hearing, which include excluding unauthorized persons from the hearing room and ensuring that the investigational hearing is transcribed, the witness is duly sworn, the transcript is a true record of the testimony, and the

transcript is provided to the designated custodian.

A commenter argued that the Bureau is not authorized to conduct joint investigations with State attorneys general under the Dodd-Frank Act and, correspondingly, State attorneys general cannot attend an investigational hearing as a representative of an agency with whom the Bureau is conducting a joint investigation. The commenter argued that Congress distinguished between State attorneys general and State regulatory agencies in section 1042 of the Dodd-Frank Act and that State attorneys general are therefore not "agencies" with whom the Bureau can partner. The commenter also asserted that the Bureau cannot share a copy of the transcript of an investigational hearing with another agency without the consent of the witness.

Another commenter argued that representatives of agencies with which the Bureau is conducting a joint investigation may be present at an investigational hearing only with the witness's consent. This commenter stated that the Bureau should recognize in the rules that a witness who does not consent to the presence of a representative of another agency at an investigational hearing should not be presumed guilty.

The Dodd-Frank Act states that the Bureau "may engage in joint investigations and requests for information, as authorized under this title." This statutory language permits the Bureau to engage in joint investigations with State or Federal law enforcement agencies, including State attorneys general, with jurisdiction that overlaps with the Bureau's. The Bureau's disclosure rules also permit the Bureau to share certain confidential information, including investigational hearing transcripts, with Federal or State agencies to the extent the disclosure is relevant to the exercise of an agency's statutory or regulatory authority. *See* 12 CFR 1070.43(b). In addition, neither the Dodd-Frank Act nor the rules require the consent of the witness to permit a representative of an agency with which the Bureau is conducting a joint investigation to be present at the hearing. Consent is required only when people other than those listed in the rule are included.

Thus, the Bureau adopts § 1080.7 of the Interim Final Rule as the Final Rule without change.

*Section 1080.8   Withholding Requested Material*

This section of the Interim Final Rule describes the procedures that apply when persons withhold material

responsive to a CID. It requires the recipient of the CID to assert a privilege by the production date and, if so directed in the CID, also to submit a detailed schedule of the items withheld. Section 1080.8 also sets forth the procedures for handling the disclosure of privileged or protected information or communications.

The Bureau received no comment on § 1080.8 of the Interim Final Rule and is adopting it as the Final Rule without substantive change.

*Section 1080.9   Rights of Witnesses in Investigations*

This section of the Interim Final Rule describes the rights of persons compelled to submit information or provide testimony in an investigation. It details the procedures for obtaining a copy of submitted documents or a copy of or access to a transcript of the person's testimony. This section of the Interim Final Rule also describes a witness's right to make changes to his or her transcript and the rules for signing the transcript.

Section 1080.9 of the Interim Final Rule lays out a person's right to counsel at an investigational hearing and describes his or her counsel's right to advise the witness as to any question posed for which an objection may properly be made. It also describes the witness's or counsel's rights to object to questions or requests that the witness is privileged to refuse to answer. This section of the Interim Final Rule states that counsel for the witness may not otherwise object to questions or interrupt the examination to make statements on the record but may request that the witness have an opportunity to clarify any of his or her answers. Finally, this section of the Interim Final Rule authorizes the Bureau investigator to take all necessary action during the course of the hearing to avoid delay and to prevent or restrain disorderly, dilatory, obstructionist, or contumacious conduct, or contemptuous language.

A commenter noted that under the Interim Final Rule witnesses could not object during an investigational hearing on the ground that a question was outside the scope of the investigation. The commenter argued that a covered person's inability to raise such objections might allow "a fishing expedition." The commenter recommended amending § 1080.9(b) to allow objections based on scope.

Section 1052(c)(13)(D)(iii) of the Dodd-Frank Act states, in relevant part:

[a]n objection may properly be made, received, and entered upon the record when it is claimed that such person is entitled to

Case 1:13-cv-01112-CKK   Document 3-5   Filed 07/22/13   Page 228 of 253

39106 CA Case 1:13-cv-01112-CKK   Document #1269836   Filed 03/17/2014   Page 312 of 403
Federal Register / Vol. 77, No. 125 / Friday, June 29, 2012 / Rules and Regulations

refuse to answer the question on grounds of any constitutional or other legal right or privilege, including the privilege against self-incrimination, but the person shall not otherwise object to or refuse to answer any question, and such person or attorney shall not otherwise interrupt the oral examination.

Thus, to the extent the scope objection was grounded in a witness's constitutional or other legal right, it would be a proper objection.

The Final Rule clarifies that counsel may confer with a witness while a question is pending or instruct a witness not to answer a question only if an objection based on privilege or work product may properly be made. The Final Rule also describes counsel's limited ability to make additional objections based on other constitutional or legal rights. The Final Rule provides that if an attorney has refused to comply with his or her obligations in the rules of this part, or has allegedly engaged in disorderly, dilatory, obstructionist, or contumacious conduct, or contemptuous language during an investigational hearing, the Bureau may take further action, including action to suspend or disbar the attorney from further participation in the investigation or further practice before the Bureau pursuant to 12 CFR 1081.107(c). The Final Rule also includes other nonsubstantive changes, including clarifying that the 30-day period that the witness has to sign and submit his or her transcript should be computed using calendar days.

### Section 1080.10   Noncompliance With Civil Investigative Demands

This section of the Interim Final Rule authorizes the Director, the Assistant Director of the Office of Enforcement, and the General Counsel to initiate an action to enforce a CID in connection with the failure or refusal of a person to comply with, or to obey, a CID. In addition, they are authorized to seek civil contempt or other appropriate relief in cases where a court order enforcing a CID has been violated.

The Bureau received no comment on § 1080.10 of the Interim Final Rule and is adopting it as the Final Rule without substantive change.

### Section 1080.11   Disposition

This section of the Interim Final Rule explains that an enforcement action may be instituted in Federal or State court or through administrative proceedings when warranted by the facts disclosed by an investigation. It further provides that the Bureau may refer investigations to appropriate Federal, State, or foreign government agencies as appropriate. This section of the Interim Final Rule

also authorizes the Assistant Director of the Office of Enforcement to close the investigation when the facts of an investigation indicate an enforcement action is not necessary or warranted in the public interest.

One commenter indicated that the Bureau's authority to refer investigations to other law enforcement agencies should be limited to circumstances when it is expressly authorized to do so by the Dodd-Frank Act, an enumerated consumer financial law, or other Federal law, because of potential risks to the confidentiality of the investigatory files.

The Bureau's ability to refer matters to appropriate law enforcement agencies is inherent in the Bureau's authority and is a corollary to the Bureau's statutorily recognized ability to conduct joint investigations. The documentary materials and tangible things obtained by the Bureau pursuant to a CID are subject to the requirements and procedures relating to disclosure of records and information in part 1070 of this title. These procedures for sharing information with law enforcement agencies provide significant and sufficient protections for these materials.

The Bureau has amended § 1080.11 to clarify that the Assistant Director and any Deputy Assistant Director of the Office of Enforcement are authorized to close investigations.

The Bureau adopts § 1080.11 of the Interim Final Rule with the changes discussed above.

### Section 1080.12   Orders Requiring Witnesses To Testify or Provide Other Information and Granting Immunity

This section of the Interim Final Rule authorizes the Assistant Director of the Office of Enforcement to request approval from the Attorney General for the issuance of an order requiring a witness to testify or provide other information and granting immunity under 18 U.S.C. 6004. The Interim Final Rule also sets forth the Bureau's right to review the exercise of these functions and states that the Bureau will entertain an appeal from an order requiring a witness to testify or provide other information only upon a showing that a substantial question is involved, the determination of which is essential to serve the interests of justice. Finally, this section of the Interim Final Rule describes the applicable rules and time limits for such appeals.

A commenter questioned whether this section of the Interim Final Rule would permit any Bureau employee to request that the Attorney General approve the issuance of an order granting immunity

under 18 U.S.C. 6004 and requiring a witness to testify or provide information. The commenter noted that the Dodd-Frank Act authorizes the Bureau, with the Attorney General's permission, to compel a witness to testify under 18 U.S.C. 6004 if the witness invokes his or her privilege against self-incrimination. The commenter argued that this section should delegate the authority to seek permission to compel testimony to a specific individual to provide accountability and ensure that information is not disclosed to the Attorney General in a manner that violates the Right to Financial Privacy Act. The commenter noted that the FTC's analogous rule specifically lists the senior agency officials who are authorized to make such requests to the Attorney General, and identifies a liaison officer through whom such requests must be made. The commenter also suggested that § 1080.12(b) of the Interim Final Rule, which provides that the Assistant Director's exercise of this authority is subject to review by "the Bureau," specify who will conduct this review.

The Final Rule provides that only the Director of the Bureau has the authority to request approval from the Attorney General for the issuance of an order requiring a witness to testify or provide other information and granting immunity under 18 U.S.C. 6004. This change addresses the concern that requests for witness immunity would be made without oversight. Limiting this authority to the Director provides sufficient accountability.

### Section 1080.13   Custodians

This section of the Interim Final Rule describes the procedures for designating a custodian and deputy custodian for material produced pursuant to a CID in an investigation. It also states that these materials are for the official use of the Bureau, but, upon notice to the custodian, must be made available for examination during regular office hours by the person who produced them.

A commenter suggested that the Bureau should detail the particular duties of custodians designated under this section and that, without an enumerated list of duties, the custodian would not have any responsibilities regarding CID materials. The commenter noted that the FTC Act requires the custodian to take specific actions, while the Dodd-Frank Act does not. The commenter suggested specifying a series of custodial duties, including (1) taking and maintaining custody of all materials submitted pursuant to CIDs or subpoenas that the Bureau issues,

Case 1:13-cv-01112-CKK Document 3-5 Filed 07/22/13 Page 229 of 253

USCA Case #13-5342 Federal Register / Vol. 77, No. 126 / Friday, June 29, 2012 / Rules and Regulations Page 313 of 403 39107

including transcripts of oral testimony taken by the Bureau; (2) maintaining confidentiality of those materials as required by applicable law; (3) providing the materials to either House of Congress upon request, after ten days notice to the party that owns or submitted the materials; (4) producing any materials as required by a court of competent jurisdiction; and (5) complying at all times with the Trade Secrets Act.

Section 1052 of the Dodd-Frank Act sets forth the duties of the Bureau's custodian. Sections 1052(c)(3) through (c)(6) of the Dodd-Frank Act give the custodian responsibility for receiving documentary material, tangible things, written reports, answers to questions, and transcripts of oral testimony given by any person in compliance with any CID. Section 1052(d) of the Dodd-Frank Act, as well as the Bureau's Rules for Disclosure of Records and Information in part 1070 of this title, outline the requirements for the confidential treatment of demand material. Section 1052(g) addresses custodial control and provides that a person may file, in the district court of the United States for the judicial district within which the office of the custodian is situated, a petition for an order of such court requiring the performance by the custodian of any duty imposed upon him by section 1052 of the Dodd-Frank Act or by Bureau rule. These duties and obligations do not require additional clarification by rule.

The Final Rule clarifies that the custodian has the powers and duties of both section 1052 of the Dodd-Frank Act and 12 CFR 1070.3.

The Bureau adopts § 1080.13 of the Interim Final Rule with the changes discussed above.

*Section 1080.14 Confidential Treatment of Demand Material and Non-Public Nature of Investigations*

Section 1080.14 of the Interim Final Rule explains that documentary materials, written reports, answers to questions, tangible things, or transcripts of oral testimony received by the Bureau in any form or format pursuant to a CID are subject to the requirements and procedures relating to disclosure of records and information in part 1070 of this title. This section of the Interim Final Rule also states that investigations generally are non-public. A Bureau investigator may disclose the existence of an investigation to the extent necessary to advance the investigation.

A commenter recommended that the Bureau revise this section to mandate that Bureau investigations remain confidential. The commenter noted the

potential reputation risk to an entity if an investigation is disclosed to the public. In addition, the commenter argued that failing to conduct investigations confidentially will increase litigation risk. One commenter recommended that the Bureau issue a public absolution of a company if the Bureau does not maintain the confidentiality of an investigation.

Section 1080.14 of the Interim Final Rule provides that investigations generally will not be disclosed to the public, but permits Bureau investigators to disclose the existence of an investigation when necessary to advance the investigation. The Interim Final Rule does not contemplate publicizing an investigation, but rather disclosing the existence of the investigation to, for example, a potential witness or third party with potentially relevant information when doing so is necessary to advance the investigation. This limited exception sufficiently balances the concerns expressed by the commenter with the Bureau's need to obtain information efficiently.

Thus, the Bureau adopts § 1080.14 of the Interim Final Rule as the Final Rule without change.

## VII. Section 1022(b)(2) Provisions

In developing the Final Rule, the Bureau has considered the potential benefits, costs, and impacts, and has consulted or offered to consult with the prudential regulators, HUD, the SEC, the Department of Justice, and the FTC, including with regard to consistency with any prudential, market, or systemic objectives administered by such agencies.[1]

The Final Rule neither imposes any obligations on consumers nor is expected to have any appreciable impact on their access to consumer financial products or services. Rather, the Final Rule provides a clear, efficient mechanism for investigating compliance with the Federal consumer financial laws, which benefits consumers by creating a systematic process to protect them from unlawful behavior.

The Final Rule imposes certain obligations on covered persons who receive CIDs in Bureau investigations. Specifically, as described above, the Final Rule sets forth the process for complying with or objecting to CIDs for documentary material, tangible things, written reports or answers to questions, and oral testimony. Most obligations in the Final Rule stem from express language in the Dodd-Frank Act and do not impose additional burdens on covered persons.

To the extent that the Final Rule includes provisions not expressly required by statute, these provisions benefit covered persons by providing clarity and certainty. In addition, the Final Rule vests the Bureau with discretion to modify CIDs or extend the time for compliance for good cause. This flexibility benefits covered persons by enabling the Bureau to assess the cost of compliance with a civil investigative demand in a particular circumstance and take appropriate steps to mitigate any unreasonable compliance burden.

Moreover, because the Final Rule is largely based on section 20 of the FTC Act and its corresponding regulations, it should present an existing, stable model of investigatory procedures to covered persons. This likely familiarity to covered persons should further reduce the compliance costs for covered persons.

The Final Rule provides that requests for extensions of time to file petitions to modify or set aside CIDs are disfavored. This may impose a burden on covered entities in some cases, but it may also lead to a more expeditious resolution of matters, reducing uncertainty. Furthermore, the Final Rule has no unique impact on insured depository institutions or insured credit unions with less than $10 billion in assets as described in section 1026(a) of the Dodd-Frank Act. Nor does the Final Rule have a unique impact on rural consumers.

A commenter suggested that the Bureau conduct a nonpublic study of the impact of complying with a CID on the entities who have been subjected to them by other agencies, with specific focus on those that were found not to have violated the law. As the commenter implicitly recognizes, such data does not currently exist and thus was not reasonably available to the Bureau in finalizing the Interim Final Rule. Moreover, as explained above, most of the costs associated with complying with a CID result from the Dodd-Frank Act, which authorizes the Bureau to issue such demands.

A commenter asserted that disfavoring extensions of petitions to

[1] Section 1022(b)(2)(A) of the Dodd-Frank Act addresses the consideration of the potential benefits and costs of regulation to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services; the impact on depository institutions and credit unions with $10 billion or less in total assets as described in section 1026 of the Dodd-Frank Act; and the impact on consumers in rural areas. Section 1022(b)(2)(B) addresses consultation between the Bureau and other Federal agencies during the rulemaking process. The manner and extent to which these provisions apply to procedural rules and benefits, costs and impacts that are compelled by statutory changes rather than discretionary Bureau action is unclear. Nevertheless, to inform this rulemaking more fully, the Bureau performed the described analyses and consultations.

**39108**    **Federal Register** / Vol. 77, No. 126 / Friday, June 29, 2012 / Rules and Regulations

modify or set aside CIDs will require the recipient to conduct a full review of the demanded material within the normal 20-day period in order to comply with the deadline for filing a petition. Under the Final Rule, recipients of a CID are not required to comply fully within twenty days; rather, they are required simply to decide whether they will comply with the demand at all. The Assistant Director of the Office of Enforcement and the Deputy Assistant Directors of the Office of Enforcement have the discretion to negotiate and approve the terms of satisfactory compliance with CIDs and, for good cause shown, may extend the time prescribed for compliance. Thus, the Final Rule provides reasonable steps to mitigate compliance burden while simultaneously protecting the Bureau's law enforcement interests.

Another commenter stated that the four interim final rules that the Bureau promulgated together on July 28, 2011 failed to satisfy the rulemaking requirements under section 1022 of the Dodd-Frank Act. Specifically, the commenter stated that "the CFPB's analysis of the costs and benefits of its rules does not recognize the significant costs the CFPB imposes on covered persons." The Bureau believes that it appropriately considered the benefits, costs, and impacts of the Interim Final Rule pursuant to section 1022. Notably, the commenter did not identify any specific costs to covered persons that are not discussed in Part C of the **SUPPLEMENTARY INFORMATION** to the Interim Final Rule.

**VIII. Procedural Requirements**

As noted in publishing the Interim Final Rule, under the Administrative Procedure Act, 5 U.S.C. 553(b), notice and comment is not required for rules of agency organization, procedure, or practice. As discussed in the preamble to the Interim Final Rule, the Bureau confirms its finding that this is a procedural rule for which notice and comment is not required. In addition, because the Final Rule relates solely to agency procedure and practice, it is not subject to the 30-day delayed effective date for substantive rules under section 553(d) of the Administrative Procedure Act, 5 U.S.C. 551 *et seq.* Because no notice of proposed rulemaking is required, the requirements of the Regulatory Flexibility Act, 5 U.S.C. 601(2) do not apply. Finally, the Bureau has determined that this Final Rule does not impose any new recordkeeping, reporting, or disclosure requirements on covered entities or members of the public that would be collections of

information requiring approval under 44 U.S.C. 3501. *et seq.*

**List of Subjects in 12 CFR Part 1080**

Administrative practice and procedure, Banking, Banks, Consumer protection, Credit, Credit unions, Investigations, Law enforcement, National banks, Savings associations, Trade practices.

For the reasons set forth in the preamble, the Bureau of Consumer Financial Protection revises part 1080 to Chapter X in Title 12 of the Code of Federal Regulations to read as follows:

**PART 1080—RULES RELATING TO INVESTIGATIONS**

Sec.
1080.1    Scope.
1080.2    Definitions.
1080.3    Policy as to private controversies.
1080.4    Initiating and conducting investigations.
1080.5    Notification of purpose.
1080.6    Civil investigative demands.
1080.7    Investigational hearings.
1080.8    Withholding requested material.
1080.9    Rights of witnesses in investigations.
1080.10   Noncompliance with civil investigative demands.
1080.11   Disposition.
1080.12   Orders requiring witnesses to testify or provide other information and granting immunity.
1080.13   Custodians.
1080.14   Confidential treatment of demand material and non-public nature of investigations.

Authority: Pub. L. 111–203, Title X, 12 U.S.C. 5481 *et seq.*

**§ 1080.1   Scope.**

The rules of this part apply to Bureau investigations conducted pursuant to section 1052 of the Dodd-Frank Act, 12 U.S.C. 5562.

**§ 1080.2   Definitions.**

For the purposes of this part, unless explicitly stated to the contrary:

*Bureau* means the Bureau of Consumer Financial Protection.

*Bureau investigation* means any inquiry conducted by a Bureau investigator for the purpose of ascertaining whether any person is or has been engaged in any conduct that is a violation.

*Bureau investigator* means any attorney or investigator employed by the Bureau who is charged with the duty of enforcing or carrying into effect any Federal consumer financial law.

*Custodian* means the custodian or any deputy custodian designated by the Bureau for the purpose of maintaining custody of information produced pursuant to this part.

*Director* means the Director of the Bureau or a person authorized to

perform the functions of the Director in accordance with the law.

*Documentary material* means the original or any copy of any book, document, record, report, memorandum, paper, communication, tabulation, chart, log, electronic file, or other data or data compilation stored in any medium, including electronically stored information.

*Dodd-Frank Act* means the Dodd-Frank Wall Street Reform and Consumer Financial Protection Act of 2010, as amended, Public Law 111–203 (July 21, 2010), Title X, codified at 12 U.S.C. 5481 *et seq.*

*Electronically stored information (ESI)* means any information stored in any electronic medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form.

*Office of Enforcement* means the office of the Bureau responsible for enforcement of Federal consumer financial law.

*Person* means an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity.

*Violation* means any act or omission that, if proved, would constitute a violation of any provision of Federal consumer financial law.

**§ 1080.3   Policy as to private controversies.**

The Bureau shall act only in the public interest and will not initiate an investigation or take other enforcement action when the alleged violation is merely a matter of private controversy and does not tend to affect adversely the public interest.

**§ 1080.4   Initiating and conducting investigations.**

The Assistant Director of the Office of Enforcement and the Deputy Assistant Directors of the Office of Enforcement have the nondelegable authority to initiate investigations. Bureau investigations are conducted by Bureau investigators designated and duly authorized under section 1052 of the Dodd-Frank Act, 12 U.S.C. 5562, to conduct such investigations. Bureau investigators are authorized to exercise and perform their duties in accordance with the laws of the United States and the regulations of the Bureau.

**§ 1080.5   Notification of purpose.**

Any person compelled to furnish documentary material, tangible things, written reports or answers to questions, oral testimony, or any combination of

such material, answers, or testimony to the Bureau shall be advised of the nature of the conduct constituting the alleged violation that is under investigation and the provisions of law applicable to such violation.

### § 1080.6   Civil investigative demands.

(a) *In general.* In accordance with section 1052(c) of the Act, the Director of the Bureau, the Assistant Director of the Office of Enforcement, and the Deputy Assistant Directors of the Office of Enforcement, have the nondelegable authority to issue a civil investigative demand in any Bureau investigation directing the person named therein to produce documentary material for inspection and copying or reproduction in the form or medium requested by the Bureau; to submit tangible things; to provide a written report or answers to questions; to appear before a designated representative at a designated time and place to testify about documentary material, tangible things, or other information; and to furnish any combination of such material, things, answers, or testimony.

(1) *Documentary material.* (i) Civil investigative demands for the production of documentary material shall describe each class of material to be produced with such definiteness and certainty as to permit such material to be fairly identified, prescribe a return date or dates that will provide a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction, and identify the custodian to whom such material shall be made available. Documentary material for which a civil investigative demand has been issued shall be made available as prescribed in the civil investigative demand.

(ii) Production of documentary material in response to a civil investigative demand shall be made under a sworn certificate, in such form as the demand designates, by the person to whom the demand is directed or, if not a natural person, by any person having knowledge of the facts and circumstances relating to such production, to the effect that all of the documentary material required by the demand and in the possession, custody, or control of the person to whom the demand is directed has been produced and made available to the custodian.

(2) *Tangible things.* (i) Civil investigative demands for tangible things shall describe each class of tangible things to be produced with such definiteness and certainty as to permit such things to be fairly identified, prescribe a return date or dates which will provide a reasonable period of time within which the things so demanded may be assembled and submitted, and identify the custodian to whom such things shall be submitted.

(ii) Submissions of tangible things in response to a civil investigative demand shall be made under a sworn certificate, in such form as the demand designates, by the person to whom the demand is directed or, if not a natural person, by any person having knowledge of the facts and circumstances relating to such production, to the effect that all of the tangible things required by the demand and in the possession, custody, or control of the person to whom the demand is directed have been submitted to the custodian.

(3) *Written reports or answers to questions.* (i) Civil investigative demands for written reports or answers to questions shall propound with definiteness and certainty the reports to be produced or the questions to be answered, prescribe a date or dates at which time written reports or answers to questions shall be submitted, and identify the custodian to whom such reports or answers shall be submitted.

(ii) Each reporting requirement or question in a civil investigative demand shall be answered separately and fully in writing under oath. Responses to a civil investigative demand for a written report or answers to questions shall be made under a sworn certificate, in such form as the demand designates, by the person to whom the demand is directed or, if not a natural person, by any person responsible for answering each reporting requirement or question, to the effect that all of the information required by the demand and in the possession, custody, control, or knowledge of the person to whom the demand is directed has been submitted to the custodian.

(4) *Oral testimony.* (i) Civil investigative demands for the giving of oral testimony shall prescribe a date, time, and place at which oral testimony shall be commenced, and identify a Bureau investigator who shall conduct the investigation and the custodian to whom the transcript of such investigation shall be submitted. Oral testimony in response to a civil investigative demand shall be taken in accordance with the procedures for investigational hearings prescribed by §§ 1080.7 and 1080.9 of this part.

(ii) Where a civil investigative demand requires oral testimony from an entity, the civil investigative demand shall describe with reasonable particularity the matters for examination and the entity must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf. Unless a single individual is designated by the entity, the entity must designate the matters on which each designee will testify. The individuals designated must testify about information known or reasonably available to the entity and their testimony shall be binding on the entity.

(b) *Manner and form of production of ESI.* When a civil investigative demand requires the production of ESI, it shall be produced in accordance with the instructions provided by the Bureau regarding the manner and form of production. Absent any instructions as to the form for producing ESI, ESI must be produced in the form in which it is ordinarily maintained or in a reasonably usable form.

(c) *Meet and confer.* The recipient of a civil investigative demand shall meet and confer with a Bureau investigator within 10 calendar days after receipt of the demand or before the deadline for filing a petition to modify or set aside the demand, whichever is earlier, to discuss and attempt to resolve all issues regarding compliance with the civil investigative demand. The Assistant Director of the Office of Enforcement and the Deputy Assistant Directors of the Office of Enforcement may authorize the waiver of this requirement for routine third-party civil investigative demands or in other circumstances where he or she determines that a meeting is unnecessary. The meeting may be in person or by telephone.

(1) *Personnel.* The recipient must make available at the meeting personnel with the knowledge necessary to resolve any issues relevant to compliance with the demand. Such personnel could include individuals knowledgeable about the recipient's information or records management systems and/or the recipient's organizational structure.

(2) *ESI.* If the civil investigative demand seeks ESI, the recipient shall ensure that a person familiar with its ESI systems and methods of retrieval participates in the meeting.

(3) *Petitions.* The Bureau will not consider petitions to set aside or modify a civil investigative demand unless the recipient has meaningfully engaged in the meet and confer process described in this subsection and will consider only issues raised during the meet and confer process.

(d) *Compliance.* The Assistant Director of the Office of Enforcement and the Deputy Assistant Directors of the Office of Enforcement are authorized to negotiate and approve the terms of satisfactory compliance with civil investigative demands and, for good

cause shown, may extend the time prescribed for compliance.

(e) *Petition for order modifying or setting aside demand—in general.* Any petition for an order modifying or setting aside a civil investigative demand shall be filed with the Executive Secretary of the Bureau with a copy to the Assistant Director of the Office of Enforcement within 20 calendar days after service of the civil investigative demand, or, if the return date is less than 20 calendar days after service, prior to the return date. Such petition shall set forth all factual and legal objections to the civil investigative demand, including all appropriate arguments, affidavits, and other supporting documentation. The attorney who objects to a demand must sign any objections.

(1) *Statement.* Each petition shall be accompanied by a signed statement representing that counsel for the petitioner has conferred with counsel for the Bureau pursuant to section 1080.6(c) in a good-faith effort to resolve by agreement the issues raised by the petition and has been unable to reach such an agreement. If some of the matters in controversy have been resolved by agreement, the statement shall specify the matters so resolved and the matters remaining unresolved. The statement shall recite the date, time, and place of each such meeting between counsel, and the names of all parties participating in each such meeting.

(2) *Extensions of time.* The Assistant Director of the Office of Enforcement and the Deputy Assistant Directors of the Office of Enforcement are authorized to rule upon requests for extensions of time within which to file such petitions. Requests for extensions of time are disfavored.

(3) *Bureau investigator response.* Bureau investigators may, without serving the petitioner, provide the Director with a statement setting forth any factual and legal response to a petition for an order modifying or setting aside the demand.

(4) *Disposition.* The Director has the authority to rule upon a petition for an order modifying or setting aside a civil investigative demand. The order may be served on the petitioner via email, facsimile, or any other method reasonably calculated to provide notice of the order to the petitioner.

(f) *Stay of compliance period.* The timely filing of a petition for an order modifying or setting aside a civil investigative demand shall stay the time permitted for compliance with the portion challenged. If the petition is denied in whole or in part, the ruling will specify a new return date.

(g) *Public disclosure.* All such petitions and the Director's orders in response to those petitions are part of the public records of the Bureau unless the Bureau determines otherwise for good cause shown. Any showing of good cause must be made no later than the time the petition is filed.

§ 1080.7   Investigational hearings.

(a) Investigational hearings, as distinguished from hearings in adjudicative proceedings, may be conducted pursuant to a civil investigative demand for the giving of oral testimony in the course of any Bureau investigation, including inquiries initiated for the purpose of determining whether or not a respondent is complying with an order of the Bureau.

(b) Investigational hearings shall be conducted by any Bureau investigator for the purpose of hearing the testimony of witnesses and receiving documentary material, tangible things, or other information relating to any subject under investigation. Such hearings shall be under oath or affirmation and stenographically reported, and a transcript thereof shall be made a part of the record of the investigation. The Bureau investigator conducting the investigational hearing also may direct that the testimony be recorded by audio, audiovisual, or other means, in which case the recording shall be made a part of the record of the investigation as well.

(c) In investigational hearings, the Bureau investigators shall exclude from the hearing room all persons except the person being examined, his or her counsel, the officer before whom the testimony is to be taken, any investigator or representative of an agency with which the Bureau is engaged in a joint investigation, and any individual transcribing or recording such testimony. At the discretion of the Bureau investigator, and with the consent of the person being examined, persons other than those listed in this paragraph may be present in the hearing room. The Bureau investigator shall certify or direct the individual transcribing the testimony to certify on the transcript that the witness was duly sworn and that the transcript is a true record of the testimony given by the witness. A copy of the transcript shall be forwarded promptly by the Bureau investigator to the custodian designated in section 1080.13.

§ 1080.8   Withholding requested material.

(a) Any person withholding material responsive to a civil investigative demand or any other request for production of material shall assert a claim of privilege not later than the date set for the production of material. Such person shall, if so directed in the civil investigative demand or other request for production, submit, together with such claim, a schedule of the items withheld which states, as to each such item, the type, specific subject matter, and date of the item; the names, addresses, positions, and organizations of all authors and recipients of the item; and the specific grounds for claiming that the item is privileged. The person who submits the schedule and the attorney stating the grounds for a claim that any item is privileged must sign it.

(b) A person withholding material solely for reasons described in this subsection shall comply with the requirements of this subsection in lieu of filing a petition for an order modifying or setting aside a civil investigative demand pursuant to section 1080.6(e).

(c) Disclosure of privileged or protected information or communications produced pursuant to a civil investigative demand shall be handled as follows:

(1) The disclosure of privileged or protected information or communications shall not operate as a waiver with respect to the Bureau if:

(i) The disclosure was inadvertent;

(ii) The holder of the privilege or protection took reasonable steps to prevent disclosure; and

(iii) The holder promptly took reasonable steps to rectify the error, including notifying a Bureau investigator of the claim of privilege or protection and the basis for it.

(2) After being notified, the Bureau investigator must promptly return, sequester, or destroy the specified information and any copies; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if he or she disclosed it before being notified; and, if appropriate, may sequester such material until such time as a hearing officer or court rules on the merits of the claim of privilege or protection. The producing party must preserve the information until the claim is resolved.

(3) The disclosure of privileged or protected information or communications shall waive the privilege or protection with respect to the Bureau as to undisclosed information or communications only if:

(i) The waiver is intentional;

(ii) The disclosed and undisclosed information or communications concern the same subject matter; and

(iii) They ought in fairness to be considered together.

## § 1080.9   Rights of witnesses in investigations.

(a) Any person compelled to submit documentary material, tangible things, or written reports or answers to questions to the Bureau, or to testify in an investigational hearing, shall be entitled to retain a copy or, on payment of lawfully prescribed costs, request a copy of the materials, things, reports, or written answers submitted, or a transcript of his or her testimony. The Bureau, however, may for good cause deny such a request and limit the witness to inspection of the official transcript of the testimony. Upon completion of transcription of the testimony of the witness, the witness shall be offered an opportunity to read the transcript of his or her testimony. Any changes by the witness shall be entered and identified upon the transcript by the Bureau investigator with a statement of the reasons given by the witness for making such changes. The transcript shall then be signed by the witness and submitted to the Bureau unless the witness cannot be found, is ill, waives in writing his or her right to signature, or refuses to sign. If the signed transcript is not submitted to the Bureau within 30 calendar days of the witness being afforded a reasonable opportunity to review it, the Bureau investigator, or the individual transcribing the testimony acting at the Bureau investigator's direction, shall sign the transcript and state on the record the fact of the waiver, illness, absence of the witness, or the refusal to sign, together with any reasons given for the failure to sign.

(b) Any witness compelled to appear in person at an investigational hearing may be accompanied, represented, and advised by counsel as follows:

(1) Counsel for a witness may advise the witness, in confidence and upon the initiative of either counsel or the witness, with respect to any question asked of the witness where it is claimed that a witness is privileged to refuse to answer the question. Counsel may not otherwise consult with the witness while a question directed to the witness is pending.

(2) Any objections made under the rules in this part shall be made only for the purpose of protecting a constitutional or other legal right or privilege, including the privilege against self-incrimination. Neither the witness nor counsel shall otherwise object or refuse to answer any question. Any objection during an investigational hearing shall be stated concisely on the record in a nonargumentative and nonsuggestive manner. Following an objection, the examination shall proceed

and the testimony shall be taken, except for testimony requiring the witness to divulge information protected by the claim of privilege or work product.

(3) Counsel for a witness may not, for any purpose or to any extent not allowed by paragraphs (b)(1) and (2) of this section, interrupt the examination of the witness by making any objections or statements on the record. Petitions challenging the Bureau's authority to conduct the investigation or the sufficiency or legality of the civil investigative demand shall be addressed to the Bureau in advance of the hearing in accordance with § 1080.6(e). Copies of such petitions may be filed as part of the record of the investigation with the Bureau investigator conducting the investigational hearing, but no arguments in support thereof will be allowed at the hearing.

(4) Following completion of the examination of a witness, counsel for the witness may, on the record, request that the Bureau investigator conducting the investigational hearing permit the witness to clarify any of his or her answers. The grant or denial of such request shall be within the sole discretion of the Bureau investigator conducting the hearing.

(5) The Bureau investigator conducting the hearing shall take all necessary action to regulate the course of the hearing to avoid delay and to prevent or restrain disorderly, dilatory, obstructionist, or contumacious conduct, or contemptuous language. Such Bureau investigator shall, for reasons stated on the record, immediately report to the Bureau any instances where an attorney has allegedly refused to comply with his or her obligations under the rules in this part, or has allegedly engaged in disorderly, dilatory, obstructionist, or contumacious conduct, or contemptuous language in the course of the hearing. The Bureau will thereupon take such further action, if any, as the circumstances warrant, including actions consistent with those described in 12 CFR 1081.107(c) to suspend or disbar the attorney from further practice before the Bureau or exclude the attorney from further participation in the particular investigation.

## § 1080.10   Noncompliance with civil investigative demands.

(a) In cases of failure to comply in whole or in part with Bureau civil investigative demands, appropriate action may be initiated by the Bureau, including actions for enforcement.

(b) The Director, the Assistant Director of the Office of Enforcement,

and the General Counsel of the Bureau are authorized to:

(1) Institute, on behalf of the Bureau, an enforcement proceeding in the district court of the United States for any judicial district in which a person resides, is found, or transacts business, in connection with the failure or refusal of such person to comply with, or to obey, a civil investigative demand in whole or in part if the return date or any extension thereof has passed; and

(2) Seek civil contempt or other appropriate relief in cases where a court order enforcing a civil investigative demand has been violated.

## § 1080.11   Disposition.

(a) When the facts disclosed by an investigation indicate that an enforcement action is warranted, further proceedings may be instituted in Federal or State court or pursuant to the Bureau's administrative adjudicatory process. Where appropriate, the Bureau also may refer investigations to appropriate Federal, State, or foreign governmental agencies.

(b) When the facts disclosed by an investigation indicate that an enforcement action is not necessary or would not be in the public interest, the investigational file will be closed. The matter may be further investigated, at any time, if circumstances so warrant.

(c) The Assistant Director of the Office of Enforcement and the Deputy Assistant Directors of the Office of Enforcement are authorized to close Bureau investigations.

## § 1080.12   Orders requiring witnesses to testify or provide other information and granting immunity.

The Director has the nondelegable authority to request approval from the Attorney General of the United States for the issuance of an order requiring a witness to testify or provide other information and granting immunity under 18 U.S.C. 6004.

## § 1080.13   Custodians.

(a) The Bureau shall designate a custodian and one or more deputy custodians for material to be delivered pursuant to a civil investigative demand in an investigation. The custodian shall have the powers and duties prescribed by 12 CFR 1070.3 and section 1052 of the Act, 12 U.S.C. 5562. Deputy custodians may perform all of the duties assigned to custodians.

(b) Material produced pursuant to a civil investigative demand, while in the custody of the custodian, shall be for the official use of the custodian in accordance with the Act; but such material shall upon reasonable notice to the custodian

be made available for examination by the person who produced such material, or his or her duly authorized representative, during regular office hours established for the Bureau.

**§ 1080.14   Confidential treatment of demand material and non-public nature of investigations.**

(a) Documentary materials, written reports, answers to questions, tangible things or transcripts of oral testimony the Bureau receives in any form or format pursuant to a civil investigative demand are subject to the requirements and procedures relating to the disclosure of records and information set forth in part 1070 of this title.

(b) Bureau investigations generally are non-public. Bureau investigators may disclose the existence of an investigation to potential witnesses or third parties to the extent necessary to advance the investigation.

Dated: June 4, 2012.

**Richard Cordray,**

*Director, Bureau of Consumer Financial Protection.*

[FR Doc. 2012–14047 Filed 6–28–12; 8:45 am]

**BILLING CODE 4810–AM–P**

---

**BUREAU OF CONSUMER FINANCIAL PROTECTION**

**12 CFR Part 1082**

**[Docket No. CFPB–2011–0005]**

**RIN 3170–AA02**

**State Official Notification Rule**

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Final rule.

**SUMMARY:** The Dodd-Frank Wall Street Reform and Consumer Financial Protection Act of 2010 (Dodd-Frank Act) requires the Bureau of Consumer Financial Protection (Bureau) to prescribe rules establishing procedures that govern the process by which State Officials notify the Bureau of actions undertaken pursuant to the authority granted to the States to enforce the Dodd-Frank Act or regulations prescribed thereunder. This final State Official Notification Rule (Final Rule) sets forth the procedures to govern this process.

**DATES:** The Final Rule is effective June 29, 2012.

**FOR FURTHER INFORMATION CONTACT:** Veronica Spicer, Office of Enforcement, Consumer Financial Protection Bureau, 1700 G Street NW., Washington, DC 20552, at (202) 435–7545.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Dodd-Frank Wall Street Reform and Consumer Financial Protection Act of 2010 (Dodd-Frank Act) was signed into law on July 21, 2010. Title X of the Dodd-Frank Act established the Bureau to regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws. Section 1042 of the Dodd-Frank Act, 12 U.S.C. 5552, governs the enforcement powers of the States under the Dodd-Frank Act. Under section 1042(a), a State attorney general or regulator (State Official) may bring an action to enforce Title X of the Dodd-Frank Act and regulations issued thereunder. Prior to initiating any such action, the State Official is required to provide notice of the action to the Bureau and the prudential regulator, if any, pursuant to section 1042(b) of the Dodd-Frank Act. Section 1042(b) further authorizes the Bureau to intervene in the State Official's action as a party, remove the action to a Federal district court, and appeal any order or judgment.

Pursuant to section 1042(c) of the Dodd-Frank Act, the Bureau is required to issue regulations implementing the requirements of section 1042. On July 28, 2011, the Bureau promulgated the State Official Notification Rule (Interim Final Rule) with a request for comment. The comment period for the Interim Final Rule ended on September 26, 2011. After reviewing and considering the issues raised by the comments, the Bureau now promulgates the Final Rule establishing a procedure for the timing and content of the notice required to be provided by State Officials pursuant to section 1042(b) of the Dodd-Frank Act, 12 U.S.C. 5552(b).

**II. Summary of the Final Rule**

Like the Interim Final Rule, the Final Rule implements a procedure for the timing and content of the notice required by section 1042(b), sets forth the responsibilities of the recipients of the notice, and specifies the rights of the Bureau to participate in actions brought by State Officials under section 1042(a) of the Dodd-Frank Act. In drafting the Final Rule, the Bureau endeavored to create a process that would provide both the Bureau and, where applicable, the prudential regulators with timely notice of pending actions and account for the investigation and litigation needs of State regulators and law enforcement agencies. In keeping with this approach, the Final Rule provides for a default notice period of at least ten calendar days, with exceptions for emergencies and other extenuating circumstances.

and requires substantive notice that is both straightforward and comprehensive. The Final Rule further makes clear that the Bureau can intervene as a party in an action brought by a State Official under Title X of the Dodd-Frank Act or a regulation prescribed thereunder, provides for the confidential treatment of non-public information contained in the notice if a State so requests, and provides that such provision of notice shall not be deemed a waiver of any applicable privilege. In addition, the Final Rule specifies that the notice provisions do not create any procedural or substantive rights for parties in litigation against the United States or against a State that brings an action under Title X of the Dodd-Frank Act or a regulation prescribed thereunder.

**III. Legal Authority**

Section 1042(c) of the Dodd-Frank Act authorizes the Bureau to prescribe regulations implementing the requirements of section 1042(b). In addition, the Bureau has general rulemaking authority pursuant to section 1022(b)(1) of the Dodd-Frank Act to prescribe rules to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws and to prevent evasions thereof.

**IV. Overview of Comments Received**

In response to the Interim Final Rule, the Bureau received several comments. Four letters were received from associations representing the financial industry, two letters were received from financial industry regulators and supervisors, and one letter was received from an individual consumer. The Bureau also received a comment letter from a financial industry regulator in response to its **Federal Register** notification of November 21, 2011, regarding the information collection requirements associated with the Interim Final Rule pursuant to the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13. All of the comments are available for review on *www.regulations.gov.*

The financial industry associations' comments fell into several general categories. Several comments expressed concerns about the Bureau's ability to maintain confidentiality for notification materials received by the Bureau. Other commenters requested clarity as to the type of actions for which the Bureau requires notification. One commenter requested that the Bureau require uniform interpretation by States of all Federal law within the Bureau's jurisdiction.

**Exhibit 32**



Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

April 22, 2013

Randal Shaheen, Esq.
Venable LLP
575 Seventh Street NW
Washington, DC 20004

Dear Mr. Shaheen,

This letter confirms that I called you today in accordance with the Consumer Financial
Protection Bureau's discretionary Notice and Opportunity to Respond and Advise
(NORA) process. During our telephone conversation, I notified you that the CFPB's
Office of Enforcement is considering recommending that the Bureau take legal action
against your clients Morgan Drexen, Inc., and Walter Ledda, and I offered your clients
the opportunity to make NORA submissions. As we discussed, the staff expects to
allege that your clients violated Sections 1031 and 1036 of the Consumer Financial
Protection Act, 12 U.S.C. § 5536 and the Telemarketing Sales Rule, 16 CFR § 310.
In connection with the contemplated action, the staff may seek injunctive and
monetary relief against your clients.

A NORA submission is a written statement setting forth any reasons of law or policy
why your clients believe the Bureau should not take legal action against them. Any
facts presented or factual assertions relied upon by your clients in the written
statements must be made under oath by someone with personal knowledge of such
facts. The written statements shall be submitted on 8.5 by 11 inch paper, double
spaced, in at least 12-point type, and no longer than 40 pages, and must be received no
later than May 6, 2013. To ensure timely delivery, any submission should be e-mailed
to wendy.weinberg@cfpb.gov, or hand-delivered to me at: Consumer Financial
Protection Bureau, 1750 Pennsylvania Ave. NW, 10th Floor, Washington, DC 20006.
Please inform me by no later than April 29, 2013 whether your client will be making a
submission.

Please be advised that the Bureau may use information contained in any submission as
an admission, or in any other manner permitted by law, in connection with CFPB
enforcement proceedings or otherwise. For your information, I have enclosed a copy
of the NORA bulletin. Please also be advised that submissions may be discoverable
by third parties in accordance with applicable law.

As described more fully in the bulletin, this letter does not create or confer upon any
person any substantive or procedural rights or defenses that are enforceable in any
manner.

1



1700 G Street NW, Washington, DC 20552

If you have any questions, please contact me at (202) 435-7688.

Sincerely,

*Wendy Weinberg*

Wendy Weinberg
Consumer Financial Protection Bureau
Enforcement Attorney


Enclosure: Early Warning Notice Bulletin

2

*The* Consumer Financial Protection *Bureau*

**CFPB Bulletin 2011-04 (Enforcement)**

**Date:**        November 7, 2011 (updated January 12, 2012)

**Subject:**     Notice and Opportunity to Respond and Advise (NORA)

This is the first in a series of periodic bulletins that the Consumer Financial Protection Bureau (CFPB) intends to issue in order to provide information about the policies and priorities of the Bureau's Office of Enforcement. These bulletins are intended to inform the public in a transparent manner about some of the types of legal violations that the Office intends to investigate for potential enforcement action, and the procedures and methods that it will use to do so.

Before the Office of Enforcement recommends that the Bureau commence enforcement proceedings, the Office of Enforcement may give the subject of such recommendation notice of the nature of the subject's potential violations and may offer the subject the opportunity to submit a written statement in response (view a sample NORA letter). The decision whether to give such notice is discretionary, and a notice may not be appropriate in some situations, such as in cases of ongoing fraud or when the Office of Enforcement needs to act quickly. The objective of the notice is to ensure that potential subjects of enforcement actions have the opportunity to present their positions to the Bureau before an enforcement action is recommended or commenced.

The primary focus of the written statement in response should be legal and policy matters relevant to the potential enforcement proceedings. Any factual assertions relied upon or presented in the written statement must be made under oath by someone with personal knowledge of such facts. Submissions may be discoverable by third parties in accordance with applicable law.

Unless otherwise specified in the Office of Enforcement's notice, the written statement shall be submitted on 8.5 by 11 inch paper, double spaced, in at least 12-point type, and no longer than 40 pages; and must be received by the Bureau no more than 14 calendar days after the notice. The written statement should be sent to the Bureau staff conducting the investigation, and shall clearly reference the specific investigation to which it relates. If the Office of Enforcement ultimately recommends the commencement of an enforcement proceeding, the written statement will be included with that recommendation.

Persons involved in an investigation who wish to submit a written statement on their own initiative at any point during an investigation should follow the relevant procedures described above.

*The CFPB created the Early Warning Notice process solely for the administrative use of its employees. It is not intended to nor should it be construed to: (1) restrict or limit in any way the CFPB's discretion in exercising its authorities; (2) constitute an interpretation of law; or (3) create or confer upon any person, including one who is the subject of a CFPB investigation or enforcement action, any substantive or procedural rights or defenses that are enforceable in any manner.*

**Exhibit 33**



575 SEVENTH STREET NW   WASHINGTON, DC 20004
T 202.344.4000   F 202.344.8300   www.Venable.com

Randy Shaheen
**T 202.344.4488**
**F 202.344.8300**
rmshaheen@venable.com

May 8, 2013

**CONFIDENTIAL**

Lucy Morris, Esq.
Consumer Financial Protection Bureau
1750 Pennsylvania Avenue, NW
Washington, DC 20006

Re:     NORA Response Letter

Dear Lucy:

We are writing in response to Ms. Weinberg's April 22, 2013 letter. We are not, at this time, addressing in detail the preliminary conclusions reached by staff concerning Morgan Drexen's conduct.

Rather, because the Company believes staff's concerns can and should be resolved by a fair and reasonable settlement our letter is directed primarily toward this outcome. While there is consensus among the attorneys supported by Morgan Drexen that the FTC (and the CFPB) do not have jurisdiction over their law practice (*ABA v. FTC*, 671 F. Supp. 2d 64 (D.D.C. 2009) (subsequently vacated on grounds of mootness), their goal (and the goal of the Company, itself) has always been to comply with the provisions of the amended TSR and other relevant laws. While the Company does not share staff's views regarding its compliance, it is more than willing to work cooperatively with staff to reasonably amend its practices and advertising to address staff's concerns.

While we do not wish to respond to staff's concerns in detail here, any discussion of settlement would be incomplete without at least noting some of the significant legal difficulties facing the Bureau should it opt to pursue the allegations outlined by staff.

**Allegations Relating to Fees**

Staff's primary allegation is that fees are collected in violation of the amended TSR. The amended TSR prohibits the collection of any fees for debt settlement services prior to the actual settlement of a debt, so-called "upfront fees." The regulations do not prohibit any other type of fee nor is there any way to construe its language otherwise. The difficulty with staff's theory is that upfront fees are not collected in connection with debt settlement. Rather, the attorneys charge two types of fees for services other than debt settlement.

First, some of the attorneys Morgan Drexen supports provide bankruptcy services with debt settlement as an ancillary service. That is, the attorneys have been retained by their clients for



Lucy Morris, Esq.
May 8, 2013
Page 2

bankruptcy services; however, in connection with that service and prior to the filing of the petition, efforts are made to resolve unsecured debt in order to obviate the need for bankruptcy or forestall the event. Other attorneys believe that preparation of a bankruptcy petition in parallel with efforts at debt settlement provides their clients with greater leverage in settlement negotiations. For the same reason, some consumers opt to retain counsel for both debt settlement and bankruptcy but engage separate counsel for each.

Whenever a law firm client retains counsel for bankruptcy representation under any of the above scenarios, fees are collected for services performed pursuant to the bankruptcy engagement. Nothing in the amended TSR prohibits the imposition or collection of fees for the performance of other legal services.[1]

Second, law firm clients also pay a small monthly retainer fee. This fee permits them to meet with their attorney at a substantially reduced rate for any purpose outside of the scope of their debt settlement and/or bankruptcy representation (for example, if they are sued by a creditor, need assistance with the preparation of a will, or the review/revision of a legal document.) In 2012, Morgan Drexen calendared for attorneys it supports over 20,951 such meetings. As with the fees associated with the provision of bankruptcy services nothing in the amended TSR prohibits the collection of a retainer fee which gives the client the right to additional legal representation at a substantially reduced rate.

**Allegation That Services are not Provided by an Attorney**

Staff has also alleged that the claim that a debt settlement client is represented by an attorney is deceptive. Staff's preliminary conclusion in this regard contravenes the plain facts and the findings of numerous states and state bars.

The facts demonstrate that the "debt settlement" clients are, in fact, clients of the attorneys and that a legitimate attorney-client relationship exists. The attorneys dictate how their prospective clients can be solicited. The attorneys named in the advertisements review and approve each advertisement run on behalf of their law firms. It is the attorneys who determine what information they require from prospective clients who are interested in their firms' services. The attorneys themselves make the determination that they will or will not represent a prospective client. The attorneys, utilizing their independent legal knowledge and training, determine the appropriate legal tactic to utilize in assisting their client resolve their unsecured debts. Once the attorneys have decided to provide legal representation to a client, the attorneys communicate via a letter on their firm letterhead with their client's creditors to notify the creditors that they are representing the debtor and to request that all communication be directed

---

[1] Nor has staff alleged that such services are not actually performed. Individualized and accurate bankruptcy petitions, with supporting schedules, are prepared for each and every client who decides to retain his attorney for bankruptcy services.

# VENABLE®LLP

Lucy Morris, Esq.
May 8, 2013
Page 3

to the attorneys. The attorneys set up, in their state of residence, an IOLTA, or other similar lawyer trust account, for their clients' funds to be deposited. The attorneys are tasked by their regulator – the judiciary or state bar – with making sure that each penny is accounted for, and, should there be a deficit, the attorneys are ultimately responsible to their clients. The attorneys communicate with their clients on a monthly basis in order to provide their clients with updates on the progress of their clients' accounts and any and all transactions made from their clients' trust accounts. The attorneys review all offers of settlements made by their clients' creditors and determine whether to accept, reject, or make a counteroffer to the creditor's offer. The attorneys periodically review their clients' files in order to determine whether debt settlement will continue to work for their clients or if they will need to explore other legal tactics. The attorneys are responsible for supervising the services performed by their in-house and outsourced staff and remain accountable to their clients for any errors committed by their staff.

Indeed, this point is made quite clear by the fact that Morgan Drexen has different procedures for the attorneys it supports. For example, some attorneys offer their clients the EDAF program (which provides funds in advance to help settle a debt) and some do not. There are also differences among the attorneys Morgan Drexen supports with respect to client engagement terms and the application of the preferred creditor program. If, as staff posits, the debt settlement services are actually being provided by Morgan Drexen then why would there be any need to accommodate the differing preferences or practices of the attorneys that Morgan Drexen supports?

While one state agency's recent finding is incongruent, that finding stands alone among a vast array of courts, hearing officers and state bars who have found that Morgan Drexen's services are just that – outsourced administrative support services provided to attorneys pursuant to Rule 5.3 of the Rules of Professional Responsibility.

    a. <u>Colorado:</u> In late 2011, Donald Drew Moore ("DDM"), Lawrence W. Williamson ("LWW"), and Morgan Drexen, Inc. ("MD") brought a lawsuit against the Attorney General ("AG") and the Administrator of the Uniform Debt-Management Services Act ("Administrator"). DDM, LWW, and MD sought declaratory relief from the District Court of Colorado for an order stating that the AG and the Administrator's attempt to regulate in-state and/or out-of-state attorneys, legally practicing law within the State of Colorado, and the attorneys' support staff was an unconstitutional encroachment of the judiciary's exclusive power to regulate the practice of law under the separation of powers doctrine. The District Court Judge found for DDM, LWW, and MD, holding that the AG's and the Administrator's attempt to regulate the attorneys, in-state and out-of-state, and MD violated the separation of powers doctrine and was unconstitutional. More significantly to this matter, the Court found



Lucy Morris, Esq.
May 8, 2013
Page 4

that (1) Morgan Drexen's services constituted "legal services;" (2) the services were provided in an attorney-client relationship; and (3) the evidence demonstrated that Morgan Drexen was providing services under the supervision of the attorneys in rendition of the attorneys' professional services.

b. Connecticut: Beginning in 2009, the Connecticut State Bar and the Connecticut Department of Banking reviewed the use of MD by Connecticut attorney, Kimberly A. Pisinski ("KAP"), in support of KAP's bankruptcy and debt settlement legal practice. The Disciplinary Counsel of the State Bar found that KAP's use of MD was permissible under the Connecticut Rules of Professional Conduct. Additionally, the Dept. of Banking acknowledged that KAP's use of MD in her bankruptcy/debt settlement practice area did not trigger separate licensure under the state's Debt Adjustors & Negotiators Act for either KAP or MD.

c. New Hampshire: Beginning in 2007, the New Hampshire Department of Banking began looking into the back office support provided by MD to out-of-state and in-state attorneys for the attorneys' debt settlement legal practice. After an extensive investigation which included multiple meetings with attorneys using the support of Morgan Drexen, the Dept. of Banking found that MD, as back office service provider for attorneys lawfully practicing in New Hampshire, is exempted from the licensing regulations found in state's Debt Adjusting Act.

d. New Jersey: In 2012, the New Jersey State Bar reviewed Milton Bouhoutsos' utilization of Morgan Drexen's support services in his debt settlement legal practice. The State Bar concluded that Milton's utilization of MD was a legitimate outsourcing of paraprofessional services. And, based upon its review, the State Bar concluded that Mr. Bouhoutsos, and not Morgan Drexen, was the attorney providing services.

e. Nevada: In 2012, Michael S. Terry ("MST"), prior to making the decision to utilize MD's back office support in connection with his bankruptcy practice, contacted the NV Dept. of Business and Industry, Division of Financial Institutions ("Division"), for clarification on the Division's interpretation of NV's Debt Management Services Act ("Act"). MST received confirmation from the Division that, constitutionally, the Division cannot regulate attorneys and the attorneys' legal practice. As such, the Division verified that the Act does not apply to the attorneys and/or the attorneys' in-house/outsourced support staff.



    f. <u>Utah:</u> In October of 2010, an administrative law judge at the Utah Department of Commerce – Division of Consumer Protection, after a full evidentiary hearing, found that the law firms were providing services to Utah Consumer in compliance with the Utah Rules of Professional Conduct. After conducting an investigation, the Chief Investigator of the Utah Division of Consumer Protection acknowledged Morgan Drexen's support role and confirmed that, in that capacity, Morgan Drexen was exempted from licensure under Utah's Debt Management Services Act.

    g. <u>Virginia:</u> On or about August 16, 2011, the Virginia State Corporation Commission – Bureau of Financial Institutions ("BFI") began reviewing the services provided by the attorneys supported by MD and MD's support of the attorneys. The BFI found that MD was, in fact, supporting the Virginia attorneys. The BFI raised a concern, based on the Virginia Rules of Professional Conduct, with MD's access to the attorney's IOLTA trust account. However, upon discussion of a modified protocol in connection with the trust account, the BFI permitted MD to continue in its support role without the necessity of complying the state's registration requirements of Virginia's Debt Management Plan statutes.

    h. <u>Florida:</u> In 2011, the Florida Bar opened an Unlicensed Practice of Law investigation in regard to Morgan Drexen's services. After an extensive investigation that lasted more than a year, the UPL Counsel of the State Bar concluded that there was attorney supervision.

    i. <u>Mississippi:</u> In 2009, the Mississippi Bar opened an investigation into attorney Tami Munsch and her use of Morgan Drexen. After an extensive investigation, in 2010, the Bar concluded: "The use of the base and paralegal services under her supervision amount to outsourced paraprofessional services which does not appear to violate Rules 5.3 and 5.4(a), MRPC." Accordingly, the Bar complaint be dismissed.

    j. <u>California:</u> The state bar of California reviewed the practice of Howard/Nassiri, P.C. and its use of Morgan Drexen and determined that matter be closed with no action. (November 23, 2011)

    k. <u>Arizona:</u> In 2008, the Arizona State Bar opened up an investigation into Morgan Drexen's practices and whether they constituted the unauthorized practice of law. The State Bar concluded it investigation: "We believe it your intention to remain in



Lucy Morris, Esq.
May 8, 2013
Page 6

full compliance with the Arizona Supreme Court Rules 31. Accordingly we are closing the file related to this matter. (March 2, 2009)

l.  <u>Ohio:</u>  In January 2010, the Unauthorized Practice of Law Committee of the Ohio State Bar Association opened up an investigation of Morgan Drexen and the attorney using its services. The Committee "carefully considered the claim ... following such consideration, it was the determination of the Committee that the matter should be dismissed and the filed closed. (June 1, 2010)

### Settlement of Staff's Concerns Based Upon the Use of Enhanced Disclosures Preserves Consumer Choice and Avoids Any Violation of the First Amendment

Notwithstanding the clear legal and practical obstacles staff's allegations would face in Court, the Company believes staff's concerns should be resolved through settlement rather than litigation. With regard to fees the Company has expressed a willingness to discuss heightened or additional disclosures. For example, disclosures concerning the availability and fees for ancillary services such as bankruptcy or the monthly retainer fee could be heightened. Similarly, to address staff's concern that many of the bankruptcy petitions that are prepared are never filed, the Company is prepared to discuss a disclaimer that discloses the percentage of clients who actually file for bankruptcy.[2]

Staff, however, has taken the position that its concerns cannot be alleviated by disclosures and that instead Morgan Drexen should be prohibited from supporting attorneys who provide any services in parallel with debt settlement.

Staff's position is both bad policy and bad law. It is bad policy because there are legitimate reasons why consumers might freely choose to retain counsel for both debt settlement and bankruptcy. First, if a client believes they will be able to settle one or more debts then dual engagement provides them with a significant savings with respect to the fee charged for successful debt settlement. Last year over 26,418 debts were settled by clients with dual engagements, resulting in savings of over $ 30,726,650 in debt settlement fees.

Second, the attorneys supported by Morgan Drexen believe that a parallel bankruptcy representation provides their clients with significant leverage in debt settlement negotiations. Discussions with creditors on behalf of dual engagement law firm clients routinely include mention of preparation of bankruptcy pleadings. Creditors, therefore, are loathe to push too hard

---

[2] In making this offer, the Company is not in any way conceding that its current disclosures are inadequate or that it has an obligation to inform potential law firm clients what percentage of clients actually file for bankruptcy.

# VENABLE®LLP

on debtors who have already invested in the preparation of bankruptcy papers because they recognize that such individuals have little to lose (or fear) from rejection of an unreasonable debt settlement offer.

Not only is this a common sense proposition, it is also supported by data. Morgan Drexen will be able to show the Bureau that the filing of collection lawsuits by creditors has dropped significantly since the attorneys it supports began offering dual engagements.

Staff's position is also bad law in that – consistent with the First Amendment – courts have consistently favored the use of disclaimers over prohibition. There can be no doubt that it is possible to communicate to potential debt settlement clients the nature of the service or services available and the fees for such services (and any applicable discounts.) Such disclosures are routinely made for a wide range of services. In addition, as noted above, to address staff's concern the Company is willing to disclose the percentage of law firm clients who actually file for bankruptcy. Once adequately informed, potential clients are then able to freely choose whether to retain an attorney supported by Morgan Drexen for one or both services.

Staff's view boils down to the proposition that consumers should not be able to freely make that choice. Congress, of course, has the right to so declare and agencies, upon an appropriate showing and within the limits of their authority, can adopt rules or regulations to restrict consumer choice. However, what agencies cannot do is interpret laws designed to prevent consumer deception to also prevent the exercise of free choice, however rational or irrational it may be, by adequately informed consumers.

On a number of occasions courts have struck down efforts by FDA to do just that. Indeed, the FTC, whom the CFPB has frequently cited as its lodestar for its enforcement authority, has also counseled FDA to insure that consumers are adequately informed while preserving the exercise of consumer choice. For example, in *Pearson v. Shalala*, 164 F.3d 650 (D.C. Cir. 1999), the Court held that the FDA violated the First Amendment when it refused to allow dietary supplement manufacturers to make claims that fell short of the "significant scientific agreement" standard even with the use of appropriate disclaimers. FDA had argued that the government was "not obligated to consider requiring disclaimers in lieu of an outright ban on all claims that lack significant scientific agreement." *Id.* at 655.

Applying *Central Hudson's* commercial speech standard, the court concluded that there was not a "reasonable fit" between the government's goals of protecting public health and preventing consumer fraud and the "means chosen to advance those goals" which was the rejection of a proposed health claim without consideration of a corrective disclaimer. *Id.* at 656-58. In language, of which we believe the CFPB should take note, the Court held that under the commercial speech doctrine there "was a preference for disclosure over outright

# VENABLE®LLP

Lucy Morris, Esq.
May 8, 2013
Page 8

suppression" and for the "less restrictive and more precise means" of regulating commercial speech. *Id.* at 656-58.[3]

Further, in a related, similar case, *Whitaker v. Thompson*, 248 F.Supp.2d 1 (D.D.C. 2002) the Court held that any complete ban of a claim would be approved only under narrow circumstances, i.e., where the government provided empirical evidence proving that the public would still be deceived even if the claim was qualified by a disclaimer *Id.* at 11.

In the wake of these decisions the FDA sought comments with regard to how to balance the First Amendment and its mission to protect public health. The FTC approved the submission of comments by its staff that emphasized the importance the FTC places on "remedies that favor disclosures and qualification over outright bans."[4] The Bureau is no more immune from the First Amendment than FDA and Staff has not made the requisite showing here that the alleged consumer deception and violations of the amended TSR that it believes the Company is engaged in cannot be "cured" by disclaimers.

Sincerely,


Randal M. Shaheen

cc: Wendy Weinberg, Shirley Chiu

---

[3] There should be no question that staff's proposed ban on the Company supporting attorneys who provide parallel debt settlement and bankruptcy services implicates the First Amendment. The First Amendment has long been held to extend to conduct prohibitions and, in any event, staff's proposed ban would also clearly prohibit the advertising and promotion of such services.

[4] Before the Food and Drug Administration: *In the Matter of Request for Comment on First Amendment Issues,* Docket No. 02N-0209: Comments of the Staff of the Bureau of Economics, the Bureau of Consumer Protection and the Office of Policy Planning of the Federal Trade Commission.

**Exhibit 34**



Consumer Financial
Protection Bureau

1700 G Street, N.W., Washington, DC 20552

June 12, 2013

**Via Overnight Mail and E-Mail**

Randall M. Shaheen, Esq.
Andrew Bigart, Esq.
Venable LLP
575 7th Street, NW
Washington, DC 20004

**Re: Morgan Drexen**

Dear Randy,

I am writing to follow up on our meeting on May 29, 2013 ("May 29 Meeting"). At the close of the meeting, I highlighted certain infirmities in Morgan Drexen, Inc.'s ("Morgan Drexen") response to the Civil Investigative Demand issued by this office on March 13, 2012 ("CID"). In the interest of furthering our discussion, please respond to the specific issues set forth below.

**Production of Data**

At the May 29 Meeting, we stated that, in order for us to engage in productive discussions with Morgan Drexen, Morgan Drexen would have to produce data called for in the CID.

To date, Morgan Drexen has produced data responsive to the following subparts of Document Request No. 21: (a), (b), (c), (d), (e), (f), (g), (j), (k), (m), (n), (p), (q), (r), (t), (u), (v), and (w).

It is unclear whether the data Morgan Drexen has produced in response to these subparts relates to consumers who entered into a debt resolution representation agreement, those who entered into a bankruptcy fee agreement, or those who enter into both types of agreements. To be clear, the Bureau expects Morgan Drexen to produce data relating to *any* consumer who entered into *either or both* of these agreements. Please confirm that Morgan Drexen has provided such information with respect to the subparts to which it has produced data. If Morgan Drexen has not, please supplement your production to Document Request No. 21(a), (b), (c), (d), (e), (f), (g), (j), (k), (m), (n), (p), (q), (r), (t), (u), (v), and (w) with this information by June 30, 2013. Also, for each consumer, please identify in your data set whether the consumer entered into a debt resolution representation agreement, a bankruptcy fee agreement, or both.

During the May 29 Meeting, you stated that Morgan Drexen possesses data responsive to Document Request No. 21 that is more recent than the data Morgan Drexen produced in June 2012. You noted, for example, that Morgan Drexen has tracked the number of bankruptcy filings by its clients in the past year. You committed to update the data Morgan Drexen previously produced in response to Document Request No. 21. By June 30, 2013, please: (1) update any data you have provided in response to Document Request No. 21 as necessary to make it current; and (2) supplement your previous production with all responsive information relating to any consumer who began working with Morgan Drexen *after* Morgan Drexen produced data responsive to Request No. 21 to the Bureau.

consumerfinance.gov

During the May 29 Meeting, we talked specifically about Morgan Drexen updating its response to subpart (k), which calls for "all fees other than engagement fees that were directly or indirectly charged to the Client by Morgan Drexen or associated attorneys (e.g. monthly fees, enrollment fee, check fee, settlement fee), including charges by third parties assessed to the Client's account, and a description of the type of fee, the identity of the payor and payee, and the date of payment." You did not object to producing this data. We are aware that consumers pay an engagement fee under the bankruptcy fee agreement, a bankruptcy filing fee, and an ongoing administrative monthly fee. If every consumer is charged the same set of fees, the Bureau will consider Morgan Drexen's response to subpart (k) complete if it simply identifies the names and amounts of those fees. If consumers are charged different fees, please provide us with the specific information called for in subpart (k).

On a number of occasions, we have asked you to clarify Morgan Drexen's response to subpart (m). Please confirm that the data provided represents *all* payments made by consumers, whether pursuant to a debt resolution representation agreement, a bankruptcy fee agreement, or any other agreement with Morgan Drexen or an Associated Attorney, regardless of what account the payment was deposited into by Morgan Drexen or an Associated Attorney. If Morgan Drexen's production does not contain all payments made by consumers, please update your response by June 30, 2013.

To date, Morgan Drexen has not provided any data responsive to subparts (h), (i), (l), (o), (s), (x) of Document Request No. 21. In the May 29 Meeting, you suggested that Morgan Drexen is concerned that some of the data called for in these subparts may be privileged, or that, in the alternative, the production of certain sets of data would contravene the California Rules of Professional Conduct. In your June 15, 2012 letter, however, you indicated that Morgan Drexen does not maintain information on subparts (h), (i), (l), (o), or (s). In an attempt to find a compromise that will allow the parties to move forward on this issue, at this time, the Bureau seeks production only on subpart (h) if Morgan Drexen possesses such information. As we have noted on a number of occasions now, neither of Morgan Drexen's concerns about producing this information has any basis in law. If your client is in possession of this relevant, non-privileged information, its refusal to produce it will seriously hinder our ability to engage discussions such as the May 29 Meeting. Please provide data responsive to this subpart by June 30, 2013.

## Confirmation of Complete Production

At the May 29 Meeting, we also stated that, in order for us to engage in productive discussions with Morgan Drexen, Morgan Drexen would have to confirm that it has met certain of its production obligations. Please respond to the following inquiries relating to specific document requests.

**Document Request No. 3:** Please state whether Morgan Drexen has provided all policies and procedures in its possession that relate to the provision of debt settlement services, as called for by Document Request No. 3. If Morgan Drexen has not, please produce all outstanding, responsive policies and procedures by June 30, 2013.

In your letter dated July 27, 2012, you promised that Morgan Drexen would supplement its response to the Bureau's request seeking "all documents relating to Morgan Drexen's policies and procedures relating to the provision of Debt Settlement Services to consumers or Clients," with documents relating to bankruptcy services by July 30, 2012. Morgan Drexen has not provided any supplementary documents. Please confirm that Morgan Drexen does not have any such documents in its possession. Alternatively, please produce all outstanding documents by June 30, 2013.

**Document Request No. 4:** Please state whether Morgan Drexen has produced all training manuals and training materials for its employees, or Associated Attorneys, as called for by Document Request No. 4. If

2

Morgan Drexen has not, please produce all outstanding, responsive training manuals and training materials by June 30, 2013.

**Document Request No. 12:** Please state whether Morgan Drexen has produced exemplars of all contracts or agreements between Morgan Drexen and all Clients, as called for by Document Request No. 12. If Morgan Drexen has not, please produce all outstanding, responsive exemplars by June 30, 2013.

~~**Document Request No. 17:** Document Request No. 17 calls for Morgan Drexen to produce all complaints~~ about Morgan Drexen or Associated Attorneys and any responses to the complaints. Please confirm that Morgan Drexen does not have any additional responsive documents in its possession. Alternatively, please produce all outstanding, responsive documents by June 30, 2013.

**Document Request No. 20:** Morgan Drexen has not produced any documents responsive to Document Request No. 20. Please confirm that Morgan Drexen does not have any such documents in its possession. Alternatively, please produce all outstanding, responsive documents by June 30, 2013.

I am available to discuss any questions you have. My telephone number is: 202-255-9747. My e-mail address is: gabriel.o'malley@cfpb.gov. I look forward to receiving your response to the issues set forth above.

Sincerely

Gabriel O'Malley
Shirley Chiu
Enforcement Attorneys

3

**Exhibit 35**

**From:** Gabriel.O'Malley@cfpb.gov [mailto:Gabriel.O'Malley@cfpb.gov]
**Sent:** Monday, July 08, 2013 5:29 PM
**To:** Shaheen, Randal M.
**Cc:** Shirley.Chiu@cfpb.gov
**Subject:** Follow-Up To 7/8/13 Telephone Call

Randy,

I am writing to follow up on our telephone discussion this afternoon regarding Morgan Drexen's document and data production.

Based on our conversation, it is my understanding that Morgan Drexen is now refusing to provide updated data responsive to CID Request No. 21, including data relating to consumers who entered into bankruptcy contracts with Morgan Drexen-affiliated attorneys, unless and until the Bureau engages in discussions with Morgan Drexen about injunctive relief necessary to settle this matter. As I stated, this position is counterproductive and inconsistent with representations Morgan Drexen made in our meeting on May 29, 2013.

Y_ _stated that Morgan Drexen will complete its document production in response to CID Request Nos. 3, 4, 12, 17, and 20 (per _ _etter request, dated June 12, 2013) over the next three weeks and that we should receive a production of documents each of the next three Fridays. Please confirm this is the case. Also, as you committed, please let us know, generally, what documents Morgan Drexen will be producing and what the volume of the document productions will be. Thank you.

Gabriel O'Malley
Enforcement Attorney
Supervision, Enforcement, Fair Lending & Equal Opportunity
(202) 435-9747
gabriel.o'malley@cfpb.gov

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MORGAN DREXEN, INC. and KIMBERLY A. PISINSKI,**<br><br>       *Plaintiffs*,<br><br>v.<br><br>**CONSUMER FINANCIAL PROTECTION BUREAU**,<br><br>       *Defendant*. | Civil Action No. 13-01112 (CKK) |

## SCHEDULING AND PROCEDURES ORDER
### (July 25, 2013)

The Court held two on the record telephone conference calls with the parties on July 24, 2013 and July 25, 2013, during which Plaintiffs consented to withdraw their [3] motion for preliminary injunction and both parties consented to instead proceed with an expedited briefing on the merits of Plaintiffs' Complaint.   The parties jointly proposed a schedule, which this Court granted. Accordingly, and in order to administer this civil action in a manner fair to the litigants and consistent with the parties' interest in completing this litigation in the shortest possible time and at the least possible cost, it is, this 25th day of June, 2013, hereby

**ORDERED** that the parties are directed to comply with each of  the directives set forth in this Order.   The Court will hold the parties responsible for following these directives; failure to conform to this Order's directives **may, when appropriate, result in the imposition of sanctions**.

1.      **COMMUNICATIONS WITH THE COURT.**   The parties should endeavor to keep communications with Chambers to a minimum.   *Ex parte* communications on matters other than scheduling are **strictly prohibited**; if the parties need to contact Chambers, it must be done **jointly** pursuant to a conference call arranged by the parties.

2.      **MOTIONS FOR EXTENSIONS OF TIME.**   The Court will not entertain or honor stipulations for extensions of time; parties must file a motion in accordance with the following instructions:

   (a)      Motions for extensions of time **must be filed at least four (4) business days prior to the first affected deadline**.

   (b)      Motions for extensions of time are strongly discouraged; they will be granted only in truly exceptional or compelling circumstances and parties should not

expect the Court to grant extensions.

(c)     All motions for extensions of time **must include the following or they will not be considered**:

   (i)     The specific grounds for the extension;

   (ii)    The number of previous extensions, if any, granted to each party;

   (iii)   A statement of the impact that the requested extension would have on all other previously set deadlines;

   (iv)    A proposed schedule for any other affected deadlines, to be proposed only after consulting with opposing counsel; and

   (v)     A statement of opposing counsel's position vis-à-vis the motion in accordance with Local Rule LCvR 7(m).

3.     **MOTIONS GENERALLY.**  Parties must comply with the following instructions when briefing any motion:

(a)     Memoranda of points and authorities filed in support of or in opposition to any motion may not, without leave of the Court, exceed forty-five (45) pages, and reply memoranda may not exceed twenty-five (25) pages, with margins set at one inch and with all text double-spaced (excepting footnotes) and in twelve-point Times New Roman (including footnotes).

(b)     A party may not file a sur-reply without first requesting leave of the Court.

(c)     Where a party fails to file a memorandum of points and authorities in opposition to a given motion, the Court **may treat the motion as conceded**. *See* Local Rule LCvR 7(b).  Similarly, where a party fails to respond to arguments in opposition papers, the Court may treat those specific arguments as conceded.  *See Phrasavang v. Deutsche Bank*, 656 F. Supp. 2d 196, 201 (D.D.C. 2009).

(d)     **Exhibits shall be properly edited** to exclude irrelevant material and to direct the Court's attention to the pertinent portions thereof.

(e)     Each submission shall be accompanied by a table of cases and other authorities cited therein.

(f)     Every pleading or paper, regardless of whether it is signed by an attorney or a *pro se* party, shall contain the name, address, telephone number, and, for an

2

attorney, bar identification number.  *See* Local Rule LCvR 5.1(e).

4.   **MOTIONS FOR SUMMARY JUDGMENT.**  Parties must comply with the following instructions when briefing motions for summary judgment and the Court may strike papers not in conformity therewith:

(a)   The Court **strictly adheres to the dictates of Local Rule LCvR 7(h)**, which requires that each party submitting a motion for summary judgment attach a statement of material facts for which that party contends there is no genuine dispute, with specific citations to those portions of the record upon which the party relies in fashioning the statement.  The party opposing the motion must, in turn, submit a statement enumerating all material facts which the party contends are genuinely disputed and thus require trial.  *See* Local Rule LCvR 7(h)(1).  The parties are strongly encouraged to carefully review *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145 (D.C. Cir. 1996), on the subject of Local Rule LCvR 7(h).

(b)   The moving party's statement of material facts shall be a short and concise statement, **in numbered paragraphs**, of all material facts as to which the moving party claims there is no genuine dispute.  The statement must contain **only one factual assertion in each numbered paragraph**.

(c)   The party responding to a statement of material facts must respond to each paragraph with a **correspondingly numbered paragraph**, indicating whether that paragraph is admitted or denied.  If a paragraph is admitted only in part, the party must specifically identify which parts are admitted and which parts are denied.

(d)   The Court may assume that facts identified by the moving party in its statement of material facts are **admitted**, unless such facts are controverted in the statement filed in opposition to the motion.  *See* Local Rule LCvR 7(h)(1).

(e)   The responding party must include any information relevant to its response in its correspondingly numbered paragraph, with specific citations to the record.  However, if the responding party has additional facts that are not directly relevant to its response, it must identify such facts in consecutively numbered paragraphs **at the end** of its responsive statement of facts.  **If additional factual allegations are made, the opponent must file a responsive statement of its own**.

(f)   The parties must furnish **precise citations** to the portions of the record on which they rely; the Court need not consider materials not specifically identified.  *See* Fed. R. Civ. P. 56(c)(3).

3

5.      **MOTIONS FOR RECONSIDERATION.**  Motions for reconsideration of prior rulings are strongly discouraged.  Such motions shall be filed only when the requirements of Fed. R. Civ. P. 54(b), Fed. R. Civ. P. 59(e), and/or Fed. R. Civ. P 60(b) are met.  If such a motion is filed, it **shall not exceed ten (10) pages in length**.  Moreover, the Court will not entertain: (a) motions which simply reassert arguments previously raised and rejected by the Court; or (b) arguments which should have been previously raised, but are being raised for the first time.  *See Nat'l Trust v. Dep't of State*, 834 F. Supp. 453, 455 (D.D.C. 1993).  Motions not in compliance with these instructions may be stricken.

6.      **COURTESY COPIES.**  The parties shall deliver one (1) courtesy copy of any submission that is over twenty-five (25) pages in length or that includes more than one (1) exhibit to the Court Security Officer at the loading dock located at Third and C Streets (not the Clerk's Office or Chambers).  Courtesy copies shall be appropriately bound and tabbed for ease of reference.

7.      **SETTLEMENT.**  The parties are expected to evaluate their respective cases for purposes of settlement.  The Court encourages the use of alternative dispute resolution  *e.g.*, mediation or neutral case evaluation.  The use of these methods is available at any time, as is a settlement conference before a magistrate judge.  If counsel are interested in pursuing these options, they may contact Chambers at any time.  If the case settles in whole or in part, counsel shall **promptly** advise the Court.

8.      **APPEARANCES AT HEARINGS.**  Principal trial counsel must appear at all hearings unless excused by the Court in advance.

It is **FURTHER ORDERED** that the parties shall adhere to the following schedule:

(a)      On or before **August 7, 2013**, Plaintiffs shall file their motion for summary judgment;

(b)      On or before **August 27, 2013**, Defendant shall file its opposition to Plaintiffs' motion for summary judgment and cross-motion to dismiss and/or for summary judgment;

(c)      On or before **September 13, 2013**, Plaintiffs shall file their reply in further support of their motion for summary judgment and opposition to Defendant's cross-motion; and

(d)      On or before **September 25, 2013**, Defendants shall file its reply in further support of its cross-motion to dismiss and/or for summary judgment.

Additional dates will be set as necessary.  The dates identified above are firm; the Court has endeavored to give the parties the schedule that they have requested and expects that they will adhere

<div align="center">4</div>

to that schedule.  The Court shall also endeavor to issue a ruling on the parties' motions on an expedited basis and will advise the parties in the event a hearing is necessary.

   **SO ORDERED.**

Date: July 25, 2013          _____/s/_____

              **COLLEEN KOLLAR-KOTELLY**
              United States District Judge

5

USCA Case #13-5342   Document #1484126        Filed: 03/17/2014      Page 343 of 403

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MORGAN DREXEN, INC. and KIMBERLY A. PISINSKI, *Plaintiffs*, v. CONSUMER FINANCIAL PROTECTION BUREAU, *Defendant*. | Civil Action No. 13-01112 (CKK) **EXPEDITED BRIEFING SCHEDULE** **LOCAL RULE LCvR 7(h)(1) STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs Kimberly A. Pisinski ("Pisinski") and Morgan Drexen, Inc. ("Morgan Drexen") (together, "Plaintiffs"), by and through their undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56, Local Rule LCvR 7(h)(1), and this Court's Scheduling and Procedure Order [Docket No. 8], present the following material facts in support of their Motion for Summary Judgment against Defendant Consumer Financial Protection Bureau ("CFPB"):

## I.   LEGISLATIVE HISTORY: INTENT TO CREATE A SUPER AGENCY OF UNPRECEDENTED POWER AND INDEPENDENCE

1.     On June 17, 2009, President Obama proposed a "sweeping overhaul of the financial regulatory system, a transformation on a scale not seen since the reforms that followed the Great Depression."  Remarks by the President on 21st Century Financial Regulatory Reform (available at http://www.whitehouse.gov/the_press_office/Remarks-of-the-President-on-Regulatory-Reform/) (last visited Aug. 1, 2013).

2.     The President's June 30, 2009 draft legislation proposing the creation of CFPB adopted a multimember commission.  Consumer Financial Protection Agency Act of 2009, H.R. 3126, 111th Cong. §§ 111-114 (1st Sess. 2009) (as introduced).

3.     The financial reform legislation reported by the House Energy and Commerce Committee adopted a multimember commission structure for CFPB.  H.R. Rep. 111-367, pt. 1, at 8-9 (2009).

4.     The House-passed bill adopted a multimember commission structure for the CFPB.  H.R. 4173, 111th Cong. § 4103 (2009) (enacted).

5.     The Senate-passed version of the legislation replaced the multimember commission structure with a single Director.  *See* 156 CONG. REC. S4034, S4078 (daily ed. May 20, 2010) (amending the bill).

6.     The Majority Report of the Senate Committee on Banking, Housing, and Urban Affairs stated in part that CFPB was supposed to remedy "the failure of the federal banking and other regulators to address significant consumer protection issues" which led to "what has become known as the Great Recession."  S. Rep. 111-176, at 9 (2010).

7.     Michael S. Barr, Assistant Secretary for Financial Institutions, Department of the Treasury, stated before Congress that "[w]e believe that the Federal regulatory structure for consumer protection needs fundamental reform.  We have proposed to consolidate rule-writing, supervision, and enforcement authority under one agency, with marketwide coverage over both nonbanks and banks that provide consumer financial products and services." *Creating A Consumer Financial Protection Agency: A Cornerstone of America's New Economic Foundation, Hearing Before the S. Comm. On Banking, Housing, and Urban Affairs*, S. Hrg. 111-274 (2009) (statement of Michael S. Barr, Assistant Secretary for Financial Institutions, Department of the Treasury).

8.     Christopher Dodd, Chairman, Committee on Banking, Housing, and Urban Affairs, stated "[a]n independent consumer protection agency can and should be very good for

business, not just for consumers.  It can and should protect the financial well-being of American

consumers so that businesses can rely on a healthy consumer base as they seek to build long-term

profitability.  It can and should eliminate the regulatory overlap and bureaucracy that comes

from the current Balkanized system of consumer protection regulation.  It can and should level

the playing field by applying a meaningful set of standards, not only to the highly regulated

banks but also to their nonbank competitors that have slipped under the regulatory radar screen."

*Creating a Consumer Financial Protection Agency: A Cornerstone of America's New Economic*

*Foundation, Hearing Before the S. Comm. On Banking, Housing, and Urban Affairs*, S. Hrg.

111-274 (2009).

      9.     Travis B. Plunkett, Legislative Director, Consumer Federation of America, stated

that "the new agency would consolidate and streamline Federal consumer protection for credit,

savings and payment products that is now required in almost 20 different statutes and divided

between seven different agencies."  *Id.* (statement of Travis B. Plunkett, Legislative Director,

Consumer Federation of America).

      10.    Richard Blumenthal, Attorney General for Connecticut, stated before Congress

that the new agency would be a "Federal Consumer Financial Super Cop."  *Id.* (statement of

Richard Blumenthal, Attorney General, State of Connecticut).

      11.    Rachel Barkow, Professor of Law, New York University School of Law, stated

"[m]any of these agencies fall short in their efforts to protect consumers because they become

captured by the industries they are charged with regulating.  The experience of these agencies

therefore offers some valuable insights in thinking about how to structure the CFPA . . .  Agency

capture is further exacerbated by the fact that industry groups are also well positioned to

contribute to political campaigns and to lobby, which in turn gives them influence with the

agency's legislative overseers." *Proposed Consumer Financial Protection Agency, Hearing Before Subcomm. on Commerce, Trade, and Consumer Protection*, 111th Cong. (available at http://democrats.energycommerce.house.gov/Press_111/20090708/testimony_barkow.pdf) (last visited Aug. 5, 2013).

     12.     Richard Christopher Whalen, Senior Vice President and Managing Director of Institutional Risk Analytics stated that "[a] unified federal supervisor should combine the regulatory resources of the Federal Reserve Banks, SEC, the OCC, and the Office of Thrift Supervision, to create a new safety-and-soundness agency explicitly insulated from meddling by the Executive Branch and the Congress." *Modernizing Bank Supervision and Regulation-Part II, Hearing Before the S. Comm. On Banking, Housing, and Urban Affairs*, S. Hrg. 111-137 (2009) (statement of Richard Christopher Whalen, Senior Vice President and Managing Director, Institutional Risk Analytics).

## II.     CREATION OF CFPB AS A SUPER AGENCY OF UNPRECEDENTED POWER AND INDEPENDENCE

     13.     On July 21, 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), as "a direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008." S. Rep. No. 111-176, at 2 (2010).

### A.     Title X Severely Limits Executive Oversight of CFPB By Vesting All Power In A Single Director With Tenure Protection

     14.     Title X of the Dodd-Frank Act created CFPB.  12 U.S.C. §§ 5491.

     15.     Title X established CFPB as a new "Executive Agency" that is an "independent bureau" "established in the Federal Reserve System."  12 U.S.C. § 5491(a).

     16.     The Director of CFPB must be appointed by the President. 12 U.S.C. § 5491(b)(2).

17.     The Director of CFPB receives a five-year term in office and may be removed by the President for "inefficiency, neglect of duty, or malfeasance in office."  12 U.S.C. § 5491(b)(2) and (c).

18.     The Director of CFPB is authorized to appoint his own deputy. 12 U.S.C. § 5491(b)(5).

**B.     Title X Eliminates Congressional Oversight of CFPB Because There Is No Power of the Purse**

19.     The Dodd-Frank Act authorizes CFPB to fund itself by unilaterally claiming funds from the Federal Reserve Board.  12 U.S.C. § 5497(a)(1).

20.     The Dodd-Frank Act authorizes CFPB to claim an increasing percentage of the Federal Reserve System's 2009 operating expenses, beginning in fiscal year 2011 at up to 10 percent of those expenses, and reaching up to 12 percent in fiscal year 2013 and thereafter, adjusted for inflation.  12 U.S.C. § 5497(a)(2)(A).

21.     This structure will permit CFPB's Director to unilaterally requisition up to $597,600,000 in 2013, and thereafter, adjusted for inflation.  *See* Consumer Financial Protection Bureau, Fiscal Year 2013 Congressional Budget Justification, at 7 (available at http://files.consumerfinance.gov/f/2012/02/budget-justification.pdf) (last visited Aug. 2, 2013).

22.     CFPB's automatic budget authority is nearly double the FTC's budget request to Congress for fiscal year 2013.  *See* Federal Trade Commission, Fiscal Year 2013 Congressional Budget Justification (requesting $300,000,000) (available at http://www.ftc.gov/ftc/oed/fmo/2013_CBJ.pdf) (last visited Aug. 2, 2013).

23.     The Dodd-Frank Act prohibits the House and Senate Appropriations Committees from reviewing CFPB's self-funded budget.  12 U.S.C. § 5497(a)(2)(C) ("Notwithstanding any other provision in this title, the funds derived from the Federal Reserve System pursuant to this

subsection shall not be subject to review by the Committees on Appropriations of the House of Representatives and the Senate.").

### C. Title X Limits Judicial Oversight of CFPB by Limiting Judicial Review of CFPB's Interpretation of Consumer Financial Laws

24.     Section 1022(b)(4)(B) of the Dodd-Frank Act requires courts to grant the same deference to CFPB's interpretation of federal consumer financial laws that they would "if the Bureau were the only agency authorized to apply, enforce, interpret, or administer the provisions of such Federal consumer financial law."  12 U.S.C. § 5512(b)(4)(B).

### D. Title X Delegates Broad Authority and Discretion to CFPB

25.     The Dodd-Frank Act established CFPB to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws."  12 U.S.C. § 5491(a).

26.     CFPB's power includes the ability to promulgate rules "necessary or appropriate to enable [CFPB] to administer and carry out the purposes and objectives of the Federal Consumer financial laws, and to prevent evasions thereof."  12 U.S.C. § 5512(b)(1).

27.     CFPB's regulations can be overturned by the Financial Stability Oversight Council ("FSOC") only if "the regulation or provision would put the safety and soundness of the United States banking system or the stability of the financial system of the United States at risk."  12 U.S.C. § 5513(a).

28.     CFPB's regulations can be overturned by FSOC only if two thirds of FSOC so vote.  12 U.S.C. § 5513(c)(3)(A).

29.     Congress established FSOC through Title I of the Dodd-Frank Act.  12 U.S.C. § 5321(a).

30.     FSOC has ten members. 12 U.S.C. § 5321(b).

6

31.     One of the members of FSOC is the Director of CFPB.  12 U.S.C. §
5321(b)(1)(D).

32.     Thus, seven of the remaining nine members of FSOC would have to vote to
overturn any CFPB regulation.  12 U.S.C. § 5513(c)(3)(A).

33.     This FSOC oversight applies to CFPB regulations, not enforcement activity.  12
U.S.C. § 5513.

34.     The "Federal consumer financial laws" that CFPB is authorized to regulate
include:  (1) the Alternative Mortgage Transaction Parity Act, of 1982, 12 U.S.C. § 3801; (2) the
Consumer Leasing Act of 1976, 15 U.S.C. § 1667; (3) the Electronic Funds Transfer Act, 15
U.S.C. § 1693 (except with respect to section 920); (4) the Equal Credit Opportunity Act, 15
U.S.C. § 1691, (5) the Fair Credit Billing Act, 15 U.S.C. § 1666; (6) the Fair Credit Report Act,
15 U.S.C. § 1681 (except with respect to sections 615(e) and 628); (7) the Home Owners
Protection Act of 1998, 12 U.S.C. § 4901; (8) the Fair Debt Collections Practices Act, 15 U.S.C.
§ 1692; (9) subsections (b) through (f) of section 43 of the Federal Deposit Insurance Act, 12
U.S.C. § 1831t(c)-(f); (10) sections 502 through 509 of the Gramm-Leach-Bliley Act, 15 U.S.C.
§ 6802-6809 (except section 505 as it applies to section 501(b)); (11) the Home Mortgage
Disclosure Act of 1975, 12 U.S.C. § 2801; (12) the Homeownership and Equity Protection Act
of 1994, 15 U.S.C. § 1601; (13) the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §
2601; (14) the S.A.F.E. Mortgage Licensing Act of 2008, 12 U.S.C. § 5101; (15) the Truth in
Lending Act, 15 U.S.C. § 1601; (16) the Truth in Savings Act, 12 U.S.C. § 4301; (17) section
626 of the Omnibus Appropriations Act, 2009 (Public Law 111-8); and (18) the Interstate Land
Sales Full Disclosure Act, 15 U.S.C. § 1701.  12 U.S.C. § 5481(12)-(14).

35.     The Dodd-Frank Act transferred to CFPB authority from seven different agencies. *See* 12 U.S.C. § 5581(a)(2)(A) ("Board of Governors (and any Federal reserve bank  . . ., the Federal Deposit Insurance Corporation, the Federal Trade Commission, the National Credit Union Administration, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, and the Department of Housing and Urban Development").

36.     In addition to enforcing other laws, Section 1031(a) of the Dodd-Frank Act empowers CFPB to take any of several enumerated actions, including direct enforcement action, to prevent a covered person from engaging in "unfair," "deceptive," or "abusive act[s] or practice[s]" ("UDAAP" authority).  12 U.S.C. § 5531(a).

37.     The Dodd-Frank Act authorizes CFPB to prescribe rules identifying such practices under Federal law.  12 U.S.C. § 5531(b).

38.     Section 1031(d) leaves the term "abusive" to be defined by CFPB, subject only to the limitations that the act or practice "(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; (2) takes unreasonable advantage of (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d).

39.     During a January 24, 2012 hearing before a subcommittee of the U.S. House Committee on Oversight and Government Reform, Director Cordray stated that the Act's use of the term "abusive" is "a little bit of a puzzle because it is a new term"; CFPB has "been looking at it, trying to understand it, and we have determined that that is going to have to be a fact and

8

circumstances issue; it is not something we are likely to be able to define in the abstract.

Probably not useful to try to define a term like that in the abstract; we are going to have to see

what kind of situations may arise where that would seem to fit the bill under the prongs." *How*

*Will the CFPB Function Under Richard Cordray*, *Hearing Before the Subcomm. on TARP,*

*Financial Services, and Bailouts of Public and Private Programs*, 112th Cong., 112-107, at 69

(2012).

40.     CFPB has discretion under Section 1022(b)(3) to exempt any class of covered

person, service providers, or consumer financial products or services from the scope of any rule

promulgated under Title X.  12 U.S.C. § 5512(b)(3).

41.     CFPB is empowered to engage in investigations, issue subpoenas, civil

investigative demands, and commence judicial proceedings.  12 U.S.C. § 5562.

42.     CFPB is empowered to conduct hearings and adjudicative proceedings to ensure

or enforce compliance with the Dodd-Frank Act, any rules promulgated thereunder, or any other

Federal law that CFPB is authorized to enforce.  12 U.S.C. § 5563.

43.     CFPB is empowered to commence a civil action against any person whom it

deems to have violated a Federal consumer financial law, and to seek all legal and equitable

relief.  12 U.S.C. § 5564.

**E.      CFPB Asserts Power to Regulate Lawyers Practicing Law Despite a
         Statutory Exception for Lawyers**

44.     Section 1027(e) of the Dodd-Frank Act contains an exception from the authority

of CFPB for attorneys engaged in the practice of law.  12 U.S.C. § 5517(e).

45.     Section 1027(e) states, under "exclusion for the practice of law":

>      Except as provided under paragraph (2), the Bureau may not
>      exercise any supervisory or enforcement authority with respect to
>      an activity engaged in by an attorney as part of the practice of law
>      under the laws of a State in which the attorney is licensed to

<div align="center">9</div>

> practice law. . . . Paragraph (1) shall not be construed so as to limit the exercise by the Bureau of any supervisory, enforcement, or other authority regarding the offering or provision of a consumer financial product or service described in any subparagraph of section 5481(5) of this title (A) that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship; or (B) that is otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service. . . .  Paragraph (1) shall not be construed so as to limit the authority of the Bureau with respect to any attorney, to the extent such attorney is otherwise subject to any of the enumerated consumer laws or authorities transferred under subtitle F or H.

12 U.S.C. § 5517(e).

46.     However, Sections 1061 to 1067 of the Dodd-Frank Act give CFPB the authority to enforce certain business practices transferred to it by other administrative agencies. 12 U.S.C. §§ 5581-5587.

47.     On August 10, 2010, the Federal Trade Commission ("FTC"), in exercising its rulemaking authority amended the TSR to extend its reach to "debt relief services."  The amendments of the TSR have been codified as 16 C.F.R. § 310 *et seq*.  Telemarketing Sales Rule, 75 Fed. Reg. 48458 (Aug. 10, 2010).

48.     The FTC explained that the purpose of the amendments was to "protect consumers from deceptive or abusive practices in the telemarketing of debt relief service." *Id.*

49.     The FTC amended the TSR to accomplish the following:

> define debt relief services, prohibit debt relief providers from collecting fees until after services have been provided, require specific disclosures of material information about offered debt relief services, prohibit specific misrepresentations about material aspects of debt relief services, and extend the TSR's coverage to include inbound calls made to debt relief companies in response to general media advertisements.

*Id.*

50. Under the amended TSR, the term "debt relief services" was defined to include "any program or service represented, directly or by implication to negotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecure creditor or debt collector."  16 C.F.R. § 310.2(m).

51. The FTC explained that "an exemption from the amended rule for attorneys engaged in the telemarketing of debt relief services is not warranted."  Telemarketing Sales Rule, 75 Fed. Reg. at 48468.

52. The FTC based its findings on the following:

53. First, the FTC assumed that attorneys "who provide bona fide legal services," do not engage in "interstate telephonic communications in order to solicit potential clients to purchase debt relief services."  *Id.*

54. Second, the FTC assumed that attorneys generally meet their prospective clients in person before agreeing to represent them.  *Id.*

55. Third, the FTC assumed that "attorneys acting in compliance with state bar rules and providing bona fide legal services already fall outside of the TSR's coverage in most instances."  *Id.*

56. Fourth, the FTC assumed that attorneys, and "those partnering with attorneys, who principally rely on telemarketing to obtain debt relief service clients . . . engaged in the same types of deceptive and abusive practices as those committed by non-attorneys."  *Id.*

57.     Fifth, the FTC stated that the scope of the TSR and several other statutes and FTC rules designed to curb deception, abuse, and fraud also did not exempt attorneys from their regulations. *Id.* at 48469.

58.     On July 21, 2011, the Federal Trade Commission ("FTC") transferred to CFPB its authority to regulate "debt relief services" under the TSR.  Designated Transfer Date, 75 Fed. Reg. 57252, 57253 (Sept. 20, 2010).

## III.     APPOINTMENT AND CONFIRMATION OF RICHARD CORDRAY AS DIRECTOR

59.     On January 4, 2012, President Obama appointed Richard Cordray as a "recess appointment."  Helene Cooper & Jennifer Steinhauer, *Bucking Senate, Obama Appoints Consumer Chief*, N.Y. TIMES, Jan. 4, 2012 (available at http://www.nytimes.com/2012/01/05/us/politics/richard-cordray-named-consumer-chief-in-recess-appointment.html?pagewanted=all&_r=0) (last visited Aug. 5, 2013).

60.     The legitimacy of Mr. Cordray's appointment was called into question by *Noel Canning v. NLRB*, 705 F.3d 490, 514 (D.C. Cir. Jan. 25, 2013), *cert. granted*, 133 S. Ct. 2861 (Jun. 24, 2013) (holding constitutionally infirm other appointments the President made on January 4, 2012 to NLRB because the Senate was not in recess).

61.     On July 16, 2013, the Senate confirmed Mr. Cordray's appointment.  United States Senate Periodical Press Gallery, Senate Floor Log (available at http://www.senate.gov/galleries/pdcl/) (last visited Aug. 5, 2013).

## IV.     CFPB'S INVESTIGATION OF MORGAN DREXEN AND THREAT OF IMMINENT LITIGATION TO PUT MORGAN DREXEN OUT OF BUSINESS

62.     Morgan Drexen is in the business of licensing its proprietary software to law firms and providing these firms with live paraprofessional and support services.  Declaration of Walter Ledda [Docket No. 3-2] ("Ledda Decl.") ¶ 2.

63.     Specifically, Morgan Drexen provides non-attorney paralegal support services to attorneys in the areas of debt resolution, bankruptcy, personal injury, mass tort litigation, and tax preparation.  Ledda Decl. ¶ 3.

64.     On March 13, 2012, CFPB issued a Civil Investigative Demand ("CID") to Morgan Drexen.  Declaration of Randal M. Shaheen [Docket No. 3-5] ("Shaheen Decl.") at Ex. 1.

65.     The CID stated the "[a]ction [r]equired" for Morgan Drexen was to "[p]roduce [d]ocuments and/or [t]angible [t]hings" and to "[p]rovide [w]ritten [r]eports and/or [a]nswers to [q]uestions" by April 13, 2012.   Shaheen Decl. Ex. 1.

66.     The CID stated:  "[t]he delivery of this demand to you by any method prescribed by Section 1052 of the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5562, is legal service and may subject you to a penalty imposed by law for failure to comply."  Shaheen Decl. Ex. 1.

67.     Section IIB of the instructions accompanying the CID stated that "[y]ou must contact Wendy J. Weinberg . . . to schedule a meeting . . . to be held within 10 calendar days after receipt of this CID . . . ."  Shaheen Decl. Ex. 1.

68.     Instruction G of the instructions accompanying the CID stated that any petition to modify the demand "must be filed . . . within twenty calendar days after service of the CID . . ."  Shaheen Decl. Ex. 1.

69.     The information requested included communications between Morgan Drexen and Associated Attorneys concerning attorney clients, and various personal financial data (including written notes memorializing communications with clients).  Shaheen Decl. Ex. 1 (Request Nos. 10 and 21).

13

70.     Morgan Drexen responded to the CID on April 13, 2012.  Shaheen Decl. ¶ 6.

71.     Morgan Drexen continued to respond to the CID and engaged in a dialogue concerning compliance.  *See generally* Shaheen Decl. Exs. 1-35.

72.     CFPB followed up on Morgan Drexen's responses with language requiring further production.  *See* Shaheen Decl. Ex. 5.

73.     On April 24, 2012, CFPB wrote:  "In light of Morgan Drexen's unacceptable failure to provide the materials described above, it is critical that you produce them immediately and in any event by close of business Friday, April 27, 2012."  Shaheen Decl. Ex. 5 (p. 4).

74.     Over the course of the investigation, Morgan Drexen produced over seventeen thousand pages of documents to CFPB.  Shaheen Decl. Ex. 26.

75.     Over the course of the investigation, CFPB issued two more CIDs to Morgan Drexen, this time for oral testimony.  Shaheen Decl. ¶¶ 34-36.

76.     Over the course of the investigation, CFPB requested information concerning the amount of any given "engagement fee under the bankruptcy fee agreement" and any "bankruptcy filing fee" for attorneys.  Shaheen Decl. Ex. 34 (p. 2).

77.     Over the course of the investigation, CFPB deposed Jeffrey Katz, David Walker, Laura Wiegman, and Walter Ledda, all from Morgan Drexen.  Shaheen Decl. ¶¶ 35, 37.

78.     Morgan Drexen has "diverted substantial attention and resources, in terms of paying attorney's fees, as well as the company time necessary to provide officers for depositions, collect and review documents, and otherwise respond to CFPB's demands."  Declaration of Walter Ledda [Docket No. 3-2] ("Ledda Decl.") ¶ 14(a).

79.     The investigation has also significantly increased Morgan Drexen's costs with respect to accessing credit.  Ledda Decl. ¶ 14(b).

14

80.     For example, CFPB sent a CID to Morgan Drexen's banking partners, which led to the company's losing its credit facilities.  Ledda Decl. ¶ 14(b).

81.     CFPB also sent a CID to US Capital which has impacted Morgan Drexen's ability to obtain reasonable financing.  Ledda Decl. ¶ 14(b).

82.     Morgan Drexen now pays 22% interest where, before the CID, Morgan Drexen was able to obtain financing at 4.5%.  Ledda Decl. ¶ 14(b).

83.     CFPB also demanded documents directly from certain of Morgan Drexen's attorney business partners, such as Howard Law, P.C.  Ledda Decl. ¶ 14(d); Shaheen Decl. Exs. 27-28.

84.     CFPB also demanded documents directly from Kovel and Fuller, which partners with Morgan Drexen to provide marketing services to the attorneys supported by Morgan Drexen.  Ledda Decl. ¶ 14(e).

85.     CFPB also demanded that Morgan Drexen produce documents that are in the files of Morgan Drexen's attorney business partners.  Ledda Decl. ¶ 7; Shaheen Decl. Ex. 1 (Request Nos. 10 and 21).

86.     CFPB's demands for attorney client files have placed Morgan Drexen in a difficult position because Morgan Drexen's attorney business partners have not authorized disclosure.  *See* Declaration of Kimberly Pisinski [Docket No. 3-3] ("Pisinski Decl.") ¶ 5; Shaheen Decl. Exs. 27-28.

87.     CFPB's investigation has been stigmatizing to Morgan Drexen.  Ledda Decl. ¶ 14(f).

88.     CFPB has threatened to send subpoenas to all of Morgan Drexen's attorney customers.  Ledda Decl. ¶ 14(g).

15

89.     CFPB informed counsel to Morgan Drexen that the attorneys supported by Morgan Drexen are in violation of the Telemarketing Sales Rule, 16 C.F.R. §§ 310.1 *et seq.*, because the attorneys charge their clients hourly fees for the preparation of bankruptcy pleadings. Shaheen Decl. ¶ 43.

90.     Violations of the Telemarketing Sales Rule are punishable by a permanent or temporary injunction, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and monetary relief, including but not limited to significant civil money penalties.  *See* 15 U.S.C. § 6102(c) (stating that violations of the rule shall be treated as a violation of section 1031 of the Consumer Financial Protection Act, subjecting offenders to the penalties available under 12 U.S.C. § 5565).

91.     CFPB has initiated suits against other entities accused of violating the Telemarketing Sales Rule, seeking permanent injunctions, restitution, disgorgement, civil money penalties, and attorneys' fees.  *See Consumer Financial Protection Bureau v. Mission Settlement Agency*, No. 13-CV-3064, 2013 WL 1891278 (S.D.N.Y. May 7, 2013); *Consumer Financial Protection Bureau v. Jalan*, No. SACV12-02088, 2012 WL 6584110 (C.D. Cal. Dec. 3, 2012).

92.     On April 22, 2013, CFPB wrote counsel to Morgan Drexen and stated that CFPB was proceeding:

> in accordance with [CFPB]'s discretionary Notice and Opportunity to Respond and Advise (NORA) process.  During our telephone conversation, I notified you that [CFPB]'s Office of Enforcement is considering recommending that the Bureau take legal action against your clients Morgan Drexen, Inc. and Walter Ledda, and I offered your clients the opportunity to make NORA submissions. As we discussed, the staff expects to allege that your clients violated Sections 1031 and 1036 of the Consumer Financial Protection Act, 12 U.S.C. § 5536 and the Telemarketing Sales Rule, 16 CFR § 310.  In connection with the contemplated action, the staff may seek injunctive and monetary relief against your clients.

16

Shaheen Decl. Ex. 32.

93.    CFPB informed counsel to Morgan Drexen that it would not accept any resolution

of its concerns short of Morgan Drexen refusing to support attorneys engaged by clients for both

bankruptcy counseling and debt settlement.  Shaheen Decl. ¶ 43.

94.    These "engagements comprise a large percentage of Morgan Drexen's total

business, and any requirement that Morgan Drexen stop providing these services to attorneys

would threaten the viability of Morgan Drexen's business."  Ledda Decl. ¶ 13.

## V.    PISINSKI'S RIGHT TO PRACTICE LAW WITHOUT CFPB REGULATION AND INTERFERENCE

95.    Pisinski is a lawyer practicing law in Connecticut.  Pisinski Decl. ¶ 1.

96.    Pisinski has spent a large portion of her career doing volunteer work serving

underprivileged and at-risk women and children, including those in financial distress.  *See*

Pisinski Biography (Pisinski worked as a legislative advocate in both New York and South

Carolina for various women's and children's issues and assisted in South Carolina with starting

up one of the first homeless daycare centers in the country.  [Pisinski] is an active member of the

Canton Juvenile Review Board, the Council for Exceptional Children, and Learning Disability

Association, among others) (available at http://www.zoominfo.com/p/Kimberly-

Pisinski/456795667) (last visited Aug. 5, 2013).

97.    Pisinski contracts with Morgan Drexen to provide non-attorney/paralegal services

that support her law practice.  Pisinski Decl. ¶ 3; Ledda Decl. ¶ 4.

98.    Ms. Pisinski "depend[s] on Morgan Drexen to assist [her] in providing [her]

clients with high quality and relatively low cost legal services."  Pisinski Decl. ¶ 10.

99.    CFPB's investigation of Morgan Drexen has been disruptive to Ms. Pisinski's law

practice and to her clients.  Pisinski Decl. ¶ 4.

100.    Ms. Pisinski offers her clients bankruptcy services.  Pisinski Decl. ¶ 2.

101.    As part of any bankruptcy engagement, clients may elect for Ms. Pisinski to first amicably resolve their debts with creditors prior to filing the bankruptcy petition.  Pisinski Decl. ¶ 2.

102.    Ms. Pisinski's clients provide her with their "most private financial information" that she receives as part of the confidential attorney-client relationship.  Pisinski Decl. ¶ 5.

103.    Clients have verbalized to Ms. Pisinski that they "worry about the government accessing their information and if they are not completely sure of the security of their information then they will not give [Ms. Pisinski] the information that [she] need[s] to properly counsel them."  Pisinski Decl. ¶ 7.

## VI.    CFPB HAS GREATER POWER AND LESS CHECKS AND BALANCES THAN ANY COMPARABLE AGENCY

104.    Congress has used a multimember commission structure for independent regulatory agencies for more than 125 years since the creation of the Interstate Commerce Commission ("ICC"). The ICC's five commissioners were appointed by the President with the consent of the Senate:  "An uneven number of commissioners (5) appointed to staggered terms of a fixed period extending beyond the term of the President (6 years)."  Act of Feb. 4, 1887, ch. 104, § 11, 24 Stat. 379, 383.

105.    More than a century after Congress created the ICC, Congress created the Federal Election Commission ("FEC").Congress provided for a multimember commission for FEC: "There is established a commission to be known as the Federal Election Commission. The Commission is composed of the Secretary of the Senate and the Clerk of the House of Representatives or their designees, ex officio and without the right to vote, and 6 members appointed by the President, by and with the advice and consent of the Senate. No more than 3

18

members of the Commission appointed under this paragraph may be affiliated with the same

political party."  2 U.S.C. § 437c-(a)(1).

106.    In the intervening years, Congress used the multimember commission structure

for other agencies, including the FTC (15 U.S.C. § 41); SEC (15 U.S.C. § 78d(a)); Commodity

Futures Trading Commission (7 U.S.C.A. § 2); Federal Communications Commission (47 U.S.C.

§ 154); FERC (42 U.S.C. § 7171(b)(a)(5); and the Consumer Products Safety Commission

("CPSC") (15 U.S.C. § 2053(a)).

107.    The Federal Reserve is overseen by a seven member board.  12 U.S.C. § 241.

108.    Each new President has the opportunity to appoint at least two board members.

*See* 12 U.S.C. § 242 (providing for fourteen-year staggered terms).

109.    The Office of the Comptroller of the Currency ("OCC") has a head (the

Comptroller) who serves a five year term.  12 U.S.C. §§ 1-2.

110.    The Comptroller can be removed by the President at will, upon reasons to be

communicated by him to the Senate.  12 U.S.C. § 2 ("The Comptroller of the Currency shall be

appointed by the President . . . and shall hold his office for a term of five years unless sooner

removed by the President, upon reasons to be communicated by him to the Senate").

111.    The now defunct Office of Thrift Supervision ("OTS") was headed by a single

director who served a five year term.  12 C.F.R. § 500.10.

112.    The Office of Legal Counsel takes the position that the OTS Director serves at the

President's pleasure.  *See* Post-Employment Restriction of 12 U.S.C. § 1812(e), 2001 WL

35911952, at *4 (O.L.C. Sept. 4, 2001) ("We do not endorse the view that tenure protection for

the Director should be inferred under the statute here") (available at

http://www.justice.gov/olc/2001/otspost2.pdf) (last visited Aug. 5, 2013).

19

113.    The Federal Deposit Insurance Corporation is run by a five person Board of Directors.  12 U.S.C. § 1812(a)(1).

114.    No more than three FDIC Directors may be members of the same political party. 12 U.S.C. § 1812(a)(2).

115.    The FTC is governed by a five person Commission that serves staggered seven year terms.  15 U.S.C. § 41.

116.    The President has the power to designate the Chairperson from among the five FTC Commissioners.  *Id.*

117.     The FTC is subject to the congressional appropriations process.  15 U.S.C. § 57c.

118.    The Department of Housing and Urban Development is a cabinet-level agency. 42 U.S.C. § 3532(a).

119.    The HUD is headed by a Secretary who serves without restrictions on the President's power to remove.  *Id.*

120.    The HUD is subject to the congressional appropriations process.  42 U.S.C. § 3535(s).

121.    The SEC is composed of five Commissioners.  15 U.S.C. § 78d(a).

122.    The SEC commissioners are appointed by the President with the advice and consent of the Senate.  *Id.*

123.    No more than three Commissioners may be members of the same political party. *Id.*

124.    The SEC is subject to the congressional appropriations process.  15 U.S.C. § 78kk.

125.    The CPSC is composed of "five Commissioners who shall be appointed by the President, by and with the advice and consent of the Senate."  15 U.S.C. § 2053(a).

126.    The CPSC Commissioners serve seven-year terms, during which time they may only be removed for cause.  15 U.S.C. § 2053(a).

127.    The Office of Legal Counsel takes the position that the President has the authority to pick the CPSC Chairman from among the Commissioners, and may replace the Chairman at will.  *See* U.S. Department of Justice Office of Legal Counsel Memorandum Opinion, President's Authority to Remove the Chairman of the Consumer Product Safety Commission (July 31, 2001) ("We conclude that the President has the authority to remove the Chairman of the CPSC for any reason.") (available at http://www.justice.gov/olc/cpscchairmanremoval.htm) (last visited Aug. 5, 2013).

128.    CPSC is subject to the congressional appropriations process.  15 U.S.C. § 2081.

129.    The Environmental Protection Agency ("EPA") is headed by an Administrator. Reorganization Plan No. 3 of 1970, 84 Stat. 2086 (1970); 40 C.F.R. § 1.23.

130.    There are no restrictions on the President's ability to remove the Administrator. 40 C.F.R. § 1.23.

131.    EPA is subject to the congressional appropriations process.  Cong. Research Service 7-5700, Environmental Protection Agency (EPA): Appropriations for FYI2013 (available at http://www.fas.org/sgp/crs/misc/R42520.pdf) (last visited Aug. 5, 013).

**VII.    THE STRUCTURE OF CFPB, ITS ACTIONS, AND WHETHER IT VIOLATES THE CONSTITUTIONES SEPARATION OF POWERS HAVE BEEN THE SUBJECT OF SIGNIFICANT DEBATE AMONG MEMBERS OF CONGRESS, ADVOCACY GROUPS, SCHOLARS, AND REGULATED ENTITIES**

132.    Even after enactment, members of Congress continue to call for a restructuring of CFPB that would require a multimember commission structure for CFPB.  *See* News Release,

21

Senator Jerry Moran, Sen. Moran Introduces Bill to Reform Consumer Financial Protection
Bureau (Apr. 6, 2011) (stating "The Responsible Consumer Financial Protection Regulations Act
of 2011, S. 737, would replace the single CFPB Director with a Senate-confirmed five-person
commission – similar to the leadership structure of the Securities and Exchange Commission
(SEC), Commodity Futures Trade Commission (CFTC) and Federal Trade Commission (FTC)")
(available at http://www.moran.senate.gov/public/index.cfm/news-releases?ID=18419a98-8ee4-
4b84-80cd-52cf6043368d)  (last visited Aug. 5, 2013).

133.    In April 2013, Professor Todd J. Zywicki published an article in the George
Washington Law Review explaining that CFPB's structure makes it "one of the most powerful
and publicly unaccountable agencies in American history."  Todd J. Zywicki, *The Consumer
Financial Protection Bureau: Savior or Menace?* 81 GEO. WASH. L. REV. 856, 875 (Apr. 2013).

134.    Professor Neomi Rao goes further and writes that the Supreme Court's decision in
*Free Enterprise* Fund suggests that CFPB is unconstitutional because of the "removal restrictions
that insulate the director from presidential oversight." Neomi Rao, *Removal: Necessary and
Sufficient for Presidential Control*, 65 ALABAMA L. REV -- (2014) (forthcoming).

135.    On June 21, 2012, two regulated entities and the Competitive Enterprise Institute
filed a constitutional challenge against the Dodd-Frank Act (including Title X) in this Court.
Complaint at ¶ 1, *State Nat'l Bank of Big Spring v. Geithner*, No. 1:12-cv-01032-ESH (D.D.C.
June 21, 2012).

136.    The plaintiffs in that case were represented by C. Boyden Gray and Adam J.
White of Boyden Gray & Associates P.L.L.C., Gregory Jacob of O'Melveny & Myers LLP, and
Sam Kazman and Hans Bader of the Competitive Enterprise Institute.  *Id.*

137.    Judge Huvelle declined to reach the merits of CFPB's constitutionality and dismissed the case for lack of standing. *State Nat'l Bank of Big Spring v. Lew*, No. 12-1032(ESH), 2013 WL 3945027 (D.D. C. Aug. 1, 2013).

## VIII.    CFPB'S UNACCOUNTABILTY IS EVIDENCED BY ITS ACTIONS IN COLLECTING PERSONAL DATA FROM U.S. CITIZENS

138.    On April 23, 2013, the Senate Committee on Banking, Housing, and Urban Affairs held a hearing on the Semi-Annual Agenda of CFPB. *The Consumer Financial Protection Bureau's Semi-Annual Report to Congress*, *Hearing Before the S. Committee on Banking, Housing, and Urban Affairs*, 113th Cong. (Apr. 23, 2013) (available at http://www.banking.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearing_ID=7 65a704e-a287-4f96-910e-5866ac0fc352) (last visited Aug. 2, 2013).

139.    At the April 23, 2013 hearing, United States Senator Mike Crapo (R-Idaho) raised concerns regarding CFPB's data collection efforts. *Id.* (available at http://www.banking.senate.gov/public/index.cfm?FuseAction=Newsroom.MinorityNews&Conte ntRecord_id=5d06aa95-ba2d-14f0-5491-53fe83bd0be7&Region_id=&Issue_id=) (last visited Aug. 5, 2013).

140.    On May 16, 2013, Senator Crapo sent a letter to CFPB Director Richard Cordray requesting that CFPB furnish information concerning its "legal authority to collect consumer lending and credit data for the agency's Big Data initiative." Letter from Senator Mike Crapo to Richard Cordray, Director, Consumer Financial Protection Bureau (May 16, 2013) (available at http://www.crapo.senate.gov/issues/banking/documents/letter.pdf) (last visited Aug. 2, 2013).

141.    On May 23, 2013, Director Cordray sent a letter to Senator Crapo responding to Senator Crapo's May 16, 2013 letter and disputing that CFPB had a "Big Data initiative." Letter from Richard Cordray, Director, Consumer Financial Protection Bureau to Senator Mike Crapo

(May 23, 2013) at p. 2 (available at
http://www.cfpbmonitor.com/files/2013/06/CFPBdatacollection-esponse.pdf) (last visited Aug.
2, 2013).

142.    On July 2, 2013, Senator Crapo wrote to the Comptroller General of GAO,
requesting an investigation into CFPB's data collection practices.  Letter from Senator Mike
Crapo to Gene Dodaro, Comptroller General, U.S. Government Accountability Office (July 2,
2013) (available at
http://www.crapo.senate.gov/issues/banking/documents/CrapoGAORequestre.CFPBData.pdf)
(last visited Aug. 5, 2013).

143.    On July 12, 2013, GAO accepted Senator Crapo's request as within the scope of
its authority and stated that it would begin the work (*i.e.*, investigate CFPB's data collection
practices) "shortly."  Letter from Katherine Siggerud, Managing Director for Congressional
Relations, U.S. Government Accountability Office to Senator Mike Crapo (July 12, 2013)
(available at http://www.cfpbmonitor.com/files/2013/07/GAOLetter.pdf) (last visited Aug. 5,
2013).

144.    Judicial Watch President Tom Fitton stated that CFPB's actions were "a more
direct assault on American citizens' reasonable [expectation] of privacy than the gathering of
general phone records."  Bob Unruh, *Now Obama Watching American's Credit Cards*,
WND.com (quoting Tom Fitton) (available at http://www.wnd.com/2013/06/now-obama-
watching-americans-credit-cards/) (last visited July 22, 2013).

145.    Mr. Fitton has also stated that CFPB is "an out-of-control government agency that
threatens the fundamental privacy and financial security of Americans.  This is every bit as
serious as the controversy over the NSA's activities." *Id.*

146.    David T. Hirschmann, the President and Chief Executive Officer of the U.S. Chamber of Commerce's Center for Capital Markets, wrote in a letter to Director Cordray that CFPB "should not misuse the supervision process to demand huge amounts of data" and expressed concern that CFBP's requests are otherwise improper.  Letter from David T. Hirschmann, President and Chief Executive Officer of the U.S. Chamber of Commerce's Center for Capital Markets, to Richard Cordray, Director, Consumer Financial Protection Bureau (Feb. 14, 2013) (available at http://www.centerforcapitalmarkets.com/wp-content/uploads/2010/04/2013-2-14-CFPB-supervision-letter.pdf) (last visited Aug. 2, 2013).

147.    John Berlau, a scholar of the Competitive Enterprise Institute, has called CFPB's data collection activities "an NSA-style surveillance program without any serious justification, such as terrorism."  Brendan Bordelon, *Consumer Financial Protection Bureau compared to NSA*, THE DAILY CALLER, June 26, 2013 (quoting John Berlau) (available at http://dailycaller.com/2013/06/26/consumer-financial-protection-bureau-compared-to-nsa/) (last visited Aug. 5, 2013).

148.    Randy E. Barnett, a professor of constitutional law at Georgetown University, wrote in the Wall Street Journal that NSA and CFPB's activities "dangerously violate[] the most fundamental principles of our republican form of government" (the Fourth Amendment's prohibition against unreasonable searches and seizures, and the requirement that no warrants shall issue but upon probable cause).  Randy E. Barnett, Editorial, *The NSA's Surveillance is Unconstitutional*, WALL ST. J., Jul. 11, 2013, at A13.

149.    Mr. Barnett further wrote that:  "[t]he secrecy of these programs makes it impossible to hold elected officials and appointed bureaucrats accountable."  *Id.*

Respectfully submitted,

Dated:  August 7, 2013    _____/s/_____
Randall K. Miller
D.C. Bar No. 460682
Nicholas DePalma
D.C. Bar No. 974664
Venable LLP
8010 Towers Crescent Drive, Suite 300
Tysons Corner, VA 22182
(703) 905-1449
(703) 821-8949 (facsimile)
rkmiller@venable.com
nmdepalma@venable.com

*Randal M. Shaheen
D.C. Bar No. 409292
575 7th Street, N.W.
Washington, D.C. 20004
202.344.4488
202.344.4323
rmshaheen@venable.com
*subject to admission


Counsel for Plaintiffs Kimberly A. Pisinski and
Morgan Drexen, Inc.

26

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MORGAN DREXEN, INC. and
KIMBERLY A. PISINSKI,

    *Plaintiff*,

v.

CONSUMER FINANCIAL
PROTECTION BUREAU,

    *Defendant*.

Civil Action No. 13-01112 (CKK)

**EXPEDITED BRIEFING
SCHEDULE**

**MEMORANDUM OF POINTS
AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

Randall K. Miller
D.C. Bar No.  460682
Nicholas M. DePalma
D.C. Bar No. 974664
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Tysons Corner, VA 22182
Tel: (703) 760-1600
Fax: (703) 821-8949
rkmiller@venable.com
nmdepalma@venable.com

*Randal M. Shaheen
D.C. Bar No. 409292
575 7th Street, N.W.
Washington, D.C. 20004
202.344.4488
202.344.4323
rmshaheen@venable.com
*subject to admission*

*Attorneys for Plaintiffs Morgan Drexen, Inc. and
Kimberly A. Pisinski*

Dated: August 7, 2013

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 3

LEGAL STANDARD ............................................................................................... 3

THE COURT HAS AUTHORITY TO CONSIDER THIS MATTER ......................... 4

    A.  Plaintiffs Have Standing ............................................................................. 4

        1.  Morgan Drexen Is Subject to Enforcement ...................................... 4

        2.  Morgan Drexen Faces an Immediate Threat of Further Injury ....................... 6

        3.  Morgan Drexen Suffered Concrete and Presently-Existing Harm When CFPB Sent CIDs to Morgan Drexen's Business Partners ............................. 7

        4.  CFPB Demanded Privileged Information .................................................. 7

    B.  Plaintiffs' Claims Are Ripe ......................................................................... 8

CFPB'S STRUCTURE IS UNCONSTITUTIONAL .................................................. 10

    A.  Applicable Legal Principles ........................................................................ 10

    B.  CFPB Is Unconstitutional Whether It Is an Executive or Independent Agency .............. 13

    C.  CFPB Does Not Have Constitutionally-Required Political Accountability ................... 15

    D.  CFPB Does Not Have a Constitutionally-Required Multimember Commission ............ 17

    E.  CFPB's Lack of Structural Protections Is Unconstitutional In Light of Congress's Broad Delegation of Power ........................................................ 20

    F.  The Dodd-Frank Act Transfers Authority to CFPB From Agencies That Have Constitutionally Compliant Checks and Balances ......................... 21

    G.  CFPB's Unconstitutional Structure Has Harmed Plaintiffs ............................ 26

RELIEF REQUESTED .............................................................................................. 28

CONCLUSION .......................................................................................................... 29

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Bar Ass'n v. F.T.C.*,
   671 F. Supp. 2d 64 (D.D.C. 2009), *vacated as moot*, 636 F.3d 641 (D.C. Cir. 2011) ............27

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...........................................................................................................3

*Andrade v. Lauer*,
   729 F.2d 1475 (D.C. Cir. 1984) .......................................................................................8

*Assure Competitive Transport, Inc.* v. *United States*,
   629 F.2d 467 (7th Cir. 1980) ..........................................................................................18

*Baker v. Carr*,
   369 U.S. 186 (1962)...........................................................................................................4

*Bowsher v. Synar*,
   478 U.S. 714 (1986)................................................................................................8, 10, 12

*Braniff Airways, Inc.* v. *Civil Aeronautics Bd.*,
   379 F.2d 453 (D.C. Cir. 1967) .......................................................................................18

*Buckley v. Valeo*,
   424 U.S. 1 (1976)........................................................................................................10, 12

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...........................................................................................................3

*Clapper v. Amnesty Int'l USA*,
   133 S. Ct. 1138 (2013).......................................................................................................6

*Clinton v. City of New York*,
   524 U.S. 417 (1998).........................................................................................................12

*Clinton v. Jones*,
   520 U.S. 681 (1997).........................................................................................................16

*David B. Lilly Co., v. United States*,
   571 F.2d 546 (Fed. Cl. 1978).....................................................................................18, 19

*Dearth v. Holder*,
   641 F.3d 499 (D.C. Cir. 2011) .........................................................................................6

*Diamond v. Atwood*,
   43 F.3d 1538 (D.C. Cir. 1995) .........................................................................................3

ii

*Edmond v. United States*,
    520 U.S. 651 (1997) ................................................................................11

*Elk Run Coal Co., Inc. v. U.S. Dept. of Labor*,
    804 F. Supp. 2d 8 (D.D.C. 2011) ...........................................................9

*Falcon Trading Group, Ltd.* v. *SEC*,
    102 F.3d 579 (D.C. Cir. 1996) ...............................................................18

*FEC v. NRA Political Victory Fund*,
    6 F.3d 821 (D.C. Cir. 1993) ...................................................................4

*Franchise Tax Bd. of Ca. v. Alcan Aluminum Ltd.*,
    493 U.S. 331 (1990) ................................................................................4

*Free Enter. Fund v. Pub. Co. Acct'ing Oversight Bd.*,
    130 S. Ct. 3138 (2010) ................................................................. passim

*Freytag v. Comm'r*,
    501 U.S. 868 (1991) ................................................................................11

*Gen. Electric Co. v. Environmental Protection Agency*,
    360 F.3d 188 (D.C. Cir. 2004) ...............................................................9

*Greene v. Dalton*,
    164 F.3d 671 (D.C. Cir. 1999) ...............................................................3

*Holcomb v. Powell*,
    433 F.3d 889 (D.C. Cir. 2006) ...............................................................3

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) ........................................................................14, 19

*INS v. Chadha*,
    462 U.S. 919 (1983) ........................................................................11, 12

*Loving v. United States*,
    517 U.S. 748 (1996) ....................................................................2, 3, 10

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ................................................................................4

*Mistretta v. United States*,
    488 U.S. 361 (1989) ....................................................................10, 11, 16

*Morrison v. Olson*,
    487 U.S. 654 (1988) ........................................................................16, 20

*Mountain States Legal Found. v. Glickman*,
   92 F.3d 1228 (D.C. Cir. 1996) ...................................................................4

*Myers v. United States*,
   272 U.S. 52 (1926) ...................................................................................12

*POM Wonderful LLC v. FTC*,
   894 F. Supp. 2d 40 (D.D.C. 2012) ...........................................................9

*Pyramid Lake Paiute Tribe of Indians v. Nevada, Dept. of Wildlife*,
   No. 11-16470, 2013 WL 3889091 (9th Cir. 2013) ..................................7

*Railroad Yardmasters of America* v. *Harris*,
   721 F.2d 1332 (D.C. Cir. 1983) ..............................................................18

*Raytheon Co. v. Ashborn Agencies, Ltd.*,
   372 F.3d 451 (D.C. Cir. 2004) ..................................................................4

*Rio Grande Pipeline Co. v. FERC*,
   178 F.3d 533 (D.C. Cir. 1999) ..................................................................8

*Sackett v. EPA*,
   132 S. Ct. 1367 (2012) ..........................................................................5, 6

*United States v. Richardson*,
   418 U.S. 166 (1974) ...............................................................................17

*Whitman v. American Trucking Associations*,
   531 U.S. 457 (2001) ...................................................................11, 12, 20

**STATUTES**

12 U.S.C. 1462a(a)-(b).............................................................................24

12 U.S.C. § 2 ...........................................................................................23

12 U.S.C. § 4 ...........................................................................................23

12 U.S.C. § 1812(a)(2)..............................................................................24

12 U.S.C. § 1812(e) ..................................................................................23

12 U.S.C. § 5412 ......................................................................................23

12 U.S.C. §§ 5481 *et seq.*.........................................................................1

12 U.S.C. §§ 5491, 5493(a) .......................................................................23

12 U.S.C. § 5491(c)(3)..............................................................................14

iv

12 U.S.C. § 5497(a)(2)(C) ................................................................17

12 U.S.C. § 5512(b)(4)(B) ...............................................................13

12 U.S.C. § 5517(e) .........................................................................27

12 U.S.C. §§ 5581-5587 ...................................................................27

12 U.S.C. § 5581(b)(5) .....................................................................22

15 U.S.C. § 78d(a) ...........................................................................18

12 USC § 1462a(c)(2) .......................................................................23

**OTHER AUTHORITIES**

17 C.F.R. § 200.41 ...........................................................................18

17 C.F.R. § 200.57 ...........................................................................18

16 CFR § 310 .....................................................................................6

76 Fed. Reg. 43570 ..........................................................................22

76 Fed. Reg. 43569 ..........................................................................22

Fed. R. Civ. P. 56(a) ..........................................................................3

U.S. Const. art. 1, § 1 ......................................................................11

U.S. Const., art. I, § 9, cl. 7 .............................................................11

U.S. Const. art. II, § 1 ......................................................................11

U.S. Const. art. II, § 2, cl. 2 .............................................................11

U.S. Const. art. II, § 3 ......................................................................11

## PRELIMINARY STATEMENT

This is a constitutional challenge to Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), 12 U.S.C. §§ 5481 *et seq.*, which created Defendant Consumer Financial Protection Bureau ("CFPB").  Plaintiff Morgan Drexen, Inc. ("Morgan Drexen"), which provides "back office" support for attorneys such as Plaintiff Kimberly Pisinski ("Pisinski"), has been the target of a burdensome CFPB investigation and an imminent litigation threat, where CFPB has demanded the production of documents – including privileged attorney-client communications and confidential personal material held by Morgan Drexen for lawyers like Pisinski.  Plaintiffs challenge the structure of CFPB as violating the Constitution's separation of powers given:  (1) the extraordinary scope of power delegated to CFPB; and (2) the lack of political oversight and necessary checks and balances.

As set forth in Plaintiffs' Statement of Undisputed Material Facts (hereinafter, "SF") the Dodd-Frank Act created CFPB as a super agency with broad discretion – consolidating rulemaking, supervision, and enforcement authority, with market wide coverage, over both banks and nonbanks that provide consumer financial products and services.  Title X transferred enforcement authority from seven different agencies (each with appropriate checks and balances) to CFPB, and empowered CFPB to remedy any practice that it finds to be unfair, deceptive, or abusive (with "abusive" being a "puzzle" and "new term" that cannot be defined according to CFPB's Director, SF ¶ 39).  CFPB has authority over banks, thrift, savings and loans, credit unions, and virtually every company that extends credit to consumers or tries to collect or settle consumer debt.  In a very real sense, CFPB's authority extends into virtually every boardroom and living room in America.

Despite granting CFPB significant power, however, Congress withheld typical oversight, especially the President's power to remove the CFPB Director at-will, a built-in multimember

commission (which has been the hallmark of independent agencies for more than 125 years), and political accountability through the appropriations process. Congress did this after hearing testimony about immunizing CFPB from political influence. SF ¶ 12. But Congress went too far. The Constitution demands accountability for government entities that wield such extraordinary government power to protect against "tyranny." *Loving v. United States*, 517 U.S. 748, 756 (1996).

CFPB's combination of power and insulation from political accountability is unprecedented. Scholars, Members of Congress, the U.S. Chamber of Commerce, and regulated entities have identified and discussed serious constitutional issues emanating from CFPB's structural design (SF ¶¶ 132-37), but no court has passed on these questions. Moreover, the harm that flows from CFPB's unconstitutional structure is not theoretical: Congress confirmed CFPB's first Director weeks ago yet CFPB is already pushing beyond its statutory mandate and seeking to regulate lawyers engaged in the practice of law (SF ¶¶ 62-103), a state function, and aggregating personal financial information (SF ¶ 138-49), without appropriately balancing privacy and other interests. CFPB's actions have triggered a GAO investigation into its data mining practices (SF ¶ 143). For the reasons stated herein, the Court should declare Title X unconstitutional.

## SUMMARY OF PROCEDURAL
## BACKGROUND AND ACCELERATED SCHEDULE

This case was commenced on July 22, 2013 when Plaintiffs filed their Complaint and Motion for Preliminary Injunction. Plaintiffs requested expedited proceedings and submitted declarations demonstrating irreparable harm, including, but not limited to, facts showing that CFPB's investigation and demands were creating significant impairment to Morgan Drexen's and Pisinski's business and reputation, and that CFPB had threated imminent litigation. The Court

2

held telephonic hearings on July 24, 2013 and July 25, 2013 "during which Plaintiffs consented

to withdraw their . . . motion for preliminary injunction and both parties consented to instead

proceed with an expedited briefing on the merits of Plaintiffs' Complaint." [Docket No. 8].  "[I]n

order to administer this civil action in a manner fair to the litigants and consistent with the

parties' interest in completing this litigation in the shortest possible time and at the least possible

cost," the court ordered an "expedited procedure on the merits."  *Id.*  In accordance with the

Court's order, Plaintiffs are filing herewith a Notice of Withdrawal of their Motion for

Preliminary Injunction and substituting this Motion for Summary Judgment.[1]

## ARGUMENT

## LEGAL STANDARD

Summary judgment is warranted when the pleadings and any discovery materials and

declarations demonstrate that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006);

*Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  Facts are "material" if their

establishment "might affect the outcome of the suit under the governing law." *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Although the Court must view the facts and the

inferences from those facts in the light most favorable to the nonmoving party, the party

opposing summary judgment may not rely solely on allegations or conclusory statements.

*Greene v. Dalton,* 164 F.3d 671, 675 (D.C. Cir. 1999).

---

[1] The expedited schedule provides as follows:  "(a) On or before August 7, 2013, Plaintiffs shall file their motion for summary judgment; (b) On or before August 27, 2013, Defendant shall file its opposition to Plaintiffs' motion for summary judgment and cross-motion to dismiss and/or for summary judgment; (c) On or before September 13, 2013, Plaintiffs shall file their reply in further support of their motion for summary judgment and opposition to Defendant's cross-motion; and (d) On or before September 25, 2013, Defendant[] shall file its reply in further support of its cross-motion to dismiss and/or for summary judgment."  [Docket  No. 8].

3

### THE COURT HAS AUTHORITY TO CONSIDER THIS MATTER

#### A. PLAINTIFFS HAVE STANDING

"[T]he gist of the question of standing" is, "at bottom," whether plaintiffs have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness" that "sharpens" the presentation of issues to the Court.  *Baker v. Carr*, 369 U.S. 186, 204 (1962); *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007).  To assure such "adverseness," a plaintiff must demonstrate that "[1] it has suffered a concrete and particularized injury that is either actual or imminent, [2] that the injury is fairly traceable to the defendant, and [3] that it is likely that a favorable decision will redress that injury." *Massachusetts*, 549 U.S. at 517 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Even the "threat of relatively small financial injury [is] sufficient to confer Article III standing."  *Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 454 (D.C. Cir. 2004) (describing holding of *Franchise Tax Bd. of Ca. v. Alcan Aluminum Ltd.*, 493 U.S. 331 (1990)).  For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, the court need not consider the standing of the other plaintiffs to raise the claim."  *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

Here, Plaintiffs have standing for several independent reasons as set forth below.

#### 1. Morgan Drexen Is Subject to Enforcement

Morgan Drexen has standing to challenge the constitutionality of CFPB because it is directly subject to enforcement, "the paradigm of direct governmental authority."  *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 824 (D.C. Cir. 1993)).  In *Free Enter. Fund v. Pub. Co. Acct'ing Oversight Bd.*, 130 S. Ct. 3138 (2010), the Supreme Court held that the petitioners were "entitled to declaratory relief sufficient to ensure that the reporting requirements and auditing standards to which they are subject will be enforced only by a constitutional agency accountable

4

to the Executive." *See Free Enter. Fund*, 130 S. Ct. at 3150-51 (citing *Bowsher v. Synar*, 478

U.S. 714, 727, n.5 (1986)) for the proposition that a separation of powers violation may create a

"here-and-now" injury that can be remedied by a court) (internal quotation marks omitted)).

 Here, CFPB has purported to subject Morgan Drexen to its direct authority, including

through the issuance of Civil Investigative Demands ("CIDs").  SF at ¶¶ 64, 75.  Morgan Drexen

has incurred significant costs in complying with the CIDs, has produced over 17,000 pages of

documents to CFPB (SF ¶ 74) along with four of its officers for depositions (SF ¶ 77), and

incurred significant attorneys' fees.  SF ¶ 78.  Like the petitioners in *Free Enterprise Fund*,

Morgan Drexen is entitled to ensure that the investigation to which it has been subject is

conducted by a constitutional agency, and Morgan Drexen is suffering a "here-and-now" injury

because CFPB violates the Constitution's separation of powers.

 CFPB's counsel has suggested that its CIDs are paper tigers that are not self-enforcing.

*See* July 24, 2013 Hearing Tr., at 5 ("the nature of those demands is that they are not self-

enforcing. So, the defendant -- or the plaintiff, really, doesn't have an obligation to comply with

them under the law"); July 25, 2013 Hrg. Tr. at 6-7 (the CIDs are "not self-enforcing, so if we --

they don't actually have an obligation to do anything until we receive them -- an order from a

District Court to enforce those investigative demands.").  However, in contrast to these

statements, the CIDs use mandatory language, referring to:  "demand"; "[a]ction [r]equired"; "[a]

penalty imposed by law for failure to comply"; and "must."  SF ¶¶ 64-67.  Instruction G to the

CID states that any petition to modify the demand "must be filed . . . within twenty calendar days

after service of the CID . . ." SF ¶ 68.  In *Sackett v. EPA*, 132 S. Ct. 1367 (2012), the

Environmental Protection Agency ("EPA") issued landowners a "compliance order" directing

them to undertake certain actions and provide "access to all records and documentation related to

<div align="center">5</div>

conditions at the Site." *Sackett* at 1371.  The plaintiffs sued for declaratory and injunctive relief. *Id.*  The EPA argued that "compliance orders are not self-executing, but must be enforced by the agency in a plenary judicial action" and that the compliance order was a "step in the deliberative process, rather than as a coercive sanction that itself must be subject to judicial review." *Id.* at 1373.  The Supreme Court disagreed:  "The mere possibility that an agency might reconsider in light of 'informal discussion' does not suffice" to defeat jurisdiction.  *Id.* at 1372.  *See also Free Enter. Fund*, 130 S. Ct. at 3151 ("We normally do not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law") (citations and quotations omitted).

### 2.      Morgan Drexen Faces an Immediate Threat of Further Injury

The Supreme Court has recognized that "certainly impending" injury would "constitute injury in fact" for standing purposes.  *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (rejecting challenge to a surveillance statute where the plaintiffs could not prove that they were the target of surveillance); *see also Dearth v. Holder*, 641 F.3d 499, 401 (D.C. Cir. 2011) (holding that where a plaintiff is seeking declaratory or injunctive relief he "must show that he is suffering an ongoing injury or faces an immediate threat of injury").  Here, CFPB has taken the position that Morgan Drexen is acting illegally.  SF ¶¶ 89-93 (Shaheen Decl. ¶ 43).  CFPB sent Morgan Drexen a "Notice and Opportunity to Respond and Advise (NORA)" stating that "the staff expects to allege that [Morgan Drexen] violated Sections 1031 and 1036 of the Consumer Financial Protection Act, 12 U.S.C. § 5536 and the Telemarketing Sales Rule, 16 CFR § 310." SF ¶ 92 (Shaheen Decl. Ex. 32).  CFPB also threatened "injunctive and monetary relief." *Id.* CFPB's NORA letter constitutes the type "certainly impending" threat that gives Morgan Drexen standing to challenge its constitutionality.

6

### 3.    Morgan Drexen Suffered Concrete and Presently-Existing Harm When CFPB Sent CIDs to Morgan Drexen's Business Partners

CFPB also caused Morgan Drexen concrete and presently-existing harm by sending CIDs to Morgan Drexen's business partners.  CFPB's actions caused Morgan Drexen to lose its credit facilities (SF ¶¶ 79-80) and impacted its ability to obtain reasonable financing.  SF ¶ 81.  Morgan Drexen now pays 22% interest where, before the CID to US Capital, Morgan Drexen had financing at 4.5% (SF ¶ 82).  CFPB also sent a CID to Morgan Drexen's attorney business partners and its marketing services business partner, which stigmatized Morgan Drexen and harmed its reputation.  SF ¶¶ 83-87.  The total effect of CFPB's actions in the aggregate has caused significant and concrete harm.  *See Pyramid Lake Paiute Tribe of Indians v. Nevada, Dept. of Wildlife*, No. 11-16470, 2013 WL 3889091, *4 n.11 (9th Cir. 2013) (citing case law that "the total effect on the Tribe's water rights is ultimately the sum of the individual parts" and likening agency action to "death by a thousand cuts").

### 4.    CFPB Demanded Privileged Information

CFPB has also substantially burdened Morgan Drexen's business by demanding that it produce documents that are protected by the attorney-client privilege.  SF ¶¶ 85-86.  These documents include the private notes by attorneys of their communications with clients.  SF ¶ 69.  Morgan Drexen maintains these documents for its business partners (attorneys like Pisinski), who expect that their client's confidences and privileges will be honored.  SF ¶ 86.  CFPB's demands present Morgan Drexen with a Hobson's choice:  either produce the confidential data (thus violating Morgan Drexen's ethical obligations and harming its client relationships) or refuse to produce the documents and face CFPB retribution.  Plaintiffs have standing to challenge this demand.

7

### B.  PLAINTIFFS' CLAIMS ARE RIPE

Courts consider two factors in determining ripeness: "[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).  Here, the Court "assume[s] that issue is suitable for judicial review" because Plaintiffs have raised "a purely legal question."  *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 540 (D.C. Cir. 1999).  There is "hardship to the parties" for the same reason that Plaintiffs have demonstrated standing.

Plaintiffs need not exhaust administrative remedies before bringing this challenge.  *See Free Enter. Fund v. Pub. Co. Acct'ing Oversight Bd.*, 537 F.3d 667, 670-71 (D.C. Cir. 2008), *aff'd in relevant part*, 130 S. Ct. 3138, 3150-51 (2010) (sustaining a constitutional challenge to an agency's implementing statute without first requiring the plaintiff to exhaust its administrative remedies); *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986) (holding that a separation of powers violation may create a "here-and-now" injury that can be remedied by a court prior to a plaintiff exhausting its administrative remedies); *Hettinga v. United* States, 560 F.3d 498, 504 (D.C. Cir. 2009) ("Prudential exhaustion is not required where . . . [the agency] lacks institutional competence to resolve the particular type of issue presented, such as the constitutionality of a statute"); *Andrade v. Lauer*, 729 F.2d 1475, 1490-93 (D.C. Cir. 1984) (reversing dismissal and holding that plaintiffs could bring their constitutional claim in federal court without first exhausting administrative remedies).

Unlike a plaintiff who challenges a typical enforcement proceeding, Plaintiffs' constitutional challenge relates to the foundational authority of CFPB as an institution – a question that has been raised but not passed upon by any court.  Such a challenge need not be

pursued through an administrative regime.  *See Gen. Elec. Co. v. Environmental Protection*

*Agency*, 360 F.3d 188, 191-92 (D.C. Cir. 2004) (holding that GE's facial due process challenge to

the CERCLA statute was not the type of pre-enforcement action that Congress sought to

preclude) (citing *Johnson v. Robison*, 415 U.S. 361, 373-74 (1974)) (distinguishing between

facial, or "systemic," and as-applied, or particularized challenges in holding that a provision

barring review of individual veterans benefit challenges did not bar a constitutional challenge to

the statute itself."); *see also Elk Run Coal Co., Inc. v. U.S. Dept. of Labor*, 804 F. Supp. 2d 8, 15-

23 (D.D.C. 2011) (exercising jurisdiction over constitutional claims challenging an

administrative review process of the Mine Act).[2]

      The Dodd-Frank Act does not provide an administrative process for reviewing the type of

claim alleged here, nor does CFPB have any specialized expertise to bear on the claim.  Hence,

there is neither an avenue for administrative relief nor any prudential justification for requiring

this challenge to be pursued through administrative channels.  *See Free Enter. Fund*, 130 S. Ct.

at 3150 (2010) (courts "presume that Congress does not intend to limit jurisdiction if 'a finding of

preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a

statute's review provisions'; and if the claims are 'outside the agency's expertise.'") (quoting

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994)).

      *Free Enterprise Fund* is again illustrative.  There, the plaintiff brought a facial challenge

to the Sarbanes-Oxley Act on the grounds that it violated the separation of powers and the

Appointments Clause of the Constitution by conferring wide-ranging executive power on the

Public Company Accounting Oversight Board ("PCAOB"), comprised of members appointed by

---

[2] Plaintiffs' constitutional challenge against CFPB distinguishes this case from *POM Wonderful LLC v. FTC*, 894 F. Supp. 2d 40, 44-45 (D.D.C. 2012), where Judge Roberts declined to exercise jurisdiction over a challenge brought by POM Wonderful.  There, Judge Roberts relied on the fact that POM Wonderful could raise its issues as affirmative defenses in an existing FTC administrative proceeding.  *Id.* at 44-45.  Here, however, Plaintiffs are entitled to challenge the constitutionality of the agency purporting to exercise authority over them.

9

the Securities and Exchange Commission ("SEC"), without subjecting it to presidential control.

*Id.* The government argued lack of jurisdiction, claiming the plaintiff should have challenged the constitutionality of PCAOB through SEC review of the Board's standards or rules, or by ignoring PCAOB's request for documents and testimony thereby provoking a sanction that could be appealed. The Supreme Court held that the plaintiff "object[s] to the Board's existence, not to any of its auditing standards," and concluded that the "general challenge to the Board [was] 'collateral' to any Commission orders or rules from which review might be sought." *Id.* at 3150. Here, as in *Free Enterprise Fund*, Plaintiffs' constitutional challenge to CFPB's existence is collateral to any CFPB action and is exclusively within the purview of an Article III court.

## CFPB'S STRUCTURE IS UNCONSTITUTIONAL

### A.  APPLICABLE LEGAL PRINCIPLES

Administrative agencies are essential to the functioning of our federal government and have long been recognized as constitutional, provided that Congress, in creating them, ensures that such agencies: (1) satisfy the Constitution's separation of powers, which imposes "checks and balances" to limit agency power; (2) have political accountability to the President and Congress, and indirectly, the electorate; and (3) operate pursuant to an "intelligible principle" that provides reasonable limits on agency discretion.

"The Framers recognized that . . . structural protections against abuse of power [are] critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986). Separation of powers is "at the heart of our Constitution," *Buckley v. Valeo*, 424 U.S. 1, 119 (1976), and is essential to defend against "tyranny," *Loving*, 517 U.S. at 756, and to "the preservation of liberty." *Mistretta v. United States*, 488 U.S. 361, 380 (1989). The Constitution's separation of powers is "intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps." *INS v. Chadha*, 462 U.S.

10

919, 957 (1983).  The Supreme Court has adopted a "flexible understanding" of separation of

powers, recognizing "that the greatest security against tyranny . . . lies not in a hermetic division

among the Branches, but in a carefully crafted system of checked and balanced power . . . ."

*Mistretta v. United States*, 488 U.S. 361, 381 (1989).

Of relevance here, Article I provides that all "legislative Powers herein granted shall be

vested in a Congress of the United States, which shall consist of a Senate and House of

Representatives." U.S. Const. art. 1, § 1.  Notably, the Constitution gives Congress the power of

the purse, such that "[n]o Money shall be drawn from the Treasury, but in Consequence of

Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7.  Similarly, the Constitution provides

that "executive Power shall be vested in a President," U.S. Const. art. II, § 1, and that "he shall

take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.  The President "shall

appoint" all "officers of the United States." U.S. Const. art. II, § 2, cl. 2.

Political accountability enables the public to monitor and check through the ballot box

government actions to "ensure that those who wield[]" power are "accountable to political force

and the will of the people." *Freytag v. Comm'r*, 501 U.S. 868, 884 (1991); *see also Edmond v.

United States*, 520 U.S. 651, 663 (1997) (discussing the importance of preserving "political

accountability relative to important government assignments").  Congress must also establish an

intelligible principle for agencies to follow so as to avoid unlimited agency discretion and an

unlawful delegation of legislative power.  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472

(2001).  The required structural protections are influenced by the scope of power delegated to the

agency and its degree of discretion.  *See id.* at 475 ("[T]he degree of agency discretion that is

acceptable varies according to the scope of the power congressionally conferred.").

11

In *Free Enterprise Fund*, the Supreme Court invalidated the structure of PCAOB, noting that "[b]y granting the Board executive power without the Executive's oversight, this Act subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts. The Act's restrictions are incompatible with the Constitution's separation of powers." *Id.* at 3155.

Although Congress may have created CFPB in good faith to remedy certain financial ills, good intentions are not a suitable replacement for constitutionally-required checks and balances. Courts have not hesitated to invalidate similarly well-intentioned statutes that violate the Constitution's separation of powers. *See Free Enter. Fund*, 130 S. Ct. at 3164; *see also Clinton v. City of New York*, 524 U.S. 417 (1998) (invalidating the Line Item Veto Act); *Chadha*, 462 U.S. at 953-54 (invalidating a one-house veto of proposed administrative action); *Bowsher*, 478 U.S. at 726 (holding that Congress may not constitutionally remove officers charged with executing the laws, other than by impeachment); *Buckley*, 424 U.S. at 1 (holding that Congress may not appoint members of the Federal Election Commission); *Myers v. United States*, 272 U.S. 52, 176 (1926) (holding that Congress may not interfere with the President's power to remove the postmaster).

It is no answer to say that Congress acted with executive consent.  "[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *INS v. Chadha*, 462 U.S. 919, 944 (1983).  "Perhaps an individual President"—or Congress—"might find advantages in tying his own hands," the Supreme Court recently noted, "[b]ut the separation of powers does not depend on the views of individual Presidents"—or particular Congresses.  *Free*

12

*Enter. Fund*, 130 S. Ct. at 3155. This is true regardless of "whether 'the encroached-upon branch

approves the encroachment.'" *Id*. (*quoting New York v. United States*, 505 U.S. 144, 182 (1992)).

## B.  CFPB IS UNCONSTITUTIONAL WHETHER IT IS AN EXECUTIVE OR INDEPENDENT AGENCY

CFPB's structure is unprecedented because it is greatly insulated from the political

branches (the President and Congress) and lacks internal checks and balances.  There are at least

five structural features of CFPB that, viewed in the aggregate, make CFPB unconstitutional.

First, CFPB is controlled by a single Director who serves a fixed term of five years and is

removable only for cause (and not at-will) by the President.  SF ¶¶ 16-17 (12 U.S.C. §

5491(b)(2) and (c)).  Second, CFPB is not subject to Congressional oversight through the

appropriations process[3]; instead, CFPB automatically receives a fixed sum that it can use to carry

out its activities – up to a twelve percent (12%) cap of the Federal Reserve's total operating

expenses (about a half a billion dollars).  SF ¶¶ 20-21 (12 U.S.C. § 5497(a)(2)(A)).  Third, the

final version of Dodd-Frank did not retain the original multimember commission structure in the

House-passed version, a structural feature that has been the hallmark of independent agencies for

more than 125 years.  SF ¶¶ 104-06.  Fourth, CFPB is insulated from accountability from the

Federal Reserve, which does not review or approve CFPB actions.  Fifth, the Dodd-Frank Act

limits judicial review over CFPB actions.  *See* 12 U.S.C. § 5512(b)(4)(B) (requiring that courts

grant the same deference to CFPB's interpretation of federal consumer financial laws that they

would "if [CFPB] were the only agency authorized to apply, enforce, interpret, or administer the

provisions of such Federal consumer financial law.").  This striking provision requires *Chevron*

deference for all statutes transferred to CFPB – and essentially unwinds decades of precedent

---

[3] The appropriations process also implicates the President's authority including because the President has the right to veto any appropriations bill.

created by other agencies and courts reviewing those other agencies.  CFPB's structure is

unprecedented in the federal government.  *See* Declaration of Law Professor Todd Zywicki

[Docket No. 3-4] ¶¶ 13-20.  Indeed, as described below, at least one of the checks and balances

missing from CFPB is present with respect to each of the entities from whom authority was

transferred.  Unlike these entities, CFPB is unaccountable to the political branches of

government and lacks the oversight and checks and balances that the Constitution requires.

Cases have established two different types of agency structures that comply with the

Constitution: executive agencies (or departments) and independent agencies.  CFPB is not

structured properly as either an executive or independent agency.  For executive agencies, the

head typically serves at the pleasure of the President and is removable at-will by the President.

This is not the case for CFPB, which limits removal of its director to "for cause," which Dodd-

Frank defines as "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3).

For so-called "independent agencies," accountability is provided with other features like a

multimember bipartisan structure, such as the FTC.  As Professor Zywicki observes, a

multimember and typically bipartisan commission structure is usually identified as a defining

feature of an independent agency.[4]  *See* Zywicki Decl. ¶ 16; *see also Humphrey's Ex'r*, 295 U.S.

at 624 ("The commission is to be *non-partisan*, and it must from the very nature of its duties, act

with entire impartiality. . .  Like the Interstate Commerce Commission, its members are called

upon to exercise the trained judgment of a *body of experts* 'appointed by law and informed by

experience.'") (quoting *Illinois Central R. Co. v. Interstate Commerce Comm'n,* 206 U. S. 441

(1907); and *Standard Oil Co. v. United States,* 283 U. S. 235 (1931)) (emphasis added).  In

---

[4] The Board of Governors of the Federal Reserve is not expressly bipartisan.  However, its seven members serve staggered 14 year terms.  12 U.S.C. §§ 241-42.  Thus, as a practical matter, the Board of Governors will be bipartisan since no party has controlled the White House for 14 consecutive years since Franklin D. Roosevelt.

14

addition, independent agencies are sometimes, but not always accountable to Congress through the appropriations process.

CFPB does not conform to the recognized models of agency structure and accountability: it is neither an executive nor an independent agency.  It is effectively an independent agency housed inside another independent agency, isolated from effective accountability to Congress, the President, or the Federal Reserve.  Indeed, CFPB lacks even the limited accountability that the PCAOB had to the SEC—a structure that was held to be unconstitutional. As Professor Zywicki states, "CFPB [is] one of the most powerful and publicly unaccountable agencies in American history" (Zywicki Decl. ¶ 17) — in fact, wielding so much unaccountable power and discretion as to be unconstitutional.

We discuss each of these factors below and the importance that courts place on the role they play in creating political accountability and providing for appropriate checks and balances. Whether the Constitution requires one of these factors or several is a question the Court need not reach given the unprecedented circumstance that *none* are present in CFPB.

### C. CFPB DOES NOT HAVE CONSTITUTIONALLY-REQUIRED POLITICAL ACCOUNTABILITY

To pass constitutional muster and to maintain democratic accountability, CFPB must be subject to political oversight, typically through the President's removal power and Congress's power of the purse.  The Dodd-Frank Act stripped away these mechanisms and severed the necessary responsiveness to the electorate.

**No Presidential Power to Discipline Through At-Will Removal**.  First, the Director's protection from presidential removal interferes with the democratically-elected President's ability to supervise his Article II power and therefore, the electorate's ability to check CFPB.  The Dodd Frank Act calls CFPB an executive agency and gives CFPB executive authority.  SF ¶ 15 (12

15

U.S.C. § 5491(a)).  Article II vests all of the "executive power" in a democratically-elected President precisely to ensure both that the people can easily identify and correct its misuses and to ensure that the execution of executive power is free from legislative influence.  *See Free Enter. Fund, supra*.  In dividing the powers of the Federal Government among three coordinate Branches, the Framers "consciously decid[ed] to vest Executive authority in one person rather than several."  *Clinton v. Jones*, 520 U.S. 681, 712 (1997) (Breyer, J., concurring).  Congress may not "impermissibly interfere[] with the President's exercise of his constitutionally appointed functions."  *See Mistretta*, 488 U.S. at 382; *Morrison v. Olson*, 487 U.S. 654, 685 (1988).[5]  By prohibiting the President from removing the Director at-will, the Dodd-Frank Act violates this stricture.  As the Supreme Court has held, "[b]y granting the Board executive power without the Executive's oversight, this Act subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts. The Act's restrictions are incompatible with the Constitution's separation of powers."  *Free Enter. Fund*, 130 S. Ct. at 3155.

**No Appropriations Oversight**.  Article I, Section 9 provides, in part: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  Dodd-Frank exempts CFPB from the congressional appropriations power because the Dodd-Frank Act authorizes the Director to unilaterally requisition half a billion dollars (12% of the Fed's budget), without congressional approval.  SF ¶¶ 19-21.  In fact, Dodd-Frank states: "Notwithstanding any other provision in this title, the funds derived from the Federal Reserve System pursuant to this subsection *shall not be subject to review* by the Committees on Appropriations of the House of

---

[5] In *Morrison v. Olson*, 487 U.S. 654 (1988), the Court held that tenure protection for the Independent Counsel was constitutionally sustainable only because the Independent Counsel was an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and without policymaking or significant administrative authority.  *Id.* at 691.

16

Representatives and the Senate." 12 U.S.C. § 5497(a)(2)(C) (emphasis added). This eliminates the electorate's ability to check CFPB's power through Congress. Thus, Congress's "ultimate weapon of enforcement" – the power of the purse – which essentially gives voice to the electorate – is unavailable. *United States v. Richardson*, 418 U.S. 166, 178 n.11 (1974).

In other cases, courts have grappled with which political institution -- Congress or the President – had the power to oversee a federal agency, a classic separation of powers dispute between two coordinate branches.[6] In this case, by disabling removal and insulating CFPB from the appropriations process, Congress has eviscerated CFPB's political accountability to both itself and the President, and violated the constitutionally-required protections for the electorate.

### D. CFPB DOES NOT HAVE A CONSTITUTIONALLY-REQUIRED MULTIMEMBER COMMISSION

Given the scope of CFPB's power and its corresponding lack of political accountability, Congress's departure from the structure of other independent agencies by establishing a single Director instead of the House-passed multimember commission (SF ¶¶ 2-4) is a constitutional violation. The Dodd Frank Act aggregates unilateral decision making authority over all CFPB regulatory and enforcement decisions in a single tenure-protected Director serving for a fixed five-year term. SF ¶¶ 16-17. There is no internal check on the Director's judgment or decision. The Director need not confer with anyone, and no vote or deliberation or expression of minority viewpoints at CFPB need occur, prior to the Director's exercise of power.

This stands in sharp contrast to the multimember commission structure that for more than 125 years has been the hallmark of other so-called "independent agencies" which – like CFPB – exercise broad rulemaking and enforcement powers. For example, the FTC, SEC, Commodity

---

[6] *See Bowsher*, 478 US at 734 (1986) ("by placing the responsibility for the execution of the [laws] in the hands of an officer who is subject to removal only by itself, Congress in effect has retained control over the execution of the Act and has intruded into the executive function. The Constitution does not permit such intrusion.").

17

Futures Trading Commission ("CFTC"), Federal Communications Commission ("FCC"), Federal Energy Regulatory Commission ("FERC", and the Consumer Products Safety Commission ("CPSC") (SF ¶ 106)[7], as well as other agencies, use a multimember commission structure.  The Federal Reserve operates under the authority of a Board of Governors.  SF ¶ 107 (12 U.S.C. § 241).  The subject of *Free Enterprise Fund* also uses a multimember structure.  *Free Enter. Fund*, 130 S. Ct. at 3142; 15 U.S.C. § 7211(e)(1) (establishing a five person Board for PCAOB).

The multimember structure and its attributes of collegial decision-making pervade federal administrative regulatory and enforcement authority exercised in the United States.  For example, the SEC is composed of five Commissioners who are appointed by the President with the advice and consent of the Senate.  No more than three Commissioners may be members of the same political party.  15 U.S.C. § 78d(a).  The SEC's canons of ethics state that SEC's pluralistic decision-making is designed to "safeguard against the domination of this Commission by less than a majority."  17 C.F.R. § 200.57.  A "quorum" is required for the SEC to conduct business.  17 C.F.R. § 200.41.  "Valid agency action depends on the effective concurrence of a majority of the designated quorum."[8]  *Braniff Airways, Inc.* v. *Civil Aeronautics Bd.*, 379 F.2d 453, 460 (D.C. Cir. 1967); *accord Falcon Trading Group, Ltd.* v. *SEC*, 102 F.3d 579 (D.C. Cir. 1996).  "The requirement of a quorum is a protection against totally unrepresentative action in the name of the body by an unduly small number of persons."  *Assure Competitive Trans., Inc.* v. *United States*, 629 F.2d 467, 473 (7th Cir. 1980) (citation omitted).

---

[7] The statutory citations are:  FTC (15 U.S.C. § 41); SEC (15 U.S.C. § 78d(a)); CFTC (7 U.S.C.A. § 2); FCC (47 U.S.C. § 154); FERC (42 U.S.C. § 7171(b)(a)(5); and CPSC (15 U.S.C. § 2053(a)).

[8] "A quorum is '[t]he minimum number of members who must be present at the meetings of a deliberative assembly for business to be legally transacted.'"  *Railroad Yardmasters of America* v. *Harris*, 721 F.2d 1332, 1341 (D.C. Cir. 1983) (citations omitted).

Courts have recognized that a multimember agency structure safeguards fairness and individual liberty  *See David B. Lilly Co., v. United States*, 571 F.2d 546, 548-49  (Fed. Cl. 1978) (upholding an order of the Renegotiation Board only after ensuring that the respondent's position was considered as part of a "deliberative process" among a quorum of the Board).  In *Lilly*, the critical factor was "the integrity of the deliberative process through which the Board acts."  *Id*. at 549.  The respondent to the Board's action had "a right to present his claim to a quorum of the Board" and the "quorum of the Board must fully consider the claim."  *Id*.  Former SEC Chairman Arthur Levitt, testified before Congress that the Commission's experience substantiates the presumption that deliberation is beneficial to the Commission's functions:  "The Commission believes that the ability to confer as a larger, five member body has contributed greatly to the quality of the Commission's decision-making process."[9]

Here, whether such a multimember agency structure is constitutionally required in light of the scope and breadth of CFPB is a matter of first impression.  An affirmative answer is justified by the circumstances of this case.  Congress has consistently used multimember deliberative bodies to head independent agencies that have power similar (albeit not as broad) as CFPB (including the FTC and SEC).  The Supreme Court in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935) approved the prohibition on presidential at-will removal of FTC commissioners only after noting the protections afforded by the multimember structure of the FTC.  *Id*. at 624 (noting that the agency would act with "impartiality" through the "the trained judgment of a body of experts.").  Requiring a multimember commission is consistent with the

---

[9] *Deregulating Capital Markets:  Hearings on Securities Reform and H.R. 2131, the Capital Markets Deregulation and Liberalization Act of 1995 Before the Subcomm. on Telecomm. and Fin. of the House Comm. on Commerce*, 104th Cong. (1995) (testimony of Arthur Levitt, Chairman, U.S. Securities and Exchange Commission).  In *Free Enterprise. Fund*, the Court assumed that SEC commissioners were removable for cause, even in the absence of a statutory for-cause removal restriction, noting the multimember structure of the agency and the fixed terms for its commissioners. 139 S. Ct. at 3153 (2010).

logic, history, and structure of the separation of powers doctrine to avoid tyranny that is threated

by the concentration of legislative, executive, and judicial power in a single unelected individual.

A multimember structure diffuses power among various members, and creates a vital internal

check that allows for collective deliberation among persons with diverse views, expertise, and

backgrounds.  The Constitution may not require that every independent agency have a

multimember commission format; however, under the circumstances presented here, where there

is an extremely broad delegation yet where political accountability (and judicial review) are

seriously curtailed, a multimember format provides a modicum of the checks and balances

envisioned by the Framers of the Constitution.

### E.  CFPB's Lack of Structural Protections Is Unconstitutional In Light of Congress's Broad Delegation of Power

Each of the structural features described above -- especially the lack of presidential

power to remove the Director at-will, the absence of congressional appropriation oversight, and

the lack of a multimember commission structure – raise serious constitutional issues.  Combined

together, however, the constitutional violation is unavoidable.

An independent way to evaluate the constitutionality of CFPB's structure is to undertake

a two-part inquiry to:  (1) evaluate the overall scope of delegated power and degree of agency

discretion; and (2) assess the sufficiency of the overall combined structural protections of

accountability and checks and balances in light of the scope of delegated power and degree of

agency discretion.  Stated differently, the level of regulatory discretion and scope of delegation

inform the degree of structural accountability and checks and balances needed.  *See Whitman*,

531 U.S. at 475 ("[T]he degree of agency discretion that is acceptable varies according to the

scope of the power congressionally conferred."); *see generally Morrison v. Olson,* 487 U.S. at

695-97 (finding less protection is necessary when the agency in question had a targeted and

narrow scope of delegated power exercised by inferior officers).  The more unfettered the powers exercised or delegated, the greater is the need for internal as well as external, congressional and presidential, checks to preserve the separation of powers and promote democratic control of government.

Here, in step 1, CFPB has great power and great discretion.  CFPB was created to exercise the authority of seven separate agencies and assume market wide coverage.  As noted above, with respect to virtually every boardroom and living room, CFPB exercises rulemaking, adjudicatory, and enforcement powers; it conducts investigations, issues subpoenas and civil investigative demands for the attendance and testimony of witnesses and production of documents and materials, and commences administrative and judicial proceedings; it can take actions, including direct enforcement action, to prevent "unfair," "deceptive," or "abusive act[s] or practice[s]" ("UDAAP" authority) where the term "abusive" is, according to CFPB's Director, "a little bit of a puzzle because it is a new term" and its meaning will have to be developed on a case-by-case basis.  SF ¶¶ 36-39.

In step 2, however, instead of providing *additional* protections in light of the broad delegation, Congress created unprecedented *insulation*.  Concentration of power in a single Director, free from congressional appropriations oversight, who does not serve at the pleasure of the President, and whose agency is subject to curtailed judicial review – all of these structural features create extreme isolation from political process and checks and balances.  CFPB's lack of structural protection cannot be reconciled with its broad delegation of power.

### F.   THE DODD-FRANK ACT TRANSFERS AUTHORITY TO CFPB FROM AGENCIES THAT HAVE CONSTITUTIONALLY COMPLIANT CHECKS AND BALANCES

Congress created CFPB in order to consolidate in one agency the authority to supervise, make rules, enforce and issue orders and guidance for federal consumer financial laws.  In doing

so Congress transferred authority to CFPB from seven other agencies -- (1) the Federal Reserve

Board of Governors; (2) Comptroller of the Currency ("OCC"); (3) Office of Thrift Supervision

("OTS"); (4) Federal Deposit Insurance Corporation ("FDIC"); (5) National Credit Union

Administration ("NCUA"); (6) FTC; and (7) Department of Housing and Urban Development

("HUD").  12 U.S.C. § 5581.  Although Congress is free to exercise its discretion consistent with

the Constitution, it cannot transfer authority to enforce laws from agencies that have appropriate

checks and balances and accountability to one that has neither of these protections.

Section 1063(i) of the Dodd-Frank Act requires CFPB to publish a list of rules and orders

that it will enforce as a result of the transfer of authority described above.  CFPB published such

a list in July 2011.  Identification of Enforceable Rules and Orders, 76 Fed. Reg. 43569 (July 21,

2011).  This list demonstrates the unprecedented breadth and scope of authority transferred from

seven accountable agencies to a single unaccountable agency.  CFPB now has enforcement and

other related authority over forty-nine (49) pre-existing consumer financial protection rules,

including the Equal Credit Opportunity Act, Fair Credit Reporting Act, Truth in Lending Act,

Truth in Savings Act, Adjustable Rate Mortgages Act, the Telemarketing Sales Rule, and the

Real Estate Settlement Procedures Act.

The accountability and checks and balances that previously existed with respect to these

forty-nine consumer financial protection rules is set forth below.  Strikingly, the Dodd-Frank Act

insulated CFPB from the type of rigorous judicial review that previously surrounded these rules

by requiring that courts defer to the interpretation of CFPB and not any other agency with respect

to interpretation of these rules.[10]  In addition, in its federal register notice, CFPB left itself

---

[10] The possibility of conflicting interpretation exists for two reasons.  First, in some instances, CFPB shares
jurisdiction with another agency for enforcement of a rule. *See* 12 U.S.C. § 5581(b)(5) (outlining the authority of the
CFPB and Federal Trade Commission to enforce consumer law).  Second, CFPB was not given jurisdiction over
some consumer financial protection rules for certain designated persons.

22

considerable discretion in determining whether to continue to apply existing guidance issued

with respect to these forty-nine rules by the transferor agency.  Identification of Enforceable

Rules and Orders, 76 Fed. Reg. at 43570.

**Federal Reserve.**  The Federal Reserve is overseen by a seven member board, including

a Chair and Vice-Chair, who each serve 4 year terms.  12 U.S.C. § 242.  The 7 board members

serve 14 year staggered terms, the term of a board member expiring every 2 years.  *Id.*  Thus, the

Federal Reserve is held accountable by the deliberative nature of a multimember commission.

Additionally, each new President has the opportunity to appoint at least two board members.

**OCC.**  The OCC is charged with the specific task of chartering, regulating and

supervising all national banks and federal savings associations.  It has a single director who

serves a five year term at the pleasure of the President and can be removed for any reason,

provided that the President communicate the reasons for removal to the Senate.  12 U.S.C. § 2.

The Comptroller must carry out his duties under the "general direction" of the Secretary of the

Treasury (12 U.S.C. § 2) and, unlike CFPB,[11] cannot appoint his immediate subordinates.

Instead the Secretary of the Treasury appoints Deputy Comptrollers.  12 U.S.C. § 4.

**OTS.**  Title III of the Dodd-Frank Act eliminated the OTS.  12 U.S.C. § 5412.  Before its

elimination, OTS was headed by a single director who serves a five year term at the pleasure of

the President.  12 C.F.R. § 500.10.  The statute did not provide tenure protection through "for

cause" removal (12 USC § 1462a(c)(2) (prior to 2010 amendment)), and the Office of Legal

Counsel expressed the view that the Director served at the President's pleasure.  *See* Post-

Employment Restriction of 12 U.S.C. § 1812(e), 2001 WL 35911952, at *4 (O.L.C. Sept. 4,

2001) ("We do not endorse the view that tenure protection for the Director should be inferred

---

[11] 12 U.S.C. §§ 5491, 5493(a).

23

under the statute here") (available at http://www.justice.gov/olc/2001/otspost2.pdf) (last visited

Aug. 5, 2013).  In addition, like the OCC, the Director carried out his or her duties under the

general oversight of the Secretary of the Treasury and the Secretary was authorized to appoint

the OTS Deputy Directors.  12 U.S.C. 1462a(a)-(b) (prior to 2010 amendment).

     **FDIC.**  The FDIC insures deposits in banks and thrift institutions and identifies,

monitors, and addresses risk to the deposit insurance funds.  The FDIC is run by a five person

Board of  Directors, all of whom are appointed by the President and confirmed by the Senate. 12

U.S.C. § 1812(a)(1).[12]  No more than three may be from the same political party. 12 U.S.C. §

1812(a)(2).

     **NCUA.**  Congress created the NCUA was to charter and supervise federal credit unions

and insure credit union deposits.  It is governed by a three member board that serve staggered six

year terms.  12 U.S.C. § 1752a(a)-(c).  Each board member is appointed by the President and

confirmed by the Senate.  *Id.*  No more than two board members can be from the same political

party.  *Id.*

     **FTC.**  The FTC is charged with enforcing the Federal Trade Commission Act 15 USC §

45 which prohibits deceptive or unfair acts or practices as well as issuing regulations and

enforcing various federal statutes designed to protect consumers.  It is governed by a five-person

Commission that serves staggered five year terms.  12 U.S.C. § 41.  Each Commissioner is

appointed by the President and confirmed by the Senate.  *Id.*  In addition, the President also has

authority to designate the Chairperson from among the five Commissioners.  *Id.*  Unlike the

banking agencies described above, the FTC's budget is appropriated by Congress.  15 U.S.C. §

57c.

---

[12] Two of the five board members are ex officio but are also appointed by the President to their other position
(Comptroller of the Currency and the Director of CFPB).

**HUD.**  HUD is a cabinet level agency.  42 U.S.C. § 3532(a).  Like other cabinet officials, the HUD Secretary is appointed by the President and confirmed by the Senate and serves at the pleasure of the President.  *Id.*  In addition, HUD's budget is appropriated by Congress.  42 U.S.C. § 3535(s).

In summary, the supervision, interpretation, promulgation of regulations, and the enforcement of the consumer financial laws was previously under the auspices of agencies subject to a robust system of checks and balances and accountability.  Each of the transferee agencies had at least one of the following:  Presidential removal power, multimember commissions, bipartisan representation, and/or congressional budgetary appropriation.  By transferring authority to CFPB, the Dodd-Frank Act put an end to these checks and balances. These laws, which reach into virtually every boardroom and living room in America, are now under the auspices of an agency which has a single Director, removable by the President only under extreme circumstances, and who needs no budgetary appropriations from any other branch of government or government agency.  The following chart, submitted to the Senate by the U.S. Chamber of Commerce, demonstrates that these features are not aggregated in any other comparable agency.

25

| | Checks and Balances on Leadership Power and Decision Making | | | | | | Budget Oversight |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Commission/ Board Structure | Requirement of Bipartisan Representation on Commission/ Board | Outside Officials Serve on Agency's Decisionmaking Body or Appoint Some of its Top Officials | Head Subject to At-Will Removal by the President | Cabinet Official Statutorily Authorized to Supervise Agency | Dedicated Inspector General | Budget Dependent on Appropriations |
| CONSUMER FINANCIAL PROTECTION BUREAU | X | X | X | X | X | X | X |
| Federal Reserve System | ✓ | | | | | ✓ | |
| National Credit Union Administration | ✓ | ✓ | | | | | |
| Office of the Comptroller of the Currency | | | ✓ | ✓ | ✓ | | |
| Office of Thrift Supervision | | | ✓ | ✓ | ✓ | | |
| Social Security Administration | | | ✓ | | | ✓ | ✓ |
| Consumer Product Safety Commission | ✓ | ✓ | | | | ✓ | ✓ |
| Federal Communications Commission | ✓ | ✓ | | | | ✓ | ✓ |
| Federal Deposit Insurance Corporation | ✓ | ✓ | ✓ | | | ✓ | ✓ |
| Commodity Futures Trading Commission | ✓ | ✓ | | | | ✓ | ✓ |
| Securities and Exchange Commission | ✓ | ✓ | | | | ✓ | ✓ |
| Federal Energy Regulatory Commission | ✓ | ✓ | | | | ✓ | ✓ |
| Federal Trade Commission | ✓ | ✓ | | | | ✓ | ✓ |

Statement Andrew Pincus on behalf of the U.S. Chamber of Commerce on "Enhanced Consumer Financial Protection After the Financial Crises," *U.S. Senate Committee on Banking, Housing, and Urban Affairs*, at 29 (July 19, 2011) (available at http://www.banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=19e3ef e3-0c50-47df-bb3c-b75ff93e7a5f) (lasted visited Aug. 5, 2013).

### G.  CFPB'S UNCONSTITUTIONAL STRUCTURE HAS HARMED PLAINTIFFS

In many cases involving the separation of powers, the potential for injury caused by agency overreach remains theoretical.  Here, however, CFPB is overstepping its bounds by attempting to regulate lawyers like Pisinski (through their support provider, Morgan Drexen) who are providing bankruptcy services.  Regulation of lawyers is prohibited under CFPB's

26

enabling statute. *See* 12 U.S.C. § 5517(e) (providing that CFPB "may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law"). CFPB has taken the position that this exception does not apply to the regulation of debt settlement under the Telemarketing Sales Rule because it is transferred authority under 12 U.S.C. §§ 5581-5587.[13] However, CFPB is seeking to expand this limited exception, for example, by demanding production of information concerning the amount of any given "engagement fee under the bankruptcy fee agreement" and any "bankruptcy filing fee." (SF ¶ 76) (Shaheen Decl. Ex. 34). Of course, whether someone is engaged in the unauthorized practice of law is reserved to the States under the Tenth Amendment.

Equally troubling, the GAO is investigating whether CFPB is using such personal financial data (provided to lawyers in the context of attorney-client confidentiality) to build a database without adequately balancing privacy concerns. The scope of CFPB's power and its actions in investigating Morgan Drexen call to mind the warning that "[t]he accumulation of all powers, Legislative, Executive, and Judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 46, p. 334 (H. Dawson ed. 1876) (J. Madison).

---

[13] The FTC has taken the position that the prohibitions relating to debt settlement found in the Telemarketing Sales Rule apply to attorneys who otherwise meet the jurisdictional requirements for the Rule. Whether the FTC was constitutionally correct in making that determination, (see *Am. Bar Ass'n v. F.T.C.*, 671 F. Supp. 2d 64 (D.D.C. 2009), *vacated as moot*, 636 F.3d 641 (D.C. Cir. 2011) (invalidating attempt by FTC to regulate lawyers)), is not a question this Court need now address because CFPB's attempt to exercise jurisdiction over the provision of legal counseling relating to bankruptcy falls outside the scope of the TSR.

USCA Case #13-5342      Document #1484126          Filed: 03/17/2014      Page 402 of 403

## RELIEF REQUESTED

Plaintiffs request that the Court enter an order declaring unconstitutional those portions of Title X of the Dodd-Frank Act that create CFPB.  If the Court does so, Congress can remedy CFPB's structure to comply with the Constitution's separation of powers.  Indeed, Congress has specifically considered remedies, such as replacing the Director with a multimember commission.  SF ¶ 132.

## **CONCLUSION**

WHEREFORE, Plaintiffs respectfully request that their motion for summary judgment be granted.


Dated: August 7, 2013

<div style="margin-left: 40%;">

Respectfully submitted,

VENABLE LLP


_____/s/_____
Randall K. Miller
D.C. Bar No.  460682
Nicholas M. DePalma
D.C. Bar No. 974664
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Tysons Corner, VA 22182
Tel: (703) 760-1600
Fax: (703) 821-8949
rkmiller@venable.com
nmdepalma@venable.com

*Randal M. Shaheen
D.C. Bar No. 409292
575 7th Street, N.W.
Washington, D.C. 20004
202.344.4488
202.344.4323
rmshaheen@venable.com
*subject to admission

*Attorneys for Plaintiffs Morgan Drexen, Inc. and
Kimberly A. Pisinski*

</div>

29